**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| Point Bridge Capital, LLC, | § | |
| Hal Lambert | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Case No. 4:24-cv-00988-P |
| | § | |
| Charles Johnson, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

Plaintiffs Point Bridge Capital, LLC and Hal Lambert ("Plaintiffs") submit this Appendix

in Support of its Response in Opposition to Defendant's Motion to Dismiss.

| Exhibit No. | Description | Appendix Page Range |
|---|---|---|
| 1 | Declaration of Will Thompson, dated December 23, 2024. | Appx. 001 – Appx. 005 |
| A | Copy of an Federal Election Commission report of individual contributions with Charles Johnson listed under the "Contributor name" and listing the employer as "TRAITWELL." | Appx. 006 – Appx. 008 |
| B | Copy of "Plaintiff's Original Complaint" in the matter *Johnson v. Verizon CMP Holdings, LLC*, 4:20-cv-00179, dkt. 1 (S.D. Tex) | Appx. 009 – Appx. 014 |
| C | Copy of "Plaintiff's First Amended Complaint" in the matter *Johnson v. Verizon CMP Holdings, LLC*, 4:20-cv-00179, dkt. 1 (S.D. Tex. | Appx. 015 – Appx. 024 |
| D | Copy of a Substack article titled *Why I Am Suing BuzzFeed's Ryan Mac For Libel Over Peter Thiel Story* with the author listed as Charles Johnson and dated September 12, 2020 | Appx. 025 – Appx. 034 |
| E | Copy of a text message between Charles Johnson and Hal Lambert from October 6, 2020. | Appx. 035 – Appx. 036 |

| Exhibit No. | Description | Appendix Page Range |
|---|---|---|
| F | Copy of a post on X from https://x.com/JohnsonThought1/status/1866982588222410858. | Appx. 037 – Appx. 038 |
| G | Copy of an "Application for Registration of a Foreign For-Profit Corporation from the Texas Secretary of State for the entity named "Our Perfect Score, Inc. | Appx. 039 – Appx. 041 |
| H | Copy of the LinkedIn page for Traitwell. | Appx. 042 – Appx. 045 |
| I | Copy of a Substack article titled The Artful Return of the Bushes with the author listed as Charles Johnson and dated May 4, 2022 | Appx. 046 – Appx. 056 |
| J | Copy of a draft complaint that Charles Johnson emailed to Hal Lambert. | Appx. 057 – Appx. 079 |
| K | Intentionally Left Blank | Appx. 080 |
| L | Copy of "Application for Registration of a Foreign For-Profit Corporation from the Texas Secretary of State for the entity named "Metis Funding LLC." | Appx. 081 – Appx. 083 |
| M | Copy of a Substack article titled *Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An FBI Counterintelligence Investigation* with the author listed as Charles Johnson and dated October 25, 2022 | Appx. 084 – Appx. 098 |
| N | Copy of a Substack article tiled *Go Ahead and Quit Twitter: You'll Live Without Your Addiction — And Maybe Be Happier,* with the author listed as Charles Johnson and dated Nov. 5, 2022 | Appx. 099 – Appx. 109 |
| O | Copy of a report from the Missouri Ethics Commission showing that a Charles Johnson in Conroe, Texas 77384 donated $264.12 to the Unsicker for Missouri Ethics Committee | Appx. 110 – Appx. 111 |
| P | Copy of the order granting Hal Lambert and Point Bridge Capital's motion to dismiss the lawsuit that Charles Johnson for, among other things, lack of personal jurisdiction in the matter 1:23-cv-01485, E.D. Va., dkt. 8, entered on April 2, 2024 | Appx. 112 – Appx. 118 |

| Exhibit No. | Description | Appendix Page Range |
|---|---|---|
| **Q** | Copy of the order granting Hal Lambert and Point Bridge Capital's second motion to dismiss the lawsuit that Charles Johnson for, among other things, lack of personal jurisdiction in the matter 1:23-cv-01485, E.D. Va., entered on September 17, 2024 | Appx. 119 – Appx. 126 |
| **2** | Declaration of Hal Lambert, dated December 23, 2024 | Appx. 127 – Appx. 129 |

Dated: December 23, 2024              Respectfully submitted,

                                      **QUINN EMANUEL URQUHART & SULLIVAN LLP**

                          By:     */s/ Will Thompson*
                                  Will Thompson
                                  State Bar No. 24094981
                                  willthompson@quinnemanuel.com
                                  3100 McKinnon St., Ste. 1125
                                  Dallas, Texas 75201
                                  Telephone: (469) 902-3600
                                  Facsimile: (469) 902-3610

                                  **ATTORNEY FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

        I hereby certify that a true and correct copy of the foregoing instrument has been served on this day December 23, 2024 via the Court's CM/ECF system to all counsel of record.

                                  */s/ Will Thompson*
                                  Will Thompson

3

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
| **_Plaintiffs_,** | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
| **_Defendant._** | § | |
| | § | |
| | § | |

## <u>DECLARATION OF WILL THOMPSON</u>

I, Will Thompson, declare as follows. I am an attorney admitted to the State Bar of Texas and this Court and a partner at the law firm of Quinn Emanuel Urquhart and Sullivan LLP. I am attorney of record for the plaintiffs in the above captioned action. I am over the age of twenty-one years and am not a party to this action. I have personal knowledge of the facts set forth in this declaration. I declare under penalty of perjury that the facts stated in this document are true and correct.

1.     Exhibit A attached hereto is a true and correct copy of an Federal Election Commission report of individual contributions with Charles Johnson listed under the "Contributor name" and listing the employer as "TRAITWELL."

2.     Exhibit B attached hereto is a true and correct copy of  "Plaintiff's Original Complaint" in the matter _Johnson v. Verizon CMP Holdings, LLC_, 4:20-cv-00179, dkt. 1 (S.D. Tex).

3.     Exhibit C attached hereto is a true and correct copy of "Plaintiff's First Amended Complaint" in the matter _Johnson v. Verizon CMP Holdings, LLC_, 4:20-cv-00179, dkt. 1 (S.D. Tex

1

4.      Exhibit D attached hereto is a true and correct copy of a Substack article titled *Why I Am Suing BuzzFeed's Ryan Mac For Libel Over Peter Thiel Story* with the author listed as Charles Johnson and dated September 12, 2020.

5.      Exhibit E attached hereto is what appears to be a true and correct copy of a text message between Charles Johnson and Hal Lambert from October 6, 2020. (*See* Declaration of Hal Lambert at ¶ 7).

6.      Exhibit F attached hereto is a true and correct copy of a post on X from https://x.com/JohnsonThought1/status/1866982588222410858.

7.      Exhibit G attached hereto is a true and correct copy of an "Application for Registration of a Foreign For-Profit Corporation from the Texas Secretary of State for the entity named "Our Perfect Score, Inc..

8.      Exhibit H attached hereto is a true and correct copy of the LinkedIn page for Traitwell.

9.      Exhibit I attached hereto is a true and correct copy of a Substack article titled The Artful Return of the Bushes with the author listed as Charles Johnson and dated May 4, 2022.

10.     Exhibit J attached hereto is what appears to be a true and correct copy of a draft complaint that Charles Johnson emailed to Hal Lambert. (*See* Declaration of Hal Lambert at ¶ 8).

11.     Exhibit L attached hereto is a true and correct copy of "Application for Registration of a Foreign For-Profit Corporation from the Texas Secretary of State for the entity named "Metis Funding LLC."

12.     Exhibit M attached hereto is a true and correct copy of a Substack article titled *Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence*

*and Chabad, Deserves An FBI Counterintelligence Investigation* with the author listed as Charles Johnson and dated October 25, 2022.

13.     Exhibit N attached hereto is a true and correct copy of a Substack article tiled *Go Ahead and Quit Twitter: You'll Live Without Your Addiction — And Maybe Be Happier,* with the author listed as Charles Johnson and dated Nov. 5, 2022.

14.     Exhibit O attached hereto is a true and correct copy of a report from the Missouri Ethics Commission showing that a Charles Johnson in Conroe, Texas 77384 donated $264.12 to the Unsicker for Missouri committee.

15.     Exhibit P attached hereto is a true and correct copy of the order granting Hal Lambert and Point Bridge Capital's motion to dismiss the lawsuit that Charles Johnson for, among other things, lack of personal jurisdiction in the matter 1:23-cv-01485, E.D. Va., dkt. 8, entered on April 2, 2024.

16.     Exhibit Q attached hereto is a true and correct copy of the order granting Hal Lambert and Point Bridge Capital's second motion to dismiss the lawsuit that Charles Johnson for, among other things, lack of personal jurisdiction in the matter 1:23-cv-01485, E.D. Va., entered on September 17, 2024.

My name is Will Thompson, my date of birth is November 20, 1982, and my address is 3100 McKinnon St, Suite 1125, Dallas, TX 75201, and USA. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas County, State of Texas, on the 23rd day of August 2024.


_____*/s/ Will Thompson*_____
Will Thompson

3

Appx. 004

4

# Exhibit A

 An official website of the United States government

Here's how you know

This site is in beta, visit FEC.gov         An official website of the United States Government 



**Federal Election Commission**

U N I T E D   S T A T E S   —*of*—   A M E R I C A

Home [/] › Campaign finance data › Browse data › Individual contributions

# Individual contributions

Viewing **9** filtered results for:   Reset filters

| "Charles Johnson" |    "77384" |

| Contributor name | Recipient | State | Employer | Receipt date | Amount | |
|---|---|---|---|---|---|---|
| JOHNSON, CHARLES | WHITEHOUSE FOR SENATE | TX | TRAITWELL | 09/22/2021 | $250.00 | |
| JOHNSON, CHARLES | ALEXANDRIA OCASIO-CORTEZ FOR CONGRESS | TX | TRAITWELL | 09/22/2021 | $250.00 | |
| JOHNSON, CHARLES | ANNA PAULINA LUNA FOR CONGRESS | TX | SELF | 08/14/2020 | $500.00 | |
| JOHNSON, CHARLES CARLISLE | CONSERVATIVE CATTLEMAN'S POLITICAL ACTION COMMITTEE | TX | STEALTH STARTUP | 03/02/2020 | $5,000.00 | |
| JOHNSON, CHARLES CARLISLE | THOMAS MASSIE FOR CONGRESS | TX | STEALTH STARTUP | 02/06/2020 | $2,800.00 | |
| JOHNSON, CHARLES CARLISLE | CLINT MORGAN FOR CONGRESS | TX | STEALTH STARTUP | 11/27/2019 | $2,800.00 | |
| JOHNSON, CHARLES | KING FOR CONGRESS | TX | SELF | 09/25/2019 | $2,800.00 | |

| Contributor name | Recipient | State | Employer | Receipt date | Amount | |
|---|---|---|---|---|---|---|
| JOHNSON, CHARLES | KOBACH FOR SENATE | TX | SELF | 09/15/2019 | $2,800.00 | |
| JOHNSON, CHARLES | KOBACH FOR SENATE | TX | SELF | 09/15/2019 | $2,800.00 | |

Results per page: 30

Showing 1 to 9 of 9 entries

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| CHARLES JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:19-CV-01413-KOB |
| VERIZON CMP HOLDINGS, LLC, | ) | |
| HUFFPOST.COM, INC., and ANDY | ) | **JURY DEMANDED** |
| CAMPBELL, | ) | |
| | ) | |
| Defendants. | ) | |

_____

### PLAINTIFF'S ORIGINAL COMPLAINT
_____

COMES NOW, CHARLES JOHNSON ("*Johnson*")  and hereby asserts his Original Complaint against Defendants VERIZON CMP HOLDINGS, LLC ("*Verizon Media*"), HUFFPOST.COM, INC. ("*Huffpost*"), and ANDY CAMPBELL ("*Campbell*" and, together with Verizon Media and Huffpost, the **"*Defendants*"**) and would respectfully show the Court as follows:

## I.    PARTIES

1.    Plaintiff Johnson is a natural person and is domiciled in Montgomery County, Texas.  He may be served through the undersigned counsel of record.

2.    Defendant Verizon Media is a Delaware limited liability company.  It is wholly owned by Verizon Communications, Inc., which is a Delaware corporation with its principal place of business in New York.  It may be served with process through its registered agent, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

3.      Defendant Huffpost is a Delaware corporation with its principal place of business located at 770 Broadway, New York, New York.  It may be served with process through the Texas Secretary of State at that address.

4.      Defendant Campbell is a natural person and is domiciled in New York.  He may be served with process at his place of employment at 770 Broadway, New York, New York through the Texas Secretary of State.

## II.      <u>JURISDICTION AND VENUE</u>

5.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332.  There is complete diversity between the parties and the amount in controversy exceeds $75,000.00 for all claims pleaded by Plaintiff.

6.      This Court has personal jurisdiction over the Defendants because, at the time the Article was published and the causes of action herein accrued, Johnson resided in Texas and the tort complained of herein was committed in whole or in part in Texas.  Moreover, Defendant Verizon Media is subject to the general jurisdiction of Texas courts because it has systematic and continuing contacts with Texas because it maintains offices in Texas and transactions substantial business in Texas.  Finally, Defendant Huffpost is subject to the general jurisdiction of Texas courts because it has systematic and continuing contacts with Texas by procuring subscriptions to its publication in Texas and delivering said subscriptions in Texas.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events giving rise to the causes of action occurred in this District and the Defendants are subject to the Court's personal jurisdiction in this District.

Appx. 011

### III.   FACTS

1.      The framers of the Constitution wanted to ensure that the First Amendment would protect a free press so that no state action could ever inhibit or limit the free dissemination of information to the people of the Republic for which the Constitution stands.  It is a noble ambition that is distinctively American and sets the standard for the rest of the world.

2.      But the First Amendment does not just protect a free press – it also protects the freedom of speech of every American, whether or not they have access to the power of the mainstream media to trumpet their views.  Ironically, however, state action is not the greatest contemporary threat to free speech.  It is rather the "free press".

3.      This is because publicly stating a fact or giving an opinion must be self-censored to ensure that one does not risk being labeled by the press with a loathsome term that brings with it stigma and ostracization that could result in losing a career, public scorn and humiliation, and even the risk of physical harm.  Once these labels are given—in this digital age—they are permanent and scar a reputation for indefinite duration with a simple internet search.

4.      For many years, there were few of these loathsome labels that Americans dreaded more than "racist".  However, new terms have arisen that carry an equally chilling effect on free speech and equally devastating assault on one's reputation.

5.      The terms "white nationalist", "holocaust denier", and "white supremacist" are the new buzz terms used to describe a myriad of person on the political right who may have views that diverge from mainstream politics.  While there are some who truly espouse view of a "whites only" nation, view whites as superior, or who truly deny that atrocities were committed against Jewish people during the Second World War, these terms are often misapplied to persons who not only reject such views but, in fact, abhor those beliefs.

3

6.      Plaintiff Charles Johnson is one such person.  Johnson is undeniably involved with conservative political causes.  He absolutely believes that there was a systematic campaign to commit atrocities against Jewish people during the Second World War.  He absolutely does not believe that America should be a nation only for white people.  Nor does he believe that white people are "superior" to other races of human beings.  In fact, he has a child who is non-white.

7.      Nevertheless, on February 17, 2019, the notoriously left-leaning *The Huffington Post* ran a hit job on Johnson, with a headline that read "2 GOP Lawmakers Host Chuck Johnson, Holocaust-Denying White Nationalist" (the "***Article***").  *See* https://www.huffpost.com/entry/gop-reps-host-chuck-johnson-holocaust-denying-white-nationalist_n_5c40944be4b0a8dbe16e670a.

8.      The Article went on to suggest that Johnson was a white supremacist and claimed that Johnson was "widely known" as a white nationalist.  It also suggested that Johnson was anti-Semitic.

9.      The Article was authored by Campbell and published by Campbell, Verizon Media, and Huffpost.

10.      As a result of these false statements of fact of and concerning Johnson, his reputation has been damaged and he has suffered actual damages and reputational injury in excess of $1,000,000.00.

## IV.    CAUSES OF ACTION

### COUNT I

#### Libel

11.      Plaintiff realleges all of the preceding allegations as if fully stated herein.

12.      Defendants published false statements of fact of and concerning Plaintiff. Defendants acted with negligence as well as actual malice and/or reckless disregard for the truth

4

the false statements of fact.  Alternatively, Defendants are strictly liable for the defamatory Article.

The false statements of fact were defamatory of Plaintiff and caused reputational injury.  The false

statements also caused Plaintiff actual damages and mental anguish.

13.    Plaintiff further seeks exemplary damages because Defendants' actions were

committed with actual malice and/or reckless disregard for the truth.

14.    All conditions precedent to Plaintiff's ability to maintain this suit have occurred.

## V.    JURY DEMAND

Plaintiff demands a trial by jury.

## VI.    PRAYER FOR RELIEF

Such other and further relief as the Court may deem just and proper.


Respectfully submitted,

CAMARA & SIBLEY LLP


/s/ Joseph D. Sibley_____
Joseph D. Sibley
State Bar No. 24047203
sibley@camarasibley.com
Camara & Sibley LLP
4400 Post Oak Pkwy.
Suite 2700
Houston, Texas 77027
Telephone: (713) 966-6789
Fax: (713) 583-1131

**ATTORNEYS FOR PLAINTIFF**

Appx. 014

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:20-cv-00179 |
| THEHUFFINGTONPOST.COM, INC.,, | ) | |
| | ) | **JURY DEMANDED** |
| Defendants. | ) | |
| | ) | |
| | ) | |

---

## PLAINTIFF'S FIRST AMENDED COMPLAINT
---

COMES NOW, CHARLES JOHNSON ("***Johnson***" or "***Plaintiff***")  and hereby asserts his First Amended Complaint against Defendant THEHUFFINGTONPOST.COM, INC. ("***Huffpost***" or "***Defendant***")[1] and would respectfully show the Court as follows:

## I.     PARTIES

1.     Plaintiff Johnson is a natural person and is domiciled in Montgomery County, Texas.  He may be served through the undersigned counsel of record.

