# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
| *Plaintiffs*, | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

<u>**DECLARATION OF WILL THOMPSON**</u>

I, Will Thompson, declare as follows. I am an attorney admitted to the State Bar of Texas and this Court and a partner at the law firm of DLA Piper LLP. I am attorney of record for the plaintiffs in the above captioned action. I am over the age of twenty-one years and am not a party to this action. I have personal knowledge of the facts set forth in this declaration. I declare under penalty of perjury that the facts stated in this document are true and correct.

1. Exhibit A attached hereto is a true and correct copy of an email thread dated on or about October 7, 2025 from Charles Johnson (charlescjohnson88@gmail.com) to me, copying additional recipients, bearing the subject line Re: Subpoena to Othram from Point Bridge Capital and Hal Lambert re: Charles Johnson.

2. Exhibit B attached hereto is a true and correct copy of an email thread dated on or about September 4, 2025 from Charles Johnson to me, copying an additional recipient, bearing the subject line Re: Point Bridge v. Johnson—Post-Judgment Financial Information.

1

3.  Exhibit C attached hereto is a true and correct copy of Plaintiffs' post-judgment discovery that I prepared and served on or about September 16, 2025, including interrogatories requesting identification of bank accounts and related information.

4.  Exhibit D attached hereto is a true and correct copy of an email thread dated on or about September 4, 2025 bearing the subject line Re: Point Bridge Capital v. Johnson—Post-judgment discovery—Deposition Dates for Johnson.

5.  Exhibit E attached hereto is a true and correct copy of an email dated on or about September 23, 2025 from Arthur Bloom (arthuriana89@gmail.com) to me, bearing the subject line Demand for retraction.

6.  Exhibit F attached hereto is a true and correct copy of messages in an Othram-related email chain among Charles Johnson, Othram CEO David Mittelman, Othram counsel Rob Purcell, Tor Ekeland, and others in September–October 2025, including discussion of appellate-stay assertions and coordination on Othram matters.

7.  Exhibit G attached hereto is a true and correct copy of additional emails in the same Othram stock-transfer chain dated on or about October 6–7, 2025 among Mr. Johnson, Mr. Purcell, Dr. Mittelman, and Mr. Ekeland.

8.  Exhibit H attached hereto is a true and correct copy of further emails in the Othram chain, including a message dated on or about September 26, 2025 from Charles Johnson to Rob Purcell regarding Othram – Stock Transfer Agreement.

9.  Exhibit I attached hereto is a true and correct copy of a stock purchase agreement between Othram, Inc. and Charles Carlisle Johnson.

10. Exhibit J attached hereto is a true and correct copy of a stock purchase agreement between Othram, Inc. and Charles Carlisle Johnson.

11. Exhibit K attached hereto is a true and correct copy of screenshots captured on or about October 1, 2025 showing public posts on X (Twitter), between Bernie Kleinman and Charles Johnson.

12. Exhibit L attached hereto is a true and correct copy of an email thread dated on or about September 23, 2025 bearing the subject line Re: Point Bridge Capital --- have you attempted to sell any assets.

13. Exhibit M attached hereto is a true and correct copy of Plaintiffs' Trail Exhibit 64.

My name is Will Thompson, my date of birth is November 20, 1982, and my business address is 1900 N. Pearl Street Dallas, Texas 75201, and USA. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas County, State of Texas, on October 28, 2025.

_____*/s/ Will Thompson*_____
Will Thompson

3

# Exhibit A

## Will Thompson

| | |
|---|---|
| **From:** | Charles Johnson <charlescjohnson88@gmail.com> |
| **Sent:** | Tuesday, October 7, 2025 7:03 PM |
| **To:** | Thompson, Will |
| **Cc:** | Faulkner, Sherry; tor@torekeland.com; David Mittelman |
| **Subject:** | Re: Subpoena to Othram from Point Bridge Capital and Hal Lambert re: Charles Johnson |

⚠️ EXTERNAL MESSAGE

1. He's a personal attorney. He isn't needed at the Fifth Circuit.

2. Throughout this process you have behaved unethically so I will be filing a bar complaint against you for unethical conduct followed by a personal lawsuit when the Point Bridge matter is concluded.

I am advising you to behave ethically. That's not a threat. That's just sound advice.

All the best,
Charles

On Tue, Oct 7, 2025 at 19:58 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Charles (and Tor):

1. Is Tor filing an appearance as your lawyer before Judge Pittman or the Fifth Circuit, which the rules require him to do.

2. What are you threatening in the rest of your email---the only way to take your comments is some type of extortionate threat. So, rather than try to hide behind vagaries and the passive voice---be specific.

   a. "you have a choice to do the right thing" **what is the "right thing that you are referring to"**

   b. "and unfortunately it's looking like you're moving in the direction of your law license being in jeopardy." **Why would my law license be in jeopardy? Are you making a threat?**

Appx. 006

**Tor**---did you approve or advise that Charles send these threats or make these statements to me?

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Tuesday, October 7, 2025 4:30 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Cc:** Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>; tor@torekeland.com; David Mittelman <david@othram.com>
**Subject:** Re: Subpoena to Othram from Point Bridge Capital and Hal Lambert re: Charles Johnson

⚠ EXTERNAL MESSAGE

I did, and that was to be expected. The appeal was filed with the 5th circuit and they confirmed receipt of it today, by courier.

I would recommend sitting down with your client — your real client, not Hal — before the 5th circuit eviscerates the holding of the most overturned federal judge in the country.

As you know, this isn't my first time before the 5th circuit though I believe it is yours.

https://www.cahill.com/publications/client-alerts/2022-02-17-us-court-of-appeals-for-the-fifth-circuit-takes-a-narrow-approach-to-personal-jurisdiction-over-out-of-state-website

Every day counselor you have a choice to do the right thing and unfortunately it's looking like you're moving in the direction of your law license being in jeopardy.  It doesn't have to be this way.

All the best,

Charles

On Tue, Oct 7, 2025 at 19:20 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Charles, did you see that Judge Pittman summarily rejected your discovery stay motion?

Appx. 007

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Tuesday, October 7, 2025 4:17:19 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Cc:** david@othram.com <david@othram.com>; Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>;
tor@torekeland.com <tor@torekeland.com>
**Subject:** Re: Subpoena to Othram from Point Bridge Capital and Hal Lambert re: Charles Johnson

⚠️ EXTERNAL MESSAGE

Adding Tor Ekeland.

Hey Will,

This is harassing as the matter is before the Fifth Circuit. You're under no obligation to respond, David,
and I would let the court process play out.

All the best,

Charles

On Tue, Oct 7, 2025 at 19:09 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Dear David (copying @Charles Johnson): I represent Point Bridge Capital and Hal Lambert in litigation
against Charles Johnson. The court entered a judgment against Charles for over $70 million. This
subpoena to Othram seeks documents in Othram's possession about Charles. If you have any
questions, please give me a call or have your lawyer call me. All the best.

-Will

3

Appx. 008

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

Appx. 009

# Exhibit B

**Will Thompson**

| | |
|---|---|
| **From:** | Charles Johnson <charlescjohnson88@gmail.com> |
| **Sent:** | Thursday, September 4, 2025 8:54 PM |
| **To:** | Thompson, Will |
| **Cc:** | Faulkner, Sherry |
| **Subject:** | Re: Point Bridge v. Johnson---Post-Judgement Financial Information |

**⚠ EXTERNAL MESSAGE**

I can always file a motion to stay with the Court of Appeals but I am under no obligation to comply nor is anyone else while the matter is under review.

Come on, Mr. Thompson. The harassment should end at a certain point, no?

Let's wait to see what the appeals court says. I can file a stay if you want, which either the appeals court or judge Pittman will grant.

On Thu, Sep 4, 2025 at 19:54 Charles Johnson <charlescjohnson88@gmail.com> wrote:
You're going to want to have a chat with your bosses at DLA Piper regarding the conflict of interest and with your client about how he needs to provide you with more capital.

On Thu, Sep 4, 2025 at 19:53 Charles Johnson <charlescjohnson88@gmail.com> wrote:
Here this'll help.
https://charlesjohnson.substack.com/p/looks-like-were-going-to-the-fifth

On Thu, Sep 4, 2025 at 19:49 Charles Johnson <charlescjohnson88@gmail.com> wrote:
Yeah, none of that is going to happen. But hey keep going!


On Thu, Sep 4, 2025 at 19:43 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Charles, A large judgment has been entered against you. You can't deny that. And Point Bridge and Hal Lambert are entitled to broad discovery into your finances. Please provide this financial information. Plaintiffs will treat account identifiers as confidential and agree to any reasonable stipulated protective order.


You said that you would rather go to jail than sit for a deposition. This information request may obviate or delay the need for a deposition. *I do not want you to go to jail*.


· Banking: Each bank/credit union, branch/city, full account & routing numbers, and current balances.

Appx. 011

·       Taxes: Your complete federal and state returns for the last five tax years, including all schedules, W-2/1099s, K-1s, and similar information.

·       Payment apps/processors: Your handles/usernames and linked accounts for PayPal, Venmo, Cash App, Apple/Google Pay; any merchant processors (Stripe/Square/etc.) and settlement accounts.

·       Crypto (including "cold storage"): All exchange accounts (usernames) and all wallet addresses you control (custodial and self-custody/hardware/paper/multisig). Provide address lists or CSV exports and identify any hardware wallets (make/model). We are not asking for seed phrases or PINs.

·       Entities & trusts: Names, your role (owner/manager/trustee/beneficiary), FEINs, and trustee/registered-agent contact info.

·       Real & titled property: Property addresses/APNs; vehicles/boats/aircraft with VIN/HIN/tail numbers and storage locations.

·       Transfers ≥ $2,500 since January 1, 2024: Date, amount, sending/receiving account or wallet ID, and purpose.

-Will

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

Appx. 012

# Exhibit C

**Will Thompson**

| | |
|---|---|
| **From:** | Thompson, Will |
| **Sent:** | Tuesday, September 16, 2025 6:47 PM |
| **To:** | Charles Johnson |
| **Cc:** | Faulkner, Sherry |
| **Subject:** | First Set of Post-Judgement Discovery to Charles Johnson |
| **Attachments:** | 2025.9.16 Plaintiffs Point Bridge and Lambert First Set of Post Judgemnt  Discovery Interrogatories(served1).pdf |

Charles, Attached are interrogatories asking for you to identify your bank accounts and crypto holdings. Are you going to provide this information?

## INTERROGATORIES

**Interrogatory No. 1:**   **Identify all bank accounts in which You have, or have had any beneficial, signatory, trustee, custodial, guardian, power-of-attorn withdrawal interest at any time since January 1, 2023 (incl accounts held in your name individually, jointly, in the name ( business entity, trust, or other arrangement, or for which you ha ability to direct funds). For each account identified, state:**

- The name of the financial institution;

- The name in which the account is titled;

- The account number and routing number (or, if you object, the last fou of the account and routing number and the basis for your objection);

- The account type (e.g., checking, savings, money market);

- The name(s) of all persons or entities authorized to withdraw or sign account and their relationship to you;

- The branch address or, if an online-only institution, the platform/URI

- The date the account was opened and, if closed, the date of closure; a

- The current balance (or last known balance if closed) as of the date o response.

Appx. 014

**Interrogatory No. 2:**    Identify all cryptocurrency accounts, wallets, or holdings in whicl
have or have had any legal, beneficial, signatory, trustee, cust
guardian, power-of-attorney, or withdrawal interest at any time
January 1, 2023 (including but not limited to hot wallets, cold w
custodial exchange accounts, hardware wallets, multi-signature w
and accounts held in your name individually, jointly, in the name (
business entity, trust, or other arrangement, or for which you hav
ability to direct funds). For each account or wallet identified, state:

- The name of the exchange, platform, or custodian;

- The type of wallet or account (e.g., hot wallet, cold storage, exchange ac
  hardware wallet);

3

- All wallet addresses, public keys, account IDs, or other identifying inform

- The name(s) of all persons or entities authorized to access, transact w
  control the account or wallet and their relationship to you;

- The date the account or wallet was created and, if closed, the date of cl
  and

- The current balance (or last known balance if closed) as of the date o
  response, stated in cryptocurrency units and approximate U.S. dollar val

2

Appx. 015

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| Point Bridge Capital, LLC, | § | |
| Hal Lambert | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Case No. 4:24-cv-00988-P |
| | § | |
| Charles Johnson, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFFS' FIRST SET OF POST-JUDGMENT DISCOVERY
TO DEFENDANT CHARLES JOHNSON**

Plaintiffs Point Bridge Capital, LLC and Hal Lambert ("Plaintiffs") serve the following

First Set of Post-Judgment Discovery Requests ("Requests") to Defendant Charles Johnson

("Defendant," "Johnson," or "You").

**INSTRUCTIONS**

The following instructions shall apply to each of the Requests herein:

1.      Unless otherwise stated, the relevant time period for these Requests is from January 1, 2019 through the present.

2.      In answering the following Requests, You must respond in the manner provided for by the Federal Rules of Civil Procedure, and the Local Rules of the United Stated District Court, Northern District of Texas.

3.      All documents must be produced in a format that is consistent with the Federal Rules of Civil Procedure..

4.      If Your response to a particular Request is a statement that you lack the ability to comply with that Request, You must specify whether the inability to comply is because the particular item or category of information never existed, has been destroyed, has been lost, misplaced, or stolen, or has never been, or is no longer, in your possession, custody, or control, in which case the name and address of any person or entity known or believed by You to have possession, custody, or control of that information or category of information must be identified.

5.      If Your response to any Request is that the documents are not in Your possession, custody, or control, describe the efforts You made to locate such documents.

Appx. 016

6.      If an objection is made to any part of a particular Request, that part should be specified (together with the grounds for the objection), and any other portion of the Requests to which no objection is made should be produced.

7.      Produce all documents responsive to the Requests for production, together with any objections, at the offices of Quinn Emanuel Urquhart & Sullivan LLP, 3100 McKinnon, Suite 1125, Dallas, Texas 75214, attn. Will Thompson.

8.      Your obligation to respond to these Requests is continuing and Your responses are to be supplemented to include subsequently acquired information.

## **DEFINITIONS**

1.      "Point Bridge" means Plaintiff Point Bridge Capital, LLC in the above-captioned action, and include its officers, directors, employees, staff members, agents, or other representatives.