2.     Defendant Huffpost is a Delaware corporation with its principal place of business located at 770 Broadway, New York, New York.  It may be served with process through the Texas Secretary of State at that address and has previously appeared in this case through counsel.

---

[1] The Defendant was previously misnamed as "HuffPost.com, Inc." in Plaintiff's Original Complaint.  In addition, former Defendants Verizon CMP Holdings, LLC and Andy Campbell were dismissed by stipulation.

## II.     JURISDICTION AND VENUE

3.     This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332.  There is complete diversity between the parties and the amount in controversy exceeds $75,000.00 for all claims pleaded by Plaintiff.

4.     Defendant regularly conducted its online publishing and other business through its website in Texas through www.HuffPost.com (the "*Website*") and derives substantial revenue from its subscription, sales, and advertising by servicing the Texas market through the Website and the Article complained of herein was published on the same Website.  Moreover, by publishing "news" stories on its Website, Defendant attracts subscribers, advertisers, and customers who purchase merchandise and services.  Defendant offers paid subscriptions to Texas residents and tracks the location and activities of Texas residents on the Website thereby enabling targeted advertising to Texas residents that generate substantial revenue for Defendant.  Defendant sells merchandise and services on the Website to Texas residents and generates substantial profits from these sales.  Defendant has actually entered into contracts for subscriptions to its online subscription services with Texas residents through its Website.  Defendant has actually entered into contracts with advertisers in Texas to advertise on its Website and/or ran advertisements on its Website geared to the Texas market.  Defendant has actually sold merchandise and services through its Website to Texas residents.  These are sufficient minimum contacts with Texas from which the conduct complained of arises because the article was published on the same Website the HuffPost offers and obtains paid subscriptions to Texas residents, targets paid advertising toward Texas residents, and offers and sells merchandise and services to Texas residents.  Based on this conduct, Defendant has purposefully availed itself of the privileges of doing business in Texas

Appx. 017

through online publishing, marketing, and sales to Texas residents and to exercise jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events giving rise to the causes of action occurred in this District and the Defendants are subject to the Court's personal jurisdiction in this District.

## III.    FACTS

1.      The framers of the Constitution wanted to ensure that the First Amendment would protect a free press so that no state action could ever inhibit or limit the free dissemination of information to the people of the Republic for which the Constitution stands.  It is a noble ambition that is distinctively American and sets the standard for the rest of the world.

2.      But the First Amendment does not just protect a free press – it also protects the freedom of speech of every American, whether or not they have access to the power of the mainstream media to trumpet their views.  Ironically, however, state action is not the greatest contemporary threat to free speech.  It is rather the "free press".

3.      This is because publicly stating a fact or giving an opinion must be self-censored to ensure that one does not risk being labeled by the press with a loathsome term that brings with it stigma and ostracization that could result in losing a career, public scorn and humiliation, and even the risk of physical harm.  Once these labels are given—in this digital age—they are permanent and scar a reputation for indefinite duration with a simple internet search.

4.      For many years, there were few of these loathsome labels that Americans dreaded more than "racist" or a similar term.  However, new terms have arisen that carry an equally chilling effect on free speech and equally devastating assault on one's reputation.

Appx. 018

5.    The terms "white nationalist", "Holocaust denier", and "white supremacist" are the new buzz terms used to describe a myriad of person on the political right who may have views that diverge from mainstream politics.  While there are some who truly espouse view of a "whites only" nation, view whites as superior, or who truly deny that atrocities were committed against Jewish people during the Second World War, these terms are often misapplied to persons who not only reject such views but, in fact, abhor those beliefs.

6.    Plaintiff Charles Johnson is one such person.  Johnson is admittedly involved with conservative political causes.  He also absolutely believes that there was a systematic campaign to commit atrocities against Jewish people during the Second World War.  He absolutely does not believe that America should be a nation only for white people.  Nor does he believe that white people are "superior" to other races of human beings.  In fact, he has a child who is non-white.  He does not promote genocide or promote DNA sequencing or genetic research for the purpose of harming non-whites or Jews.

7.    Nevertheless, on February 17, 2019, the notoriously left-leaning *The Huffington Post* , by and through its reporters, editors, and agents, ran a hit job on Johnson, published on Defendant's website www.HuffPost.com, with a headline that read "2 GOP Lawmakers Host Chuck Johnson, Holocaust-Denying White Nationalist" (the "***Article***").  *See* https://www.huffpost.com/entry/gop-reps-host-chuck-johnson-holocaust-denying-white-nationalist_n_5c40944be4b0a8dbe16e670a.  The Article was published by Defendant HuffPost on its website www.HuffPost.com.

8.    The Article discusses attempts by Johnson and other persons that Article describes as white supremacists, white nationalists, Neo-Nazis, anti-Semites, and Holocaust deniers to utilize DNA sequencing and genetics to effectuate their agendas.  Although there are some statements

4

made in the Article that are attributed to third-party sources, Johnson does not complain regarding the truth or falsity of those statements, although they are relevant in ascertaining the overall gists of the Article.

9.    Specifically, the Article makes the following factual claims without attributing the claims to any third-party sources:

> Two Republican congressmen met with noted Holocaust denier and white nationalist Chuck Johnson to discuss "DNA sequencing," less than a day after the House voted to disavow white supremacy and white nationalism[.]

> [Johnson] also questions how many Jewish people were killed in the Holocaust, ran a crowdfunding site for white supremacists and neo-Nazis, said "anti-racist is anti-white," was kicked off Twitter for threatening to "take out" a Black Lives Matter activist and suggested an Amtrak crash was caused by the engineer's sexuality.

10.    These statements (which Johnson denies the truth of), read in light of and in juxtaposition to the headline that calls Johnson a "Holocaust-Denying White Nationalist", clearly make the factual truth claim that Johnson is a white supremacist, a white nationalist, a Neo-Nazi, anti-Semitic, and a Holocaust denier that threatens violence against non-whites and Jews and financially supports white supremacists and Nazis.  This is false.  Moreover, these statements, the headline, the overall gist, tone, tenor, surrounding circumstances of the Article of the whole, and the juxtaposition of the statements therein create the specific defamatory gist by implication and innuendo that Johnson (in furtherance of his evil beliefs) is involved in some type of scheme— either individually, or together with other white supremacists, white nationalists, Neo-Nazis, anti-Semites, and Holocaust deniers, or both—to use DNA and genetic sequencing to do harm to non-whites and/or Jews in ways that include, but are not limited to, influencing legislators.  A reasonable reader could further conclude that the Article suggests that machinations of state-sponsored "genocide" against non-whites and/or Jews are being orchestrated by a bona fide Nazi and white supremacist – Charles Johnson.

11.     These are not matters of opinion – these are verifiable truth claims that Johnson is involved in attempts to utilize DNA sequencing to do harm to non-whites and/or Jews.  This is sensationalized by the Article's alarmist tone that other white supremacists, white nationalists, Neo-Nazis, anti-Semites, and Holocaust deniers have become "obsessed with genetics".  This is completely false and Johnson's meeting with legislators had nothing to do with non-whites or Jews or the DNA or genetics of those people groups.  There was no plot for genocide against non-whites and/or Jews or utilization of DNA or genetic technology to their detriment.  The ridiculous impression created by the Article is maliciously false and is the result of the purposeful omission by the Defendant of facts that, if disclosed, would have made clear that Johnson's meeting with the lawmakers had nothing to do with white supremacy, white nationalism, anti-Semitism, Holocaust denial, or the DNA or genetics of non-white and/or Jewish people.

12.     In fact, it was not until the Article that there was any "controversy" surrounding Johnson's involvement with DNA sequencing, genetics, or meetings with the legislators at issue in the Article.  Nothing was brought to the public fore until the Article.  Johnson does not have a pervasive fame or notoriety or even a limited fame or notoriety on right-wing causes.  This is disclosed by the Article itself which repeatedly recites that the prominent figures discussed in the Article were *unaware* of any supposed controversies surrounding Johnson or his viewpoints.

13.     HuffPost, by and through its agents, acted with actual malice and/or reckless disregard for the truth of these factual assertions, gists, and innuendo in the following ways:

a.  Defendant failed to contact Johnson prior to publication to verify the factual claims. This is because Defendant's notoriously left-leaning political agenda caused it to turn a blind eye to the truth of the fact claims made and be willfully ignorant to the truth of the fact claims made.

6

b.  Defendant made no attempt to investigate or disclose what was discussed in Johnson's meeting with legislators, made no attempt to confirm whether white supremacist or anti-Semitic ideas were discussed in the meeting, and made no attempt to determine whether the DNA sequencing at issue were in relation to race or ethnicity as falsely suggested by the Article.

c.  Defendant had an injurious motive toward Johnson to reach the false conclusions as evidence by Defendant's repeated attacks on supporters of right-wing or Republican political causes and, more specifically, on Johnson individually.

d.  Defendant has, in essence, admitted its error, negligence, and actual malice by, on January 24, 2020, publishing the following clarification of the Article:

> UPDATE: Jan. 24, 2020 — A year after publication, Johnson's lawyers sent HuffPost a letter in which they assert Johnson "believes that there was a systematic campaign to commit atrocities against Jewish people during the Second World War, that he believes that America should not be a nation only for white people, that he does not believe that white people are 'superior' to other races of human beings, and that he is not anti-Semitic."

14.    These facts demonstrate that Defendant did not exercise elementary journalistic ethics and guidelines by contacting Plaintiff prior to publication, did not otherwise verify the false gist of the Article, and had an injurious motive that caused it to turn a blind eye to the truth.  Only with a threat of a lawsuit did Defendant partially correct its defamatory gist.

15.    As a result of these malicious false statements of fact of and concerning Johnson, his reputation has been damaged and he has suffered actual damages and reputational injury in excess of $1,000,000.00.

## IV.    CAUSES OF ACTION

### COUNT I

### Libel (*per se* and *per quod*)

16.    Plaintiff realleges all of the preceding allegations as if fully stated herein.

Appx.  022

17.     Defendant published false statements of fact of and concerning Plaintiff, who is not a general purpose or limited purpose public figure.  Defendant acted with negligence as well as actual malice and/or reckless disregard for the truth the false statements of fact.  Alternatively, Defendant is strictly liable for the defamatory Article.  The false statements of fact were defamatory of Plaintiff and caused reputational injury *per se* because they injured Plaintiff in his occupation.  The false statements also caused Plaintiff actual damages and mental anguish.

18.     Plaintiff further seeks exemplary damages because Defendant's actions were committed with actual malice and/or reckless disregard for the truth.

19.     Defendant is vicariously liable for the actions of its reporters, editors, and other agents that contributed to the libelous conduct.

20.     All conditions precedent to Plaintiff's ability to maintain this suit have occurred.

## V.     JURY DEMAND

Plaintiff demands a trial by jury.

## VI.     PRAYER FOR RELIEF

Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

CAMARA & SIBLEY LLP

/s/ Joseph D. Sibley_____
Joseph D. Sibley
State Bar No. 24047203
sibley@camarasibley.com
Camara & Sibley LLP

8

Appx. 023

4400 Post Oak Pkwy.
Suite 2700
Houston, Texas 77027
Telephone: (713) 966-6789
Fax: (713) 583-1131

**ATTORNEYS FOR PLAINTIFF**


**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document has been filed on this 9th day of April, 2020, pursuant to the electronic filing requirements of the United States District Court for the Southern District of Texas, which provide for service on counsel of record in accordance with the electronic filing protocols in place.


*/s/ Joseph D. Sibley*
Joseph D. Sibley

Appx. 024

# Exhibit D

# Why I Am Suing BuzzFeed's Ryan Mac For Libel Over Peter Thiel Story

It's important for fake journalists to be exposed for the frauds they are so real journalists might thrive.



**CHARLES JOHNSON**
SEP 12, 2020

♡ 6     💬 3     ↻                                          Sha

---

Once upon a time I thought I might be a journalist but I have put aside the childish notion that people actually care about what's true.

When I was younger and dumber I set about winning every award that the professio offered. And I won them. One after another, award ceremony after award ceremony. Why did I do that? Well, I thought prestige could make me feel whole but like a lot things we chase when we are young, I made a lot of mistakes in focus.

I broke real stories and was even profiled by its leading lights. I met 'em all — Rupe Murdoch, David Carr, Roger Ailes, Tucker Carlson, Andrew Breitbart, Conrad Blac to name drop a few. I became friendly with billionaires and congressmen, ambassad and foreign diplomats.

I was that wunderkind but now I am neither a wunder nor a kind. And whiz kid bot lives—and sound—a lot better than whiz man. There is white in my red beard now aches in body parts which I didn't even know could ache.

What drove me from the profession? Nastiness — and poverty. I got attacked, lied about, and threatened by lesser talents. I learned that the way to live a full life is to a quiet life. I discovered what all public people who take positions do: *They will atta your family to get to you.* And you will lose for the same reason that the many can

destroy the few: there are more of them and they won't fight fair. *The truth will only s* *you free if you're allowed to tell it. And the truth will only set YOU free, not your audience.* Your audience can just easily become a mob. When you're allowed to tell the truth y won't want to. You'll prefer instead to just move on and spend your efforts on something beautiful instead, something that matters, something personal.

The media and social media have a cardinal sin: their business model. Engagement enragement. They [need sacrifices and repetitional destruction]. This is how they ma bucks and why they give zero fucks if they hurt anyone. They are in the business of telling you who is a hero and who is a villain and there is no appeal except possibly a jury of your peers.

The corporate press is designed and optimized to sell advertising and not to tell you the truth. At its most frivolous, it produces empty calories. At its worst it needs witches to feed itself. Only a witch would say that they weren't a witch, don't you know. Let's drag him on Twitter where he can't respond. Seems fair!

Never mind that what I wrote all those years ago on Twitter isn't even controversial but prophetic: I pointed how #BlackLivesMatter was interested in spreading lies ab police shootings to justify riots and destruction. Yes, I pointed that out *five years ag* You, too, can predict that social media censorship will become one of the biggest issues. But you will be dismissed as crazy. That is, before, you are proven correct an not acknowledged. Like [Cassandra] you will suffer if you predict the future and no o listens. Like [Semmelweis] you will be ignored even when you have the cure.

An editor at Vanity Fair once put it to me simply: **journalism is simply about the** **journalist's next job**. If in the process of getting a better job they can help you they will; if they need to hurt you, well, they'll do that, too.

It won't matter if you win lawsuits against them. I won [high six figure settlement] fr Gawker, which was, in point of fact, [a laundry service for Russian intelligence]. Inde the same billionaire who bankrolled Gawker's legal bills is now barred under [the ve]

bipartisan Russian sanctions passed under President Trump. Are we not supposed t
pay attention Gawker founder Nick Denton's sojourn to Switzerland — where said
Russian billionaire lives — after he was bankrupted by Hulk Hogan, Peter Thiel an
yours truly?

Perhaps you will learn how much the journalist world and the intelligence world an
the technology world are really just about one thing: power, at any price and at all
costs. You can donate to Jewish organizations, be supported by Jewish leaders, back
Jewish candidates, do business with Jews, have Jewish friends, even a Jewish
girlfriend. None of it matters when the journalists will just lie about you. They will
unperson you. And you are supposed to accept it, as if they, not you, are the author
your fate. They'll call you a "troll," lie about you "shitting on the floor" because they
think it's funny to hurt your reputation. These aren't good people and someone nee
to hold them account.

Logic fails when you confront this sort of hatred. If I am a hater of the Jews, which
am not, I'm apparently pretty bad at it, backing the most pro-Jewish president ever.
provide my bona fides: Do I have to go back in time and kill Baby Hitler? Or will a
second circumcision do? Somehow I feel as if nothing I can do save bring lawsuits
change the behavior of fake journalists. Engaging them is enriching them and more
importantly, pretending that they deserve respect. They need to be punished. But he

You can sue discredited publications. In most cases they'll settle before it gets to co
These victories are fun but you never get the satisfaction of your day in court. In otl
cases you take them to court with the money you won from the previous settlement
On and on, we go! This is the work. This is the fate I have. OK then.

The fake journalists are getting desperate while their business models fall apart. Fo
some, this collapse coincides with their own lives falling apart. For others they neve
had their lives quite together in the first place. For others they live off of rich paren
or spouses, especially the ones who lust after the prestige game. You can't eat presti
buy a house with it, or pay your kid's school fees.

So they turn to envy and resentment, especially of the rich. Some of these fake journalists develop behaviors that can only be described as stalking. They call it a "beat" as if they were going to beat you.

This is what is happening at BuzzFeed where even their editor departs for a job at t New York Times. This time, Ben Smith is smearing other prophets but not before publishing the discredited dossier at BuzzFeed. I was to learn fake journalists fail u especially if they "report" whatever their establishment sources tell them. This is brutal, ugly, gross stuff.

I really resisted the temptation to sue the media but enough is enough.

At the request of family and friends and my medical travails — I was losing my sigl — I chose a few years ago to live a quieter life—to avoid participation in public affa except when duty and necessity requires it. I don't have many of the views in my thirties I had in my twenties. This is called personal growth.