2.      "Plaintiffs" collectively mean Plaintiffs Point Bridge Capital, LLC and Hal Lambert

3.      "Defendant," "You," "Your," or "Yourself" means Defendant Charles Johnson, the defendant in the above-captioned action, and includes, any agents, or other representatives acting on Your behalf and any trust in which you have served as the trustee, trustor, or beneficiary (including the EB White Trust, Xavier Capital Trust, KawRuh Trust, and Task Force Trust).

4.      ""Person(s)" means any individual, corporation, proprietorship, association, joint venture, company, partnership or other business or legal entity, including governmental bodies and agencies.

5.      "Concern," "concerning," "relate to," or "relating to" mean relating to, referring to, concerning, mentioning, reflecting, pertaining to, evidencing, involving, describing, discussing, commenting on, embodying, responding to, supporting, contradicting, or constituting (in whole or in part), as the context makes appropriate.

6.      "Identify," "identifies," or "identification" mean: (1) when referring to a person, the person's full name, present or last known address, and the last known title and place of employment; (2) when referring to a business, legal, or governmental entity or association, the name and address of the main office; (3) when referring to a fact, the fact and the documentary or testimonial support for that fact; (4) when referring to a written communication, identity of the document(s) in which the communication was made; (5) when referring to an oral communication, the identity of persons participating in the communication.

7.      "Any" and "all" each mean and include the other.

8.      "Include" and "including" mean including without limitation.

9.      The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

2

10.    The singular form of any word shall be deemed to include the plural.  The plural form of any word shall be deemed to include the singular.

## **INTERROGATORIES**

**Interrogatory No. 1:**    **Identify all bank accounts in which You have, or have had any legal, beneficial, signatory, trustee, custodial, guardian, power-of-attorney, or withdrawal interest at any time since January 1, 2023 (including accounts held in your name individually, jointly, in the name of any business entity, trust, or other arrangement, or for which you have the ability to direct funds). For each account identified, state:**

- The name of the financial institution;

- The name in which the account is titled;

- The account number and routing number (or, if you object, the last four digits of the account and routing number and the basis for your objection);

- The account type (e.g., checking, savings, money market);

- The name(s) of all persons or entities authorized to withdraw or sign on the account and their relationship to you;

- The branch address or, if an online-only institution, the platform/URL;

- The date the account was opened and, if closed, the date of closure; and

- The current balance (or last known balance if closed) as of the date of your response.

**Interrogatory No. 2:**    **Identify all cryptocurrency accounts, wallets, or holdings in which You have or have had any legal, beneficial, signatory, trustee, custodial, guardian, power-of-attorney, or withdrawal interest at any time since January 1, 2023 (including but not limited to hot wallets, cold wallets, custodial exchange accounts, hardware wallets, multi-signature wallets, and accounts held in your name individually, jointly, in the name of any business entity, trust, or other arrangement, or for which you have the ability to direct funds). For each account or wallet identified, state:**

- The name of the exchange, platform, or custodian;

- The type of wallet or account (e.g., hot wallet, cold storage, exchange account, hardware wallet);

3

- All wallet addresses, public keys, account IDs, or other identifying information;

- The name(s) of all persons or entities authorized to access, transact with, or control the account or wallet and their relationship to you;

- The date the account or wallet was created and, if closed, the date of closure; and

- The current balance (or last known balance if closed) as of the date of your response, stated in cryptocurrency units and approximate U.S. dollar value

Dated: September 16, 2025                    Respectfully submitted,

                                            **DLA PIPER LLP (US)**

                                 By:        */s/ Will Thompson*
                                            Will Thompson
                                            State Bar No. 24094981
                                            will.thompson1@us.dlapiper.com
                                            1900 N. Pearl Street
                                            Dallas, Texas 75201
                                            Telephone: (406) 546-5587

                                 **COUNSEL FOR PLAINTIFFS**

                                 <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on September 16, 2025, I served this document on counsel of record

for Defendant Charles Johnson via a manner authorized by the Federal Rules of Civil Procedure.

                                 */s/ Will Thompson*
                                 Will Thompson

4

# Exhibit D

**Thompson, Will**

---

| | |
|---|---|
| **From:** | Charles Johnson <charlescjohnson88@gmail.com> |
| **Sent:** | Thursday, September 4, 2025 3:19 PM |
| **To:** | Thompson, Will |
| **Subject:** | Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson |

⚠ EXTERNAL MESSAGE

Would you like to see a photo of me in a federal prison?

On Thu, Sep 4, 2025 at 18:12 Charles Johnson <charlescjohnson88@gmail.com> wrote:
They arrested the wrong Charles Johnson and kept me in county lockup for a long weekend. I believe it was expunged.

I have visited federal prison on several occasions, including the Super Max. Not worried about it. Frankly I could use the time to write and read and work out.

On Thu, Sep 4, 2025 at 18:10 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

What was the mistaken identity thing? That sounds different compared to spending time for contempt of court.

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Thursday, September 4, 2025 3:07 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Subject:** Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson

⚠ EXTERNAL MESSAGE

Remember, Mr. Thompson, it would be neither my first time in jail (mistaken identity thing) nor at the Fifth Circuit (as you know).

Alas I'm probably going to be encouraged to sue to find the litigation financing behind this whole shindig and I don't really want to do that.

You should tell Hal he should settle with me before the Feds get him. It'll look better at sentencing.

On Thu, Sep 4, 2025 at 18:04 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

I don't think that you really wanted to go to jail. I think that you were performing---Anderson County jail is not a nice place.  Would you really be ok going there? No Hurtado bbq there.

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Thursday, September 4, 2025 3:00 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Subject:** Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson

⚠ EXTERNAL MESSAGE

Remember, Mr. Thompson, I wanted to go to jail during this trial, and I still do.

You should probably preserve your records, though.

Champerty is an issue even in Texas!

On Thu, Sep 4, 2025 at 17:57 Charles Johnson <charlescjohnson88@gmail.com> wrote:

You can try but yeah, it's not going to happen.

I don't mean to be rude to you but you're likely going to want to chill a bit before it's overturned.

On Thu, Sep 4, 2025 at 17:56 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Just to be clear, you are going to resist any deposition absent a court order. If the court compelled your deposition, would you still not show up?  Thx for the quick response, Charles.

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Thursday, September 4, 2025 2:54 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Subject:** Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson

⚠ EXTERNAL MESSAGE

Hey Mr. Thompson,

Not going to be going to any deposition. But I love that for you.

Probably don't want to be sending me or anyone else too many harassing emails as you're conflicted... 🙄

I kept trying to warn you...

The fees have been paid for the 5th circuit so let's let the appeals process play out, okay?

All the best,

Charles

On Thu, Sep 4, 2025 at 17:43 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

> Charles, In furtherance of post-judgment discovery, please provide dates when you are available for a deposition. I would like to find a time that accommodates our schedules.

therefore **ORDERED** that Defendant Charles Johnson shall pay Plaintiffs **$1,033,130.00 in attorney's fees**. The amount will be reflected in the Court's final judgment.

Next, the Court turns to Plaintiffs' Motion for Treble Damages and Asset Preservation Relief. Having considered the Motion, record, and applicable law, the Court hereby **GRANTS** the Motion.

It is therefore **ORDERED** as follows:

- The damages the jury awarded to Hal Lambert on Question 1, (ECF No. 97 at 9), are trebled from $7,500,000.00 to $22,500,000.00.

- The damages the jury awarded to Point Bridge Capital on Question 2, (ECF No. 97 at 9), are trebled from $8,000,000.00 to $24,000,000.00.

These trebled damages will be reflected in the Court's final judgment.

In addition, it is **ORDERED** that Defendant Charles Johnson, and anyone acting in concert with him, is prohibited from taking any of the following actions until the mandate in this case shall issue from the Court of Appeals:

- Selling, transferring, or otherwise disposing of any cryptocurrency (including bitcoin), stocks, private investments, or other assets identified in Trial Exhibit 64;

Appx. 024

- Moving any such assets into a trust, LLC, or other entity in an effort to place them beyond the reach of creditors;

- Opening or using any financial, brokerage, or digital asset account in any name other than his own for the purpose of holding assets he controls;

- Destroying, concealing, or altering any records that reflect the existence, nature, or location of his assets.

**SO ORDERED** on this **29th day of July 2025.**

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

Appx. 025

# Exhibit E

**Thompson, Will**

| | |
|---|---|
| **From:** | Arthur Bloom <arthuriana89@gmail.com> |
| **Sent:** | Tuesday, September 23, 2025 7:08 PM |
| **To:** | Thompson, Will |
| **Subject:** | Demand for retraction |

⚠ EXTERNAL MESSAGE

Dear Mr. Thompson,

I am told you called me a "vile anti-semite" in court during proceedings involving Charles Johnson. Is this correct? If so this has the potential to prejudice people against my journalism, and I consider it defamatory. Do you consider this statement your pure opinion or a fact? Statements like this are only absolutely privileged in the context of court proceedings as long as they are pertinent to the questions at issue, and it's difficult to see how this one would be. I would like you to retract your statement publicly. If you're willing to do so, there's no need for this to go any further.

Yours truly,

Arthur Bloom

1

# Exhibit F

| | |
|---|---|
| **From:** | David Mittelman <david@othram.com> |
| **Sent:** | Monday, October 6, 2025 3:29 PM |
| **To:** | Charles Johnson |
| **Cc:** | Purcell, Rob E.; tor@torekeland.com; Durham, Heather J. |
| **Subject:** | Re: Othram - Stock Transfer Agreement |

**[Caution - External Email. Do not click on links or open attachments unless you recognize the sender and know the content is safe.]**

Thank you.

Rob/Heather, can you get on the phone so we can see what we can do to assist?

David Mittelman, PhD | Chief Executive Officer
othram.com | 2829 Technology Forest Blvd, Ste 100 | The Woodlands, TX 77381

On Mon, Oct 06, 2025 at 5:27 PM, Charles Johnson <charlescjohnson88@gmail.com> wrote:
  Hey Rob,

  Long time no talk. It looks like you've moved on from John Burbank's office?

  Here's Tor Ekeland. He can chat with you though really that shouldn't be necessary.

  Thanks,
  Charles

On Sat, Sep 27, 2025 at 1:08 AM Charles Johnson <charlescjohnson88@gmail.com> wrote:
  If that doesn't work, happy to put you with my lawyer next week or thereafter. I'm going to think about how best to do this to represent the interests of all stakeholders.

  On Sat, Sep 27, 2025 at 00:34 Charles Johnson <charlescjohnson88@gmail.com> wrote:
  Hi Rob,

  The Fifth Circuit automatically stays enforcement of a Judgement.

**13:21**

pacermonitor.com



Fifth Circuit Court of Appeals pacermonitor.com Point Bridge C

## PacerMonitor

≡

**Texas Northern District Court**

| | |
|---|---|
| **Judge:** | Mark Pittman |
| **Case #:** | 4:24-cv-00988 |
| **Nature of Suit** | 470 Other Statut Influenced and C Organizations |
| **Cause** | 18:1962 Rackete Act |
| **Case Filed:** | Oct 16, 2024 |
| **Terminated:** | Jul 29, 2025 |

| Docket | Parties (4) | Related Cases (1) |
|---|---|---|

**Docket last updated: 12 hours ago**

Appx. 030

I am happy to indemnify Othram and/or its officers if it's an issue.

Please let me know when you can send the wire:

13:14

Wire_Instructions_JXZLLC ⌄    Done

1 of 1

Please make direct deposit payable to:

Name of Entity:

__[JXZ LLC]_____(LLC)

Business Address: (as appears on Bank Statement)

30 N Gould St, Suite R_____
Sheridan, WY 82801. _____
_____
_____
_____

Name of Business Checking Account:

Wells Fargo Bank_____
_____

Business Checking Account number:

5690436018 _____

4

Even if the order is applied, which it doesn't, it doesn't affect my ex wife and daughter's trusts which are separate and distinct from mine.

Thanks,
Charles

On Fri, Sep 26, 2025 at 19:19 Purcell, Rob E. <RPurcell@sflaw.com> wrote:

Charles,

We have recently received the attached Judgement and Order.  In light of these, we would need clearance from the respective court to proceed with the transfer as currently proposed.  If you believe otherwise, please have your counsel reach out to us directly.

Best regards,

Rob

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Friday, September 26, 2025 9:11 AM
**To:** David Mittelman <david@othram.com>
**Cc:** Durham, Heather J. <HDurham@sflaw.com>; Purcell, Rob E. <RPurcell@sflaw.com>
**Subject:** Re: Othram - Stock Transfer Agreement

[Caution - External Email. Do not click on links or open attachments unless you recognize the sender and know the content is safe.]

Let me know if you need my lawyers to indemnify Othram.

On Fri, Sep 26, 2025 at 12:06 Charles Johnson <charlescjohnson88@gmail.com> wrote:

Sure, the court order doesn't apply as it is under appeal.

5

Please pay the money by the end of the day.



Please make direct deposit payable to:

**Name of Entity:**

___[JXZ LLC]_____(LLC)

**Business Address: (as appears on Bank Statement)**

30 N Gould St, Suite R_____
Sheridan, WY 82801._____
_____
_____
_____

**Name of Business Checking Account:**

**Wells Fargo Bank**_____
_____

**Business Checking Account number:**

5690436018_____

7

On Fri, Sep 26, 2025 at 12:03 David Mittelman <david@othram.com> wrote:

Charles,

Please address your concerns with Heather and Rob so we can sort this out.


Best,

David

David Mittelman, PhD | Chief Executive Officer

othram.com | 2829 Technology Forest Blvd, Ste 100 | The Woodlands, TX 77381


On Tue, Sep 23, 2025 at 3:59 PM, Charles Johnson <charlescjohnson88@gmail.com> wrote:

Hey Heather,


Can we please transfer funds this week? I need this transaction completed ASAP so I can go to work.


Thanks,

Charles


On Fri, Sep 19, 2025 at 20:04 Durham, Heather J. <HDurham@sflaw.com> wrote:

Hi Charles,

Please find attached the fully executed Stock Transfer Agreement. Once the necessary consents have been obtained, we will follow up to coordinate a closing date for the transfer of payment and the execution of the stock power form.