There are no profiles anymore. I seek to live a quiet life and do what I can for my country and my family, just as I always have. As a canceled person I have more or le accepted that the public conversation isn't for nerds like me. Not when there are people hunting us for sport. I chose to spend my time around the great, beautiful, noble.

Some days I wonder if backing Trump was worth it and then I remember why I supported him. No, it wasn't because I believed he'd usher in some sort of white nationalist Xanadu. I backed Donald Trump because I believed him when he said h bring peace to the world and that he would end wars rather than begin them. In tha crucial task he has not fallen down.

A lot has happened to the country and to me since I helped elect Trump president against all odds. I had a child, divorced, and moved to the one place where I felt

happiest as a child — Texas, specifically Montgomery County, the most pro-Trump county in America.

Like a lot of people with nothing to lose and nowhere else to go I found my home and my people, at last. My neighbors have taught me that we Texans don't run from a fight. Not at the Alamo. Not now. Texas, like America, is a state of mind.

I fight now because the lies have set from muck to concrete and because I am no longer fighting just for myself. I am fighting for America, for a responsible press, for the First Amendment. I am fighting for my friends and family and for the sort of country I want my daughter to grow up in.

I always give my opponents an opportunity to do the right thing. I have repeatedly informed BuzzFeed to leave me alone if they cannot get basic facts about me correct. They have continued so now we have to escalate it.

This stalking began in 2017 when Mac falsely reported in Forbes that I threatened a Black Lives Matter activist. I did no such thing and what's more no one at Twitter knows why I was suspended from Twitter. (For what it's worth: This lack of knowledge includes the CEO of Twitter, Jack Dorsey, who I have talked to about my suspension.

In yesterday's article on Peter Thiel dinner guests — really — BuzzFeed libels me yet again, claiming I am a Holocaust denier. I am not, nor have ever been, nor do credible Jewish organizations like the Simon Wiesenthal Center believe me to be one.

Make no mistake this attack on Peter Thiel was a long time coming after Thiel and backed Trump in 2016.

But it's also an attack on American security, something we ought to take very seriously. It's also sadly not Mac's first such attempt. Publications which repeatedly behave without regard to the facts need to be shut down, especially if they endanger public safety and lack a business model. If the fake press can controversialize or sm

entrepreneurs and investors they'll deter investment and attention in the key areas essential for American safety and prosperity.

Most recently Mac worked with criminal hackers to smear Clearview, a facial recognition, which has been instrumental in rescuing children from pedophiles. Th is no moral difference — and perhaps no legal difference — between Julian Assang publishing stolen information and BuzzFeed doxxing Clearview's customers in an attempt to intimidate them away from using that technology.

First Mac falsely claimed that Clearview's technology doesn't work and that it was lying about its number of users. In fact the technology works so well that it's all the rage among law enforcement officers.

Mac also doesn't behave like a normal journalist. He has disrespected off the record comments with Elon Musk, comments which led Musk to be sued. He skirted by having to be deposed in that case but Musk rightly called him a "fucking asshole."

I have a different term for Mac: reputational arsonist.

Mac is busy setting fires again. He attacks me professionally and calls me a "notorio far right troll," whatever that is. I am an investor and entrepreneur.

This time I am attacked in a driveby, set to coincide with Thiel's comments on Palantir, a company working to secure American liberty, ahead of its initial public offering.

(Full disclosure: I am not an investor but an admirer of Palantir. Peter and I haven't spoken in months. We do not agree on much — I support the President but those disagreements are private — just as the dinner parties he and I have had over the years. I won't litigate them here or anywhere.)

At no point did Ryan Mac or Rosie Gray reach out to me or my attorneys for comme This is odd as both of them have contact information for my attorneys Ron Colema

and Joe Sibley which I have given to both of them many times. This is how I know i
was malicious.

Gray did once reach out to on the Holocaust denial matter. She was rebuked by Ron
Here's what Ron said and which Gray included.

> Johnson's lawyer described the issue of anti-Semitism as "a red herring and
> defamatory." Coleman said Johnson isn't a Holocaust denier and has "warm and
> mutually respectful relationships with Jews, including activists on Jewish issues
> innumerable Jews from Holocaust survivor families." Johnson, the lawyer said,
> expressed regret over missing the Irving dinner "out of respect for friends who h
> invited him, a common courtesy," and described Irving's work as "multifaceted."

Do you really think I would work so hard to help find work for an Orthodox Jewish
attorney if I hated Jews? Go and ask Ron Coleman. Or any of the other Jews who kr
me and love me.

My other attorney, Joe Sibley, forced Mac to print a correction in yet another article
about my views. I shouldn't have to keep doing this.

Mac has also wrongly stated that I attended the Inauguration in 2017. In fact I was
celebrating the birth of my daughter.

The journalistic lack of standards continue emerge quickly.

- In one case BuzzFeed claims I introduced Peter Thiel to FCC chairman, Ajit Pa
  have never met Pai and could not place him. I have told Ryan Mac this before,
  many times. I simply do not know Pai. I have zero interest in the
  telecommunications industry. It seems too boring.

- In still another BuzzFeed credits reporting of Joe Bernstein but Bernstein hasn
  worked at BuzzFeed in over a year and told me he doesn't deserve the credit.

- In yet another case they rely on a source who I fired for getting a story wrong which culminated in bankrupting a website. This is, by the way, after I paid all the legal bills and the settlement associated with her mistake. Since then I have realized how important it is for journalism to be undertaken with care, attentio to detail. We have too many fake journalistic outlets. These outlets do violence the real journalists among us.

Real journalists present both sides. They have a sense of perspective. They don't pri malicious lies.

I'd prefer we have more real journalists and I'm very interested in funding and help them. Those journalists who've worked with me at the Wall Street Journal, New Yo Times, and elsewhere know that they have my total respect. I support efforts to rest the cannibalization of the music and news business by the tech companies. I suppo everything we can do to make these serious journalists better off.

I am fundamentally opposed to hatred masquerading as journalism, to witch hunts faking being investigations.

If I am going to be treated as witch when I am not a witch I am going to have to lea how to start casting spells — and filing lawsuits. They may yet burn me alive but they'll have to work for it.

After all I am already in [one lawsuit with the Huffington Post](). Why not another wit BuzzFeed?

Charles Johnson,

charlescarlislejohnson@gmail.com

September 12, 2020

 **6 Likes**

# Discussion about this post

Comments    Restacks

Write a comment...

**Dwight Sauter** Sep 13, 2020

Charles Johnson, thank you for the backstory. This explains so much about the person and motiv
behind the Steel Dossier. So much has been put into perspective. I'm sharing this.

♡ LIKE    💬 REPLY    ⬆ SHARE

**Battle Boy** Sep 13, 2020

My god, in true journalist fashion, you never get to the point in a direct way. Lost interest after th
paragraph while you were whining about your career and patting yourself on the back.

♡ LIKE    💬 REPLY    ⬆ SHARE

**1 more comment...**

© 2024 Charles Johnson · Privacy · Terms · Collection notice
Substack is the home for great culture

# Exhibit E

2:13    ...ll LTE 🔋



CJ

Charles >

Oct 6, 2020 at 4:42 PM

One of my new genetics companies got rejected from @BankMercury today for no reason. We were working on a genetic predictor for coronavirus. What gives @naval? @kevinhartz? @typesfast cc: @cyantist, @ScottAdamsSays


**Charles**
twitter.com

Hmm.. can talk about tonight. When do U get into FW?

I'm in ft worth tonight

Ok where are you staying? Downtown?

The Worthington

Ok, let me know when you get there. I'm across the street

Okay we are here

Now

At the Worthington working

Ok




+    iMessage    🎤

# Exhibit F

12/22/24, 9:09 PM          (1) Charles Johnson's Thoughts & Adventures on X: "I'm currently CEO of @traitwell and I have backing to purchase it." / X

Case 4:24-cv-00988-P          Document 28          Filed 12/23/24          Page 41 of 132          PageID 322

𝕏

Home

Explore

Notifications

Messages

Grok

Communities

Premium

Profile

More

Post

🔍 Search

**Charles Johnson's Thoughts & Adventures** @JohnsonThought1 · Dec 11  ⋯
I have sent an email to $me CEO @annewoj23 offering to purchase 23&me.

Not a joke.

🇺🇸

💬 17          ⟲ 12          ♡ 172          �III 86K          🔖  ⬆️

**Charles Johnson's Thoughts & Adventures** @JohnsonThought1 · Dec 11  ⋯
I'll update accordingly and release the email if I don't hear back from her.

💬 3          ⟲ 1          ♡ 24           III 4.3K          🔖  ⬆️

← **Post**

I'm currently CEO of @traitwell and I have backing to purchase it.

4:05 PM · Dec 11, 2024 · **8,277** Views

💬 3               ⟲ 1               ♡ 30               🔖 2               ⬆️

Post your reply                                             Reply

**Charles Johnson's Thoughts & Adventures** @JohnsonThought1 · Dec 11  ⋯
This @traitwell post gives you a sense of how we're bringing AI to genomics.
charlesjohnson.substack.com/p/beadle-ai-fo…

💬 1          ⟲ 1          ♡ 8          III 6.2K          🔖  ⬆️

**NPC** 🤖 @NPC012345678910 · Dec 12                      ⋯
Not even 600 followers 😭😭😭 tears mate

💬          ⟲          ♡ 1          III 26          🔖  ⬆️

**J Rapp** @1takeitzjake · Dec 12                      ⋯
those backers must have deep pockets cause $me reported having 126M
cash at of end of Q3

💬          ⟲          ♡          III 123          🔖  ⬆️

**Relevant peo**

**Charles Joh**
@JohnsonTl
Subscribe to
for the realn
Traitwell.co
DMs open. (

**What's happe**

Bucc
LIVE

Trending in United Sta
**Guatemala**
75.3K posts

American actors · Trer
**#VeryScaryPeopl**
3,153 posts

Politics · Trending
**Greenland**
Trending with Panam
14.9K posts

**Show more**

Terms of Service   Priv
Accessibility   Ads inf

# Exhibit G

| **Form 301** | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $750 | <br>**Application for Registration of a Foreign For-Profit Corporation** | **Filed in the Office of the Secretary of State of Texas Filing #: 803793109 10/12/2020 Document #: 1001236100002 Image Generated Electronically for Web Filing** |

1. The entity is a foreign for-profit corporation. The name of the entity is :

## Our Perfect Score, Inc.

2A. The name of the corporation in its jurisdiction of formation does not contain the word "corporation," "company," "incorporated," or "limited" (or an abbreviation thereof). The name of the corporation with the word or abbreviation which it elects to add for use in Texas is:

2B. If the corporate name is not available in Texas, then set forth the name under which the corporation will qualify and transact business in Texas:

## Traitwell, Inc.

3. Its federal employer identification number is: **852949243**

☐ Federal employer identification number is not available at this time.

4. It is incorporated under the laws of: **DELAWARE, USA** and the date of its formation in that jurisdiction is: **9/9/2020**

5. As of the date of filing, the undersigned certifies that the foreign corporation currently exists as a valid corporation under the laws of the jurisdiction of its formation.

6. The purpose or purposes of the corporation that it proposes to pursue in the transaction of business in Texas are set forth below. The entity also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is organized.

## Our business sells DNA sequencing services, counseling services, and genomic apps.

7. The date on which the foreign entity intends to transact business in Texas, or the date on which the foreign entity first transacted business in Texas is: **10/13/2020**

8. The principal office address of the corporation is:

## 8301 New Trails Drive Suite 110, The Woodlands, TX, USA 77381

☐ 9A. The initial registered agent is an organization by the name of:

☑ 9B. The initial registered agent is an individual resident of the state whose name is:

## Dorothy    Morgan

☑ 9C. The business address of the registered agent and the registered office address is:

**3536 HWY6 #236    Sugar Land  TX  77478**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

10. The corporation hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

11. The name and address of each person on the board of directors is:

| | |
|---|---|
| Director 1: | **Dorothy      Morgan** |
| Address: | **3536 HWY 6 #236    Sugar Land  TX, USA  77478** |
| Director 2: | **Charles      Johnson** |
| Address: | **3720 College Park Drive   Apt 7206  Conroe  TX, USA  77384** |

### Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

### Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: **October 12, 2020**          **Dorothy Morgan**

Signature and title of authorized person on behalf of the foreign entity

**FILING OFFICE COPY**

# Exhibit H



Home  My Network  Jobs  Messaging  Notifications  Me ▾    For Business ▾    Network Smar Try Premium F

...

**Traitwell**

Traitwell is a genomics startup specializing in trait prediction from DNA analysis.

Biotechnology Research · The Woodlands, Texas · 2K followers · 2-10 employees

Follow    ✈ Message    ⋯

**Home**   About   Posts   Jobs   People

### Overview

Traitwell is a genomics startup specializing in trait prediction from DNA analysis. We bring together cutting-edge machine learning methods, the latest genomics research, and a consumer-first focus to our genomics apps

Show all details →

### Page posts



1mo •

🤩 We are thrilled to have our DNA kits made more accessible to all in our new **Amazon** store!

...more

👍 3

👍 Like    💬 Comment    ↗ Repost

Show all posts →

### People highlights

3 employees work in United States



Dorothy, Gavan, and Premkumar

Show all people highlights →

🟨 **PREMIUM**

**Insights on Traitwell** ❓

Total employees

0% Total headcount growth 6 months

🕐 3.4 years Median tenure

**Unlock more organization insights**

Access employee, hiring, and job opening insights with Premium

**Retry Premium Free**



| About | Accessibility | Talent Solutions | ❓ Questions? Visit our Help Center. | Select Language English (English) |
| Professional Community Policies | Careers | Marketing Solutions | |
| Privacy & Terms ▾ | Ad Choices | Advertising | ⚙️ Manage your account and privacy Go to your Settings. |
| Sales Solutions | Mobile | Small Business | |
| Safety Center | | | 🛡️ Recommendation transparency Learn more about Recommended Content. |

LinkedIn Corporation © 2024



**Pages people also viewed**

**Pipio**
Software Development
11,640 followers
+ Follow

**Roc Search**
Staffing and Recruiting
172,496 followers
+ Follow

**DApp360 Workforce**
Blockchain Services
496 followers
+ Follow



Show all →

### People also follow

**Engineering UPdates**
Education Administration Programs
714,744 followers

Devin S follows this page

+ Follow

**FollowICT**
Media Production
13,566 followers

+ Follow

**Burke Law Group**
Law Practice
1,690 followers

Jordan & 2 other connections follow this page

+ Follow

Show all →

# Exhibit I

# The Artful Return of The Bushes?

Are Democrats taking back law & order from the Republicans? An assessment of Joe Biden's plans



**CHARLES JOHNSON**
MAR 04, 2022

 4     4    

Sha



The once and future natural aristocracy: George P. Bush and George H.W. Bush

*"I have said that Texas is a state of mind, but I think it is more than that. It is a mystique closely approximating a religion. And this is true to the extent that people either passionately love Texas or passionately hate it and, as in other religions, few people dare to inspect it for fear of losing their bearings in mystery or paradox. But I think there will be little quarrel with my feeling that Texas is one thing. For all its enormous range of space, climate, and physical appearance, and for all the internal squabbles, contentions, and strivings, Texas has a tight cohesiveness perhaps stronger than any other section of America. Rich, poor, Panhandle, G city, country, Texas is the obsession, the proper study, and the passionate possession of all Texans." — John Steinbeck*

I am a California and Massachusetts refugee really but I am also a Texas resident — you have to be born a Texan as you are born a Hawaiian and you don't become one simply by moving there — and I voted in the Republican Primary in early voting. (I split my time between Northern Virginia, Southern California, and the Houston suburbs and I was born and raised in the Boston area. I make the circuit between m business and family ties.)

It was my first time voting in Texas and truthfully I had forgotten I was registered t vote at all but my friend checked and sure enough, I had apparently filled out the material and curiously enough I am a registered Republican. Who knew? Be careful what forms you fill out kids. Did you know I'm also an organ donor? I sure didn't! (How soon before we donate our DNA before we die?)

Today I identify mostly as an Independent. I really do try to back the candidate I th is best — somebody has to — and I'll do that again come the general election.

So with that in mind I voted against Congressman Dan Crenshaw — who I will exp in a subsequent post as a total compromised fraud — and for George P. Bush who w be in a run off with Ken Paxton for Texas Attorney General. I don't know if there's some sort of law of the universe that Johnsons back Bushes but here I was voting fo him.

For what it's worth I suspect he's more of his grandfather's son than his father's. Jel low energy we know well. I think he will very likely be president someday and I thir he will use the office of Attorney General to do unto the tech companies what Tedd Roosevelt did onto the trusts. In this way Bush is a true inheritor of the Roosevelt mantle, unlike say, Attorney General turned U.S. Senator Josh Hawley who sued Google when he was Missouri's attorney general.

I also voted for and backed my friend, Clint Morgan, who ran for Texas Criminal Cd of Appeals, and whose defeat against Abbott-backed but nonentity Scott Walker

makes me really wonder about the Republican Party's bona fides on law and order.
(More of that, down below.)

When it comes to Paxton I confess that I like him a bit — I once took him out for
dinner — but I do think that the mounting ethics and criminal charges he's facing a
disqualifying. Paxton is a little too mobbed up, I'm afraid, to be a serious figure in
Texas politics. What's more I'm not a fan of people overstaying their welcome.