Best,

Heather

**Heather Durham**, Corporate Associate



425 Market Street, 11th Floor

San Francisco, CA  94105

415-773-7284 Phone | 415-421-2922 Fax

hdurham@sflaw.com

The information contained in this message, including but not limited to any attachments, may be confidential and may be protected by privacy laws. It is not intended for transmission to, or receipt by, any unauthorized persons. It is intended solely for assisting the intended agency with investigative leads in applicable cases and is not intended as legal services or advice.  If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message and any attachments or copies.  Any disclosure, copying, distribution, or reliance on the contents of this message or its attachments is strictly prohibited and may be unlawful. Unintended transmission does not constitute waiver of any privacy rights or any privilege.  Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

The information contained in this message, including but not limited to any attachments, may be confidential and may be protected by privacy laws. It is not intended for transmission to, or receipt by, any unauthorized persons. It is intended solely for assisting the intended agency with investigative leads in applicable cases and is not intended as legal services or advice.  If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message and any attachments or copies.  Any disclosure, copying, distribution, or reliance on the contents of this message or its attachments is strictly prohibited and may be unlawful. Unintended transmission does not constitute waiver of any privacy rights or any privilege.  Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

Appx. 037

# Exhibit G

| | |
|---|---|
| **From:** | Tor Ekeland <tor@torekeland.com> |
| **Sent:** | Tuesday, October 7, 2025 7:36 AM |
| **To:** | Purcell, Rob E.; Charles Johnson |
| **Cc:** | David Mittelman; Cialone, Frank |
| **Subject:** | Re: Othram - Stock Transfer Agreement |

**[Caution - External Email. Do not click on links or open attachments unless you recognize the sender and know the content is safe.]**

 **This message needs your attention**

• This is their first email to your company.

Report this Email or Mark as Safe          Powered by Mimecast

Rob:

How is noon on Friday for you? I can send a link if that works.

-Tor

Tor Ekeland
Tor Ekeland Law PLLC
30 Wall Street
8th Floor
New York, NY 10005
tor@torekeland.com
torekeland.com

(718) 737-7264

This account is checked once in the morning and once in the afternoon. If you need a response before that please call the office number listed above. This email is sent from a law firm and may contain privileged and confidential information. If you have received it in error, please let us know and then delete all copies of it.

**From:** Purcell, Rob E. <RPurcell@sflaw.com>
**Date:** Monday, October 6, 2025 at 8:40 PM
**To:** Charles Johnson <charlescjohnson88@gmail.com>, Tor Ekeland <tor@torekeland.com>
**Cc:** David Mittelman <david@othram.com>, Cialone, Frank <FCialone@sflaw.com>
**Subject:** RE: Othram - Stock Transfer Agreement

Charles,

Happy to hop on a call with your counsel and you to discuss.  I will also have one of my litigation partners, Frank Cialone (copied), join us.  We are both available tomorrow between 3 - 5 pm Eastern time/12 - 2pm

Appx. 039

Pacific time if that works for you and Tor.  Otherwise, we are available Friday between Noon - 1pm Eastern/9-10am Pacific or 2-3:30pm Eastern/11-12:30pm Pacific.

Best regards,
Rob

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Monday, October 6, 2025 3:28 PM
**To:** Purcell, Rob E. <RPurcell@sflaw.com>; tor@torekeland.com
**Cc:** David Mittelman <david@othram.com>; Durham, Heather J. <HDurham@sflaw.com>
**Subject:** Re: Othram - Stock Transfer Agreement

**[Caution - External Email. Do not click on links or open attachments unless you recognize the sender and know the content is safe.]**

Hey Rob,

Long time no talk. It looks like you've moved on from John Burbank's office?

Here's Tor Ekeland. He can chat with you though really that shouldn't be necessary.

Thanks,
Charles

On Sat, Sep 27, 2025 at 1:08 AM Charles Johnson <charlescjohnson88@gmail.com> wrote:
> If that doesn't work, happy to put you with my lawyer next week or thereafter. I'm going to think about how best to do this to represent the interests of all stakeholders.
>
> On Sat, Sep 27, 2025 at 00:34 Charles Johnson <charlescjohnson88@gmail.com> wrote:
>> Hi Rob,
>>
>> The Fifth Circuit automatically stays enforcement of a Judgement.

**13:21** 

pacermonitor.com



Fifth Circuit Court of Appeals pacermonitor.com Point Bridge C

## PacerMonitor

≡

**Texas Northern District Court**

| | |
|---|---|
| **Judge:** | Mark Pittman |
| **Case #:** | 4:24-cv-00988 |
| **Nature of Suit** | 470 Other Statut Influenced and O Organizations |
| **Cause** | 18:1962 Rackete Act |
| **Case Filed:** | Oct 16, 2024 |
| **Terminated:** | Jul 29, 2025 |

| Docket | Parties (4) | Related Cases (1) |
|---|---|---|

**Docket last updated: 12 hours ago**

3

I am happy to indemnify Othram and/or its officers if it's an issue.

Please let me know when you can send the wire:

Appx. 042

13:14

Wire_Instructions_JXZLLC ⌄   **Done**

1 of 1

Please make direct deposit payable to:

**Name of Entity:**

__[JXZ LLC]_____(LLC)

**Business Address:** (as appears on Bank Statement)

30 N Gould St, Suite R_____
Sheridan, WY 82801._____
_____
_____
_____

**Name of Business Checking Account:**

Wells Fargo Bank_____
_____

**Business Checking Account number:**

5690436018_____

5

Even if the order is applied, which it doesn't, it doesn't affect my ex wife and daughter's trusts which are separate and distinct from mine.

Thanks,
Charles

On Fri, Sep 26, 2025 at 19:19 Purcell, Rob E. <RPurcell@sflaw.com> wrote:

Charles,
We have recently received the attached Judgement and Order. In light of these, we would need clearance from the respective court to proceed with the transfer as currently proposed. If you believe otherwise, please have your counsel reach out to us directly.

Best regards,
Rob

---

**From:** Charles Johnson <charliescjohnson88@gmail.com>
**Sent:** Friday, September 26, 2025 9:11 AM
**To:** David Mittelman <david@othram.com>
**Cc:** Durham, Heather J. <HDurham@sflaw.com>; Purcell, Rob E. <RPurcell@sflaw.com>
**Subject:** Re: Othram - Stock Transfer Agreement

**[Caution - External Email. Do not click on links or open attachments unless you recognize the sender and know the content is safe.]**

Let me know if you need my lawyers to indemnify Othram.

On Fri, Sep 26, 2025 at 12:06 Charles Johnson <charliescjohnson88@gmail.com> wrote:

Sure, the court order doesn't apply as it is under appeal.

Please pay the money by the end of the day.

Appx. 044

13:14

Wire_Instructions_JXZLLC ⌄    Done

1 of 1

Please make direct deposit payable to:

Name of Entity:

___[JXZ LLC]_____(LLC)

Business Address: (as appears on Bank Statement)

30 N Gould St, Suite R_____
Sheridan, WY 82801._____
_____
_____
_____

Name of Business Checking Account:

Wells Fargo Bank_____
_____

Business Checking Account number:

5690436018_____

7

On Fri, Sep 26, 2025 at 12:03 David Mittelman <<u>david@othram.com</u>> wrote:

Charles,
Please address your concerns with Heather and Rob so we can sort this out.

Best,
David

David Mittelman, PhD | Chief Executive Officer
<u>othram.com</u> | <u>2829 Technology Forest Blvd, Ste 100 | The Woodlands, TX 77381</u>

On Tue, Sep 23, 2025 at 3:59 PM, Charles Johnson <<u>charlescjohnson88@gmail.com</u>> wrote:

Hey Heather,

Can we please transfer funds this week? I need this transaction completed ASAP so I can go to work.

Thanks,
Charles

On Fri, Sep 19, 2025 at 20:04 Durham, Heather J. <<u>HDurham@sflaw.com</u>> wrote:

Hi Charles,

Please find attached the fully executed Stock Transfer Agreement. Once the necessary consents have been obtained, we will follow up to coordinate a closing date for the transfer of payment and the execution of the stock power form.

Best,
Heather

**Heather Durham**, Corporate Associate



<u>425 Market Street, 11</u>th Floor
San Francisco, CA 94105
415-773-7284 Phone | 415-421-2922 Fax
<u>hdurham@sflaw.com</u>

The information contained in this message, including but not limited to any attachments, may be confidential and may be protected by privacy laws. It is not intended for transmission to, or receipt by, any unauthorized persons. It is intended solely for assisting the intended agency with investigative leads in applicable cases and is not intended as legal services or advice. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message and any attachments or copies. Any disclosure, copying, distribution, or reliance on the contents of this message or its attachments is strictly prohibited and may be unlawful. Unintended transmission does not constitute waiver of any privacy rights or any privilege. Unless expressly stated otherwise, nothing contained in this message

Appx. 046

should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

Appx. 047

# Exhibit H

| | |
|---|---|
| **From:** | Charles Johnson <charlescjohnson88@gmail.com> |
| **Sent:** | Friday, September 26, 2025 10:08 PM |
| **To:** | Purcell, Rob E. |
| **Cc:** | David Mittelman; Durham, Heather J. |
| **Subject:** | Re: Othram - Stock Transfer Agreement |

**[Caution - External Email. Do not click on links or open attachments unless you recognize the sender and know the content is safe.]**



This message needs your attention

• This is a personal email address.

Report this Email or Mark as Safe                    Powered by Mimecast

If that doesn't work, happy to put you with my lawyer next week or thereafter. I'm going to think about how best to do this to represent the interests of all stakeholders.

On Sat, Sep 27, 2025 at 00:34 Charles Johnson <charlescjohnson88@gmail.com> wrote:
  Hi Rob,

  The Fifth Circuit automatically stays enforcement of a Judgement.

Appx. 049



13:21

pacermonitor.com

Fifth Circuit Court of Appeals pacermonitor.com Point Bridge Ca

## PacerMonitor



**Texas Northern District Court**

| | |
|---|---|
| **Judge:** | Mark Pittman |
| **Case #:** | 4:24-cv-00988 |
| **Nature of Suit** | 470 Other Statute Influenced and C Organizations |
| **Cause** | 18:1962 Racketee Act |
| **Case Filed:** | Oct 16, 2024 |
| **Terminated:** | Jul 29, 2025 |

| Docket | Parties (4) | Related Cases (1) |
|---|---|---|

**Docket last updated: 12 hours ago**

I am happy to indemnify Othram and/or its officers if it's an issue.

Please let me know when you can send the wire:

13:14

Wire_Instructions_JXZLLC ⌄     **Done**

1 of 1

**Please make direct deposit payable to:**

**Name of Entity:**

__[JXZ LLC]_____(LLC)

**Business Address:  (as appears on Bank Statement)**

30 N Gould St, Suite R_____
Sheridan, WY 82801._____
_____
_____
_____

**Name of Business Checking Account:**

Wells Fargo Bank_____
_____

**Business Checking Account number:**

5690436018_____

4

Even if the order is applied, which it doesn't, it doesn't affect my ex wife and daughter's trusts which are separate and distinct from mine.

Thanks,
Charles

On Fri, Sep 26, 2025 at 19:19 Purcell, Rob E. <RPurcell@sflaw.com> wrote:

> Charles,
>
> We have recently received the attached Judgement and Order.  In light of these, we would need clearance from the respective court to proceed with the transfer as currently proposed.  If you believe otherwise, please have your counsel reach out to us directly.
>
>
> Best regards,
>
> Rob

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Friday, September 26, 2025 9:11 AM
**To:** David Mittelman <david@othram.com>
**Cc:** Durham, Heather J. <HDurham@sflaw.com>; Purcell, Rob E. <RPurcell@sflaw.com>
**Subject:** Re: Othram - Stock Transfer Agreement

**[Caution - External Email. Do not click on links or open attachments unless you recognize the sender and know the content is safe.]**

Let me know if you need my lawyers to indemnify Othram.

On Fri, Sep 26, 2025 at 12:06 Charles Johnson <charlescjohnson88@gmail.com> wrote:

> Sure, the court order does't apply as it is under appeal.

Please pay the money by the end of the day.

Appx. 054

13:14

Wire_Instructions_JXZLLC ⌄      Done

1 of 1

Please make direct deposit payable to:

Name of Entity:

___[JXZ LLC]_____(LLC)

Business Address: (as appears on Bank Statement)

30 N Gould St, Suite R_____
Sheridan, WY 82801._____
_____
_____
_____

Name of Business Checking Account:

Wells Fargo Bank_____
_____

Business Checking Account number:

5690436018_____

On Fri, Sep 26, 2025 at 12:03 David Mittelman <david@othram.com> wrote:

Charles,

Please address your concerns with Heather and Rob so we can sort this out.

Best,

David

David Mittelman, PhD | Chief Executive Officer

othram.com | 2829 Technology Forest Blvd, Ste 100 | The Woodlands, TX 77381

On Tue, Sep 23, 2025 at 3:59 PM, Charles Johnson <charlescjohnson88@gmail.com> wrote:

Hey Heather,

Can we please transfer funds this week? I need this transaction completed ASAP so I can go to work.

Thanks,

Charles

On Fri, Sep 19, 2025 at 20:04 Durham, Heather J. <HDurham@sflaw.com> wrote:

Hi Charles,

Please find attached the fully executed Stock Transfer Agreement. Once the necessary consents have been obtained, we will follow up to coordinate a closing date for the transfer of payment and the execution of the stock power form.

Best,

Heather

**Heather Durham**, Corporate Associate



425 Market Street, 11th Floor

San Francisco, CA  94105

415-773-7284 Phone | 415-421-2922 Fax

hdurham@sflaw.com

The information contained in this message, including but not limited to any attachments, may be confidential and may be protected by privacy laws. It is not intended for transmission to, or receipt by, any unauthorized persons. It is intended solely for assisting the intended agency with investigative leads in applicable cases and is not intended as legal services or advice.  If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message and any attachments or copies.  Any disclosure, copying, distribution, or reliance on the contents of this message or its attachments is strictly prohibited and may be unlawful. Unintended transmission does not constitute waiver of any privacy rights or any privilege.  Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is it intended to reflect an intention to make an agreement by electronic means.