Paxton cultivated me pretty hard as a would be donor but he lost me when he asked
for a bribe in his office over looking the state capitol. I demurred and I have since
spoken to the FBI about it. Apparently I'm not alone and I'm reliably informed that
Paxton will be indicted or arrested on federal corruption charges ahead of the runo
May.

Paxton owes much of his successes to being on the same ticket at Greg Abbott who
without a doubt one of the most cleverly crooked politicians I have ever encountere
Whereas Abbott is clever and subtle Paxton is loutish and obvious. He was nearly
defeated by a Democrat in 2018. When he attended a Republican Attorney General
Association event he blew a bunch of money on clothes and nice things. It smacked
desperation.

A good friend laid out how George P. Bush was going to ultimately win the GOP
primary a year or so ago. His understanding of the hidden politics of Texas was
nothing short of extraordinary. He told me that among the more powerful interest
groups in Texas is the construction industry and with good reason. (Dallas and
Houston metro areas come in No. 1 and No. 2 [respectively for new real estate
construction in the nation](#).)

Historically the construction industry backs the Republicans while the trial lawyers
back the Democrats. The construction industry has fought with the trial lawyers an
appears to have the upper hand. One of the architects of that battle was constructio
magnate Richard Weekley of Texans for Lawsuit Reform who backed [Eva Guzman t](#)

the tune of millions of dollars. Weekley's support of Guzman was a defection from Paxton who he likely knew wasn't going to make it. Weekley no doubt wanted to bl⟨ Bush from the office.

Texas has a lot of land which it will happily sell you very, very cheaply. Land and natural resource extraction fund a lot of Texas's government as there is no state income tax. The Trump tax bill made it impossible to deduct your state and local ta⟨ against your federal taxes and so a lot of Americans picked up and moved to states without income taxes. The coronavirus accelerated this trend with remote work.

Cheap housing makes it easier to have a large family so many people move from all over the country to do just that. It also makes it easy to launder lots of dirty cash. A⟨ to that Texas's status as a border state and you have lots of people coming and goin⟨ looking for work and willing to work for cheap.

You aren't allowed to talk about how the construction industry is very much propp⟨ up by the cartels or how a lack of zoning might make this more possible. You tend t⟨ think of Miami for that sort of thing. There's a lot of Texas's economy that is propp⟨ up by Latin Americans and others hiding out in the Houston and Dallas suburbs.

There is, a slight problem with the Texas dream — hurricanes — and the construct⟨ industry likes its federal welfare money once a hurricane rolls through. George P. B⟨ stood up to these cretins — what Bush called "liberal deadbeat mayors" — and saw⟨ it that the minimal amount of federal money was stolen by them. This was, I think, ⟨ correct decision though it was deeply unpopular at the time. That's what leadership looks like. It's long overdue.



Governor of Massachusetts Calvin Coolidge inspects the militia during the Boston
Police Strike of 1919.

Are Democrats taking the issue of law and order from the GOP? That's the sort of
question I find myself wrestling with and wondering about.

In my darker moments I wonder if the Republicans were ever really law and order, a
least since Calvin Coolidge, who argued rightly that there was no right to strike
against the common good. For what it's worth I favor this approach too and would
extend it to all public sector workers.

It must be made honorable once more to be a cop and cops have to act honorably.
Biden is right: we can keep our liberties and our safety. It's not a false choice. These
are difficult things to keep straight but then statesmanship is an art not a science.

A very good friend of mine — Clint Morgan — is a prosecutor in Harris County. Bo
does he have stories upon stories about all the criming going down in H-Town. Nev

forget that my adopted city gave the world the blessed martyr George Floyd, who li[ ]
St. Paul, traveled the land with his gospel before meeting his untimely end.

Clint is the sort of person that makes you proud to be an American, having worked
way up from poverty in redneck Missouri to being one of the best prosecutors in
Texas. In the spirit of full disclosure I am a donor to Clint's campaign and I would [ ]
him my kidney if he asked (though preferably after we exhausted all other options).

Indeed Morgan was altogether too qualified for the position. His lackluster oppone[ ]
Scott Walker, was not. He is an embarrassment who rarely shows up to write opinio[ ]
and he was endorsed by *The Houston Chronicle*. He won because Governor Abbott's
political machine backed him and for no other reason. As if to add insult to Abbott
appointed Walker's equally unimpressive son to a judgeship as well. Abbott backed
family Walker back in the days when Abbott and Perry fashioned themselves
reformers on criminal justice but really let out a whole bunch of criminals who are
plaguing our streets today. We live with that Koch- and Soros-backed insanity.

With 2024 in view, Abbott is now campaigning as Law & Order type. Spare us, Greg
Abbott is a compromise candidate of the Chamber of Commerce and the mob but I
repeat myself. His biography includes the tell of having worked for Bracewell &
Giuliani way back when.

I am committed to ending his political career though I can't quite bring myself to v[ ]
for Beto. *What am I to do? Why did you have to be so cringe, Beto? Why?*



Governor Abbott with Paxton's alleged mistress.

I think Biden's State of the Union confirms that the Democrats are no longer in fav
of Defund the Police party but the fund the police party. That was a cynical weapon

get votes. Did you really think Joe Biden of crack bill fame was against the police anyway? After all, all the criminals around Trump were in favor of criminal justice reform, weren't they?

It's clear now that the Biden government is planning to use the "please think of the children" attack on Big Tech. *The Wall Street Journal* makes it explicit with a story to about how TikTok harms American children.

They're right to because Big Tech — Facebook, Snapchat, Clubhouse, and TikTok - a Chinese-backed social experiment weaponized against the youths of the West.

We have explored some of the Likud ties of Facebook through Sheryl Sandberg and will soon address its covert Chinese backing through Founders Fund. Snapchat also owes its existence to Chinese-Australian immigrant Jeremy Liew, who we are told v forced to quit Lightspeed Ventures over his odd China ties. (There's apparently a cleaning house that's taking place throughout Silicon Valley.)

And Tik Tok is, of course, explicitly Chinese, and that's why Congressman Gaetz, alone in his party, called for it to be banned. (Gaetz hasn't gotten the memo that you only supposed to talk about being anti-China not actually be anti-China.)



**Matt Gaetz**
@mattgaetz

Aged well.

 Rep. Matt Gaetz   @RepMattGaetz

TikTok is a Chinese dual-use surveillance system that is going to aid in their development of facial recognition.

I hope we get to a place where our country will ban it.

4:10 AM · Aug 1, 2020

**4,029** Likes    **727** Retweets

Rather than take on the problem head on, President Donald Trump elected to gift
TikTok to his political allies — Oracle and Walmart. It didn't take and now we have
new president.

His wife, Dr. Jill Biden, invited Frances Haugen to the State of the Union. We've tal
at length about Haugen is a construct of the deep state and why that's a good thing.

Her presence at the State of The Union confirms it. The Brits give out OBEs and w
give State of the Union invites. I should know, having once been a guest of my frien
Congressman Matt Gaetz.

And yes, I will say the quiet part aloud. I do favor more censorship of foreigners
infecting our social media environment. I want to block publications like BuzzFeed
and Huffington Post from publishing in the US, especially if they have foreign mon
backing them. I should have some good news on that front soon.

Let me be clear to the Silicon Valley investors and mobsters trying to be good boys
girls and invest accordingly. I am your ticket out of jail.



It's time for some de-oligarachization!

Step right up and help us make America great again!


## Discussion about this post

Comments      Restacks

Write a comment...

**John McNally** Mar 5, 2022

Great piece

♡ LIKE (1)      💬 REPLY      ⬆ SHARE

**Esteban** Mar 4, 2022

After George W I have no interest in any more Bushes. Jeb's son may manage a career in Texas w
the family has tons of favors to call in, and which is for all intents and purposes a one party state
now,) but I suspect he'll find that his brand is much too toxic nationally. Even George HW was no
terribly popular and he barely squeaked in after the particularly sleazy Clinton years.

♡ LIKE (1)      💬 REPLY      ⬆ SHARE

**2 more comments...**

© 2024 Charles Johnson · Privacy · Terms · Collection notice
Substack is the home for great culture

# Exhibit J

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - )
                                                        )

Charles Johnson, individually, and as trustee for )
Kawruh Trust, E.B. White Trust, and Xavier Capital )
Trust,                                               )    Index No.

                                        Plaintiff, )

                            vs                      )

Hoan Ton-That, Richard Schwartz, )
and Hal Lambert, )

                            Defendants. )

## VERIFIED COMPLAINT

       Plaintiff Charles Johnson (hereinafter "Plaintiff" or "Johnson"), brings this action against Defendants Hoan Ton-That ("Ton-That") and Richard Schwartz ("Schwartz") (Ton-That and Schwartz, collectively, are defined as "Defendants") (Plaintiff and Defendants collectively are the "Parties") for breach of fiduciary duties owed to shareholders of a close corporation, breach of contract, breach of the implied duty of good faith and fair dealing, fraud, constructive fraud, fraudulent inducement, declaratory relief, and equitable accounting, and a cause of action aiding and abetting cause of action against Hal Lambert ("Lambert" or the "Aiding and Abetting Defendant"), and alleges as follows:

### Nature of the Action

       1.    This case arises out of a joint venture to commercialize cutting edge facial recognition technology through a startup company. Not content to be one-third owners with Johnson, Ton-That and Schwartz engaged in a multi-step conspiracy to steal Johnson's interest in the company owning the facial recognition technology. They did so even though Johnson, while

only a minority owner, was in fact the sine qua non to the company's success due to his relationships in the venture industry and intelligence communities.

## THE PARTIES, JURISDICTION, AND VENUE

2.      Charles Johnson is a citizen and resident of Texas. Plaintiff brings this action on behalf of himself individually, and on behalf of trusts, Kawruh Trust, E.B. White Trust, and Xavier Capital Trust, for which Plaintiff is a trustee and in which Plaintiff's shares of the Company are held (the "Holding Trusts"). The Holding Trusts are based in California.

3.      Clearview AI, Inc., is a Delaware corporation, which was formerly doing business as SmartCheckr, LLC ("SmartCheckr"), a now-defunct New York limited liability company (hereinafter the "Company"). SmartCheckr was wound down, and its assets and shares transferred to Clearview pursuant to the Wind-Down and Transfer Agreement (the "Agreement") attached hereto as Exhibit A.

4.      Upon information and belief, Defendant Hoan Ton-That is a citizen and resident of New York. Upon information and belief, Ton-That and Schwarz are the majority owners and have a controlling interest in the Company.

5.      Upon information and belief, Defendant Richard Schwartz is a citizen of New York. Upon information and belief, Ton-That and Schwartz are the majority owners and have a controlling interest in the Company.

6.      Upon information and belief, Defendant Hal Lambert is a citizen of Fort Worth, Texas. Upon information and belief, Lambert is a minority shareholder and director of the Company.

Appx. 059

7.      This action arises out of the Agreement in which the Parties consented to be governed by the laws of the state of New York. (Exhibit A, ¶ 8).

8.      This Court has jurisdiction over Defendants pursuant to CPLR §§ 301 and 302 because Defendants, upon information and belief, are domiciled in the state of New York. NY CPLR §§ 301, 302.

9.      Venue for this action is proper in the County of New York pursuant to CPLR 503 because Defendants, upon information and belief, are residents of New York County, and a substantial part of events or omissions giving rise to this action occurred New York County. NY CPLR § 503(a).

## STATEMENT OF FACTS

### *Johnson, Ton-That, and Schwartz co-founded the Company*

10.     In or around May 2016, the relationship between and among Johnson and Ton-That began when Johnson, knowing of Ton-That's skills in the technology and intelligence fields, contacted him to discuss founding a facial recognition technology company.

11.     On or about July 23, 2016, Johnson introduced Ton-That to Schwartz, a communications consultant and former deputy mayor of New York City. Johnson, Ton-That, and Schwartz met several times to discuss applications of facial recognition technology, including potential law enforcement applications.

12.     On or about February 24, 2017, Johnson, Ton-That, and Schwartz reached an agreement to co-found the Company. Johnson, Ton-That, and Schwartz jointly formed the Company with the objective of becoming a leader in the field of facial recognition technology by engaging with strategic contacts in law enforcement agencies.

3

13.    Ownership of the Company was initially divided one-third each for Johnson, Ton-That, and Schwartz. Johnson presided over the Company as Co-President and Chief Strategic Officer, with Ton-That as Chief Executive Officer, and Schwartz as Co-President and Chief Operating Officer.

14.    From on or about February 24, 2017 until on or about November 24, 2018, the Parties jointly worked together to enhance the value of their venture, create intellectual property, and pursue business development opportunities together.

15.    As the only three shareholders in the Company, Johnson, Ton-That, and Schwartz were shareholders of a close corporation engaging in a joint venture.

16.    The Parties mutually contributed to the Company by combining financial resources and property, contributing effort, skill, and/or knowledge, and exercising joint control over the Company. The Parties contemplated the sharing of profits and losses.

17.    During this period, Johnson owned shares and played a key role in creating the Company. Johnson performed responsibilities as a co-founder, including but not limited to raising money for the enterprise, recruiting talent, and making key policy and management decisions.

18.    Johnson, a confidential informant for the FBI, provided significant value to the Company through his relationships with the intelligence committee and access to law enforcement

19.    Johnson introduced Robert Marling, Hal Lambert, and several other people to Ton-That who became investors in the Company. Both Lambert and Marling went on to be investors and board members of the Company.

20.    Building on a fifteen year relationship with Peter Thiel, a renowned technology investor, Johnson procured crucial funding from him in order to start the venture's operations.

4

Since the initial investment, Ton-That has repeatedly used the fact of Thiel's investment to raise money while denying Johnson's role.

21.     Ton-That hired Johnson's former employees and reached out to Johnson for advice on key management decisions.

22.     Johnson funded Company trips, including housing, meals, and other miscellaneous costs.

### *SmartCheckr Wind-Down and Stock Transfer to Clearview AI Inc.*

23.     In 2018, Ton-That and Schwartz took the first step in their multi-part conspiracy to divest Johnson of ownership in the Company.  The Defendants took advantage of Johnson, who was facing serious emotional, mental, and financial pressure due to the breakdown of his marriage and subsequent divorce.  Hiding the fact from Johnson, Ton-That and Schwartz transformed SmartCheckr into Clearview AI by transferring to Clearview— for no consideration— all of SmartCheckr's assets, including the cutting edge facial recognition technology.

24.     At the outset, Ton-That and Schwartz tried to completely exclude Johnson from business dealings by attempting to buy out Johnson's equity ownership in the Company.  These attempts failed after Johnson threatened litigation. The Defendants then shifted tactics by pressuring Johnson to accept the new arrangement, and providing Johnson with some ownership in the Company and

   *Step One* – Fraudulently induce Johnson into the Agreement

25.     On or about November 24, 2018, the Parties entered into the Agreement in which "SmartCheckr, LLC [was] dissolved with immediate effect and its affairs wound up." (Exhibit A).

26.    The Agreement reduced Johnson's ownership from a third to ten percent. (Exhibit A ¶ 2). Johnson agreed to accept "common stock of the Company, at $0.01 per Share, equal to ten percent (10%) of the *current fully-diluted equity* of the Company." (the Plaintiff's Shares) (Exhibit A, ¶ 2) (emphasis added).

27.    In consideration for this reduction of over two thirds of Johnson's equity and for the fact that "Johnson has provided good and valuable advisory services to the Company," the Agreement provided Johnson with the right to receive a sales commission of ten percent (10%) "to the extent Johnson introduces the Company to potential customers with whom the Company was not previously in contact, and such introduction leads, in fact, to a sale of Company software or services." ("Sales Commission") (Exhibit A, ¶ 5), Company's software and/or services are hereby defined as the "Product".

28.    Defendants, upon information and belief, induced Johnson to enter into the Agreement with the then-present knowledge and intent to block Johnson's right to realize Sales Commissions.

29.    The Agreement included a restrictive covenant in which the Parties agreed that they would not make or assist any statement criticizing "the reputation, business or character of the Company, or any of its … agents or employees." (Exhibit A ¶ 4.b).  Defendants recognized that any breach of such covenant "would cause materials and irreparable harm to the Company." (Exhibit A ¶ 4.e).

30.    Defendants materially breached this term by spreading misinformation about Johnson and, as one example, denying his involvement in the Company to the New York Times. [[Defendants' statements disparaging Johnson were published on by Kashmir Hill of the New York

Times on March 18, 2021. Hill's tweet publishing Ton-That's statement is attached hereto as Exhibit B.]]

31.    In reliance on the Agreement and as directed by Ton-That, Johnson set up the Holding Trusts to hold his interest in the Company. Johnson was under the impression that pursuant to the Agreement, Ton-That would transfer Johnson's shares into the Holding Trusts.

32.    The Agreement included a coercive restrictive covenant in which Johnson could not disclose the existence of the Agreement, his indirect ownership in the Company, or his prior provision of services to the Company (the "Confidentiality Term"). (Exhibit A ¶ 4.b). Upon information and belief, the purpose was to interfere with Johnson's ability to sell the product

33.    Upon information and belief, Defendants induced Johnson to execute the Agreement with the then-present intent to publicly spread false information denying Johnson's involvement in the Company, frustrating Johnson's ability to sell the Product; and did not disclose their then-present intent to later amend the Company's bylaws providing breach of the Agreement, specifically the Confidentiality Term, as grounds to buyback Johnson's shares.

34.    Any counterparty exercising due diligence would need to know the relationship of the sales person for the Company, especially concerning a high-risk transaction involving intelligence technology.