Appx. 057

# Exhibit I

## OTHRAM, INC.

### STOCK TRANSFER AGREEMENT

This Stock Transfer Agreement (the "Agreement") is made and entered into as of September 15, 2025, by and among The EB White Trust, The Kawruh Trust and The Xavier Capital Trust (collectively, and each, the "Transferor"), 77381 Holdings, LLC, a Delaware limited liability company ("Transferee"), Charles Carlisle Johnson ("CCJ"), and Othram, Inc., a Delaware corporation (the "Company") (the Transferor, the Transferee, CCJ, together with the Company, the "Parties").

### AGREEMENT

The Parties hereby agree as follows:

1.    **Transfer and Sale.** Subject to the terms and conditions of this Agreement, that certain Founder Stock Purchase Agreement by and among the Company and CCJ (being the predecessor in interest to the Transferor), dated September 24, 2018 (as amended from time to time, the "Purchase Agreement"), that certain Stock Power, dated December 31, 2019, executed by CCJ, those certain Joinder Agreements, each dated December 31, 2019, executed by each of the Transferors, that certain Stock Power, dated April 9, 2020, executed by The Xavier Capital Trust, that certain Joinder Agreement, dated April 9, 2020, executed by The Xavier Capital Trust, that certain Third Amended and Restated Investors' Rights Agreement by and among the Company, Transferor, Transferee and other parties thereto dated February 1, 2024, as amended by that certain Amendment No. 1 to Third Amended and Restated Investors' Rights Agreement, dated June 6, 2025 (as may be amended from time to time, the "Rights Agreement"), that certain Third Amended and Restated Voting Agreement by and among the Company, Transferor, Transferee and other parties thereto dated February 1, 2024, as amended by that certain Amendment No. 1 to Third Amended and Restated Voting Agreement, dated June 6, 2025 (as may be amended from time to time, the "Voting Agreement") and that certain Third Amended and Restated Right of First Refusal and Co-Sale Agreement by and among the Company, Transferor, Transferee and other parties thereto dated February 1, 2024, as amended by that certain Amendment No. 1 to Third Amended and Restated Right of First Refusal and Co-Sale Agreement, dated June 6, 2025 (as may be amended from time to time, the "Co-Sale Agreement" and, together with the other agreements referenced in this Section 1, the "Related Agreements."), (a) The EB White Trust agrees to transfer and sell 71,615 shares of Common Stock of the Company (the "EBW Shares"), (b) The Kawruh Trust agrees to transfer and sell 143,229 shares of Common Stock of the Company (the "Kawruh Shares"), and (c) The Xavier Capital Trust agrees to transfer and sell 566,406 shares of Common Stock of the Company (the "Xavier Shares," and together with the EBW Shares and the Kawruh Shares, the "Shares") to Transferee, and Transferee agrees to purchase the Shares from Transferor, as of the Closing Date (as defined below), for an aggregate purchase price of $1,000,000 (the "Purchase Price"), comprising $91,667.20 in respect of the EBW Shares, $183,333.12 in respect of the Kawruh Shares and $724,999.68 in respect of the Xavier Shares.

2.    **Closing.**

(a)    **Closing Date.**  The transfer and sale of the Shares pursuant to this Agreement (the "Closing") shall occur following receipt of all requisite consents and approvals under the Related Agreements, but in any event no later than 30 days following the date hereof (the "Closing Date").

(b)    **Closing Deliverables.**  At the Closing,

(i)    The Transferee will deliver:

(1)    To the Transferor and the Company, a duly authorized and executed copy of this Agreement; and

(2)    To the Transferor, payment of the Purchase Price by cash, check or wire transfer to a bank account or accounts designated by Transferor.

(ii)    Each Transferor will deliver:

(1)    To the Company, a Stock Power in the form attached to this Agreement as Exhibit A, executed by each Transferor in favor of Transferee; and

(2)    To the Transferee and the Company, a duly authorized and executed copy of this Agreement.

(iii)    The Company will issue and deliver:

(1)    To the Transferee, a notice of issuance representing the Shares in Transferee's name; and

(2)    To the Transferor and the Transferee, a duly authorized and executed copy of this Agreement.

3.    **Representations and Warranties of Transferee.**  In connection with the transfer and sale of the Shares to Transferee, Transferee represents and warrants to Transferor and the Company that:

(a)    **Purchase Entirely for Own Account.**  Transferee is acquiring the Shares for investment for Transferee's own account only and not with a view to, or for resale in connection with, any "distribution" of the Shares within the meaning of the Securities Act of 1933, as amended (the "Securities Act").

(b)    **Restricted Securities.**  Transferee understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Transferee's investment intent as expressed herein.  Transferee understands that the Shares are "restricted securities" under applicable U.S. federal and state laws and that, pursuant to these laws, Transferee must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and

qualified by state authorities, or an exemption from such registration and qualification requirements is available. Transferee acknowledges that except as set forth in the Rights Agreement, the Company has no obligation to register or qualify the Shares for resale. Transferee further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and requirements relating to the Company which are outside of Transferee's control, and which the Company is under no obligation and may not be able to satisfy.

(c) **Disqualification.** Transferee represents that neither Transferee nor any person or entity with whom Transferee shares beneficial ownership of Company securities is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act. Transferee also agrees to notify the Company if Transferee or any person or entity with whom Transferee shares beneficial ownership of Company securities becomes subject to such disqualifications after the date hereof (so long as Transferee or any such person beneficially owns any equity securities of the Company).

(d) **Limitations on Transfer.** Transferee will not sell, transfer, pledge or otherwise dispose of any Shares received by Transferee unless and until (i) such Shares are subsequently registered under the Securities Act and any applicable state securities laws, or (ii) (A) an exemption from such registration is available thereunder, and (B) Transferee has notified the Company of the proposed transfer and has, upon the Company's request, furnished the Company with an opinion of counsel in a form reasonably satisfactory to the Company that such transfer will not require registration of such Shares under the Securities Act. Transferee understands that the Company is not obligated, and does not intend, to register any such Shares either under the Securities Act or any state securities laws. Transferee authorizes the Company to issue stop transfer instructions to its Shares' transfer agent, or, so long as the Company may act as its own transfer agent, to make a stop transfer notation in its appropriate records, in order to ensure Transferee's compliance with this provision.

(e) **Foreign Investment Risk Review Modernization Act.** Transferee represents that it is not a "foreign person" within the meaning of 31 C.F.R. §800.216, unless the Company has otherwise explicitly waived the requirement of this subsection as it applies to Transferee in writing.

(f) **Accredited Investor.** Transferee is an accredited investor as defined in Rule 501(a) of Regulation D of the Securities Act and has such knowledge and experience in financial and business matters that Transferee is capable of evaluating the merits and risks of acquiring the Shares.

(g) **Authorization.** Transferee has all necessary power and authority to execute, deliver and perform Transferee's obligations under this Agreement and all agreements, instruments and documents contemplated hereby, and this Agreement constitutes a valid and binding obligation of Transferee.

(h) **No Conflict.** The execution, delivery and performance of this Agreement by Transferee and the consummation of the transactions contemplated hereby will not result in any violation or be in conflict with or constitute, with or without the passage of time and giving of

-3-

notice, either a default under any provision of any instrument, judgment, order, writ, decree or contract.

(i) **No General Solicitation**.  At no time was Transferee presented with or solicited through any publicly issued or circulated newspaper, mail, radio, television or other form of general advertisement or solicitation in connection with the sale and transfer of the Shares.

(j) **Transferee's Qualifications**. Transferee has a preexisting personal or business relationship with Transferors, the Company and/or certain of its officers and/or directors of a nature and duration sufficient to make Transferee aware of the character, business acumen and general business and financial circumstances of the Company and/or such officers and directors. By reason of Transferee's business or financial experience, Transferee is capable of evaluating the merits and risks of this purchase, has the ability to protect Transferee's own interests in the transaction contemplated by this Agreement and is financially capable of bearing a total loss of the Shares.

4. **Representations and Warranties of Transferor.**  In connection with the transfer of the Shares to Transferee, each Transferor represents and warrants to Transferee and the Company that:

(a) **Ownership**.  Such Transferor is the sole beneficial owner of its Shares and that such Shares are free and clear of any liens or encumbrances (other than restrictions on transfer under applicable state and federal laws and restrictions under the Related Agreements).  Such Transferor further represents that such Transferor has good and marketable title to such Shares and the right and authority to transfer and sell such Shares to the Transferee pursuant to this Agreement and without any third party consent.

(b) **Authorization.**  Transferor has all necessary power and authority to execute, deliver and perform Transferor's obligations under this Agreement and all agreements, instruments and documents contemplated hereby and to transfer, sell and deliver its Shares being transferred and sold hereunder, and this Agreement constitutes a valid and binding obligation of such Transferor.

(c) **No Conflict.**  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not result in any violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either a default under any provision of any instrument, judgment, order, writ, decree or contract (including, without limitation, the Related Agreements) or result in the creation of any lien, charge or encumbrance upon such Shares.

(d) **Third Party Consents**.  No consent or approval is needed from any third party, including any governmental department, bureau or agency or other public board or authority, in order to effect the sale of the Shares contemplated in this Agreement, other than those under the Related Agreements, which such consents and approvals have been, or will be obtained prior to Closing and remain in full force and effect through Closing.

-4-

(e) **Validity.** This Agreement, when executed and delivered by such Transferor, will constitute the valid and legally binding obligation of such Transferor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of a specific performance, injunctive relief, or other equitable remedies.

(f) **Sale for Own Account.** Such Transferor is selling its Shares for such Transferor's own account only and not with a view to, or for sale in connection with, a distribution of the Shares within the meaning of the Securities Act. No portion of the Purchase Price will be received indirectly by the Company.

(g) **No General Solicitation.** At no time has such Transferor presented Transferee with or solicited Transferee through any publicly issued or circulated newspaper, mail, radio, television or other form of general advertisement or solicitation in connection with the sale and transfer of its Shares.

(h) **Reliance**. Transferor acquired the Shares pursuant to a valid exemption from registration under the 1933 Act and applicable state securities laws. Transferor understands that the transfer of the Shares has not been registered under the 1933 Act, based upon an exemption from registration under the 1933 Act.

(i) **Disputes.** There is no litigation, claim, action, suit, arbitration or criminal or civil investigation or proceeding pending, involving or threatened with respect to the Shares or that questions the validity of this Agreement or any action taken or to be taken by such Transferor pursuant to this Agreement before or by any court or governmental or non-governmental department, commission, board, bureau, agency or instrumentality, or any other person or entity, nor has there occurred any event or does there exist any condition on the basis of which any such claim, action, suit, arbitration or criminal or civil investigation or proceeding may be asserted.

(j) **No Broker-Dealer.** Such Transferor has not effected the sale and transfer of its Shares by or through a broker-dealer in any public offering.

(k) **Right to Independent Counsel**. Such Transferor acknowledges that any counsel advising Transferee has acted as special counsel to Transferee only in this transaction and not on behalf of such Transferor and that such Transferor has had the right and opportunity to select independent counsel in order to safeguard such Transferor's own interests relating to this Agreement and the transactions contemplated by this Agreement and has done so or has elected to proceed without retaining counsel. Such Transferor further acknowledges that such Transferor has been advised to seek independent legal and financial advice relating to this Agreement and the transactions contemplated by this Agreement. Such Transferor is relying solely on any such advisors and not on any statements or representations of the Company or the Transferee, or any of their respective agents or advisors with respect to such matters. Such Transferor acknowledges and agrees that neither Transferee nor the Company has made any representation to such Transferor with respect to the tax treatment of the transactions contemplated by this Agreement or shall have any responsibility or liability for any taxes of such Transferor and that such Transferor is solely responsible for any such taxes.

5.    **Informed Decision; Investigation; Future Gains; Tax Consequences; Etc.**

(a)    Each of Transferor and Transferee (collectively, the "Transacting Parties") has entered into this Agreement based on its knowledge, investigation and analysis. Each of the Transacting Parties acknowledges that the Purchase Price of the Shares being paid by the Transferee was negotiated at arm's-length, may not represent the fair market value of the Shares, and that the Shares may have a current or future value greater or lesser than the amount paid for the Shares under this Agreement. Each of the Transacting Parties understands that the Company's plans for the future may result in the Shares becoming significantly more or less valuable, and that the future value of the Shares could be greater or lesser than the Purchase Price. Each of the parties acknowledges and understands that the Company may pursue liquidity events. Nevertheless, Transferor is selling the Shares of its own free will, and Transferee is purchasing the Shares of its own free will. Neither the Company nor any of its agents has made any representation to the parties about the advisability of this decision or the potential future value of the Shares. Each of the Transacting Parties has the capacity to protect its own interests in connection with the sale of the Shares and the transactions contemplated by this Agreement by reason of its business or financial experience or the business or financial experience of its professional advisors who are unaffiliated with, and who are not compensated by the Company. Each of the Transacting Parties agrees that neither the Company, its counterparty in this transaction nor any of their respective affiliated parties are under any obligation to disclose to such party any information or opinion they may have about the potential future value of the Company's capital stock, even if such information is material, and each of the Transacting Parties has determined to enter into this Agreement notwithstanding such lack of information. Each of the Transacting Parties hereby acknowledges that any future sale of shares of the Company's capital stock could be at a premium or a discount to the Purchase Price, and such sale could occur at any time or not at all. Each of the Transacting Parties hereby acknowledges that it has not relied on any representation or statement of the Company or its counterparty in this transaction, other than those set forth in this Agreement, in making its investment decision to enter into this Agreement.

(b)    Each of the Transacting Parties further acknowledges that it has received all information it has deemed appropriate or necessary to enable such Transacting Party to evaluate its decision to enter into this Agreement. Without limiting the foregoing, each of the Transacting Parties expressly acknowledges that (i) the other parties to this Agreement currently may have, and later may come into possession of, information with respect to the Company that is not known to such Transacting Party and that may be material to a decision to sell the Shares (the "Excluded Information"), (ii) each of the Transacting Parties has determined to enter into this Agreement notwithstanding its lack of knowledge of the Excluded Information, and (iii) the parties shall have no liability to one another, and the parties hereto waive and release any claims that it might have against any other party hereto whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Excluded Information in connection with the sale of the Shares and the transactions contemplated by this Agreement.