_Step Two_ – Frustrate Johnson's rights under the Agreement

35.    Since the execution of the Agreement, Johnson has dedicated significant effort to seeking out buyers for the Product. Johnson has connected the Company with numerous qualified buyers and sales representatives interested in contracting for or marketing the Product.

36.     Johnson also initiated contact with valuable investors interested in providing funding and reputable support for the Company.

37.     Ton-That and Schwartz blocked Johnson's ability to sell the Product for Sales Commissions by unjustifiably refusing to pursue negotiations with any of the potential buyers that Johnson introduced.

38.     Ton-That informed Hal Lambert, a major investor in the Company, that Ton-That refused to do business with any potential counterparties Johnson introduced.

39.     Johnson introduced the Company to potential customers on the following occasions:

    a.   On or about February 2019, Johnson introduced Ton-That to Jessica Garrison, former head of the Republican Attorney General's Association, whom Ton-That hired as part of a marketing strategy for contract procurement to travel to hundreds of law enforcement agencies around the country to demonstrate the Product. Garrison has procured dozens of contracts for the Product from law enforcement agencies and was publicly recognized for such successes.

    b.   On or about May 2019, Johnson introduced the Product to the CIA through a friend and colleague, who himself was a former CIA officer.  After Johnson made the introduction, Defendants concealed and lied to the CIA about their relationship with Johnson, and the CIA passed on the contract for the Product.

    c.   On or about August 1, 2019, the Sheriff of Montgomery County, Texas contacted Johnson, who introduced the Sheriff to Ton-That and Schwartz.  Since Johnson

Appx. 065

facilitated the contact between the Sheriff and the Company, the Sheriff has served as an advocate for the product and assisted with procuring numerous contracts.

d.  On or about December 26, 2019, Johnson met with members of the Indonesian intelligence committee.  Johnson connected Ton-That with these individuals, but -That neglected to follow-up with these contacts.

e.  On or about January 19, 2020, Johnson initiated contact with a representative from the Department of Defense.

f.  On or about January 27, 2020, Johnson proposed to Ton-That that the Company hire Johnson's colleague, Dan Colascione, a former software programmer who had worked with technology companies such as Facebook, Google, and Snapchat. After meeting with the programmer, Ton-That opined that the programmer would be a great fit to work with the Company, but nevertheless refused to take any follow-up actions.

g.  On or about January 29, 2020, Johnson negotiated with his colleague, a former FBI agent with extensive ties to law enforcement in the Middle East, Asia, and France, to engage his help with Product sales.  After Ton-That and Schwartz met with the agent several times, there was no follow-up on negotiations with the agent despite several follow-up attempts by Johnson and his colleague.

h.  In or about March 2020, Ton-That also ignored Johnson's colleague, Gator J. Greenwill, who along with Johnson, would provide valuable connections to the intelligence community and the venture capital community.

i. On or about April or May 2020, Congressman Matt Gaetz contacted Johnson stating that he had communicated with the former Director of National Intelligence, who informed Gaetz that both Ton-That and Schwartz denied Johnson's involvement with the Company.

40. There is no good faith explanation for Defendants refusing to consider Johnson's proposed counterparties as Defendants continued to pursue contracts for the Product. The only realistic explanation is that Defendants engaged in a purposeful and malicious mission to prevent Johnson from realizing his rightfully owed Sales Commissions pursuant to the Agreement, and designed to compensate Johnson for his lost equity.

41. Ton-That and Schwartz purposely derailed the efforts set forth in ¶ [39] by ignoring further negotiations and denying Johnson's involvement with the Company. In doing so, Ton-That and Schwartz, as majority shareholders, breached their fiduciary duty to Johnson, a minority shareholder, by impeding his ability to earn Sales Commissions.

42. Additionally, Defendants continuously circulated false information about Johnson to the press and lied about Johnson's role with the Company to further hinder Johnson's ability to sell the Product. Ton-That made several statements to reporters denying Johnson's involvement with Clearview, including but not limited to

a. On or about January 31, 2020, Kashmir Hill from the New York Times reached out to Johnson and Johnson's counsel about an interview. Hill was informed from sources that Johnson had co-founded the Company, but that Johnson no longer had a relationship with the Company.

     b.   On or about April 2020, Ton-That had told investigative journalist, Luke O'Brien, that Johnson had no relationship with the company, and O'Brien published this as "fact" in the HuffPost on April 9, 2020.

     c.   On or about May 2021 Jessica La Masurier of France 24 informed Johnson that Ton-That informed her that Johnson had no involvement with the Company.

43.    Ton-That also instructed Company employees to cut off public communications with Johnson.

44.    On many occasions Johnson importuned Defendants to let him correct the false statements they made about him. Defendant's denied Johnson's requests in bad faith.

45.    Johnson sought guidance from the Company's public relations and legal team, who refused to advise Johnson.

46.    Upon information and belief, Defendants learned that Johnson communicated with press in or about February 2021.

*Step Three* – Force Johnson into a Buyout

47.    Defendants amended the Company's Certificate of Incorporation numerous times as the Parties' relationship deteriorated.

     a.   On or about June 14, 2019, an Amended and Restated Certificate of Incorporation of the Company was filed with the Delaware Secretary of State.

     b.   On or about July 20, 2020, the Second Amended and Restated Certificate of Incorporated was filed.

    c.   On or about September 21, 2020, an amended Second Amended and Restated Certificate of Incorporation was filed providing if the Buyback term is triggered, common stock would be bought at 50% fair market value.

    d.   On or about March 3, 2021, a further amended Second Amended and Restated Certificate of Incorporation was filed providing that Buyback would be at an even lesser, 20% fair market value and could be triggered by a breach of the Confidentiality Term – this was the first Certificate of Incorporation which provided breach of confidentiality as a basis for Buyback.

    e.   On or about July 21, 2021, the Second Amended and Restated Certificate of Incorporation was amended to change the number of shares of Common and Preferred Stock.

48.    Upon information and belief, prior to the March 3, 2021 amendment described in ¶ [47(d)], Defendants became aware that Johnson had communicated with the press.

49.    Defendants then pointed to a New York Times Magazine story published on March 18, 2021 as the basis to buyout Johnson at the artificially low price of 20% fair market value.

50.    On or about May 21, 2021, without notice or a meeting, the Defendants conspired to deprive Johnson of his equity interest by passing a resolution— with board members Robert Marling and representative from Liberty City Ventures— who signed the Resolution to "buy back" Johnson's shares of Common Stock (the "Buyback Resolution"). The Buyback Resolution is attached hereto as Exhibit B.

12

51.    Despite Johnson's 158,682 shares having a fair market value of $1,432,898.46, priced at $9.03 per share, the Buyback Resolution only called for the Company to buy Johnson's shares for twenty percent (20% of the aggregate fair market value) (See Exhibit B, ⁋ 2).

52.    On or about October 9, 2021, Johnson was notified of the Buyback Resolution ("Notice").

53.    Defendants voted on the Buyback Resolution to force Johnson out of the Company based on the amended Certificate of Incorporation. Defendants amended the Certificate of Incorporation after frustrating Johnson's rights under the Agreement – the amendment providing that breach of confidentiality was grounds for a buyout solely served as an excuse to unlawfully steal Johnson's remaining shares.

54.    Moreover, the Confidentiality Term frustrates a material purpose of the Agreement, namely, to compensate Johnson through Sales Commissions for his surrender of a vast amount of his equity.

55.    Spreading the lie that Johnson had no relationship with the Company and restraining Johnson from correcting these statements undermined Johnson's ability to sell the Product and bring in revenue for the Company.

56.    Johnson's breach of the Confidentiality Term was justified as Defendants opened the door by spreading multiple lies about Johnson to the press, substantially impairing Johnson's reputation and rights under the Agreement.

57.    Defendants also acted in furtherance of their own, personal motives and against the interest of the Company by sabotaging Johnson's ability to bring in revenue and additional investors.

58.     Defendants used the Confidentiality Term to thwart Defendants' obligations and Johnson's rights under the Agreement, which after amending the Certificate of Incorporation, Defendants used as a pretext to engage in an unlawful grab of Johnson's shares.

### FIRST CAUSE OF ACTION (Breach of Fiduciary Duties Owed to Minority Shareholders of a Close Corporation) (Against Ton-That and Schwartz)

59.     Plaintiff repeats and realleges all other paragraphs of this complaint as if fully set forth herein.

60.     As majority shareholders of a closely-held corporation, Ton-That and Schwartz owed fiduciary duties to Johnson.

61.     Ton-That and Schwartz, both individually and acting in concert as majority shareholders of the Company, dominated and controlled the Company, and as such, owed fiduciary duties of good faith and reasonable care to Johnson.

62.     Johnson, Ton-That, and Schwartz were joint venturers with respect to the Company, and, as such, owed fiduciary duties to the others, including to the Company.

63.     Johnson placed trust and confidence in Ton-That and Schwartz, and a relationship of trust and confidence arose between and among them.

64.     Defendants breached their fiduciary duties owed to Johnson, a minority shareholder of the joint venture close corporation, by purposely ignoring sales opportunities for the sole purpose of preventing Johnson from realizing his Sales Commission rights.

65.     Defendants also breached their fiduciary duties owed to Johnson by passing the Buyback Resolution to buyback Johnson's minority shares at a deflated price.

Appx. 071

66.    Defendants' bad faith actions constitute a breach of fiduciary duty, which entitles Johnson to recover from Defendants any benefits that they received as the result of those malevolent acts.

**SECOND CAUSE OF ACTION (Breach of Wind-Down/ Buyback Agreement)**

67.    Johnson repeats and realleges all other paragraphs of this complaint as if fully set forth herein.

68.    The Parties had a contract, namely, the Agreement between Johnson and the Defendants, which prevented the Parties from publicly criticizing one another or the Company.

69.    The restrictive covenant bound Defendants to not make any statement or communication "to any third party which impugns or attacks, or is otherwise critical of the reputation, business or character of the Company, or any of its respective directors, officers, representatives, agents or employees." (Exhibit A ¶ 4(b)). Johnson is a shareholder and authorized sales representative of the Company, making him a "representative[], agent[] or employee[]" of the Company. *Id.*

70.    Upon information and belief, Defendants' publicly criticized Johnson and denied his involvement with in the Company to the New York Times reporter, who later published a statement from Ton-That saying "Johnson was not a founder and never had an operational role" with the Company.

71.    Upon information and belief, Ton-That told investigative journalist, Luke O'Brien, that Johnson had no relationship with the company. O'Brien published this as "fact" in the HuffPost on April 9, 2020, stating "[p]eople involved with Clearview appear to have gone to great lengths to conceal their links to the company and each other. Johnson, for instance, does not appear

on any of the incorporation documents and has left little public trace of his association with Ton-That beyond a Facebook post."

72.    Upon information and belief, Ton-That also told Jessica La Masurier of France 24 that her that Johnson had no involvement with the Company.

73.    Defendants breached this covenant by publicly criticizing Johnson and denying his involvement with the Company, which breach by the terms of the Agreement cause material and irreparable harm.

74.    Due to Defendants' breach, Johnson is entitled to compensatory and consequential damages in an amount to be determined at trial, as well as any other injunctive or other appropriate equitable relief.  *See* Exhibit A ¶ 4(e).

**THIRD CAUSE OF ACTION (Breach of the Duty of Good Faith and Fair Dealing)**

75.    Johnson repeats and realleges all other paragraphs of this complaint as if fully set forth herein.

76.    An obligation of good faith and fair dealing was an implied term of the Agreement.

77.    The implied covenant of good faith and fair dealing is consistent with the express terms of the Agreement.

78.    Defendants materially breached the duty of good faith and fair dealing under the Agreement by knowingly and substantially impairing Johnson's ability and rights under the Agreement, including but not limited to the right to earn Sales Commissions as compensation for Johnson's lost equity. Defendants arbitrarily refused to negotiate with Johnson's counterparties, knowingly spread false information denying Johnsons' role with the Company, and concealed their

intent to amend the bylaws to provide breach of the Agreement as grounds to buyback Johnson's shares

79.    As a result of said breaches, Johnson has been damaged in an amount to be determined at trial, but in an amount no less the amount of Johnson's equity that Defendants unlawfully grabbed.

80.    By reason of the material breaches and fraudulent conduct by Ton-That and Schwartz, the Agreement should be rescinded as unenforceable, and Johnson should be relieved of any obligations and restrictive covenants under the Agreement, including but not limited to the Confidentiality Term and stock transfer.

### FOURTH CAUSE OF ACTION (Fraud, Constructive Fraud and Fraudulent Inducement of the Wind- Down/ Buyback Agreement)

81.    Johnson repeats and realleges all other paragraphs of this complaint as if fully set forth herein.

82.    In or around November 2018, Defendants made misrepresentations of material fact to Johnson, as well as omissions of materials facts concerning their then-present intentions not to abide by the terms of the Agreement.

83.    Defendants failed to disclose their then-present material intention to block Johnson's sales efforts at every juncture and restrain Johnson's ability to realize his Sales Commission.

84.    Defendants held themselves out as entering into the Agreement in the best interest of the Company, but upon information and belief, Defendants' intended for the Agreement to initiate their scheme to seize Johnson's equity for their own selfish and malevolent interests.

85.     Defendants did not disclose their then-present intention to buy Johnson's shares at a deflated purchase price.

86.     Defendants failed to disclose material fact that the purpose of the Confidentiality Term was to prevent Johnson from correcting Defendants' false public statements concealing Johnson's role with the Company, and if Johnson did speak out, Defendants' intent was to buyback Plaintiff's shares.

87.     Despite Defendants' promises and representations reflected in the Agreement, they had no intention of complying with such terms.

88.     Defendants acted with scienter in that they knew the misrepresentations were false, and they intended for the misrepresentations to mislead Johnson.

89.     The misrepresentations to Johnson were material, and Johnson justifiably relied upon those misrepresentations when entering into the Agreement.

90.     Johnson has standing to assert this cause of action, because the misrepresentations made by Defendants were made to Johnson both personally and in his capacity as a shareholder of the Company, with the expectation that Johnson would rely on those misrepresentations. When Johnson relied on those misrepresentations, he did so with the understanding he would be compensated for his lost equity with the ability to earn Sales Commissions. As a result of the reliance and Defendants malevolent conduct, Johnson suffered actual pecuniary injury in the loss of his equity as well as the inability to receive Sales Commissions.

91.     Johnson's reliance was justifiable, *inter alia*, because the representations were consistent with the implied covenant of good faith and fair dealing and the written terms of the Agreement.

92.    To the extent Johnson is not adequately compensated at law, Johnson is entitled to rescission of the Agreement which was procured by way of Defendants' fraud.

93.    Defendants knowingly and intentionally made false material misrepresentations, material omissions or otherwise perpetrated a fraudulent scheme by trick, device and deception calculated to injure Johnson, and which did cause Johnson pecuniary harm.

94.    Defendants each knew of their respective roles in the illegal and fraudulent activity at the time of the Agreement and until the Buyout Resolution, and each substantially assisted the fraudulent acts of each other and the Company.

95.    Defendants aided and abetted each other's fraud and therefore are jointly and severally liable for damages resulting from the fraud.

96.    Defendants each agreed to participate in fraudulent acts and at least one Defendant commits acts in furtherance of the common fraudulent scheme, and those overt acts caused damages to Johnson in Johnson's ability to exercise his right to earn Sales Commission. By reason of their concerted efforts to defraud Johnson, Defendants are jointly and severally liability for the damages caused to Johnson.

### FIFTH CAUSE OF ACTION (Equitable Accounting)

97.    Johnson repeats and realleges all other paragraphs of this complaint as if fully set forth herein.

98.    The Parties had a mutual and confidential relationship as part of their joint venture in facial recognition technology.

99.    Johnson's equity is subject to a purchase price at fair market value, and there is a dispute as to the purchase price and value of the Company's common stock.

Appx. 076

100.    Johnson lacks an adequate remedy at law.

101.    Johnson is entitled to an accounting.

**SIXTH CAUSE OF ACTION (Declaratory Relief voiding the Agreement)**

102.    Johnson is entitled to a declaration that the Agreement and subsequent Buyback Resolution are unenforceable because in both, Defendants valued Johnson's shares at an artificially delated purchase price.

103.    Johnson is entitled to declaratory relief placing the Parties in the same positions they were in before the Agreement executed, including but not limited to providing Johnson's with his previously held one-third equity in the Company.

**SEVENTH CAUSE OF ACTION (Aiding and Abetting Breach of Fiduciary Duty) (Against Lambert)**

104.    Johnson repeats and realleges all other paragraphs of this complaint as if fully set forth herein.

105.    Lambert knowingly conspired, induced, aided, abetted, participated in, substantially assisted and/or received the benefits of the breaches of fiduciary duty of good faith and fair dealing by Ton-That and Schwartz. Amongst other acts, Lambert substantially assisted the Defendants' breach, Lambert voted to unlawfully buyout Johnson's shares.