(c)    Transferor acknowledges that neither the Company, Transferee nor their respective agents or representatives have given Transferor any investment advice, credit information, or opinion regarding whether the sale of the Shares is prudent. Transferor has reviewed with his own tax advisors the federal, state, local and foreign tax consequences of the transaction contemplated by this Agreement. Transferor understands that it (and neither the

Company nor Transferee) shall be responsible for any tax liability of Transferor that may arise as a result of the transaction contemplated by this Agreement.

6. **Legends.** Transferee authorizes the Company and its agents to place on any certificate for shares which Transferee may acquire pursuant to this Agreement any legends required under any of the Related Agreements and/or state securities laws, as well as the following legends:

(a) THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE COMPANY, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

(b) THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND REPURCHASE OPTIONS IN FAVOR OF THE COMPANY OR ITS ASSIGNEE SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER, OR SUCH HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THIS COMPANY.

(c) Any legend required to be placed thereon by relevant state securities regulators.

7. **Company Consent.** Subject to the receipt of the requisite consents and approvals under the Related Agreements, the Company consents to the transfer of the Shares under this Agreement. The Company is a party to this Agreement solely for purposes of Section 10(g) (Further Transfers of Stock), as well as this Section 7 (Company Consent), and makes no representation or warranty as to the legality of the transfer of the Shares hereunder; provided, however, that nothing in this Section 7 shall in any way limit the Company's right to claim any benefits inuring to it under any other sections of this Agreement. Notwithstanding the foregoing, unless otherwise agreed to by the Company, Transferee agrees to be bound by and comply with the same covenants to which each Transferor and/or the Shares are obligated immediately prior to the date of this Agreement (the "Covenants"), including without limitation the applicable contractual restrictions set forth in the Related Agreements, as applicable. All future transferees of all or part of the Shares shall receive and hold such Shares subject to the Covenants.

8. **Release.**

(a) Each of the Transferor and CCJ, on behalf of itself/himself and on behalf of its/his predecessors and successors, past and present trustees, beneficiaries, agents, representatives, partners, directors, officers, attorneys, employees, servants, shareholders, affiliates, subsidiaries,

-7-

heirs, executors, administrators and assigns, as well as any person acting by, through, under or in concert with any of the foregoing does hereby release and forever discharge the Company, the Transferee, and their respective predecessors and successors, past and present agents, representatives, partners, directors, officers, attorneys, employees, servants, shareholders, affiliates, subsidiaries, heirs, executors, administrators and assigns, as well as any person acting by, through, under or in concert with any of the foregoing (collectively, the "Released Parties"), from any and all claims, demands, causes of action, obligations, damages, losses, liabilities, contracts, agreements, promises, debts, costs and expenses of any kind whatsoever, whether at law or in equity, asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent (collectively, "Claims" and individually, "Claim"), which such party ever had, now has, or may claim to have against the Release Parties; provided the Transferor and CCJ are not releasing the Transferee of its obligations under this Agreement.

(b)    EACH OF THE TRANSFEROR AND CCJ HEREBY ACKNOWLEDGES THAT IT/HE HAS BEEN ADVISED BY LEGAL COUNSEL, IS FAMILIAR WITH AND FULLY UNDERSTANDS THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542 (OR SIMILAR PROVISION IN THE JURISDICTION IN WHICH SUCH PARTY RESIDES) WHICH PROVIDES AS FOLLOWS: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY." HAVING BEEN SO ADVISED, EACH OF THE TRANSFEROR AND CCJ NEVERTHELESS ELECTS TO AND DOES ASSUME ALL RISKS FOR CLAIMS KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, HERETOFORE ARISING FROM THE SUBJECT OF THIS SECTION 8, AND SPECIFICALLY WAIVES ANY RIGHTS IT/HE MAY HAVE UNDER SECTION 1542, AS WELL AS UNDER ANY OTHER APPLICABLE STATUTE OR COMMON-LAW PRINCIPLE WITH A SIMILAR EFFECT.

(c)    Each of the Released Parties is an express third-party beneficiary of this Section 8.

9.    **Agreement Not to Disparage**.    Each Transferor and CCJ (collectively, the "Restricted Parties") hereby acknowledges and agrees that none of the Restricted Parties shall, at any time, directly or indirectly, make, communicate or publish, or cause to be made, communicated or published, verbally or in writing, whether anonymously or not, any statement, observation, opinion or information of a negative, defamatory or disparaging nature concerning the Company, Transferee or any of their respective current or former affiliates, employees, officers, directors, stockholders, investors, representatives or agents, or the business, products or services of the Company. Notwithstanding the foregoing, nothing in this Section shall limit any Restricted Party's ability, with or without notice to the Company or Transferee, to: (i) file a charge or complaint with any government agency; (ii) communicate with any government agency or otherwise participate in any investigation or proceeding that may be conducted by any government agency, including by providing non-privileged documents or information; or (iii) testify truthfully in a legal proceeding.

-8-

10.    **Confidentiality**.  Each of the Restricted Parties agrees that such Restricted Party will keep confidential and will not disclose, divulge, or use for any purpose any confidential information obtained from the Company or Transferee pursuant to the terms of this Agreement, the Related Agreements or otherwise obtained from such Restricted Party's stockholding or interest in the Company, unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of any obligation to the Company), (b) is or has been independently developed or conceived by the Restricted Party without use of or reference to the Company's or Transferee's confidential information, or (c) is or has been made known or disclosed to the Restricted Party by a third party without a breach of any obligation of confidentiality such third party may have to the Company or to Transferee; *provided, however*, that a Restricted Party may disclose confidential information (i) to its or his attorneys, accountants, consultants and other professionals to the extent necessary to obtain their services in connection this Agreement, or (ii) as may otherwise be required by law, *provided* that such Restricted Party promptly notifies the Company and Transferee of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

11.    **Indemnification**.  Each Transferor will indemnify, defend and hold harmless Transferee, the Company and each of their respective Affiliates (each, an "Indemnified Party") against all expenses (including reasonable attorneys' fees, disbursements and other charges of counsel incurred by the Indemnified Party), claims, losses, damages or liabilities (or actions, proceedings or settlements in respect thereof) arising out of or based on any claim, complaint, suit or proceeding or cause of action by Transferee or a third party alleging any breach of the representations and warranties or covenants made by Transferors in this Agreement. For purposes of this Section 11, "*Affiliates*" of a party shall mean each entity controlled by, controlling or under common control with such party, including without limitation, any funds under common management with such party and the general partner of such party, and the past, present and future directors, officers, employees, stockholders, controlling persons, partners (direct or indirect), managers, members (direct or indirect), agents, subsidiaries, attorneys, financial advisors, investment banking advisors, insurers and representatives of such party.

12.    **Voluntary Execution of Agreement.**  This Agreement is executed voluntarily and without any duress or undue influence on the part or behalf of the Parties hereto.  The Parties acknowledge that:

(a)    they have read this Agreement;

(b)    they have been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of their own choice or that they have voluntarily declined to seek such counsel;

(c)    they understand the terms and consequences of this Agreement and of the releases it contains; and

(d)    they are fully aware of the legal and binding effect of this Agreement.

13.    **Miscellaneous.**

-9-

(a) **Governing Law.** The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

(b) **Entire Agreement; Amendment.** This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.

(c) **Notices.** Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(d) **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(e) **Electronic Delivery.** The Company may, in its sole discretion, decide to deliver any documents or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means. Transferee hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

(f) **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement. Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

(g) **Successors and Assigns; Transfer of Shares.** Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign,

-10-

whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

       (h)    **Further Assurances**. The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

       (i)    **Costs of Enforcement**. If any party to this Agreement seeks to enforce its rights under this Agreement by legal proceedings against the party to this Agreement, the non-prevailing party named in such legal proceedings shall pay all costs and expenses incurred by the prevailing party, including all reasonable attorneys' fees.

       (j)    **Independent Counsel**. Each party acknowledges that this Agreement has been reviewed on behalf of the Company by Shartsis Friese LLP ("Shartsis"), counsel to the Company, and that Shartsis does not represent, and is not acting on behalf of, Transferee or any Transferor. Transferee and each Transferor has each been provided with an opportunity to consult with his or its own legal counsel with respect to this Agreement.

*[Signature Page Next]*

-11-

The parties have executed this Stock Transfer Agreement as of the date first written above.

**TRANSFEREE:**

77381 HOLDINGS, LLC

By: _____

Name: Sharrin Fuller

Title: Manager

Address: 32 N Gould St

Sheridan, WY 82801

Email: csm@gwv.email


**TRANSFEROR:**

THE EB WHITE TRUST

By: _____

Name: _____

Title: _____

Address: _____

_____

Email: _____

Docusign Envelope ID: 5A8C2D3E-856A-47AE-8DD7-D8E7CEBAC1AF

The parties have executed this Stock Transfer Agreement as of the date first written above.

**TRANSFEREE:**

77381 HOLDINGS, LLC

By:_____

Name:_____

Title:_____

Address: _____

_____

Email: _____


**TRANSFEROR:**

THE EB WHITE TRUST

By: _____

Name: _Thomas McNeil Johnson_____

Title: _Trustee_____

Address: _23 Johnson St_____

_MALDEN MA 02148_____

Email: _Tomj82191@gmail.com_____

Docusign Envelope ID: B3BBE8FE-D719-4016-BEDA-5FEB91B67B49

The parties have executed this Stock Transfer Agreement as of the date first written above.

THE KAWRUH TRUST

By: _Bernadette Desvita Hapsari (signature)_

Name: Bernadette Desvita Hapsari

Title: Trustee

Address: 9042 ralph street

Rosemead, ca 91770

Email: bernahap2917@gmail.com

THE XAVIER CAPITAL TRUST

By:

Name:

Title:

Address:

Email:

**CCJ:**

CHARLES CARLISLE JOHNSON

By:

Address:

Email:

13804\003\10722680.v2

Appx. 072

Docusign Envelope ID: A34F0BED-8298-40B3-A35C-C28262E029A3

The parties have executed this Stock Transfer Agreement as of the date first written above.

THE KAWRUH TRUST

By: _____

Name: _____

Title: _____

Address: _____

_____

Email: _____

THE XAVIER CAPITAL TRUST

By: _____

Name: _Charles Carlisle Johnson_____

Title: _Trustee_____

Address: _1624 Fieldthorn Drive Reston, VA 20194_

_1624 Fieldthorn Drive Reston, VA 20194_

Email: _Charlescjohnson88@gmail.com_

**CCJ:**

CHARLES CARLISLE JOHNSON

By: _____

Address: _1624 Fieldthorn Drive Reston, VA 20194_

_1624 Fieldthorn Drive Reston, VA 20194_

Email: _Charlescjohnson88@gmail.com_

The parties have executed this Stock Transfer Agreement as of the date first written above.

**THE COMPANY:**

OTHRAM, INC.

By: _David Mittelman_____

Name: _David Mittelman_____

Title: _Chief Executive Officer_____

## EXHIBIT A

## STOCK POWER

FOR VALUE RECEIVED and pursuant to that certain Stock Transfer Agreement, dated as of September 15, 2025 by and among The EB White Trust ("Transferor"), 77381 Holdings, LLC ("Transferee") and Othram, Inc., a Delaware corporation (the "Company"), the Transferor hereby assigns and transfers unto Transferee 71,615 shares of Common Stock of the Company standing in Transferor's name on the Company's books, whether held in certificated or uncertificated form, and does hereby irrevocably constitute and appoint the Company as transfer agent with authority to transfer said stock on the books of the Company with full power of substitution in the premises.

DATED _____.

                                           **TRANSFEROR:**

                                           THE EB WHITE TRUST

                                           By:_____

                                           Name:_____

                                           Title:_____

                                                           (Signature)

                                           Address: _____

                                           _____

                                           Email: _____

## EXHIBIT A

## STOCK POWER

       FOR VALUE RECEIVED and pursuant to that certain Stock Transfer Agreement, dated as of September 15, 2025 by and among The Kawruh Trust ("Transferor"), 77381 Holdings, LLC ("Transferee") and Othram, Inc., a Delaware corporation (the "Company"), the Transferor hereby assigns and transfers unto Transferee 143,229 shares of Common Stock of the Company standing in Transferor's name on the Company's books, whether held in certificated or uncertificated form, and does hereby irrevocably constitute and appoint the Company as transfer agent with authority to transfer said stock on the books of the Company with full power of substitution in the premises.

DATED _____.

 

**TRANSFEROR:**

THE KAWRUH TRUST

By:_____

Name:_____

Title:_____
                      (Signature)

Address: _____

_____

Email: _____

## EXHIBIT A

## STOCK POWER

FOR VALUE RECEIVED and pursuant to that certain Stock Transfer Agreement, dated as of September 15, 2025 by and among The Xavier Capital Trust ("Transferor"), 77381 Holdings, LLC ("Transferee") and Othram, Inc., a Delaware corporation (the "Company"), the Transferor hereby assigns and transfers unto Transferee 566,406 shares of Common Stock of the Company standing in Transferor's name on the Company's books, whether held in certificated or uncertificated form, and does hereby irrevocably constitute and appoint the Company as transfer agent with authority to transfer said stock on the books of the Company with full power of substitution in the premises.

DATED _____.

**TRANSFEROR:**

THE XAVIER CAPITAL TRUST

By:_____

Name:_____

Title:_____
　　　　　　　　(Signature)

Address: _____

_____

Email: _____

# Exhibit J

<div align="center">

**OTHRAM, INC.**

**STOCK TRANSFER AGREEMENT**

</div>

This Stock Transfer Agreement (the "<u>Agreement</u>") is made and entered into as of September 15, 2025, by and among The EB White Trust, The Kawruh Trust and The Xavier Capital Trust (collectively, and each, the "<u>Transferor</u>"), 77381 Holdings, LLC, a Delaware limited liability company ("<u>Transferee</u>"), Charles Carlisle Johnson ("<u>CCJ</u>"), and Othram, Inc., a Delaware corporation (the "<u>Company</u>") (the Transferor, the Transferee, CCJ, together with the Company, the "<u>Parties</u>").