106.    [FACTS RE LAMBERT AIDING AND ABETTING]

107.    As a result of said breach, Johnson has been damaged in an amount to be determined at trial, but in an amount no less the amount of Johnson's equity that Defendants unlawfully grabbed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, awarding him:

Rescission of the Agreement procured by Defendants' fraudulent consideration so that Parties are restored to their positions prior to the execution of void and unenforceable Agreement, Buyback Resolution and Notice, and prior to Defendants' breach of fiduciary duties;

Declaratory judgement that Plaintiff owns 33.3% or one third of all non-diluted Clearview AI Inc. common stock to place Plaintiff in the position he was in before the execution of the fraudulent Agreement, executed in furtherance of Defendants' breach of fiduciary duties and fraudulent scheme to take over the Company and force Plaintiff out of the Company;

Compensatory damages in an amount to be determined at trial on, *inter alia,* causes of action for: breach of fiduciary duty (Count I), breach of contract (Count II), breach of the duty of good faith and fair dealing (Count III), fraud or constructive fraud (Count IV), and any other damages as appropriate;

An accounting requiring Defendants provide Plaintiff the opportunity to inspect the books and records of Clearview AI Inc. as well as of Defendants as individual shareholders and board members, and of companies owned and controlled by Defendants which received, directly or indirectly, monies emanating from Clearview AI Inc.;

Punitive damages in an amount to be determined at trial against all Defendants jointly and severally;

The costs and disbursements of this action, including attorney's fees; and

Such other and further relief as may be just and proper.

Appx. 078

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

## **VERIFICATION**

Charles C. Johnson, being duly sworn, deposes and says:

      I, Charles Johnson, am the Plaintiff in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  The same are true to my knowledge, except as to matters therein stated to be alleged upon information and belief and as to those matters, I believe them to be true.

Sworn to before me this
      ___day of _____,2022

                                      _____
                                        Charles C. Johnson

_____
                Notary Public

Appx. 079

# Exhibit K

## [intentionally left blank]

# Exhibit L

| Form 304 | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $750 | <br><br>**Application for<br>Registration of<br>a Foreign Limited Liability<br>Company** | **Filed in the Office of the<br>Secretary of State of Texas<br>Filing #: 804748261 09/28/2022<br>Document #: 1181890060002<br>Image Generated Electronically<br>for Web Filing** |

1. The entity is a foreign limited liability company. The name of the entity is :

**Metis Funding LLC**

2A. The name of the entity in its jurisdiction of formation does not contain the word "limited liability company" or "limited company"  (or an abbreviation thereof). The name of the entity with the word or abbreviation which it elects to add for use in Texas is:

2B. The entity name is not available in Texas. The assumed name under which the entity will qualify and transact business in Texas is:

3. Its federal employer identification number is:  **85347164**

☐Federal employer identification number information is not available at this time.

4. It is organized under the laws of:  **MISSOURI, USA**

and the date of its formation in that jurisdiction is:  **10/15/2020**

5. As of the date of filing, the undersigned certifies that the foreign limited liability company currently exists as a valid limited liability company under the laws of the jurisdiction of its formation.

6. The purpose or purposes of the limited liability company that it proposes to pursue in the transaction of business in Texas are set forth below. The entity also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is organized.

**Start-ups**

7. The date on which the foreign entity intends to transact business in Texas, or the date on which the foreign entity first transacted business in Texas is: **09/27/2022**

8.The principal office address of the limited liability company is:

**3720 College Park Blvd, Conroe, TX, USA 77384**

☐9A. The initial registered agent is an organization by the name of:

☑9B. The initial registered agent is an individual resident of the state whose name is:

**Charles    Johnson**

☑9C. The business address of the registered agent and the registered office address is:

**3720 College Park Blvd    Conroe  TX  77384**

### Consent of Registered Agent

☐ A. A copy of the consent of Registered Agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

10. The entity hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

11. The name and address of each governing person is:

| |
|---|
| NAME OF GOVERNING PERSON (Enter the name of either an individual or an organization, but not both:) |
| IF INDIVIDUAL |
| **Charles Johnson** |
| OR |
| IF ORGANIZATION |
| |
| ADDRESS OF GOVERNING PERSON : |
| **3720 College Park Blvd    Conroe  TX, USA  77384** |

### Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

### Effectiveness of Filing

☐ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **September 29, 2022**

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: **September 28, 2022**      **Charles Johnson**

Signature and title of authorized person on behalf of the foreign entity

**FILING OFFICE COPY**

# Exhibit M

12/22/24, 9:16 PM          Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F...

Case 4:24-cv-00988-P          Document 28          Filed 12/23/24          Page 88 of 132          PageID 369

# Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An FBI Counterintelligence Investigation

What do you do when your congressman is compromised by a foreign power?

OCT 25, 2022



♡ 4          💬 2          🔄                                              Sha



Not how you treat the flag, Dan!

A previous [post outlined foreign intelligence operations](#) running on U.S. soil throu history. We might then ask if any such foreign intelligence operations are running i the United States today and if so, which countries might be running those operatio

12/22/24, 9:16 PM    Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F…

Case 4:24-cv-00988-P    Document 28    Filed 12/23/24    Page 89 of 132    PageID 370

I submit to you that they are. In fact, quite a number of these intelligence operation are running here and that one of their beneficiaries may soon be chairman of the House Homeland Security committee. And if I had to bet, I suspect that my congressman Dan Crenshaw will get the gavel — if only because he, like McCarthy, compromised by foreign intelligence operating in the United States. Of course, McCarthy wouldn't be the first Speaker to be so compromised.

Thanks for reading Charles Johnson's Thoughts and Adventures! Subscribe for free to receive new posts and support my work.

| Type your email... | Subscribe |

Like Kevin McCarthy who uses cash from Chinese agent Peter Kuo to pay off his w with a no-show job at the Republican Party after his affair became public knowledg it has emerged that Crenshaw does much the same thing. "Rep. Dan Crenshaw's campaign has paid a small agency that employs his wife hundreds of thousands of dollars since 2020, according to Federal Election Commission (FEC) records review by the Daily Caller," goes the story, but it doesn't really address the larger question what PinkCilantro really is and who its real beneficiaries are. Let me spell it out fo you.

*Pink Cilantro is a Chabad-tied, Ukrainian-connected Israeli influence operation masquerading as a consulting firm. What such a firm has to do with Congressman Crensha Kinzinger is extremely disturbing.*

This is particularly interesting as Congressman Adam Kinzinger — one of the key Republican participants on the January 6th committee — and Congressman Dan

12/22/24, 9:16 PM          Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F...

Case 4:24-cv-00988-P          Document 28          Filed 12/23/24          Page 90 of 132          PageID 371

Crenshaw have both paid over $1m to this "consulting" firm connected to Crenshaw
wife Tara Blake.

The firm, Pink Cilantro, doesn't even have a website and only has two political clien
— Crenshaw and Adam Kinzinger. Baysa Benshushan told the Daily Caller that
"Kinzinger sought us out due to Crenshaw's impressive branding. Pink Cilantro
developed Crenshaw's brand and Kinzinger wanted an agency that could develop th
[sic] brand."

Totally normal stuff you guys. Why does Kinzinger need a "brand" person anyway?
Why — exactly — is Dan Crenshaw, who has no children, publishing a children's bo
on cancel culture? The merch, always the merch...

Naturally Pink Cilantro also received $60K in PPP Loans. Its proprietor, Baysa
Benshushan, has strong ties to Israeli intelligence. She's even married to an Israeli
defense officer who purportedly rescued Jews during a Texas hurricane.

Chabad even wrote it up.

> With Basya serving as a coordinator—fielding phone calls and using social medi
> find people in need—Tomer and Mishiko, both former soldiers in the Israeli
> Defense Forces, drove to Meyerland, an area hit hard by the storm and the cente
> Houston's Jewish community. They continued searching for and rescuing people
> until three in the morning. The next day, they set out again at 8 a.m.

OK.

It's extremely difficult to find much of anything about Tomer online. According to
Basya her husband is a "contractor." He is rarely in pictures posted by his family
members.

Benshushan's parents — Victor and Devorah Grinshtein — are heavily involved wit
Chabad Lubavitch of Texas. They've sponsored dinners. This sort of thing doesn't

12/22/24, 9:16 PM          Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F...

Case 4:24-cv-00988-P     Document 28     Filed 12/23/24     Page 91 of 132     PageID 372

come cheap.

Returning to Basya — you think there's anything unusual about her? Well, in the first 8 minutes of this podcast, "The Patient Hustler" we learn that her father came from Ukraine, to Ithaca, NY and then to Houston, Texas. Her parents are Jewish and both went to Ivy League schools; they were "part of the computer revolution" servicing Enron, Exxon, Shell by getting personal computers for each employee (sounds like PROMIS stuff).

According to Benshushan, her father Victor was a mathematician that worked on I for these companies—all of which eventually ended up with the Chinese and Russian but we can't just say that was his fault. Right? Right? Their company was purchased General Electric, and then they moved to Tzfat, Israel—one of the four holy cities for Jews according to Chabad — in the mid-1990s and they became Orthodox Jews. As does. She spent her formative years living in Israel before marrying an Israeli.

12/22/24, 9:16 PM — Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F...

Case 4:24-cv-00988-P    Document 28    Filed 12/23/24    Page 92 of 132    PageID 373

 



## Victor Grinshtein

President and co-founder

"The twenty-first century business person doesn't have time to deal with IT. We make information technology as simple as flipping a switch."

Victor Grinshtein loves when things work the way they are supposed to. He is passionate about helping business owners optimize their operations with world class information technology.

- Co-founded Xvand Technology Corporation in 2000.
- In 1982, he founded Microcomputer Power, Inc., which became one of the leading system integrators for Fortune 500 companies and government agencies in Texas. By 1995, Microcomputer Power had $80 million in annual revenue.
- In May 1995, he merged the company with AmeriData/GE Capital Information Technology (GE CITS) to improve customer service coverage nationally and internationally.
- He stayed with GE CITS until June of 1998. Using General Electric's resources, the south Texas region's annual revenue grew to $180 million and became the most profitable.

Does this man and his daughter pose a security risk for Congressman Dan Crenshaw?

Hm, you see something strange about this? What was that about Crenshaw being owned by the Ukrainian Jewish mafia? How dare you question his patriotism while calls for us to be in endless wars!

The numbers paint the picture as they always do. Crenshaw's donors — if they can called that — are really victims of an elaborate fraud — a "patient hustle," to borrov phrase from Benshushan. He has consistently and repeatedly targeted the elderly. (I top industry is "retired," according to Open Secrets.) Just how many of these retiree

12/22/24, 9:16 PM          Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F…

Case 4:24-cv-00988-P     Document 28     Filed 12/23/24     Page 93 of 132     PageID 374

were exploited it's hard to say. Could Benshushan be running an Israeli op using retirees' money and Crenshaw's brand?

Shane Goldmacher of the *New York Times*, has written a very compelling analysis "<u>F</u> <u>Deceptive Campaign Fund-Raising Ensnares Older People</u>."

> Exploiting the diminishing capacity of older people for cash extends far beyond politics. There is an <u>entire initiative</u> at the Justice Department devoted to elder abuse, and the F.B.I.'s Internet Crime Complaint Center reported nearly <u>$1 billio</u> <u>in losses for those 60 and older</u> in 2020.

What did Crenshaw spend the money on? Well, <u>he spent $144,000 on an epic lagoor</u> <u>party with drones and a Blink 182 tribute band</u>. That epic lagoon was owned by nor other than Israeli entrepreneur Uri Man.

12/22/24, 9:16 PM          Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F...

Case 4:24-cv-00988-P     Document 28     Filed 12/23/24     Page 94 of 132     PageID 375







**49 likes**

**uriman** Signed a deal with Steve Wynn today in Las Vegas. Building the largest Crystal Lagoon in the USA 🇺🇸

View 1 comment

March 17, 2017



uriman

12/22/24, 9:16 PM          Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F...

Case 4:24-cv-00988-P     Document 28     Filed 12/23/24     Page 95 of 132     PageID 376



Uri Man with accused Chinese agent Steve Wynn.

Man brags on his Instagram about his ties with the Coast Guard, a group which happens to be promoted by the Homeland security committee.

While Crenshaw decries fellow GOPers as "performance artists" he puts on quite a show, a show which oozes high level production values. Totally normal for politicia

It's all produced by Benshusan (and Benny Johnson). You can read her assessment o the op ad work here. She calls it the "Crenshaw case study." (For whatever reason th link isn't working. Here it is. https://drive.google.com/file/d/1x6uAYCaVktc_43SFCoRN0ojWK8Z8tRu1/view )

What does Likud get for its money? It gets Dan Crenshaw threatening young men f opposing Israeli treatment of the U.S.S. Liberty and invective targeting anyone who supports Afghanistan withdrawal as an "idiot" or "stupid."

We might even ask if the Crenshaw-Israeli op goes back to the fake fight between h and Pete Davidson of NBC's Saturday Night Live. Journalist Amee Vanderpool prol the ridiculousness of that made for TV encounter.

Say, isn't NBC where Israeli ~~spy~~ nonofficial cover Jake Novak worked? Wasn't he implicated in the Matt Gaetz espionage matter? Oh. He was, wasn't he?

12/22/24, 9:16 PM          Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F...

Case 4:24-cv-00988-P          Document 28          Filed 12/23/24          Page 96 of 132          PageID 377



Fake and creepy

Whenever insider trading arises the question becomes is this how the assets are compensated? That certainly seems what Senator Richard Burr was up to. Burr, who retiring as chairman of the Senate intelligence committee, was under investigation insider trading. The DOJ closed that investigation but apparently the matter is still intense enough for Congresswoman Abigail Spanberger to request to Congress that be banned—only to be rejected by the congressional leadership.

---

*Spanberger is a CIA operative-turned-congresswoman. She clearly knows that insider tradi how operatives of foreign countries are rewarded for their services.*

---

Having met Dan Crenshaw, this seems to me the most credible explanation. He not only beat the market but he was one of the top performers in all of Congress. How he do it? And may we, his constituents, join his fund? (Mast is interesting there too Given he's basically the Republican in West Palm Beach, he destroyed the market. Weird right?)

12/22/24, 9:16 PM          Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F…

Case 4:24-cv-00988-P          Document 28          Filed 12/23/24          Page 97 of 132          PageID 378



12/22/24, 9:16 PM      Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F…

Case 4:24-cv-00988-P     Document 28     Filed 12/23/24     Page 98 of 132     PageID 379



All of this happens because we've allowed Navy SEALs to become super Americans
the popular consciousness.

You can't ask any questions of their behavior lest you be seen as unpatriotic. In fact
one of my friends asked Crenshaw about some of the allegations that he wasn't as
impressive as he lets people believe. Rather than take the question as an earnest
expression, Crenshaw started yelling and screaming at my friend. This isn't normal
behavior, to put it mildly. You can see the same haughty and arrogant behavior on
display when Charlie Kirk and Dan Crenshaw debated America's involvement in
Afghanistan. Why can't we have clarity on what we do abroad Dan?

But we *should* be asking questions about all of our elected officials and soldiers. We
should be asking what the costs are of what we ask them to do. We shouldn't reward
them with committee chairmanships.

Crenshaw said that anyone who supported the "over the horizon" plan that Preside
Biden favored didn't know what they were talking about. "They love the slogan 'no

12/22/24, 9:16 PM        Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F…

Case 4:24-cv-00988-P        Document 28        Filed 12/23/24        Page 99 of 132        PageID 380

more endless wars,'" [Crenshaw said at the time](#). "We made foreign policy based on emotional slogan, and it has made America less safe, not more safe."

But Biden's policy has proven spectacularly effective and culminated in the death of Qaeda's architect — from a drone strike.

Investigative journalist Matt Cole has done a lot of good work on how the Navy SEALs were compromised. Navy SEALs I've known talk often about how often the Chinese and the Israelis try to get them to betray their country, sometimes with great effect. Cole's book, *Code Over Country: The Tragedy and Corruption of SEAL Team Six,* details how it happens.

This perhaps to be expected when you declare yourself "Super American" or when you pretend to be a hero when really all you did was get yourself blown up.

But hey, it's a hustle—and a living.

Until it's exposed.



We deserve better.

12/22/24, 9:16 PM                    Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F…

Case 4:24-cv-00988-P     Document 28     Filed 12/23/24     Page 100 of 132     PageID 381



Thanks for reading Charles Johnson's Thoughts and Adventures! Subscribe for free to receive new posts and support my work.

| Type your email… | Subscribe |

 **4 Likes**

## Discussion about this post

12/22/24, 9:16 PM          Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An F…

Case 4:24-cv-00988-P          Document 28          Filed 12/23/24          Page 101 of 132          PageID 382

Comments          Restacks

Write a comment…

**John McNally**  Oct 25, 2022

Bang on the money, but I suspect only scratching the surface.

♡ LIKE (1)          💬 REPLY          ⬆ SHARE

**1 reply**

**1 more comment…**

© 2024 Charles Johnson · <u>Privacy</u> · <u>Terms</u> · <u>Collection notice</u>
<u>Substack</u> is the home for great culture

# Exhibit N

# Go Ahead and Quit Twitter: You'll Live Without Your Addiction — And Maybe Be Happier

Why subscriptions and not ads are a better way to live your life



**CHARLES JOHNSON**
NOV 05, 2022

 1        



"Breakfast Table Political Argument," 1948

Appx. 100

Thanks for reading Charles Johnson's Thoughts
and Adventures! Subscribe for free to receive
new posts and support my work.

| Type your email... | Subscribe |

Dear Journalists,

Allow me to be the first to tell you that no one cares about Twitter nearly as much as
you do.

You have an addiction and this is an intervention if you want it to be. I love you and
want you to cover the real news.

If you need help, I can assign you something. Like say, the coming cobalt war in the
Democratic Republic of Congo — a war that seems inevitable now we've banned M
and his Chinese allies from buying cobalt from miners who use child labor?

You won't do that, of course. No, you want to talk about Twitter. OK then.