<div align="center">

**AGREEMENT**

</div>

The Parties hereby agree as follows:

1.    **Transfer and Sale.**  Subject to the terms and conditions of this Agreement, that certain Founder Stock Purchase Agreement by and among the Company and CCJ (being the predecessor in interest to the Transferor), dated September 24, 2018 (as amended from time to time, the "<u>Purchase Agreement</u>"), that certain Stock Power, dated December 31, 2019, executed by CCJ, those certain Joinder Agreements, each dated December 31, 2019, executed by each of the Transferors, that certain Stock Power, dated April 9, 2020, executed by The Xavier Capital Trust, that certain Joinder Agreement, dated April 9, 2020, executed by The Xavier Capital Trust, that certain Third Amended and Restated Investors' Rights Agreement by and among the Company, Transferor, Transferee and other parties thereto dated February 1, 2024, as amended by that certain Amendment No. 1 to Third Amended and Restated Investors' Rights Agreement, dated June 6, 2025 (as may be amended from time to time, the "<u>Rights Agreement</u>"), that certain Third Amended and Restated Voting Agreement by and among the Company, Transferor, Transferee and other parties thereto dated February 1, 2024, as amended by that certain Amendment No. 1 to Third Amended and Restated Voting Agreement, dated June 6, 2025 (as may be amended from time to time, the "<u>Voting Agreement</u>") and that certain Third Amended and Restated Right of First Refusal and Co-Sale Agreement by and among the Company, Transferor, Transferee and other parties thereto dated February 1, 2024, as amended by that certain Amendment No. 1 to Third Amended and Restated Right of First Refusal and Co-Sale Agreement, dated June 6, 2025 (as may be amended from time to time, the "<u>Co-Sale Agreement</u>" and, together with the other agreements referenced in this Section 1, the "<u>Related Agreements.</u>"), (a) The EB White Trust agrees to transfer and sell 71,615 shares of Common Stock of the Company (the "<u>EBW Shares</u>"), (b) The Kawruh Trust agrees to transfer and sell 143,229 shares of Common Stock of the Company (the "<u>Kawruh Shares</u>"), and (c) The Xavier Capital Trust agrees to transfer and sell 566,406 shares of Common Stock of the Company (the "<u>Xavier Shares</u>," and together with the EBW Shares and the Kawruh Shares, the "<u>Shares</u>") to Transferee, and Transferee agrees to purchase the Shares from Transferor, as of the Closing Date (as defined below), for an aggregate purchase price of $1,000,000 (the "<u>Purchase Price</u>"), comprising $91,667.20 in respect of the EBW Shares, $183,333.12 in respect of the Kawruh Shares and $724,999.68 in respect of the Xavier Shares.

2. **Closing.**

(a) **Closing Date.** The transfer and sale of the Shares pursuant to this Agreement (the "Closing") shall occur following receipt of all requisite consents and approvals under the Related Agreements, but in any event no later than 30 days following the date hereof (the "Closing Date").

(b) **Closing Deliverables.** At the Closing,

(i) The Transferee will deliver:

(1) To the Transferor and the Company, a duly authorized and executed copy of this Agreement; and

(2) To the Transferor, payment of the Purchase Price by cash, check or wire transfer to a bank account or accounts designated by Transferor.

(ii) Each Transferor will deliver:

(1) To the Company, a Stock Power in the form attached to this Agreement as Exhibit A, executed by each Transferor in favor of Transferee; and

(2) To the Transferee and the Company, a duly authorized and executed copy of this Agreement.

(iii) The Company will issue and deliver:

(1) To the Transferee, a notice of issuance representing the Shares in Transferee's name; and

(2) To the Transferor and the Transferee, a duly authorized and executed copy of this Agreement.

3. **Representations and Warranties of Transferee.** In connection with the transfer and sale of the Shares to Transferee, Transferee represents and warrants to Transferor and the Company that:

(a) **Purchase Entirely for Own Account.** Transferee is acquiring the Shares for investment for Transferee's own account only and not with a view to, or for resale in connection with, any "distribution" of the Shares within the meaning of the Securities Act of 1933, as amended (the "Securities Act").

(b) **Restricted Securities.** Transferee understands that the Shares have not been registered under the Securities Act by reason of a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Transferee's investment intent as expressed herein. Transferee understands that the Shares are "restricted securities" under applicable U.S. federal and state laws and that, pursuant to these laws, Transferee must hold the Shares indefinitely unless they are registered with the Securities and Exchange Commission and

-2-

qualified by state authorities, or an exemption from such registration and qualification requirements is available. Transferee acknowledges that except as set forth in the Rights Agreement, the Company has no obligation to register or qualify the Shares for resale. Transferee further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Shares, and requirements relating to the Company which are outside of Transferee's control, and which the Company is under no obligation and may not be able to satisfy.

(c) **Disqualification.** Transferee represents that neither Transferee nor any person or entity with whom Transferee shares beneficial ownership of Company securities is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act. Transferee also agrees to notify the Company if Transferee or any person or entity with whom Transferee shares beneficial ownership of Company securities becomes subject to such disqualifications after the date hereof (so long as Transferee or any such person beneficially owns any equity securities of the Company).

(d) **Limitations on Transfer.** Transferee will not sell, transfer, pledge or otherwise dispose of any Shares received by Transferee unless and until (i) such Shares are subsequently registered under the Securities Act and any applicable state securities laws, or (ii) (A) an exemption from such registration is available thereunder, and (B) Transferee has notified the Company of the proposed transfer and has, upon the Company's request, furnished the Company with an opinion of counsel in a form reasonably satisfactory to the Company that such transfer will not require registration of such Shares under the Securities Act. Transferee understands that the Company is not obligated, and does not intend, to register any such Shares either under the Securities Act or any state securities laws. Transferee authorizes the Company to issue stop transfer instructions to its Shares' transfer agent, or, so long as the Company may act as its own transfer agent, to make a stop transfer notation in its appropriate records, in order to ensure Transferee's compliance with this provision.

(e) **Foreign Investment Risk Review Modernization Act.** Transferee represents that it is not a "foreign person" within the meaning of 31 C.F.R. §800.216, unless the Company has otherwise explicitly waived the requirement of this subsection as it applies to Transferee in writing.

(f) **Accredited Investor.** Transferee is an accredited investor as defined in Rule 501(a) of Regulation D of the Securities Act and has such knowledge and experience in financial and business matters that Transferee is capable of evaluating the merits and risks of acquiring the Shares.

(g) **Authorization.** Transferee has all necessary power and authority to execute, deliver and perform Transferee's obligations under this Agreement and all agreements, instruments and documents contemplated hereby, and this Agreement constitutes a valid and binding obligation of Transferee.

(h) **No Conflict.** The execution, delivery and performance of this Agreement by Transferee and the consummation of the transactions contemplated hereby will not result in any violation or be in conflict with or constitute, with or without the passage of time and giving of

-3-

notice, either a default under any provision of any instrument, judgment, order, writ, decree or contract.

(i)    **No General Solicitation**.  At no time was Transferee presented with or solicited through any publicly issued or circulated newspaper, mail, radio, television or other form of general advertisement or solicitation in connection with the sale and transfer of the Shares.

(j)    **Transferee's Qualifications**. Transferee has a preexisting personal or business relationship with Transferors, the Company and/or certain of its officers and/or directors of a nature and duration sufficient to make Transferee aware of the character, business acumen and general business and financial circumstances of the Company and/or such officers and directors. By reason of Transferee's business or financial experience, Transferee is capable of evaluating the merits and risks of this purchase, has the ability to protect Transferee's own interests in the transaction contemplated by this Agreement and is financially capable of bearing a total loss of the Shares.

4.    **Representations and Warranties of Transferor.**  In connection with the transfer of the Shares to Transferee, each Transferor represents and warrants to Transferee and the Company that:

(a)    **Ownership**.  Such Transferor is the sole beneficial owner of its Shares and that such Shares are free and clear of any liens or encumbrances (other than restrictions on transfer under applicable state and federal laws and restrictions under the Related Agreements).  Such Transferor further represents that such Transferor has good and marketable title to such Shares and the right and authority to transfer and sell such Shares to the Transferee pursuant to this Agreement and without any third party consent.

(b)    **Authorization.**  Transferor has all necessary power and authority to execute, deliver and perform Transferor's obligations under this Agreement and all agreements, instruments and documents contemplated hereby and to transfer, sell and deliver its Shares being transferred and sold hereunder, and this Agreement constitutes a valid and binding obligation of such Transferor.

(c)    **No Conflict.**  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not result in any violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either a default under any provision of any instrument, judgment, order, writ, decree or contract (including, without limitation, the Related Agreements) or result in the creation of any lien, charge or encumbrance upon such Shares.

(d)    **Third Party Consents**.  No consent or approval is needed from any third party, including any governmental department, bureau or agency or other public board or authority, in order to effect the sale of the Shares contemplated in this Agreement, other than those under the Related Agreements, which such consents and approvals have been, or will be obtained prior to Closing and remain in full force and effect through Closing.

-4-

(e) **Validity.** This Agreement, when executed and delivered by such Transferor, will constitute the valid and legally binding obligation of such Transferor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of a specific performance, injunctive relief, or other equitable remedies.

(f) **Sale for Own Account.** Such Transferor is selling its Shares for such Transferor's own account only and not with a view to, or for sale in connection with, a distribution of the Shares within the meaning of the Securities Act. No portion of the Purchase Price will be received indirectly by the Company.

(g) **No General Solicitation.** At no time has such Transferor presented Transferee with or solicited Transferee through any publicly issued or circulated newspaper, mail, radio, television or other form of general advertisement or solicitation in connection with the sale and transfer of its Shares.

(h) **Reliance.** Transferor acquired the Shares pursuant to a valid exemption from registration under the 1933 Act and applicable state securities laws. Transferor understands that the transfer of the Shares has not been registered under the 1933 Act, based upon an exemption from registration under the 1933 Act.

(i) **Disputes.** There is no litigation, claim, action, suit, arbitration or criminal or civil investigation or proceeding pending, involving or threatened with respect to the Shares or that questions the validity of this Agreement or any action taken or to be taken by such Transferor pursuant to this Agreement before or by any court or governmental or non-governmental department, commission, board, bureau, agency or instrumentality, or any other person or entity, nor has there occurred any event or does there exist any condition on the basis of which any such claim, action, suit, arbitration or criminal or civil investigation or proceeding may be asserted.

(j) **No Broker-Dealer.** Such Transferor has not effected the sale and transfer of its Shares by or through a broker-dealer in any public offering.

(k) **Right to Independent Counsel.** Such Transferor acknowledges that any counsel advising Transferee has acted as special counsel to Transferee only in this transaction and not on behalf of such Transferor and that such Transferor has had the right and opportunity to select independent counsel in order to safeguard such Transferor's own interests relating to this Agreement and the transactions contemplated by this Agreement and has done so or has elected to proceed without retaining counsel. Such Transferor further acknowledges that such Transferor has been advised to seek independent legal and financial advice relating to this Agreement and the transactions contemplated by this Agreement. Such Transferor is relying solely on any such advisors and not on any statements or representations of the Company or the Transferee, or any of their respective agents or advisors with respect to such matters. Such Transferor acknowledges and agrees that neither Transferee nor the Company has made any representation to such Transferor with respect to the tax treatment of the transactions contemplated by this Agreement or shall have any responsibility or liability for any taxes of such Transferor and that such Transferor is solely responsible for any such taxes.

5.  **Informed Decision; Investigation; Future Gains; Tax Consequences; Etc.**

(a)  Each of Transferor and Transferee (collectively, the "Transacting Parties") has entered into this Agreement based on its knowledge, investigation and analysis. Each of the Transacting Parties acknowledges that the Purchase Price of the Shares being paid by the Transferee was negotiated at arm's-length, may not represent the fair market value of the Shares, and that the Shares may have a current or future value greater or lesser than the amount paid for the Shares under this Agreement. Each of the Transacting Parties understands that the Company's plans for the future may result in the Shares becoming significantly more or less valuable, and that the future value of the Shares could be greater or lesser than the Purchase Price. Each of the parties acknowledges and understands that the Company may pursue liquidity events. Nevertheless, Transferor is selling the Shares of its own free will, and Transferee is purchasing the Shares of its own free will. Neither the Company nor any of its agents has made any representation to the parties about the advisability of this decision or the potential future value of the Shares. Each of the Transacting Parties has the capacity to protect its own interests in connection with the sale of the Shares and the transactions contemplated by this Agreement by reason of its business or financial experience or the business or financial experience of its professional advisors who are unaffiliated with, and who are not compensated by the Company. Each of the Transacting Parties agrees that neither the Company, its counterparty in this transaction nor any of their respective affiliated parties are under any obligation to disclose to such party any information or opinion they may have about the potential future value of the Company's capital stock, even if such information is material, and each of the Transacting Parties has determined to enter into this Agreement notwithstanding such lack of information. Each of the Transacting Parties hereby acknowledges that any future sale of shares of the Company's capital stock could be at a premium or a discount to the Purchase Price, and such sale could occur at any time or not at all. Each of the Transacting Parties hereby acknowledges that it has not relied on any representation or statement of the Company or its counterparty in this transaction, other than those set forth in this Agreement, in making its investment decision to enter into this Agreement.

(b)  Each of the Transacting Parties further acknowledges that it has received all information it has deemed appropriate or necessary to enable such Transacting Party to evaluate its decision to enter into this Agreement. Without limiting the foregoing, each of the Transacting Parties expressly acknowledges that (i) the other parties to this Agreement currently may have, and later may come into possession of, information with respect to the Company that is not known to such Transacting Party and that may be material to a decision to sell the Shares ("Excluded Information"), (ii) each of the Transacting Parties has determined to enter into this Agreement notwithstanding its lack of knowledge of the Excluded Information, and (iii) the parties shall have no liability to one another, and the parties hereto waive and release any claims that it might have against any other party hereto whether under applicable securities laws or otherwise, with respect to the nondisclosure of the Excluded Information in connection with the sale of the Shares and the transactions contemplated by this Agreement.

(c)  Transferor acknowledges that neither the Company, Transferee nor their respective agents or representatives have given Transferor any investment advice, credit information, or opinion regarding whether the sale of the Shares is prudent. Transferor has reviewed with his own tax advisors the federal, state, local and foreign tax consequences of the transaction contemplated by this Agreement. Transferor understands that it (and neither the

Company nor Transferee) shall be responsible for any tax liability of Transferor that may arise as a result of the transaction contemplated by this Agreement.

6.    **Legends.**    Transferee authorizes the Company and its agents to place on any certificate for shares which Transferee may acquire pursuant to this Agreement any legends required under any of the Related Agreements and/or state securities laws, as well as the following legends:

(a)    THE SECURITIES EVIDENCED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF THESE SECURITIES REASONABLY SATISFACTORY TO THE COMPANY, STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF SUCH ACT.