Many of you have reached out to me about Twitter now that Elon Musk and his
foreign backers have purchased it. You've texted me. You've called me. You hope th
I'll complain about Musk and how I'm still banned or something. I'm disappointing
you because I don't seem to care. Well... what if I told you that I really don't?

I get it. I make good copy. It's why you used the text messages I leaked between mys
and that weird aide-de-camp Jared Birchall. (Shades of Howard Hughes, eh? What's
with the Mormon connection? "Choose the right" Jared!)

Who do you think leaked those texts to the *Washington Post* and *Wall Street Journal*?
Hmmm? Could it have been Charles Johnson that helped the FBI on the whole Mus
giving the shady Russian poker player $5.7B with no strings attached? I don't know
Seems like a mystery...

Just doing my part! No need to thank me for posting up against the tech people tied into foreign intelligence and the Chinese mob.

Did you know that there are foreign spies at Twitter? And that those foreign spies probably — right now in fact — reading your direct messages?

Do you feel safer knowing that Twitter is purportedly relying on coders from the very Chinese-backed Tesla — a company under investigation for killing people with its self-driving?

****

But hey, you've reached out and so here I am. You've got what you always sought — attention. Better grab a hold of it while you still have it! It's fleeting, as seemingly everyone's attention these days is.

Say, you guys deified Steve Jobs at one point too. Didn't he have that whole saying about how [you should try to shave time off the booting up times for the Apple product](#)? He reasoned (supposedly) that, at scale, when you make it easier for people boot up their computers, you collectively give everyone more time on this lovely planet. Now what should we think of people who systematically waste everyone's time? Are they killing people? Hmm...

As you know I was the first person banned for life from Twitter. I even sued over it and I lost (sadly).

Of course it was wrong that they banned me, but honestly, but I'm very happy that did. What's that old saw from Churchill? About a blessing in disguise being very well disguised? Well, thank God for working in mysterious ways.

Being banned from Twitter is the best thing that ever happened to me. In fact my cancellation, such as it was, gave me much needed time to reflect, to think, and to

build the sort of empathy that so many in our society, especially our faux tech elite, seem to lack.

I'm a work in progress — we all are — but the first step to fixing the problem is admitting you have a problem. So let's admit it together.

Many of you are addicts. You know it and I know it.

You make excuses for why you spend so much time on the platform. "It's helping m career!" you say. "I only use it for news!" you promise. All addicts lie to themselves a you are no different.

You are wasting your life on Twitter. You are giving up your focus. You are giving u your happiness. You are allowing yourself to be programmed by someone else. Mus being stupid, even tells you what he's going to do to you.

Elon Musk clearly didn't want to pay the full $44 billion his consortium spent on Twitter so there's a case to be made that his Twitter addiction wound up costing hi billions of dollars. What has it cost you? Precious time with your family? Blowing a deadline for work? Your piece of mind? The loss of a friendship? Wasting your elite private school education so that you can tweet about what teenagers are doing on TikTok?

Maybe you are better off without it!



When was the last time you read a book?

Allowing others to affect you emotionally is, I suppose, what the great American experiment is all about.

In a way, the huckster and the hustler are as embedded in this country as the con m I wouldn't have it any other way but there are many, especially in Musk's (and my) adopted Texas, that are all hat and no cattle. Yes, yes, he's gotten us into space. So what? This is America. We sell the dream, baby.

Of course that's really what advertising is all about — selling the ~~scheme~~ dream. It' my contention that clickbait is ruining America and it's why I sued the Huffington Post (now owned by BuzzFeed). My case is pending before the Supreme Court. If it works, it'll make it way easier to sue fake media properties. It may just change the economics of online advertising. No need to thank me. Just doing my part. Some of helped bankrupt Gawker and we were just getting started!

Anyway, journalist Jacob Silverman makes a very compelling point about Twitter or the podcast "[Tech Won't Save Us](#)." I highly recommend Paris Marx's work, for what worth. It's pretty compelling stuff and I dare not ignore it.

Silverman argues that Twitter has helped Saudi intelligence hunt down and disappe

Saudi dissidents. Saudi Arabia remains a major investor in Twitter.

A Saudi spy told me that Musk talked to him about taking Tesla private. I reported

of course.




The Associated Press
@AP

Saudi Arabia has imprisoned one of its royals for 30 years
for phone conversations he had as a student in Boston,
court documents obtained by @AP show.

The FBI says Saudi Arabia is spying on and striking out at
Saudis on U.S. soil.

apnews.com
Saudis in US targeted as kingdom cracks down on dissent
WASHINGTON (AP) — A graduate student at Boston's Northeastern University ,
Prince Abdullah bin Faisal al Saud seldom mentioned he was a member of ...

2:00 PM · Nov 2, 2022

240 Likes    195 Retweets

Being anti-Musk has probably cost me millions of dollars but hey, [millions for defe]()
[but not one cent for tribute](). I was told by an investor that he loved my work but tha
he couldn't back me for being anti-Elon. (But I'm not anti-Elon; I'm pro-American.)

I don't really think that the world should work the way that Twitter advertises.
Advertising leads to addiction.



All for the likes, baby

And ultimately to exploitation.



Not everyone should be accessible all the time, not every thought should be aired, n
every billionaire wish should be fulfilled...

Twitter is a battlefield, not a business. And maybe, just maybe, you're not a journali
but a narcissist.

Look at yourselves deep in the mirror and see what they do on Twitter.

Watch how your peers behave on Tuesday and think back to how journalists behave before 2008 on Election Day.

We deserve better than your instant takes. You deserve better than our criticisms of your work. We both deserve a better public conversation.

Thanks for reading Charles Johnson's Thoughts and Adventures! Subscribe for free to receive new posts and support my work.

Type your email...                    Subscribe

 1 Like

## Discussion about this post

Comments     Restacks

Write a comment...

© 2024 Charles Johnson · Privacy · Terms · Collection notice

Substack is the home for great culture

# Exhibit O

# MISSOURI ETHICS COMMISSION
## CONTRIBUTIONS RECEIVED - SUPPLEMENTAL

OFFICE USE ONLY

| NAME OF COMMITTEE | DATE |
|---|---|
| Unsicker For Missouri | 4/14/2024 |

**INSTRUCTIONS**

PURPOSE: The purpose of the Contributions Received supplement is to provide a printed outline for attaching additional pages to Form CD1 (Contributions Received). This form should be used as additional space for reporting persons contributing more than $100 and for committee contributions. This form may be reproduced as needed.

Total all itemized contributions at the bottom of the page and carry to item 7 (Subtotal: Itemized Contributions From Any Attached Pages) on Form CD-1.

If further information is needed concerning reporting itemized expenditures, see Form CD-1 Instructions.

| A. ITEMIZED CONTRIBUTIONS RECEIVED FROM COMMITTEES REGARDLESS OF THE AMOUNT, OR FROM PERSONS GIVING MORE THAN $100 TO A COMMITTEE.<br>3. NAME, ADDRESS AND OCCUPATION (LIST COMMITTEES FIRST) | 4. DATE RECEIVED<br>AGGREGATE TO DATE | 5. AMOUNT RECEIVED<br>(CHECK IF MONETARY OR IN-KIND) |
|---|---|---|
| NAME:<br>ADDRESS: Beth Mufson<br>CITY / STATE: 205 Brookwood Avenue<br>Easton MD 21601<br>EMPLOYER: Self employed -- Puzzle Maker<br>☐ COMMITTEE: | 2/3/2024<br><br>$ 30.00 | $ 30.00<br><br>☑ MONETARY<br>☐ IN-KIND |
| NAME:<br>ADDRESS: Raj Rana<br>CITY / STATE: 1310 Alma Ave Apt W313<br>Walnut Creek CA 94596<br>EMPLOYER: Chevron -- IT Engineer<br>☐ COMMITTEE: | 2/13/2024<br><br>$ 100.00 | $ 100.00<br><br>☑ MONETARY<br>☐ IN-KIND |
| NAME:<br>ADDRESS: Matthew Russell<br>CITY / STATE: 3665 Kaweonui Rd<br>Princeville HI 96722<br>EMPLOYER: Self -- Maintenance<br>☐ COMMITTEE: | 2/26/2024<br><br>$ 100.00 | $ 100.00<br><br>☑ MONETARY<br>☐ IN-KIND |
| NAME:<br>ADDRESS: Justin White<br>CITY / STATE: 112004 Faber Lane<br>Chaska MN 55318<br>EMPLOYER: Employed?soon! Hehe -- B2B Sales<br>☐ COMMITTEE: | 3/8/2024<br><br>$ 1,000.00 | $ 250.00<br><br>☑ MONETARY<br>☐ IN-KIND |
| NAME:<br>ADDRESS: Elbert Williams<br>CITY / STATE: 304 W Old Watson Rd<br>Saint Louis MO 63119<br>EMPLOYER: Retired -- Retired<br>☐ COMMITTEE: | 3/14/2024<br><br>$ 25.00 | $ 25.00<br><br>☑ MONETARY<br>☐ IN-KIND |
| NAME:<br>ADDRESS: Patricia Norwood<br>CITY / STATE: 31 Encino Ave<br>San Antonio TX 78209<br>EMPLOYER: Self -- Physician<br>☐ COMMITTEE: | 3/18/2024<br><br>$ 25.00 | $ 25.00<br><br>☑ MONETARY<br>☐ IN-KIND |
| NAME:<br>ADDRESS: Dana Smith<br>CITY / STATE: 119 Willow Lake Drive<br>Fairhope AL 36532<br>EMPLOYER: Self -- Sales<br>☐ COMMITTEE: | 3/26/2024<br><br>$ 50.00 | $ 50.00<br><br>☑ MONETARY<br>☐ IN-KIND |
| NAME:<br>ADDRESS: Charles Johnson<br>CITY / STATE: US Passport<br>Conroe TX 77384<br>EMPLOYER: Self -- Self<br>☐ COMMITTEE: | 1/11/2024<br><br>$ 264.12 | $ 264.12<br><br>☐ MONETARY<br>☑ IN-KIND |

TOTAL: ITEMIZED CONTRIBUTIONS                     --

(CARRY TO ITEM 7 "SUBTOTAL: ITEMIZED CONTRIBUTIONS FROM ANY ATTACHED PAGES" ON FORM CD-1)

# Exhibit P

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHARLES C. JOHNSON,
                    Plaintiff,

        v.                                              No: 1:23-cv-01485 (MSN/WEF)

HAL LAMBERT,
POINT BRIDGE CAPITAL,
                    Defendants.

## <u>ORDER</u>

Plaintiff Charles C. Johnson filed a complaint *pro se* against Defendants Hal Lambert and Point Bridge Capital alleging breach of contract and fraudulent misrepresentation (Count I) and unjust enrichment (Count II). Both counts allegedly relate to the "launch" of Umbra Lab Inc. ("Umbra Lab"). Plaintiff alleges he helped raise funds for Defendants to invest in Umbra Lab from his network of investors and was subsequently barred from working with Umbra Lab. Plaintiff further alleges to have suffered public embarrassment with his investment network due to Defendants' conduct.

Before the Court is Defendants' Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, Failure to State a Claim, and Failure to Timely Serve the Complaint,[1] Or, in the Alternative, Motion to Transfer Venue. ECF 3 ("Motion"). The motion has been fully briefed and the Court finds that oral argument will not materially aid the decisional process. Upon

---

[1] Fed. R. Civ. P. 4(m) stipulates that "[i]f a defendant is not served within 90 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against the defendant or order that service be made within a specified time." Plaintiff filed his complaint on October 31, 2023. Defendant Lambert was served with a Summons on January 31, 2024, more than ninety days after the complaint was filed. Defendant Point Bridge Capital was also not served, and no summons directed to Point Bridge Capital has been requested. Plaintiff does not dispute this in his opposition brief. Furthermore, given that Plaintiff has not shown good cause for untimely service or failure to serve Defendant Point Bridge Capital, this also serves as a valid basis for dismissal.

consideration of the pleadings and for the reasons set forth below, the Court will **GRANT** the

Motion.

Defendants argue that the Court lacks personal jurisdiction over them, that venue is not

proper in this district, that Plaintiff failed to state a claim upon which relief can be granted, and

that Plaintiff failed to timely serve the complaint. In the alternative, Defendants seek transfer of

venue. The Court finds that the motion can be resolved on personal jurisdiction grounds, and

therefore it need not address the other issues.[2]

Under Fed. R. Civ. 12(b)(2), "the Court may dismiss a case for lack of personal

jurisdiction." *Selke v. Germanwings GmbH*, 261 F. Supp. 3d 645, 651 (E.D. Va. 2017). "When a

court rules on personal jurisdiction without an evidentiary hearing, the plaintiff must make a *prima*

*facie* showing of a sufficient jurisdictional basis to survive the challenge." *Id*. "In such

circumstances, a court must view all the relevant allegations in the light most favorable to the

plaintiff and draw all reasonable inferences for the existence of jurisdiction." *Id*. at 651-52.

---

[2] To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Nevertheless, a plaintiff must make more than bald accusations or mere speculation; "naked assertions devoid of further factual enhancement," and "a formulaic recitation of the elements of a cause of action" are insufficient under Rule 12(b)(6). *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). When considering a motion under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc*., 637 F.3d 435, 440 (4th Cir. 2011). A complaint by a *pro se* plaintiff should be liberally construed. *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). But the Court's "task is not to discern the unexpressed intent of the plaintiff." *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006). In the body of his complaint, Plaintiff fails to state any facts that point to the existence of a valid contract or agreement between Defendants and him. Furthermore, even though Plaintiff alleges that he began working with Defendants on November 23, 2020, ECF 1 ("Compl.") ¶ 9, he does not allege that this action was undertaken pursuant to a contract with either Defendant. In his "First Claim for Relief," Plaintiff does allege that "Defendants entered into an express written and oral contract with Plaintiff whereby access to his network of investors was predicated on his participation in the company's operations." *Id*. ¶ 25. However, Plaintiff fails to allege any of the essential elements of an oral or written contract such as what the material terms were, what the purpose of the agreement was, or the required performance expected under the agreement. Plaintiff also does not attach said contract to his complaint. As such, Plaintiff also fails to point to any specific provision of the contract or agreement that was breached. In light of these pleading failures, the Court notes that in its current form, Plaintiff's complaint fails to adequately state a claim upon which relief can be granted. *See* Fed. R. Civ. 12(b)(6).

Defendants argue that the Court lacks personal jurisdiction over them because they "do not transact any business or perform any services in Virginia and do not contract to supply any service or things in Virginia." ECF 4 ("Def. Mem.") at 7. Defendants further argue that they "do not own, use, or possess real property in Virginia and have no employees or any other presence in Virginia . . . [and] have not purposefully availed themselves in any way of the laws of Virginia." *Id*. Lastly, Defendants argue that "all the dealings between Plaintiff and Defendants with respect to the matters addressed in the Complaint took place in Texas during a time when all of the parties were residents of Texas."[3] *Id*. at 8.

In response, Plaintiff argues that Defendant Lambert "entered into [the] contract explicitly because of Plaintiff's ability to generate business in the Eastern District of Virginia." Opp. at 3. Plaintiff further alleges that following an oral contract between him and Defendant Lambert, he "immediately began meeting individuals within the Eastern District of Virginia to generate business," resulting in Defendants "benefiting from [Plaintiff's] actions within the Eastern District of Virginia," and he was "often joined by Defendant Lambert in person, during which the events referenced in the Complaint occurred." *Id*. Defendants have the better argument.

An analysis of personal jurisdiction is a two-step process that consists of both a statutory and constitutional component. *See Benton v. Home Max Realty, Inc*., 2024 WL 346490, at *3 (E.D. Va. Jan. 30, 2024). Because Defendants are not residents of Virginia, this Court "may only exercise jurisdiction if Plaintiff can establish (1) that Defendants' contacts with Virginia satisfy the Virginia long-arm statute, Va. Code Ann. § 8.01-328.1, and (2) that the statutory assertion of jurisdiction is consistent with the Due Process Clause of the Constitution." *Id*. Under the Virginia's long arm

---

[3] This fact is supported by Plaintiff's own assertion that "[o]n or about November 21, 2021, [he] signed a lease for his tenancy in a townhouse located [in] . . . Reston, Virginia." ECF 6 ("Opp.") at 2. This is approximately a year after "Plaintiff began working with Lambert and Point Bridge Capital [] to launch Umbra Lab, Inc" on November 23, 2020. Compl. ¶ 9.

statute, this Court may exercise personal jurisdiction over a defendant "when the cause of action arises from defendant transacting any business in this Commonwealth or contracting to supply services or things in this Commonwealth." *Netstyle Corp. v. Pie Headwear, LLC*, 2023 WL 9376775, at *2 (E.D. Va. Dec. 13, 2023) (cleaned up). Furthermore, this Court may also exercise personal jurisdiction over defendants, "who act[] directly or by an agent, as to a cause of action arising from . . . transacting any business in this Commonwealth or . . .causing tortious injury by an act or omission in this Commonwealth . . ." *Newbauer v. Jackson Hewitt Tax Serv. Inc*., 2019 WL 1398172, at *6 (E.D. Va. Mar. 28, 2019) (cleaned up). Aside from Plaintiff's allegation that he is "domiciled in Fairfax County," Compl. ¶ 1, his complaint fails to identify any other act or omission on the part of either Defendant that took place in Virginia. Therefore, Virginia's long-arm statute does not reach Defendants' alleged conduct underlying Plaintiff's claims.