(b)    THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND REPURCHASE OPTIONS IN FAVOR OF THE COMPANY OR ITS ASSIGNEE SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER, OR SUCH HOLDER'S PREDECESSOR IN INTEREST, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL OFFICE OF THIS COMPANY.

(c)    Any legend required to be placed thereon by relevant state securities regulators.

7.    **Company Consent.**    Subject to the receipt of the requisite consents and approvals under the Related Agreements, the Company consents to the transfer of the Shares under this Agreement.    The Company is a party to this Agreement solely for purposes of Section 10(g) (Further Transfers of Stock), as well as this Section 7 (Company Consent), and makes no representation or warranty as to the legality of the transfer of the Shares hereunder; provided, however, that nothing in this Section 7 shall in any way limit the Company's right to claim any benefits inuring to it under any other sections of this Agreement. Notwithstanding the foregoing, unless otherwise agreed to by the Company, Transferee agrees to be bound by and comply with the same covenants to which each Transferor and/or the Shares are obligated immediately prior to the date of this Agreement (the "Covenants"), including without limitation the applicable contractual restrictions set forth in the Related Agreements, as applicable. All future transferees of all or part of the Shares shall receive and hold such Shares subject to the Covenants.

8.    **Release.**

(a)    Each of the Transferor and CCJ, on behalf of itself/himself and on behalf of its/his predecessors and successors, past and present trustees, beneficiaries, agents, representatives, partners, directors, officers, attorneys, employees, servants, shareholders, affiliates, subsidiaries,

-7-

heirs, executors, administrators and assigns, as well as any person acting by, through, under or in concert with any of the foregoing does hereby release and forever discharge the Company, the Transferee, and their respective predecessors and successors, past and present agents, representatives, partners, directors, officers, attorneys, employees, servants, shareholders, affiliates, subsidiaries, heirs, executors, administrators and assigns, as well as any person acting by, through, under or in concert with any of the foregoing (collectively, the "Released Parties"), from any and all claims, demands, causes of action, obligations, damages, losses, liabilities, contracts, agreements, promises, debts, costs and expenses of any kind whatsoever, whether at law or in equity, asserted or unasserted, known or unknown, suspected or unsuspected, fixed or contingent (collectively, "Claims" and individually, "Claim"), which such party ever had, now has, or may claim to have against the Release Parties; provided the Transferor and CCJ are not releasing the Transferee of its obligations under this Agreement.

(b)    EACH OF THE TRANSFEROR AND CCJ HEREBY ACKNOWLEDGES THAT IT/HE HAS BEEN ADVISED BY LEGAL COUNSEL, IS FAMILIAR WITH AND FULLY UNDERSTANDS THE PROVISIONS OF CALIFORNIA CIVIL CODE SECTION 1542 (OR SIMILAR PROVISION IN THE JURISDICTION IN WHICH SUCH PARTY RESIDES) WHICH PROVIDES AS FOLLOWS: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY." HAVING BEEN SO ADVISED, EACH OF THE TRANSFEROR AND CCJ NEVERTHELESS ELECTS TO AND DOES ASSUME ALL RISKS FOR CLAIMS KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, HERETOFORE ARISING FROM THE SUBJECT OF THIS SECTION 8, AND SPECIFICALLY WAIVES ANY RIGHTS IT/HE MAY HAVE UNDER SECTION 1542, AS WELL AS UNDER ANY OTHER APPLICABLE STATUTE OR COMMON-LAW PRINCIPLE WITH A SIMILAR EFFECT.

(c)    Each of the Released Parties is an express third-party beneficiary of this Section 8.

9.    **Agreement Not to Disparage**.  Each Transferor and CCJ (collectively, the "Restricted Parties") hereby acknowledges and agrees that none of the Restricted Parties shall, at any time, directly or indirectly, make, communicate or publish, or cause to be made, communicated or published, verbally or in writing, whether anonymously or not, any statement, observation, opinion or information of a negative, defamatory or disparaging nature concerning the Company, Transferee or any of their respective current or former affiliates, employees, officers, directors, stockholders, investors, representatives or agents, or the business, products or services of the Company.  Notwithstanding the foregoing, nothing in this Section shall limit any Restricted Party's ability, with or without notice to the Company or Transferee, to: (i) file a charge or complaint with any government agency; (ii) communicate with any government agency or otherwise participate in any investigation or proceeding that may be conducted by any government agency, including by providing non-privileged documents or information; or (iii) testify truthfully in a legal proceeding.

10.      **Confidentiality**.  Each of the Restricted Parties agrees that such Restricted Party will keep confidential and will not disclose, divulge, or use for any purpose any confidential information obtained from the Company or Transferee pursuant to the terms of this Agreement, the Related Agreements or otherwise obtained from such Restricted Party's stockholding or interest in the Company, unless such confidential information (a) is known or becomes known to the public in general (other than as a result of a breach of any obligation to the Company), (b) is or has been independently developed or conceived by the Restricted Party without use of or reference to the Company's or Transferee's confidential information, or (c) is or has been made known or disclosed to the Restricted Party by a third party without a breach of any obligation of confidentiality such third party may have to the Company or to Transferee; *provided, however*, that a Restricted Party may disclose confidential information (i) to its or his attorneys, accountants, consultants and other professionals to the extent necessary to obtain their services in connection this Agreement, or (ii) as may otherwise be required by law, *provided* that such Restricted Party promptly notifies the Company and Transferee of such disclosure and takes reasonable steps to minimize the extent of any such required disclosure.

11.      **Indemnification**.  Each Transferor will indemnify, defend and hold harmless Transferee, the Company and each of their respective Affiliates (each, an "Indemnified Party") against all expenses (including reasonable attorneys' fees, disbursements and other charges of counsel incurred by the Indemnified Party), claims, losses, damages or liabilities (or actions, proceedings or settlements in respect thereof) arising out of or based on any claim, complaint, suit or proceeding or cause of action by Transferee or a third party alleging any breach of the representations and warranties or covenants made by Transferors in this Agreement. For purposes of this Section 11, "*Affiliates*" of a party shall mean each entity controlled by, controlling or under common control with such party, including without limitation, any funds under common management with such party and the general partner of such party, and the past, present and future directors, officers, employees, stockholders, controlling persons, partners (direct or indirect), managers, members (direct or indirect), agents, subsidiaries, attorneys, financial advisors, investment banking advisors, insurers and representatives of such party.

12.      **Voluntary Execution of Agreement.**  This Agreement is executed voluntarily and without any duress or undue influence on the part or behalf of the Parties hereto.  The Parties acknowledge that:

(a)      they have read this Agreement;

(b)      they have been represented in the preparation, negotiation, and execution of this Agreement by legal counsel of their own choice or that they have voluntarily declined to seek such counsel;

(c)      they understand the terms and consequences of this Agreement and of the releases it contains; and

(d)      they are fully aware of the legal and binding effect of this Agreement.

13.      **Miscellaneous.**

Appx. 087

(a)  **Governing Law.**  The validity, interpretation, construction and performance of this Agreement, and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the state of Delaware, without giving effect to principles of conflicts of law.

(b)  **Entire Agreement; Amendment.**  This Agreement sets forth the entire agreement and understanding of the parties relating to the subject matter herein and supersedes all prior or contemporaneous discussions, understandings and agreements, whether oral or written, between them relating to the subject matter hereof.  No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, shall be effective unless in writing signed by the parties to this Agreement.

(c)  **Notices.**  Any notice, demand or request required or permitted to be given under this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email, or 48 hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(d)  **Severability.**  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(e)  **Electronic Delivery.**  The Company may, in its sole discretion, decide to deliver any documents or any notices required by applicable law or the Company's Certificate of Incorporation or Bylaws by email or any other electronic means.  Transferee hereby consents to (i) conduct business electronically (ii) receive such documents and notices by such electronic delivery and (iii) sign documents electronically and agrees to participate through an on-line or electronic system established and maintained by the Company or a third party designated by the Company.

(f)  **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and all of which together shall constitute one and the same agreement.  Execution of a facsimile or scanned copy will have the same force and effect as execution of an original, and a facsimile or scanned signature will be deemed an original and valid signature.

(g)  **Successors and Assigns; Transfer of Shares.**  Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives.  The Company may assign any of its rights and obligations under this Agreement.  No other party to this Agreement may assign,

whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

       (h)    **Further Assurances**. The parties agree to execute such further documents and instruments and to take such further actions as may be reasonably necessary to carry out the purposes and intent of this Agreement.

       (i)    **Costs of Enforcement**. If any party to this Agreement seeks to enforce its rights under this Agreement by legal proceedings against the party to this Agreement, the non-prevailing party named in such legal proceedings shall pay all costs and expenses incurred by the prevailing party, including all reasonable attorneys' fees.

       (j)    **Independent Counsel**. Each party acknowledges that this Agreement has been reviewed on behalf of the Company by Shartsis Friese LLP ("Shartsis"), counsel to the Company, and that Shartsis does not represent, and is not acting on behalf of, Transferee or any Transferor. Transferee and each Transferor has each been provided with an opportunity to consult with his or its own legal counsel with respect to this Agreement.

*[Signature Page Next]*

-11-

The parties have executed this Stock Transfer Agreement as of the date first written above.

**TRANSFEREE:**

77381 HOLDINGS, LLC

By: _____

Name: Sharrin Fuller _____

Title: Manager _____

Address: 32 N Gould St _____

Sheridan, WY 82801 _____

Email: csm@gwv.email _____

**TRANSFEROR:**

THE EB WHITE TRUST

By: _____

Name: _____

Title: _____

Address: _____

_____

Email: _____

13804\003\10722680.v2

Appx. 090

Docusign Envelope ID: 5A8C2D3E-856A-47AE-8DD7-D8E7CEBAC1AF

The parties have executed this Stock Transfer Agreement as of the date first written above.

**TRANSFEREE:**

77381 HOLDINGS, LLC

By:_____

Name:_____

Title:_____

Address: _____

_____

Email: _____

**TRANSFEROR:**

THE EB WHITE TRUST

By: _____

Name: _Thomas McNeil Johnson_____

Title: _Trustee_____

Address: _23 Johnson St_____

_MALDEN MA 02148_____

Email: _Tomj82191@gmail.com_____

13804\003\10722680.v2

Docusign Envelope ID: B3BBE8FE-D719-4016-BEDA-5FEB91B67B49

The parties have executed this Stock Transfer Agreement as of the date first written above.

THE KAWRUH TRUST

By: _____

Name: Bernadette Desvita Hapsari

Title: Trustee

Address: 9042 ralph street

Rosemead, ca 91770

Email: bernahap2917@gmail.com


THE XAVIER CAPITAL TRUST

By: _____

Name: _____

Title: _____

Address: _____

_____

Email: _____


**CCJ:**

CHARLES CARLISLE JOHNSON

By: _____

Address: _____

_____

Email: _____

The parties have executed this Stock Transfer Agreement as of the date first written above.

THE KAWRUH TRUST

By: _____

Name: _____

Title: _____


Address: _____

_____

Email: _____


THE XAVIER CAPITAL TRUST

By: _____
      27FC89F0B72440B...

Name: Charles Carlisle Johnson

Title: Trustee


Address: 1624 Fieldthorn Drive Reston, VA 20194

1624 Fieldthorn Drive Reston, VA 20194

Email: Charlescjohnson88@gmail.com


**CCJ:**

CHARLES CARLISLE JOHNSON

By: _____
      27FC89F0B72440B...

Address: 1624 Fieldthorn Drive Reston, VA 20194

1624 Fieldthorn Drive Reston, VA 20194

Email: Charlescjohnson88@gmail.com

The parties have executed this Stock Transfer Agreement as of the date first written above.

**THE COMPANY:**

OTHRAM, INC.

By: _David Mittelman_
_57D1448A784A4D3..._

Name: David Mittelman

Title: Chief Executive Officer

# EXHIBIT A

## STOCK POWER

FOR VALUE RECEIVED and pursuant to that certain Stock Transfer Agreement, dated as of September 15, 2025 by and among The EB White Trust ("Transferor"), 77381 Holdings, LLC ("Transferee") and Othram, Inc., a Delaware corporation (the "Company"), the Transferor hereby assigns and transfers unto Transferee 71,615 shares of Common Stock of the Company standing in Transferor's name on the Company's books, whether held in certificated or uncertificated form, and does hereby irrevocably constitute and appoint the Company as transfer agent with authority to transfer said stock on the books of the Company with full power of substitution in the premises.

DATED _____.

**TRANSFEROR:**

THE EB WHITE TRUST

By:_____

Name:_____

Title:_____
(Signature)

Address: _____

_____

Email: _____

**<u>EXHIBIT A</u>**

**<u>STOCK POWER</u>**


FOR VALUE RECEIVED and pursuant to that certain Stock Transfer Agreement, dated as of September 15, 2025 by and among The Kawruh Trust ("<u>Transferor</u>"), 77381 Holdings, LLC ("<u>Transferee</u>") and Othram, Inc., a Delaware corporation (the "<u>Company</u>"), the Transferor hereby assigns and transfers unto Transferee 143,229 shares of Common Stock of the Company standing in Transferor's name on the Company's books, whether held in certificated or uncertificated form, and does hereby irrevocably constitute and appoint the Company as transfer agent with authority to transfer said stock on the books of the Company with full power of substitution in the premises.

DATED _____.

<div align="right" style="width:60%; margin-left:40%;">

**TRANSFEROR:**

THE KAWRUH TRUST

By:_____

Name:_____

Title:_____
                (Signature)

Address: _____

_____

Email: _____

</div>

**EXHIBIT A**

**STOCK POWER**

FOR VALUE RECEIVED and pursuant to that certain Stock Transfer Agreement, dated as of September 15, 2025 by and among The Xavier Capital Trust ("Transferor"), 77381 Holdings, LLC ("Transferee") and Othram, Inc., a Delaware corporation (the "Company"), the Transferor hereby assigns and transfers unto Transferee 566,406 shares of Common Stock of the Company standing in Transferor's name on the Company's books, whether held in certificated or uncertificated form, and does hereby irrevocably constitute and appoint the Company as transfer agent with authority to transfer said stock on the books of the Company with full power of substitution in the premises.