"To satisfy the constitutional due process requirement [of personal jurisdiction], a defendant must have sufficient 'minimum contacts' with the forum such that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Consulting Engineers Corp. v. Geometric Ltd*., 561 F.3d 273, 277 (4th Cir. 2009) (quoting *Int'l Shoe Co. v. State of Wash*., 326 U.S. 310, 316 (1945)). "The minimum contacts test requires the plaintiff to show that the defendant 'purposefully directed his activities at the residents of the forum' and that the plaintiff's cause of action 'arises out of those activities.'" *Id*. (quoting *Burger King Corp. v. Rudzewicz*., 471 U.S. 462, 472 (1985)). "This test is designed to ensure that the defendant is not haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts," and it "protects a defendant from having to defend himself in a forum where he should not have anticipated being sued." *Id*.

The Fourth Circuit "has synthesized the due process requirements for asserting specific personal jurisdiction [into] a three part test."[4] *Id.* at 278. The Court considers "(1) the extent to which the defendant[s] purposefully availed [themselves] of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)). "If, and only if . . . the plaintiff has satisfied th[e] first prong of the test for specific jurisdiction need [the court] move on to a consideration of prongs two and three." *Consulting Engineers Corp.*, 561 F.3d at 278.

As relevant here, it is well-established that, under the first prong of the test, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant[s]' conduct connects [them] to the forum in a meaningful way." *McNeil v. Biaggi Prods., LLC*, 2017 WL 2625069, at *7 (E.D. Va. June 16, 2017) (quoting *Walden v. Fiore*, 571 U.S. 277, 290 (2014)). In other words, "[a]lthough the place that the plaintiff feels the alleged injury is plainly relevant to the inquiry, it must ultimately be accompanied by the defendant[s]' own contacts with the state if jurisdiction over the defendant[s] is to be upheld." *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 143 (4th Cir. 2020) (cleaned up). "[T]he purposeful availment prong of the personal jurisdiction analysis can be met if [] defendant[s]' intentional conduct in the [forum] state was calculated to cause injury to the plaintiff in the forum state," but "mere injury to a forum resident [is] not a sufficient connection to the forum."[5] *Foster Made, LLC v. Foster*, 2018

---

[4] "A court may exercise general or specific personal jurisdiction." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016). Plaintiff does not allege that this court has general personal jurisdiction over the Defendants.
[5] Plaintiff alleges to be a citizen of Reston, Virginia domiciled in Fairfax County, Virginia. Compl. ¶ 1.

WL 4693810, at *3 n.6 (E.D. Va. Sept. 28, 2018); *Gillison v. Lead Express, Inc*., 2017 WL 1197821, at *14 (E.D. Va. Mar. 30, 2017).

Plaintiff introduces in his opposition brief the fact that "Defendants, although domiciled in Texas and Delaware, conduct business in the Eastern District of Virginia through their direct, private investments in satellite technology which is then sold to the Department of Defense and other agencies." Opp. at 3. Plaintiff, however, "may not introduce new allegations or new facts in an opposition to a defendant's motion to dismiss." *Hooker v. Disbrow*, 2017 WL 1377696, at *4 (E.D. Va. Apr. 13, 2017). Nevertheless, the Court notes that in his complaint, Plaintiff alleges to be the nexus between Defendants and the Department of Defense and other federal agencies "in order [for Defendants] to obtain lucrative contacts." Compl. ¶ 10. Moreover, "the plaintiff cannot be the only link between the defendant[s] and the forum. Rather, it is the defendant[s]' conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over [them]." *Walden*, 571 U.S. at 285. Plaintiff's vague allegation is insufficient to establish personal jurisdiction given that his "showing of personal jurisdiction must be based on specific facts set forth in the record." *Edwards v. Schwartz*, 378 F. Supp. 3d 468, 493 (W.D. Va. 2019).

For these reasons, this Court lacks personal jurisdiction over the non-resident Defendants. Accordingly, Defendants' Motion to Dismiss (ECF 3) is **GRANTED**, and it is hereby

**ORDERED** that this civil action is **DISMISSED WITHOUT PREJUDICE.**[6]

The Clerk is directed to forward copies of this Order to counsel of record and plaintiff *pro se* and close this civil action.

|  | /s/ |
|---|---|
| Alexandria, Virginia | Hon. Michael S. Nachmanoff |
| April 2, 2024 | United States District Judge |

---

[6] Because the Court has dismissed the complaint, it will not consider Defendants' request to transfer venue.

# Exhibit Q

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHARLES C. JOHNSON
            *Plaintiff,*

            v.                                          No. 1:24-cv-1124-MSN-IDD

HAL LAMBERT and POINT BRIDGE
CAPITAL,
            *Defendants.*

**MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendants' Unopposed Motion to Dismiss

Plaintiff's Complaint (ECF 5). This is the second time this case has been brought before this Court.

In the first case, Plaintiff Charles C. Johnson filed a *pro se* complaint against Defendants Hal

Lambert and Point Bridge Capital alleging breach of contract and fraudulent misrepresentation

(Count I) and unjust enrichment (Count II) relating to the "launch" of Umbra Lab Inc. ("Umbra

Lab"). *Johnson v. Lambert, et al.*, Case No. 1:23-cv-01485-MSN-WEF (the "2023 Case"). This

Court granted Defendants' Motion to Dismiss for lack of personal jurisdiction over the non-

resident Defendants. *See* 2023 Case, Dkt. 8 (Order, E.D. Va. April 2, 2024) ("2023 Order"). The

present Complaint (ECF 1) contains the same core allegations against the same Defendants.

Plaintiff alleges new facts which purport to bolster his personal jurisdiction argument, but these

additional facts are materially similar to those already rejected by this Court. Plaintiff does not get

a second bite at the apple. Because Plaintiff is collaterally estopped from re-litigating the issue of

personal jurisdiction in this Court, this Court once again grants Defendants' Motion to Dismiss.

## I.      BACKGROUND

### A.      The 2023 Case

In October 2023, Plaintiff filed a complaint *pro se* against Defendants Hal Lambert and Point Bridge Capital. *See* 2023 Case, ECF 1 (the "2023 Compl."). Plaintiff alleged that he worked with Defendants to launch Umbra Lab, and then used his network of investors to help Defendants raise funds for the project. *See* 2023 Compl. at ¶¶ 8-10. Plaintiff claims that Defendants subsequently barred him from working with Umbra Lab, prompting his suit for breach of contract and fraudulent misrepresentation (Count I) and unjust enrichment (Count II). *Id.* at ¶¶ 24-30. Defendants moved to dismiss Plaintiff's complaint on the grounds that "Defendants, who both are Texas residents and citizens, have no contacts with the Commonwealth of Virginia that would allow this court to exercise personal jurisdiction over them and, further, all of the alleged acts giving rise to the Plaintiff's claims took place in Texas." 2023 Case, ECF 3 at 2.

This Court agreed with Defendants and dismissed the case for lack of personal jurisdiction. *See* 2023 Order at 2. The Court undertook the required two-step personal jurisdiction analysis. *Id.* at 3. First, the Court found that Virginia's long-arm statute does not reach Defendants' alleged conduct because Plaintiff's "complaint fails to identify any … act or omission on the part of either Defendant that took place in Virginia." *Id.* Second, the Court analyzed the constitutional due process requirement of personal jurisdiction and found that Plaintiff failed to establish that "defendant[s]' conduct connects [them] to the forum in a meaningful way." *Id.* at 5 (quoting *McNeil v. Biaggi Prods., LLC*, 2017 WL 2625069, at *7 (E.D. Va. June 16, 2017)). The Court found that Plaintiff could "not be the only link between the defendant[s] and the forum. Rather it is the defendant[s]' conduct that must form the necessary connection with the forum State that is

Appx. 121

the basis for its jurisdiction over [them]." *Id.* at 6 (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). Accordingly, this Court dismissed the action without prejudice. *Id.*

**B.     The 2024 Case**

Curiously, Plaintiff declined to seek leave to amend to the complaint in the same matter,[1] and instead filed a <u>new</u> complaint in June 2024, alleging the same material facts and claims. *Johnson v. Lambert, et al.*, Case No. 1:23-cv-01124-MSN-IDD, ECF 1 (the "2024 Compl."). Plaintiff alleged several new facts about activities that purportedly took place in Virginia in an effort to establish personal jurisdiction. For example, Plaintiff asserted:

- Johnson "from his home and office in Reston, Virginia . . . consults to U.S. Federal Government agencies located, *inter alia*, in Alexandria, Arlington, Chantilly, Manassas, and McLean, Virginia." 2024 Compl. at ¶ 8.

- Point Bridge Capital is "a Texas-based company that provides investments to U.S. Federal Government agencies located *inter alia*, in Alexandria, Arlington, Chantilly, Manassas, and McLean, Virginia." 2024 Compl. at ¶ 9.

- "Between 2016 and 2023, Lambert [CEO of Point Bridge] made numerous trips to Virginia to conduct the investment business of Point Bridge Capital, including trips to support his investments in technologies sold to U.S. Federal Government agencies located in Northern Virginia." 2024 Compl. at ¶ 10.

- "Johnson facilitated meetings between said investors and Defendants, including in-person meetings with Lambert and Johnson, investors, and potential customers in locations such as Reston, Chantilly, and McLean, Virginia." 2024 Compl. at ¶ 12.

- "While Defendants were based in Texas, Johnson continued his efforts from his home and offices in Reston, Virginia to assure the growth and success of Umbra Labs." 2024 Compl. at ¶ 13.

But, as explained below, these facts are materially similar to those which this Court already rejected. Thus, once again, Defendants moved to dismiss the 2024 Complaint on July 30, 2024. *See* 2024 Case, ECF 5 ("MTD"). Plaintiff's opposition was due August 20, 2024, but no such

---

[1] This Court dismissed the 2023 Case without prejudice. *See* 2023 Order at 6.

opposition was filed. Although Plaintiff did not challenge Defendants' motion, this Court "nevertheless has an obligation to review the motion[] to ensure that dismissal is proper." *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416 n.3 (4th Cir. 2014). This Court has undertaken such a review and once again will grant Defendants' motion.

### 1. This Court Cannot Exercise Personal Jurisdiction Over the Defendants Under Principles of Collateral Estoppel

This Court already dismissed Plaintiff's action on the basis that neither Defendant was subject to personal jurisdiction in this Court. *See generally* 2023 Order. "Collateral estoppel serves to foreclose the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate." *Zeno v. United States*, 451 Fed. Appx. 268, 271 (4th Cir. 2011) (cleaned up) (citing *In re Microsoft Corp. Antitrust Litig.,* 355 F.3d 322, 326 (4th Cir. 2004)). Collateral estoppel applies where "(1) the issue or fact is identical to the one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding." *Id.* Here, all five factors foreclose this Court from relitigating the issue of personal jurisdiction.

First, the issue or facts are identical to the ones previously litigated. The two counts contained in the 2024 Complaint are identical to the two counts in the 2023 Complaint: (I) breach of contract and fraudulent misrepresentation; and (II) unjust enrichment. Furthermore, the issue at hand in both Complaints is the same: whether Defendants are subject to this Court's personal jurisdiction as to those claims. As such, the 2024 Complaint presents the same issue. *See Zeno*,

451 F. Appx. At 271 (finding that after a 2007 suit was dismissed because "it did not have personal jurisdiction over the individual defendants," when the same Plaintiff filed suit two years later against "the same individual defendants and again filed in the District of Maryland . . . the issues [were] identical").

Plaintiff's additional factual allegations, described above, do not change this analysis because they are materially similar to those which this Court already rejected. *See, e.g., Hegedus v. Nationstar Mortg., LLC*, 2018 WL 1461747, at *3 (W.D. Va. Mar. 23, 2018) (holding that collateral estoppel applies "despite the new factual allegations" when it does not alter the legal issues in a material way). For instance, in Plaintiff's 2023 Complaint, he alleged that he served as the nexus between Defendants and federal agencies "in order [for Defendants] to obtain lucrative contacts." 2023 Compl. at ¶ 10. And this Court found that "the plaintiff cannot be the only link between the defendant[s] and the forum." 2024 Order at 6 (quoting *Walden*, 571 U.S. at 285). Then in Plaintiff's 2024 Complaint, he alleges that Plaintiff "facilitated meetings between said investors and Defendants, including in-person meetings with Lambert and Johnson, investors, and potential customers in locations such as Reston, Chantilly, and McLean, Virginia." 2024 Compl. at ¶ 12. But this allegation, and most of the other "new" allegations, restate the same claim about Plaintiff serving as the "nexus" between Defendants and investors, which this Court rejected as grounds for personal jurisdiction. *See* 2024 Order at 5 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant[s]' conduct connects [them] to the forum in a meaningful way." (quoting *McNeil*, 2017 WL 2625069, at *7). Plaintiff also adds the new allegation that "[b]etween 2016 and 2023, Lambert made numerous trips to Virginia to conduct the investment business of Point Bridge Capital." 2024 Compl. at ¶ 10. But this conclusory allegation is devoid of a factual basis. *See* 2024 Case, ECF 6, Ex. 2 (Declaration of Hal Lambert),

¶ 17 ("I have never traveled to Virginia to conduct the investment business of Point Bridge Capital."). As such, this allegation does not constitute a new material fact. This Court therefore finds that the issue or facts are identical to the ones previously litigated by this Court.

Second, the issue or fact was actually resolved in the prior proceeding. This Court resolved the question of personal jurisdiction in the 2023 Case. *See* 2023 Order at 6 ("For these reasons, this Court lacks personal jurisdiction over the nonresident Defendants.").

Third, this Court's determination that there was no personal jurisdiction was critical and necessary to the judgment in the 2023 Case. *See Zeno* 461 Fed. Appx. at 272 ("A district court may not adjudicate a dispute over which it lacks personal jurisdiction.").

Fourth, this Court's judgment that the Court lacked personal jurisdiction was final and valid. *See Shelton v. Crookshank*, 742 Fed. Appx. 782, 783 n.1 (4th Cir. 2018) (dismissal for lack of personal jurisdiction is final and appealable where the plaintiff cannot correct the jurisdictional defect by amendment). Plaintiff did not file a timely motion under Fed. R. Civ. P. 59 or 60, nor did he appeal the order to the Fourth Circuit.

Fifth and final, Plaintiff had a full and fair opportunity to litigate the issue of personal jurisdiction in the 2023 Case. Defendants raised the question of personal jurisdiction in their motion to dismiss, Plaintiff responded to the jurisdictional arguments in his opposition, and this Court considered and rejected Plaintiff's arguments. *See Zeno*, 461 Fed. Appx. at 272 (finding that where "[t]he court considered and rejected [Plaintiff's] contentions . . . the issues were fully litigated").

For these reasons, the Court will dismiss Plaintiff's Complaint.[2]

---

[2] The Court need not address Defendants' remaining arguments that (1) even without the benefit of collateral estoppel, this action must be dismissed for lack of personal jurisdiction; (2) there is no proper basis for venue in this district; and (3) the complaint fails to state any claim upon which relief can be granted. *See generally* MTD. The Court has reviewed and agrees with Defendants' arguments.

## II.    CONCLUSION

Because Plaintiff is collaterally estopped from relitigating the previously decided issue of

personal jurisdiction, the Court will grant Defendants' Motion to Dismiss and dismiss Plaintiff's

Complaint.

Accordingly, it is hereby

**ORDERED** that Defendants' Motion to Dismiss (ECF  5) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claims against Defendants are **DISMISSED** with prejudice.


**IT IS SO ORDERED.**


_____
/s/
Michael S. Nachmanoff
United States District Judge

September 17, 2024
Alexandria, Virginia

Appx. 126

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
| *Plaintiffs*, | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

## DECLARATION OF HAL LAMBERT

1.      I, Hal Lambert, declare that I am over 18 years old and have personal knowledge of the facts set forth below. I respectfully submit this declaration in connection with the above-captioned matter.

2.      I am a resident of Tarrant County, Texas. I am an investor and the founder of one the premier venture capital firms in Texas, Point Bridge Capital, the other plaintiff in the above-captioned litigation.

3.      I attended a meeting with Charles Johnson and Gator Greenwill at Winslow's Wine Cafe in Fort Worth, Texas. At the meeting, Greenwill and Johnson told me that Greenwill was associated with the CIA. They also told me that Greenwill could help secure government contracts and fundraise for early-stage companies. And they suggested that, based on their government affiliations, they could conversely make it difficult for companies to obtain government contacts, which would have a correspondingly harmful impact on fundraising. When I participated in the meeting, Johnson knew that I was associated with Clearview AI, Inc. and Umbra Lab., Inc., which is now Umbra Space.

1

4.    On October 6, 2020, Johnson texted me that he was "[a]t the Worthington [Renaissance Hotel in Ft. Worth, TX] working." The Worthington is located right next to Point Bridge's offices.

5.    Johnson has called, emailed, and texted me many times. He called and texted me on my phone, which has an area code (214) corresponding to the DFW metroplex.

6.    In conversations that I had with Johnson, I mentioned that I was longtime resident of Fort Worth and that Point Bridge had its offices in Fort Worth.

7.    I have reviewed the document that is listed as Exhibit E to the declaration of Will Thompson. The document is a true and correct copy of a text message between me and Charles Johnson.

8.    I have reviewed the document that is listed as Exhibit J to the declaration of Will Thompson. This is a true and correct copy of a document that Charles Johnson sent to me.

I declare under penalty of perjury that the foregoing is true and correct.

DATED December 23, 2024.

Hal Lambert