DATED _____.

**TRANSFEROR:**

THE XAVIER CAPITAL TRUST

By:_____

Name:_____

Title:_____
(Signature)

Address: _____

_____

Email: _____

# Exhibit K



# Richard Hanania ✔️
## @RichardHanania

You may remember the saga I reported on with Chuck Johnson. He's been right on Ghislaine being railroaded, even though I don't agree Jeffrey Epstein was a white hat intelligence agent.

Anyway, he has shared some interesting conversations with his lawyers from the Clearview case.



10:58 PM · 10/1/25 · **43** Views

    

Appx. 099

**Left screen:**

11:09

< 🖼 **Bernie Kleinman**  📹  📞

17:58 ??

Sat, Sep 13

Not in control of it  17:58 ✓

Sun, Sep 14

I thought you had some integrity and honesty and responsibility. But you are another deadbeat. Not paying their debts. You are no better than the guy who sticks up a liquor store. Providing completely specious excuses and that no one believes. Your government connections are all imaginary, and only exist in your mind. You should do the right thing and pay me. But you won't. Just as you have left a string of creditors behind you. "Not in control of it."? How do you pay your electric bill? Cell fone bill? Rent?  06:39

I don't

> **Bernie Kleinman**
> I thought you had some integrity and honesty and responsibility. But you are another dea...

They are all paid for me by the government connections you say are imaginary.

Bernie, you abandoned me mid-case and then tried to stick me with bad attorneys down in Texas. Not upset about it but let's be honest here. I got you a celebrity clie and even included your other client on a ⌄

Message  +  🔲  📷  🎤

**Right screen:**

11:09

< 🖼 **Bernie Kleinman**  📹  📞

They are all paid for me by the government connections you say are imaginary.

Sun, Sep 14

Bernie, you abandoned me mid-case and then tried to stick me with bad attorneys down in Texas. Not upset about it but let's be honest here. I got you a celebrity client and even included your other client on a list of people to be pardoned out of kindness. I can't keep telling you that I'm not in charge of my finances.

Maybe you should think on it and come back to me in a week or so. I'm moving to another place. Which of course I didn't pay for.  06:44 ✓

But I am grateful to you for revealing a lot about how you really think of me.

I was warned not to hire you but I did it anyway and as I said to you I have full intention of paying you the $20k or whatever you think you are owed. You should really talk to A Rod and come down and visit in DC so you can see for yourself that I am not crazy or a fraud.

No need to reply unless it's with an apology.  06:55 ✓

Charles. No one I have spoken to who you gave me names believes you. All of your so called connections told me that Charles lives in an imaginary world, no none of ⌄

Message  +  🔲  📷  🎤

Sun, Sep 14    06:55

Charles. No one I have spoken to who you gave me names believes you. All of your so called connections told me that Charles lives in an imaginary world, no none of them could corroborate even one iota of your so called government work. It all exists in your mind. Just admit to your self that you are a dead beat. If any of these contacts exist have them call me. I tried calling this A rod. No answer. And the judge could not reach this imaginary person. As I said, you are no better than the liquor store hold up man.
As far as the pardon: I ain't heard a word. Another Charles Johnson BS story that only exists between your ears.    06:57

One of the problems we have had is your inability to listen or to follow directions. It's fine. As I said you're welcome in DC anytime. I may even print the check and have it here for you to pick up.    06:59

Today

Any word on my bill??    05:57

Bernie Kleinman
Charles. No one I have spoken to who you gave me names believes you. All of your s

Message

**Bernie Kleinman**

Today

Any word on my bill?? 05:57

> Bernie Kleinman
> Charles. No one I have spoken to who you gave me names believes you. All of your so...

Any word on my apology? 08:16

Printed out a check for you at Homeland in DC. When your behavior changes I'll authorize your ability to pick it up. 08:19

> Bernie Kleinman
> Charles. No one I have spoken to who you gave me names believes you. All of your so...

This is disgusting. 08:20

Apologize? I apologize for telling the truth. Homeland Security. Very funny. I show up and "oops. We made a mistake". But, I am glad you fully acknowledge the debt and the chrck is being withheld. So, I can file a clsim against HS for my money now!! Perfect. Thank you for that information. I will do so this week. Thank you very very much 8m

You can come anytime and pick up the check Now

Message



**Bernie Kleinman**

Charles. No one I have spoken to who you
gave me name                es you.  All of your so...

Today

This is disgusting.                                    08:20

Apologize?  I apologize for telling the truth.
Homeland Security.  Very funny. I show up
and  " oops. We made a mistake ". But, I
am glad you fully acknowledge the debt
and the chrck is being withheld. So, I can
file a clsim against HS for my money now!!
Perfect. Thank you for that information. I
will do so this week.  Thank you very very
much                                                        9m

You can come anytime and pick up the
check                                                    1m

Your behavior is the issue, not mine.
                                                    Now







17:58

Sat, Sep 13

Not in control of it  17:58

Sun, Sep 14

I thought you had some integrity and honesty and responsibility. But you are another deadbeat. Not paying their debts. You are no better than the guy who sticks up a liquor store. Providing completely specious excuses and that no one believes. Your government connections are all imaginary, and only exist in your mind. You should do the right thing and pay me. But you won't. Just as you have left a string of creditors behind you. "Not in control of it."? How do you pay your electric bill? Cell fone bill? Rent?  06:39

I don't

Bernie Kleinman
I thought you had some integrity and honesty and responsibility. But you are another dea...

They are all paid for me by the government connections you say are imaginary.

Bernie, you abandoned me mid-case and then tried to stick me with bad attorneys down in Texas. Not upset about it but let's be honest here. I got you a celebrity clie
and even included your other client on a

They are all paid for me by the government connections you say are imaginary.

Sun, Sep 14

Bernie, you abandoned me mid-case and then tried to stick me with bad attorneys down in Texas. Not upset about it but let's be honest here. I got you a celebrity client and even included your other client on a list of people to be pardoned out of kindness. I can't keep telling you that I'm not in charge of my finances.

Maybe you should think on it and come back to me in a week or so. I'm moving to another place. Which of course I didn't pay for.  06:44

But I am grateful to you for revealing a lot about how you really think of me.

I was warned not to hire you but I did it anyway and as I said to you I have full intention of paying you the $20k or whatever you think you are owed. You should really talk to A Rod and come down and visit in DC so you can see for yourself that I am not crazy or a fraud.

No need to reply unless it's with an apology.  06:55

Charles. No one I have spoken to who you gave me names believes you. All of your so called connections told me that Charles

# Exhibit L

**Will Thompson**

| | |
|---|---|
| **From:** | Charles Johnson <charlescjohnson88@gmail.com> |
| **Sent:** | Tuesday, September 23, 2025 7:04 PM |
| **To:** | Thompson, Will |
| **Cc:** | Faulkner, Sherry |
| **Subject:** | Re: Point Bridge---have you attempted to sell any assets? |

⚠ EXTERNAL MESSAGE

How? My stock is locked up in the SPV he cheated me out of... of course he would know.

You should talk to your real client soon.

On Tue, Sep 23, 2025 at 20:01 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

He would not know if you are trying to sell Umbra.

**Othram**:  have you tried to sell Othram? Have you sold Othram?

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Tuesday, September 23, 2025 5:00 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Cc:** Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>
**Subject:** Re: Point Bridge---have you attempted to sell any assets?

⚠ EXTERNAL MESSAGE

Isn't your client in control of Umbra shares? Wouldn't he know?

On Tue, Sep 23, 2025 at 19:52 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Judge Pittman's order bars you from selling until after the mandate from the 5th Circuit issues. So, he expressly takes into consideration an appeal.

Have you sold Umbra or Othram? Have you attempted to sell it? Should be an easy question to answer.

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Tuesday, September 23, 2025 4:49 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Cc:** Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>
**Subject:** Re: Point Bridge---have you attempted to sell any assets?

⚠ EXTERNAL MESSAGE

You seem not to understand that this is at the 5th circuit... is there a reason why?

On Tue, Sep 23, 2025 at 19:48 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Charles---did you try to sell any Othram or Umbra?  Have you sold it?

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Tuesday, September 23, 2025 4:38 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Cc:** Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>
**Subject:** Re: Point Bridge---have you attempted to sell any assets?

⚠ EXTERNAL MESSAGE

Hey Will,

I've done what I am obliged to give you a chance to do the right thing. I've now fulfilled that obligation.

What a thing!

Anytime you want to come to DC to meet the Feds you say don't exist I'm happy to host you.

Good luck,

Charles



On Tue, Sep 23, 2025 at 19:32 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

> Charles:
>
>
> The only way to take your statement here as a threat: "It's a challenging thing here because you are just following orders, I suppose so *I'd advise you to proceed very carefully before you get yourself or your own career into further trouble*." What are you talking about.
>
>
> Also, please don't distract from my simple questions. Can you answer them? By evading the question, the only conclusion is that you have tried to sell assets, will not sit for a deposition (I think that you said that you welcomed jail), and that you won't provide any account info. Here are the questions again if you want to answer.
>
>
> 1. **Have you attempted to sell or dissipate any of those assets in 2025?**
>
> 2. **Have you reconsidered sitting for a deposition?**
>
>    a. **If so, provide dates in the next two weeks?**
>
> 3. **Are you going to respond to the interrogatory asking you to identify your account information?**
>
> And we know its baloney that the "Feds" are telling you not to talk to me.
>
> ---
>
> **From:** Charles Johnson <charlescjohnson88@gmail.com>
> **Sent:** Tuesday, September 23, 2025 4:00 PM
> **To:** Thompson, Will <will.thompson1@us.dlapiper.com>
> **Cc:** Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>
> **Subject:** Re: Point Bridge---have you attempted to sell any assets?
>
>
> ⚠ EXTERNAL MESSAGE
>
> Hey Will,

It's before the Fifth Circuit. If you need me to get a stay I can.

I don't mean to be rude to you but I'm getting advice from the Feds not to talk to you unless it's absolutely necessary.

It's a challenging thing here because you are just following orders, I suppose so I'd advise you to proceed very carefully before you get yourself or your own career into further trouble.

All the best,

On Tue, Sep 23, 2025 at 18:43 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Charles, Judge Pittman barred you from selling any of your assets, in particular crypto, Clearview, Othram, Anduril, Umbra (among other companies and assets identified in Exhibit 64).

1. **Have you attempted to sell or dissipate any of those assets in 2025?**

2. **Have you reconsidered sitting for a deposition?**

   a. **If so, provide dates in the next two weeks?**

3. **Are you going to respond to the interrogatory asking you to identify your account information?**

4

In addition, it is **ORDERED** that

and anyone acting in concert with him, is

the following actions until the mandate i

Court of Appeals:

- Selling, transferring, or oth

  cryptocurrency (including bitcoin),

  other assets identified in Trial Exh

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received

Appx. 110

this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

6

# Exhibit M

Case 4:24-cv-00988-P     Document 116-1     Filed 10/28/25     Page 113 of 114     PageID 3070



--------- Forwarded message ---------
From: **Charles Johnson** <charlescarlislejohnson@gmail.com>
Date: Wed, Oct 23, 2024 at 9:53 PM
Subject: 28
To:

My portfolio

Facial Recognition

In 2017 I formed a company called Clearview AI with Hoan Ton-That and Richard Schwartz.
Clearview AI is the fastest growing government contractor ever.

The latest funding round puts its valuation at over $100M. I own around 10 percent of the company. This is actually quite low relative to SenseTime, which is barred in the U.S. SenseTime is worth around $7B. Clearview's product is more interesting and more accurate.

I believe Clearview could be worth somewhere on the order of $100B – if it had a Sheryl Sandberg or Eric Schmidt running it.

I've recommended David Scalzo, an initial investor to come on as CEO. Hoan would become the CTO. I'd like to hire Dan Colascione as well. I want to patent my pay with your face.

<u>Othram</u>

<u>I cofounded Othram with David Mittelman and Steve Hsu. It's worth around $25M at last funding round. It's gotten acquisition offers over $100M.</u>

Genomic Prediction

I invested $200K at the seed stage when it was around $3M. It's now worth around $40M with minimal dilution.

I cofounded Traitwell but that's very embryonic.

Anduril

I invested about $200K in Anduril at the seed round of $80M. The current valuation of the company is north of $2B.

Umbra

I own half of an $10M SPV in Umbra, a synthetic aperture radar company. At present Umbra is worth around $100M. I also invested $200K.

Clear Labs

I own about $100K stock at the latest round.

**Plaintiffs' Exhibit**
**064**

JOHNSON 000062     Appx. 113

Currency

I invested about $600K in a bitcoin mining operation in early 2017, prices were around $900 or so. I'm not sure how much it's worth now but I'm interested in liquidating the position when bitcoin is worth $100K+. My understanding is that this bitcoin mine is among the largest in North America but I don't really know.

Ann Cavoukian has been leading the crusade against Clearview. She's received loads of money from Google.

She's the fromer privacy commissioner from Ontario.

**Google** Alerts

## "facial recognition"

Daily update · January 17, 2021

NEWS

### Entrepreneur wants to change how we shop using **facial recognition**
Crain's Detroit Business
Grand Rapids-based Iris Technology wants to use its technology to replace bar codes; The system would use **facial recognition** software and computer ...

     Flag as irrelevant

### Lawmaker looks to rein in law enforcement's use of **facial recognition** technology
Virginian-Pilot
In the case of campus police departments, a governing board would have to approve it. The Virginia State Police would still be able to use **facial** ...

     Flag as irrelevant

### Kosinski's Latest Paper Claims '**Facial Recognition** Technology Can Expose Political Orientation ...
MarkTechPost
Several studies have shown that **facial recognition** algorithms are suscep ble to many biases. Bias is pervasive in ML algorithms beyond those ...

    Flag as irrelevant

### Facebook fined $650 million for collecting **facial recognition** data inappropriately
NewsBytes
Facebook has been ordered to pay $650 million as part of a settlement to Illinois residents for collecting **facial recognition** data without their consent.

     Flag as irrelevant

### Face biometrics deployments increase as regulator and public push back
Biometric Update
The regulatory heat around **facial recognition** continues to rise, even as implementations increase from airports to digital health credentials around the ...

     Flag as irrelevant

JOHNSON 000462    Appx. 114