# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
| *Plaintiffs*, | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

**<u>DECLARATION OF WILL THOMPSON</u>**

I, Will Thompson, declare as follows. I am an attorney admitted to the State Bar of Texas and this Court and a partner at the law firm of DLA Piper LLP. I am attorney of record for the plaintiffs in the above captioned action. I am over the age of twenty-one years and am not a party to this action. I have personal knowledge of the facts set forth in this declaration. I declare under penalty of perjury that the facts stated in this document are true and correct.

1.      I appeared at the deposition of Charles Johnson on November 17, 2025. Attached hereto as exhibit A is a rough transcript of the deposition. Plaintiffs have requested a rush transcript from the court reporter.

My name is Will Thompson, my date of birth is November 20, 1982, and my business address is 1900 N. Pearl Street Dallas, Texas 75201, and USA. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Tarrant County, State of Texas, on November 18, 2025.


_____*/s/ Will Thompson*_____
Will Thompson

1

Appx. 002

2

# EXHIBIT A

1

1    Rough Draft of Deposition

2    Of Charles Johnson

3    November 17, 2025

4    Commencing at approximately 8:43 a.m.

5

6    ROUGH DRAFT DISCLAIMER:

7
     This UNEDITED ROUGH DRAFT of the proceedings is not
8    certified.  This ROUGH DRAFT may not be cited or used
     in any way nor at any time to rebut or contradict the
9    CERTIFIED FINAL TRANSCRIPT.  This ROUGH DRAFT may
     contain untranslates, RPTR'S NOTES, misspellings,
10   and/or nonsensical English because this ROUGH DRAFT has
     not been edited, proofread, corrected, finalized,
11   indexed, bound or certified.  All of these
     discrepancies will be corrected on the FINAL CERTIFIED
12   TRANSCRIPT.  There may also be a discrepancy in page
     numbers when comparing the UNEDITED ROUGH DRAFT and the
13   edited, proofread, corrected CERTIFIED FINAL.

14

15                          - - -

16                  P R O C E E D I N G S

17                Monday, November 17, 2025

18            Commencing at approximately 8:43 a.m.

19                          - - -

20

21            THE VIDEOGRAPHER:  We are on the record.

22   Today's date is November 17th, 2025.  The time is 8:43.

23   This is the video deposition of Charles Johnson

24    relative to a case styled Point Bridge Capital LLC, et

25    al, versus Charles Johnson.

                                                             2

1          This case is filed in the United States

2    District Court for the Northern District of Texas, Fort

3    Worth Division.

4          Counsel at this time would you state your

5    appearance for the record and the reporter can then

6    place our witness under oath.

7          MR. THOMPSON:  Will Thompson for the

8    plaintiffs.

9          THE REPORTER:  Would you raise your right

10   hand, please.

11         THE WITNESS:  (Complied)

12         THE REPORTER:  Do you swear or affirm that

13   the testimony you are about to give in this case will

14   be the truth, the whole truth, and nothing but the

15   truth, so help you God?

16         THE WITNESS:  I do.

17         MR. THOMPSON:  Ready to proceed?

18         THE VIDEOGRAPHER:  Counsel, you may

19   proceed.

20              CHARLES JOHNSON

21       having been duly sworn, testified as follows:

22                    EXAMINATION

23   BY MR. THOMPSON:

24        Q.     Okay.  Mr. Johnson are you ready to

25   proceed?

                                                      3

1        A.     I am.

2        Q.     All right.  Mr. Johnson, please state your

3   full legal name for the record.

4        A.     Charles Carlisle Johnson.

5        Q.     Have you used any other aliases names or --

6        A.     No.

7        Q.     -- in business, investment, or financial

8   dealings?

9        A.     No, I have not.

10        Q.     Have you ever given a deposition before?

11        A.     Yes.

12        Q.     How many times?

13        A.     This will be my ninth time.

14        Q.     Ninth time.  When was the last time you

15   gave one?

16        A.     I'm not sure.

17        Q.     Ballpark do you know?

18        A.     Four years ago.

19        Q.     What case was that?

20     A.     Somewhere in San Francisco.

21     Q.     Were you a --

22     A.     Maybe it was six years ago.

23     Q.     Were you a defendant?

24     A.     I was a fact witness.

25     Q.     Okay.  What was the case about?

4

1     A.     It was about First Amendment.

2     Q.     All right.  Well, it's been a couple of

3     years so I'm going to go over the ground rules.

4     A.     That's okay.  I'm familiar with them.  Go

5     ahead.

6     Q.     Do you understand that you are under oath

7     today?

8     A.     I do.

9     Q.     Do you understand that your testimony today

10     and the oath that you swore --

11     A.     Yes, go ahead, I'm familiar with taking the

12     deposition.

13     Q.     That the oath that you swore today has the

14     a same force and effect as the testimony as if you were

15     giving testimony before a Judge Pittman in open court?

16     A.     Yes, I am.  Go ahead.

17     Q.     Is there any medication, medical --

18        A.        No, I'm not on any drugs or medication.

19        Q.        Mr. Johnson, for the court reporter's

20   benefit, I'm going to ask my question.  Please let me

21   finish and then you can answer.  Is there any

22   medication, medical condition or other issue that

23   affects your ability to understand my questions --

24        A.        No.

25        Q.        -- or answer truthfully today?

                                                        5

1        A.        No.

2        Q.        Have you ever been diagnosed as a

3   pathological liar?

4        A.        No.

5        Q.        Have you ever been diagnosed as someone who

6   is incapable of telling the truth?

7        A.        No.  Relevance.

8        Q.        What is your current residential address?

9        A.        No fixed address.

10        Q.        What do you mean by no fixed address?

11        A.        No fixed address.  I'm -- I have no

12   physical address currently.

13        Q.        Where do you live then and sleep?

14        A.        I travel around.

15        Q.        Where does your mail get sent?

16    A.    It gets to 1624 filled ton drive but

17    there's a forwarding address there and I'm not sure

18    what the forwarding address is.

19    Q.    So how do you get mail, then?  Someone

20    sends you something?

21    A.    It's usually scanned and sent to me.

22    Q.    To your email?

23    A.    No.

24    Q.    Where does it get sent to how do you

25    actually receive your mail?

                                                    6

1    A.    I usually get, usually get a picture of it

2    sent to me.  Text message typically.

3    Q.    Who sends a text message to you?

4    A.    Relevance.

5    Q.    You have to answer my question.

6    A.    Well, relevance.  Objection, relevance.

7    Q.    Okay.  Who sends you your mail?

8    A.    Depends on who I ask to do it.

9    Q.    Okay.  Can you name some people?

10    A.    No.

11    Q.    Could you --

12    A.    Next question.

13    Q.    Who sends text messages or images of your

```
14   mail your text message?

15        A.    Next question.

16        Q.    Mr. Johnson, I'm going to object as

17   non-responsive.  You need to answer --

18        A.    Go ahead.

19        Q.    -- these questions.  Relevance is not basis

20   to not answer.

21        A.    It depends on who I instruct to do it but

22   typically the t -- ypically depends.  But I usually

23   have a young man do it for me.

24        Q.    Who is that young man as you refer to?

25        A.    Aaron Chin.
```

                                                                    7


```
1         Q.    Who?

2         A.    Aaron Chin.

3         Q.    And how do you know Mr. Chin?

4         A.    Objection.  Relevance.

5         Q.    How do you know Mr. Chin?

6         A.    Socially.

7         Q.    Okay.  Where does he live?

8         A.    I'm not sure where he lives currently.  He

9    lives somewhere in Arlington, Virginia.

10        Q.    Okay.  What's his phone number so we can

11   contact him and potentially --
```

12      A.      Don't have his phone number right on me

13  now.

14      Q.      Do you currently have a lease or anything?

15      A.      No.

16      Q.      When was the last time you lived at that or

17  spent the night at that --

18      A.      October 31st, two thousand twenty -- 2025.

19      Q.      Okay.  So in the last 17 days where have

20  you lived or slept?

21      A.      I've traveled all over.  I was in in Los

22  Angeles, was in Boston, New York.  DC proper.

23      Q.      Did you stay in hotels or houses or other

24  people's residences?

25      A.      Depended.

                                                        8

1       Q.      Okay.  Give me the list where you stayed.

2       A.      Relevance.  It's a privacy violation.  Next

3   question.

4       Q.      Well, it's relevant because I'm going to

5   ask how you paid for it if you stayed in a hotel.  So

6   I'll ask that did you stay in any hotels during that

7   time?

8       A.      I did, once.

9       Q.      Where?

```
10      A.      Or twice maybe.

11      Q.      How many nights in a hotel?

12      A.      Relevance.

13      Q.      How many nights in a hotel?

14      A.      Maybe two or three, I don't know.

15      Q.      Okay.  So that is it field thorn is that

16  the address that you mentioned?

17      A.      Correct.

18      Q.      So your mail can you remember gets sent

19  there?

20      A.      I'm not sure where my mail currently gets

21  sent I haven't checked it in a while.

22      Q.      When is the last time you lived in Texas?

23      A.      Not sure.

24      Q.      Well you list in your political

25  contributions living in Montgomery County.  Do you --
```

9

```
1   when did you stop living there?

2       A.      I'm not sure.

3       Q.      Okay.  All right Mr. Johnson I'm going to

4   have the court reporter not put this in the transcript

5   but what is your Social Security Number?

6       A.      I don't know it.

7       Q.      Could you find that out?
```

Appx. 013

```
 8      A.      I could.

 9      Q.      How would you do that?

10      A.      I would call my mother.

11      Q.      You have no idea what your Social Security

12   Number is?

13      A.      I don't.

14      Q.      What's your phone number?

15      A.      Area code 716, 429-4718.

16      Q.      Any other phone numbers that you have?

17      A.      I don't know (617).

18      Q.      So you may or may not have other phone

19   numbers that you use?

20      A.      Correct.

21      Q.      Okay.  So how do you not know that?

22      A.      The phones were given to me.

23      Q.      How many phones do you use?

24      A.      Currently I think maybe two or three but

25   I'm not sure.
```

♠

                                                               10


```
 1      Q.      Okay.  Do you have those on you?

 2      A.      No.

 3      Q.      Did you bring your phones today?

 4      A.      No.

 5      Q.      Where are they?
```

```
 6      A.    They're in a hotel.

 7      Q.    What hotel?

 8      A.    Relevance.

 9      Q.    What hotel?

10      A.    Courtyard.

11      Q.    How did you pay for that?

12      A.    A credit card.

13      Q.    What credit card?

14      A.    American Express credit card.

15      Q.    What's your spending limit on that credit

16 card?

17      A.    Don't know.

18      Q.    Do you have debt on that credit card

19 currently?

20      A.    I think so.

21      Q.    How much?

22      A.    I don't know.

23      Q.    What's your signal handle?

24      A.    Don't know my signal handle.

25      Q.    How often do you communicate via signal?
```

                                                    11

```
 1      A.    Exclusively.

 2      Q.    Exclusively?

 3      A.    Yeah.
```

4      Q.      So you don't text with people?

5      A.      Rarely do I text with people.

6      Q.      How many email addresses do you have?

7      A.      Probably a few hundred.

8      Q.      A few hundred?

9      A.      Yeah.

10     Q.      How many do you regularly use to

11   communicate?

12     A.      Don't know.

13     Q.      No idea?

14     A.      Maybe two or three.  Maybe four.  I don't

15   know.

16     Q.      Which ones are those?

17     A.      Well I guess the question is what do you

18   mean by regularly?

19     Q.      Just tell me the four ones that you, that

20   you recall when you just answered?

21     A.      Well I haven't used some of them in a few

22   years so I think the most relevant one is probably the

23   one the court has on file.

24     Q.      Okay well just give me the four that you

25   recall when you answered that question?

                                                    12

1      A.      That's okay I think it's Charles C Johnson

2    88 at Gmail.  Might be loopy Tuesday 6 at proton mail.

3    But there's a -- I don't recall.

4         Q.     Okay.  Are you planning to invoke the Fifth

5    Amendment today?

6         A.     Depending on the question.

7         Q.     So just some more ground rules here.  So

8    you understand if I answer "I don't recall," you are

9    swearing that you genuine do not remember the

10   information I'm asking.

11        A.     That's right.

12        Q.     Okay.  And you understand you're not

13   allowed to say "I don't recall" if you don't really

14   remember the answer.

15        A.     I am aware, yeah.

16        Q.     Okay.  And you also understand you may

17   invoke the Fifth Amendment if a truthful answer may

18   tend to incriminate you?

19        A.     Yeah I'm aware.

20        Q.     Okay.  And if you invoke the Fifth

21   Amendment you need to say so explicitly so the record's

22   clear --

23        A.     I'm aware.

24        Q.     Can you do that?  And you're not going to

25   use I don't recall as a substitute for the Fifth

                                                        13

1    Amendment, are you?

2        A.    No.

3        Q.    Okay.  And you understand that giving a

4    knowingly false "I don't recall" answer is percentage

5    Russ?

6        A.    No.

7        Q.    You don't.  Okay.  Are you a truthful

8    person?

9        A.    I am.

10       Q.    Okay.  When you post online, do you state

11   what you personally believe is true?

12       A.    Not always.

13       Q.    Okay.  When do you post truthfully and when

14   do you post falsely?

15       A.    Vague.  Over-generalized.

16       Q.    Tell me situations when you don't tell the

17   truth.

18       A.    Some things are jokes.  Some things are --

19   but generally I try to tell the truth.

20       Q.    So when you post online about your assets

21   and investments, are you lying?

22       A.    It depends on the situation.

23       Q.    Okay.  When do you lie about your

24   investments?

25    A.    A joke or a misstatement is not necessarily

14

1    a lie.

2    Q.    Okay.  So when do you not tell the truth

3    about your assets or investments when you post online?

4    A.    It depends on the context.

5    Q.    I asked you what context that is.

6    A.    Sometimes they're jokes.  Sometimes there

7    may be things that I don't necessarily know that I own.

8    Sometimes there may be things that I don't necessarily

9    recall but just generally speaking I have no objection

10    to your line of questioning.  Go on.

11    Q.    So when do you decide to not tell the truth

12    about your assets and --

13    A.    Well, generally I tell the truth when I'm

14    under oath, but generally -- but otherwise I don't

15    really spend that much time trying to be talmudic about

16    it.

17    Q.    And you understand that there's been a

18    70-plus million dollar judgment entered against you in

19    this case?

20    A.    I do, but it's under appeal.

21    Q.    Have you read the final judgment?

22    A.    The final judgment hasn't been posted yet.

23   It's before the Fifth Circuit, which you still have to

24   reply to a brief in December.

25        Q.     You are read the final judgment, Mr.

15

1   Johnson?

2        A.     There hasn't been a final judgment in this

3   case.

4        Q.     I'll represent that Judge Pittman did enter

5   a judgment against you this?

6        A.     Oh, yes in terms of that, no I have not

7   read that.

8        Q.     Okay.  You haven't read it?

9        A.     No.

10        Q.     Do you know how much money it os?

11        A.     Yes, I think it's 70 -- 70 million.

12        Q.     Have you paid any money towards it?

13        A.     I have not.  I have no intention to.

14        Q.     What you do mean no intention to?

15        A.     As in I have no intention of paying it.

16        Q.     Is it because you think you're going to

17   prevail before the Fifth Circuit, or you're --

18        A.     I do.

19        Q.     -- just not going to pay?

20        A.     I think I'm going to prevail before the

21    Fifth Circuit, and I think there will be a follow-up

22    lawsuit against DLA Piper and against Mr. Musk and I

23    think most of this will be settled out by December,

24    probably late December.

25        Q.    Because you think the Fifth Circuit's going

16

1    to rule in your favor?

2        A.    Correct.

3        Q.    Okay.  So if the Fifth Circuit throws your

4    case out and thinks your appeal wasn't persuasive or

5    compelling, are you going to pay the money?

6        A.    No, I'm going to appeal it to the Supreme

7    Court.

8        Q.    Okay.  Do you think the Supreme Court would

9    take it?

10        A.    Yes.

11        Q.    What's your lawsuit against Mr. Musk going

12    to be about?

13        A.    About how he uses shell entities like

14    Mr. Lambert to sue people it's a champerty violation.

15        Q.    You understand that you've applied for

16    stays in this case?

17        A.    I do.

18        Q.    Those both got rejected?

19      A.      That's typical, but yeah.  Go on.

20      Q.      Didn't you tell lawyers for Atron that

21   there was a stay in effect?

22      A.      Well, typically historically there's

23   usually a stay after a judgment is rendered when it's

24   appealed.

25      Q.      I'm going to object as non-responsive.  Did

                                                          17


1   you tell lawyers for --

2      A.      I did.  Actually I didn't -- I don't think

3   I told the lawyers.  I think I told David Mittelman who

4   is the CEO.  But go on.  It's six of one, half dozen of

5   the other.

6      Q.      How did you tell David Mittelman that?

7      A.      I told him that over Signal.

8      Q.      Okay.  Do you have a Signal messages?

9      A.      No I don't.

10      Q.      Do you recall Judge Pittman saying last

11   week that the judgments were enforceable?

12      A.      I do.

13      Q.      Do you understand you are here to answer

14   questions about your assets and other post judgment

15   discovery?

16      A.      I do.

17      Q.      Why don't you comply or respond to any of

18  the discovery in this case?

19      A.      I think it's a violation of my privacy and

20  I think it's likely intended to leak, I think the whole

21  process itself is a punishment, and it's designed to

22  intimidate me and other people from being federal

23  witnesses against Mr. Musk.

24      Q.      But why don't you file a motion, or appeal

25  that to the Fifth Circuit?  Do you know you could do

                                                                18

1   that?

2       A.      I think I'm happy to do -- happy to pursue

3   the cases I've as I've been pursuing it.

4       Q.      How do you think it's been going for you?

5       A.      I think it's annoying but it's exposed to

6   be annoying because it's designed to punishment me for

7   helping law enforcement goodness Mr. Musk.

8       Q.      How do you think you're doing in this case?

9       A.      I'm doing well.

10      Q.      You said a couple of times that you've been

11  win nothing this case?

12      A.      Correct.

13      Q.      What do you mean by that?

14      A.      I mean that I've been ex-posing the network

15    of people who are financing of what I think is a

16    frivolous lawsuit against me designed to zim date me

17    and restrict my speech typically in a rico case there's

18    more than one plaintiff or more than one defendant I

19    should say.

20        Q.    Okay.  Are you taking any of your

21    directioner orders in this case from any federal agent

22    or federal entity?

23        A.    I don't know what direction means.

24        Q.    Did they tell uh-oh you to whether to

25    comply with discovery or not?

⬆

                                                            19


1        A.    I'm not going to answer questions about my

2    relationship with the federal government.

3        Q.    I'm asking you the reason you don't comply

4    with discovery is that your sole decision or did

5    someone tell you not to do that?

6        A.    I'm not going to answer questions involving

7    my relationship with the federal government.  Next

8    question.

9        Q.    Answer the question again you refuse to

10    party in discovery do you agree with me on that sir?

11        A.    No I don't I think you're asking a question

12    that is a violation of my relationship with the federal

13    government so I'm not going to answer it next question

14    counsel.

15        Q.

16            MR. THOMPSON:  Exhibit 1 please thank you.

17            THE WITNESS:  Thank you.

18    BY MR. THOMPSON:

19        Q.    So before I ask, those are some

20    interrogatories post judgment?

21        A.    Sure.

22        Q.    So I've got tow -- before question get into

23    those I've got a couple of more questions.  Do you

24    remember Judge Pittman when you said race your supposed

25    federal connections as the reason why you did not

                                               20

&#8593;

 1    participate in discovery?

 2        A.    I don't recall him saying that.

 3        Q.    You don't?

 4        A.    No.

 5        Q.    Do you remember saying that ever?

 6        A.    To who?  To which, to judge Pittman or to

 7    who.

 8        Q.    To Judge Pittman?

 9        A.    I don't recall saying that.

10        Q.    Okay.  What was the reason do you remember

11    when Judge Pittman was in the courtroom and he

12    explained to you that if you believe you have

13    information that is classified top secret or higher,

14    you should contact the agency or someone from the U.S.

15    attorney's office that can appear and assert that

16    position?

17        A.    I do recall him saying that but what I have

18    the information I have is neither classified nor -- but

19    you know again I'm not going to talk about a

20    relationship with the federal governmental so if you

21    want to go with and tell Judge Pittman that I have no

22    objection to you doing that.

23        Q.    What is your relationship with the federal

24    government?

25        A.    Well which which part of it.

                                                    21


1         Q.    Well, I'm just going to ask about your --

2         A.    I mean I was a code named FBI informant for

3     a number of years and I was involved in federal

4     investigation of Mr. Elon Musk.  Mr. Lambert knows this

5     because Mr. Lambert talks to my then FBI handler.

6         Q.    So if none of the information that you have

7     is classified or top secret why can't you --

8         A.    Because I said I wouldn't.

```
 9        Q.      It's because you don't want to not because

10   it's a secret --

11        A.      No it's because I said I wouldn't next

12   question.

13        Q.      It's your sole decision not to provide that

14   information?

15        A.      I don't know what that means.

16        Q.      Well, again, I asked you did anyone

17   instruct you not to provide information in this case?

18        A.      I don't know what a sole decision means.

19   Next question.

20        Q.      What do you understand about sole decision?

21        A.      As in is it my decision to make or not I

22   don't know what that means.

23        Q.      You don't?

24        A.      I -- I've said and have said many times now

25   that I will not talk about my relationship with the
```

                                                              22

```
 1   federal government to an attorney that is has a

 2   thriving law practice in the form of DLA Piper with the

 3   Chinese government I will not do that.

 4        Q.      It's because of your connections with the

 5   federal government are just blon any right?

 6        A.      No are next question.
```

```
 7        Q.      What part of its not blon any?

 8        A.      I just told you I was a code named

 9    informant with the FBI that's not a blon any.

10        Q.      That is in the past right you are kicked

11    out of the program?

12        A.      And the cases that were involved and have

13    been using to prosecute people are ongoing.

14        Q.      So are you a current witness in any ongoing

15    federal progression?

16        A.      I am not supposed to answer that question.

17    Next question.

18        Q.      It's a yes or no.

19        A.      Yes I am a witness.

20        Q.      You were kicked out of the FBI or you were?

21        A.      No, I was not I have /*F I was not /STEUBGD

22    cut of the.

23        Q.      Request you stopped being a source in 2021

24    right?

25        A.      No.
                                                         23


 1        Q.      Are you can you remember a source?

 2        A.      I'm not supposed to answer that question.

 3        Q.      Your answer was I'm not supposed to answer

 4    that question.  Is that right?
```

5        A.    Correct.

6        Q.    Why are you not supposed to answer it?

7        A.    You're not supposed to discussion ongoing

8    matters.

9        Q.    According to who?

10       A.    According to the relationship you /TKPRAED

11    to with the federal government agency.

12       Q.    Well we're going to get into that a little

13    later probably after lunch.  What agency?

14       A.    I'm not going to be discussing a

15    relationship I have with a federal government agency.

16       Q.    Is that ongoing case involving former FBI

17    agent Johnathan Buma?

18       A.    I'm not involved with that case as far as I

19    know.

20       Q.    So the case you said you were witness in

21    that's not the Buma case?

22       A.    Correct.

23       Q.    Do you know why no federal agency

24    representative of the federal government's ever made an

25    appearance and said that you can't or should not

                                                        24


1    provide information in this case?

2        A.    I have not asked them to.

3      Q.      Is the case you are referring to is it

4    involve David leer man?

5      A.      No.

6      Q.      Do you know who that is?

7      A.      No I do not.

8      Q.      You don't know who David leader man is?

9      A.      I do not.

10     Q.      Is that your answer under oath?

11     A.      It is my answer under oath I don't know who

12   it is.

13     Q.      All right so I handed you Exhibit 1.

14     A.      Mm-hmm.

15     Q.      All right.  What is Exhibit 1 to the best

16   of your understanding?

17     A.      This these are the interrogatories.  I

18   believe I sent this back to counsel but I'm happy to do

19   it again.

20     Q.      Whether when did you send these?

21     A.      Probably two days ago via mail but I'm

22   happy to do it again so the only accounts that I have

23   number one is with Forest bank.

24     Q.      Hold on I'm not --

25     A.      I have a checking account there.

                                                      25

1       Q.      I'll get specific questions.

2       A.      Okay.

3       Q.      For you.

4       A.      Go ahead.

5       Q.      Why didn't you respond to these last when

6    these were served over a month ago?

7       A.      There was no need to.

8       Q.      Why was there no need?

9       A.      Mostly because I -- I believe that what's

10   going on in this case is designed to intimidate a bit

11   so I'll provide as minimal information as possible.

12      Q.      What do you mean by minimal information?

13      A.      As in the least amount of information

14   possible.

15      Q.      So not complete information?

16      A.      Correct.

17      Q.      And you're still not providing complete

18   hundred percent information?

19      A.      Correct.

20      Q.      And you won't?

21      A.      I will not, no because the person who's if

22   you could this lawsuit is under federal investigation

23   so I'll wait until that plays out.

24      Q.      Who's funding this lawsuit?

25      A.      That would be Mr. Musk.

↑

26

```
 1        Q.      Why do you think that?

 2        A.      How do I know it or why do I think it or

 3   what do you mean?

 4        Q.      Either.

 5        A.      I was told as much.

 6        Q.      Who told you?

 7        A.      Somebody who would know.

 8        Q.      Well, who told you?

 9        A.      Well the main person was gator green wall

10   but there were others as well.

11        Q.      Okay when did he tell you this?

12        A.      About two years ago.

13        Q.      When was the last time you spoke to greater

14   green well?

15        A.      Probably at the funeral of the wife of

16   David what's his last name.  I forget his last name.  I

17   spoke to him at a funeral maybe 4 months ago 5 months

18   ago.

19        Q.

20        A.      In New York.

21        Q.      What did you -- yeah go ahead.  In New

22   York?

23        Q.      What did you and gator discuss about this
```

24    case?

25        A.    We discussed how it was a form of

27

1    litigation finance designed to discover things about my

2    relationship with the federal government.

3        Q.    Does gator green well work for the federal

4    government?

5        A.    I don't know.

6        Q.    You previously represented that he was part

7    of the government?

8        A.    No that comes from a lie told by your

9    client from Winslow spar he was there for gay -- I was

10    there for a total of 15 minutes while your client was

11    so drunk that I had to carry him to his car which was

12    hill layer yus in the retrospect of course as the

13    record will reflect he was reflected for DUI that day

14    so I does have that history but no Mr. Lambert is

15    mistaken if he says that Mr. /TKPWRAOEPBL said that he

16    was working for the federal government as far as I know

17    he has a relationship with the federal government but

18    I'm not sure what that is fully.

19        Q.    You don't look like you're strong enough to

20    carry someone an adult to the car.  Are you?

21        A.    It was more of a drag than a carry, but I'm

22    sure if we were to subpoena the records from the wine

23    bar we could we could find that there was camera

24    footage.

25        Q.    Did you ever do that?

                                                    28


1        A.    I never did, no.

2        Q.    And just a little bit so I have seven hours

3    on the record with you?

4        A.    Mm-hmm.

5        Q.    So that's /SUFPB?

6        A.    You're going to get another 45 minutes.

7        Q.    Seven hours that I'm asking you questions

8    I'm going to take a break about every hour, hour and a

9    half?

10       A.    That's not necessary.

11       Q.    Well, I'm just going to tell you and then

12   for lunch we can take I sent this in an email we can

13   take a short lunch I was thinking 30, 45 minutes?

14       A.    Mm-hmm.

15       Q.    You the ever need a break the bathroom's

16   right outside and just let me know.  Okay?

17       A.    I'm going to be leaving in 45 minutes so

18   you have to keep going.

19       Q.    I think you'll stay here the whole time?

20      A.      I don't think so.

21      Q.      I think you will.  Okay.  So you said you

22  wouldn't put provide complete 100 percent information

23  in response to these interrogatories.  So what

24  information are you willing to provide?

25      A.      Well so number 1 name of financial

                                                    29

1   institution wood Forest bank the name in which the

2   accounts are held Charles Johnson it's a checking

3   account.

4       Q.      Let me stop you there.  What information

5   are you not going to provide that's relevant?

6       A.      Well I don't have anything that's

7   responsive to number 2 so I can't provide it.

8       Q.      Yeah, but you said you're not giving us a

9   complete 100 percent picture of everything?

10      A.      No, I never said I would give a complete

11  picture I said that I would not give full answers on

12  every question that you asked this is an interrogatory

13  I can certainly comply with that.  Number 1 I have --

14      Q.      Hold on.  I'm not -- do you know what

15  interrogatories need to be written?

16      A.      Yes which is why I did send it to you.

17      Q.      Where did you mail that from?

18    A.    It should have been from Boston.

19    Q.    Okay.  So I'm going to and I'm just going

20  to ask a question so the record's clear.

21    A.    Okay umm.

22    A.    Mm-hmm.

23    Q.    So the interrogatory says identify all bank

24  accounts in which you have or have had any legal --

25    A.    Yeah I don't know all the bank accounts

                                                          30

1  I've had access to.

2    Q.    Since 2023?

3    A.    Since yeah so I don't really know.

4    Q.    Okay.

5    A.    But I assume that you are asking for my

6  personal information.

7    Q.    Well, I'm not --

8    A.    My personal banking information or business

9  or whatever but there may be other bank accounts that I

10  don't necessarily know if I have access to them or not.

11    Q.    O I'm actually the question's broader so if

12  you go back to page 2 and there's a definition heading

13  do you see that?

14    A.    Yeah I saw that already.

15    Q.    Okay.  So I can read it out loud or you can

16    read it to yourself but when we're talking about you

17    and the /PWAEUPGTS, it's a little bit broader it's not

18    just Charles Johnson personally but it's --

19        A.    Sure I understand.

20        Q.    The trust accounts too do you see that?

21        A.    None of the trust accounts have sold

22    anything so it's not rely really vant.

23        Q.    So do the trust accounts have bank

24    accounts?

25        A.    No as far as I know.

                                                    31


1         Q.    To the trust accounts file tax returns?

2         A.    As far as I know, no.

3         Q.    Who would know that?

4         A.    It's a good question but my understanding

5     is that all of the so you know you're not allowed to

6     ask any questions about my wife and daughters' accounts

7     that was made clear with the judge on Monday but in

8     terms of my account my sort of stocks we have the clear

9     view matter /TKH is a lawsuit that's going on in New

10    York so I'm not sure if I even have those and then the

11    other would be the o /THRAPL stocks which are currently

12    currently being held by the off ram people.

13        Q.    What's the status of your case against

14    clear view in New York?

15        A.    I'm not sure sometime in December they're

16    supposed to come back with the judge I'm not sure.

17        Q.    You were defaulted in that or you dismissed

18    /*R missed all your claims right?

19        A.    I think I dismissed the claims yeah, but I

20    wasn't defaulted no.

21        Q.    Why did you dismiss all your claims?

22        A.    I was instructed to.

23        Q.    By who?

24        A.    By somebody with an -- somebody who asked

25    me to.

                                                    32


1        Q.    Who is that?

2        A.    I said I wasn't going to talk about my

3    relationship with the federal government.

4        Q.    Who told you to dismiss your claims against

5    clear view?

6        A.    You asked me to be precise.

7        Q.    Who asked you?

8        A.    Somebody who was in a relationship with the

9    federal government.

10        Q.    Okay.  Well who is that person?

11        A.    /TPHOUT going to answer that question.

12        Q.      Why is that -- well you hold on you're

13    choosing not to /TRAOEBGT?

14        A.      Correct.

15        A.      I'm choosing not to direct.

16        Q.      You could, you could provide the name?

17        A.      Correct.

18        Q.      Okay.

19        A.      I could.  I'm electing not to.

20        Q.      Do you remember when the judge in that case

21    tried to call the --

22        A.      That -- well so she claimed.  I didn't know

23    if she actually did that or not.

24        Q.      It was a maid up person right that's what

25    she concluded?

                                                    33


1        A.      No that's what she said publicly I don't

2    know if that's necessarily true.

3        Q.      Sorry by she the federal judge --

4        A.      There's two federal judges in the case both

5    women one is judge pal Lee a poke and the other is it's

6    a name that escapes me right now.  There's two judges

7    in that case.

8        Q.      All right?

9        A.      I think it's poke or you know judge poke or

10    justice poke I'm not really sure judge poke.

11        Q.    Maybe judge fee arrest are or however you'd

12    say?

13        A.    Well folk is her full name yeah.

14        Q.    Let's go back to this interrogatory you

15    said you mailed responses?

16        A.    I did, yeah I gave them to my father to

17    mail them.

18        Q.    Okay.  Let's just go through this.  So I'm

19    going to ask about you first personally.

20        A.    Mm-hmm.

21        Q.    Okay.  So sell me the names of all the

22    financial institutions?

23        A.    I have --

24        Q.    Be it a bank account or any type of --

25        A.    As far as I know I have only one financial

                                                              34

1    institution currently and it's called wood Forest bank.

2        Q.    Okay what about --

3        A.    And I have a checking account account

4    there.

5        Q.    What about previously?

6        A.    I don't have anything Mr. He was to January

7    112, 2023 as far as I know I have maybe a Bank of

8    America or Chase Bank but I'm not sure when those

9    accounts were shut down.

10        Q.    When was the last time you visited wood

11   Forest bank?

12        A.    Maybe a week ago ten days ago.

13        Q.    Where was that?

14        A.    In Fort Worth.

15        Q.    What were you doing there?

16        A.    I was getting some locally pops and taking

17   out -- oh, no.  Putting in $1400 into an intrapersonal

18   checking account.

19        Q.    Any other?

20        A.    No.

21        Q.    Anything else you did there?

22        A.    I went to Walmart so I bought a candy bar.

23        Q.    Do you have a safety deposit box?

24        A.    No.

25        Q.    What bank so what financial institutions

                                                          35


1    does the EB white trust have a bank account account?

2         A.    I don't know my brother handles my

3    daughter's accounts but again you're not supposed to

4    does about those so let's just be really clear about

5    that.

6        Q.        Well I get to ask about it and you can

7    answer it.  So.  You could answer --

8        A.        Sure I was those were trusts set up in

9    20182019 so they'd be beyond the scope of what you're

10   talking about anyway.

11       Q.        So is EB white trust have a bank account?

12       A.        As far as I know, no.

13       Q.        Okay and just to be clear, Mr. Johnson

14   Judge Pittman asked you to identify to answer these

15   interrogatories fully and completely?

16       A.        Mm-hmm.

17       Q.        He didn't limit the scope of their answer

18   of your answers in this or the scope of the question?

19       A.        No but he was he was quite clear that

20   asking questions about accounts that I don't have

21   access to or don't control is privacy violation and

22   it's obviously involving minor children so we're

23   obviously not going to go there.

24       Q.        So my question I'll ask it a different way.

25   Are you going to provide -- is there information you're

                                                      36

1    not providing me based on something you think junk

2    Pittman said about trust accounts for your kids orchid?

3        A.        I mean, Judge Pittman was clear that and I

4    said very emphatically that I didn't have access to

5    those accounts which I don't the trust belonged to my

6    ex-wife and to my daughter so it's not really relevant

7    and beside it's beyond it's outside the window in

8    question anyway as for the task force trust, I mean, I

9    own half of an equity or half of a position in the

10   special purpose vehicle that Mr. Lambert and I did in

11   2020 and Mr. Lambert obviously disputes that and that

12   was never that trust account was never funded fully.

13        Q.    So I'm going to object as non-responsive to

14   that Mr. Johnson.  My question I'll ask it differently

15   are you withholding information about the EB white rust

16   /T-S a potential trust?

17        A.    No, I just don't I don't I'm not involved

18   with it.

19        Q.    Okay so who has the information about that?

20        A.    I don't know.

21        Q.    So the EB white trust, its tax records its

22   bank accounts --

23        A.    I have not -- I'm not involved with that

24   that's part of the reason you set up a trust is to

25   limit your own exposure to it so no I have no access to

                                                        37

1    it.

2       Q.      Who --

3       A.      Could be my brother could be my ex-wife I'm

4   not sure but the none of the stocks have moved as far

5   as I know since they were set up.

6       Q.      What is your ex-wife's name?

7       A.      Bernadette hop sorry.

8       Q.      Okay what's her phone number?

9       A.      I don't know it.

10      Q.      How do you contact her?

11      A.      Typically she contacts me and usually it's

12  over Signal.

13      Q.      Okay when's the last time you interacted

14  with her?

15      A.      It would have been four or five days ago in

16  Los Angeles.

17      Q.      What was that about?

18      A.      It was about what was going on in ino knees

19  I can't.

20      Q.      When was the last time you communicated

21  with her before that?

22      A.      Might have been like a week before that.

23      Q.      What was the substance of that

24  conversation?

25      A.      My daughter got a per score open her

38

1    Chinese test.

2          Q.        Okay when was the last time before that?

3          A.        Maybe like a week and change before that.

4          Q.        So how often do you speak with your

5    ex-wife?

6          A.        Maybe once or twice a week.

7          Q.        Okay.  Pretty exciting things like about

8    your daughter's schoolwork that kind of stuff?

9          A.        We don't really discuss anything about

10   that.

11         Q.        Have you guys have you and your ex-wife

12   discussed anything putting aside you know schoolwork

13   about your daughter?

14         A.        Health matters about her mother or old dog

15   got sick yeah.

16         Q.        When's the last time you discussed

17   financial matters with her?

18         A.        I haven't discussed financial matters since

19   twenty -- well, let's see won tong fat called her and

20   said that he wanted to give her $400,000 if I would

21   tell her if she would tell me to drop this suit against

22   clear view AI and that was in that would have been at

23   the end of /TPO* or twenty -- yeah it would have been

24   2023 that we discussed that and I said this seems very

25    suspicious do what you think is right yeah that was in

39

1    the kitchen her of her home.

2        Q.    So other than that conversation in 2023

3    about a conversation about that $400,000 no other

4    financial discussions with --

5        A.    No.

6        Q.    -- your ex-wife?

7        A.    Let's see no I owed her $400 and I gave it

8    to her in cash and I owed her on a few occasions I've

9    owed her like hundreds of dollars on occasion for like

10   a child and for like various incidents /*R incidentals

11   and I've given those to her typically or I've given her

12   gift cards or I've given her and those are typically

13   that's typically like ways for maintenance for our

14   daughter.

15       Q.    Any other financial conversations?

16       A.    No as far as I know, no.

17       Q.    Nothing else?

18       A.    Not that she would listen to me anyway but

19   no.

20       Q.    Okay.

21       A.    She -- we don't -- we don't really discuss

22   any financial stuff.

23      Q.      Did you ever ever did you ever discuss the

24      ol /THRAPL stock we are?

25      A.      Which one oh, no that's not so she wanted

                                                                40

1       to cash out of the o /THRAPL position and and I said

2       well, let me go find out what they're all worth and so

3       I contacted Mittelman to contact about selling the

4       entire position and our contention is that we own more

5       of the stock but if I could get a million bucks from

6       David Mittelman I'd be happy to get that mostly because

7       it's no an illiquid stock and we have some you know the

8       larger family they have some health concerns going on

9       her parents are aging and so there was a question there

10      about whether or not her trust could be used my

11      ex-wife's trust could be used for the for elder care

12      and I said I didn't know the answer to that but I said

13      that I would be happy to sell to liquidate the o

14      /THRAPL stock and that she could she could have her

15      portion of it and if she need more she'd be happy to --

16      she'd be happy -- I'd be happy to give her mine as

17      well.

18      Q.      So she independently asked to liquidate the

19      on the ram stock?

20      A.      She did she did and she also asked to

21    liquidate the our daughter's position as well.

22         Q.    When did she make that request?

23         A.    That would have been let's see when I last

24    saw her was in four like an extended period that would

25    have been maybe August or July because I didn't see

                                                        41


1     them in September yeah so that would have been then.

2          Q.    Was that in person request?

3          A.    It was in person that was an in person

4     request yeah so typically I will see my ex-wife and

5     daughter at least once a quarter sometimes twice

6     depending.

7          Q.    For each quarter how much money do you

8     contribute to them?

9          A.    It depends on the situation depends what

10    they need.

11         Q.    On say in the last in 2025 how much money

12    have you provided to them?

13         A.    I don't know company find out but I don't

14    know.

15         Q.    How would you find out?

16         A.    I could check the records of my AmEx and I

17    could check the records of cash that I've withdrawn.

18         Q.    Did you do you send them like envelopes of

19   cash or how do you make the transfers?

20       A.    Sometimes envelopes of cash sometimes in

21   person I physically give them cash yeah.

22       Q.    Do you send them you know ven month?

23       A.    No.

24       Q.    Zelle?

25       A.    Don't do any of that.

                                                    42


1        Q.    You know what those platforms are?

2        A.    Yes I don't have any of them I don't use

3    them.

4        Q.    So you've traveled a lot you've post about

5    traveling a lot I see on your sub stack and Twitter?

6        A.    Yeah I've /TRAUFLD quite extensively yeah.

7        Q.    I'm a big reader of your sub stack by a

8    way.  Well you should buy subscription I'm sure /TKHRA*

9    piper can afford it?

10       Q.    Whether do you get the money to fly so

11   much?

12       A.    Usually it's paid for by others.

13       Q.    Okay.  Well I saw the last one you were at

14   I think in first class having an /ORPG use?

15       A.    Oh, yeah I went to go see Courtney love in,

16   in that would have been was it last year yeah I guess

17    it was right before or right after the election but

18    yeah Courtney love flew me to London and I stayed at

19    her home in Chelsea for I guess it would have been like

20    ten days or so.

21        Q.    Who paid for that?

22        A.    Courtney did.

23        Q.    She paid for your flight.  She did and all

24    my meals when I was there, yeah.  Very generous?

25        Q.    Who paid for your flight to you said you're

                                                          43


1    back in LA who paid for your flights there?

2        A.    That probably would have been done by carry

3    cue equal.

4        Q.    I've never heard that name can you

5    /SPHRAOES?

6        A.    K-E-R- I space KRKUKRAL yeah KERI and space

7    KUKRAL.

8        Q.    Who is that?

9        A.    She's a woman that was in a romantic

10    relationship with Steve jer bit son who is a board

11    member of I believe of space ex-who was wrongly treated

12    by him and was also involved in the investigation into

13    m Musk's relationship with I gore Kirk a November.

14        Q.    She worked for the federal government?

15      A.      I don't know I don't know what she really

16  does for work.

17      Q.      Okay.  So I'm going to ask a little more

18  specific question about your travel in the last six

19  months?

20      A.      Okay.

21      Q.      Okay so let's just take us back to, say,

22  may 2025.

23      A.      Okay.

24      Q.      How many flights have you taken?

25      A.      Since May?

                                                    44


1      Q.      Yeah.

2      A.      Maybe two or three yeah I haven't left the

3  country and --

4      Q.      You come down here at least three times?

5      A.      Oh, yeah I've been here I guess to Texas

6  yeah.

7      Q.      So let's just think hard and catalog them?

8      A.      So any time I've been to Texas that counts

9  I guess but other than that I went to visit my daughter

10  in August but I think I tacked that on to a Fort Worth

11  trip but I'm not totally sure I can't really remember.

12  And trying to think what are the other big ones.  I

13    didn't fly to Boston I took a train.  I flew to Houston

14    in July but that was other brief trip that was like a

15    24 hour kind of thing.  I'm trying to think are there

16    any others.  No I don't think so.

17        Q.

18        A.    I was.

19        Q.    Who paid for that or how do you pay for

20    that?

21        A.    In those cases I had like airline points or

22    I had like from the case of going to Texas my parents

23    paid for that my -- I believe my father paid for that

24    Houston trip yeah in fact I think he he paid for me and

25    the person who traveled with me.

                                              45


1        Q.    Who was that person?

2        A.    Her name is gabby doll chay I forget her

3    last name she has two last a hyphen named Dell chay

4    done son.

5        Q.    So you do a fair amount of traveling right?

6        A.    I mean, it's sometimes more sometimes less

7    I try to do less travel these days.

8        Q.    I ask because early on in this case Judge

9    Pittman ordered you to appear and you said I think you

10   had a doctors not?

11      A.      I did.

12      Q.      I don't know how legitimate it was saying

13  that you had a debilitating condition that prevented

14  from you traveling?

15      A.      So my eyes in general are affected by

16  what's /KOULD moisture moisture in the anterior so when

17  it's extremely moist in the air my eyes tend to tutor

18  fortunately Fort Worth is not a very moist place it's a

19  more desert climate a more western climate so when I

20  first came down here my general practitioner advised

21  that I wear sunglasses and that I sort of do my best to

22  kind of take care of my eyes.  He was of the view that

23  it was more like the Houston environment but it's sort

24  of not so it's not as bad obviously I don't as you can

25  see from my travel itinerary I don't tend to go to

                                                    46

1  places the exception of being Houston in July which I

2  don't recommend doing if you have that condition and

3  probably the reason I end up leaving Houston sooner was

4  because it was quite a lot of pressure on my eyes (part

5  of the reason).

6      Q.      Who was the /TKOERGT?

7      A.      I have two of them.  But in that particular

8  case well there's one's his name is ger bet any -- her

9 last name be call her Dr. /PWEPLGT.  It's doctor I'll

10 pull it up I'll remember it in a second but she's a

11 friend of who -- of a woman I know and then the other

12 is was somebody who is Houston based so he assumed I

13 was spending more time in Houston and he was somebody

14 that was recommended to me by Dr. -- by Robert Marchly.

15   Q. Where does Dr. Beth live?

16   A. In Alex Andrea Virginia as far as I.

17   Q. All right let's go back to the

18 interrogatories.

19   A. Mm-hmm.

20   Q. So can you provide us the account number

21 and routing number for your wood --

22   A. I don't know them, but I can find them out.

23   Q. Well that's the point of this

24 interrogatory?

25   A. I think they were sent and they are in the

                          47

1 interrogatory.

2   Q. Are you there?

3   A. I'm happy to send that again.

4   Q. Okay.  As a checking account?

5   A. As far as I know it's a checking account

6 yes but I don't have any savings or money market

7      accounts so I assume that's what that is.

8          Q.      Okay how many people are authorized to use.

9          A.      I think that one is just me and my ex-wife

10     but I don't know I think that's it.

11         Q.      Is that a Walmart?

12         A.      Yeah all wood Forest banks are at Walmart

13     or at their most of them are a lot some of them are not

14     but most of them are.

15         Q.      So no U.S. Bank /WROEFRG /SWERPBT banks?

16         A.      None of that no.

17         Q.      When did you open that wood Forest bank?

18         A.      That would have been 20 I want to say 2017

19     or 2018 but I'm not sure I can find out.

20         Q.      So where did you bank before that?

21         A.      I banked at first foundation bank I think

22     and I think I banked Atwood -- was it Wells Fargo?  No.

23     CitiBank I banked at CitiBank.

24         Q.      And it might have been Bank of America too

25     but I'm not sure I didn't handle that side of it?

                                                              48


1          Q.      Where did you mail those interrogatories

2      responses to?

3          A.      To the same add -- same address on file

4      that is at the bottom of this.

5        Q.      Okay.  I I didn't mail them my father did.

6    (/PHARGD mark 2)?

7    BY MR. THOMPSON:

8        Q.      Handing what's been marked as Exhibit do

9    you also recall that last week Judge Pittman older you

10   to bring?

11       A.      I did yeah.

12       Q.      Do you recall that?

13       A.      I do recall him saying that.

14       Q.      And you were forwarded the orders by me,

15   correct?

16       A.      Yep.  That's right.

17       Q.      So you have them?

18       A.      Yep.  No I don't have them with me now.

19       Q.      No but you were aware of them?

20       A.      Yes I was aware of them yes.

21       Q.      So Exhibit 2 are the positive judgment

22   requests for production that the plaintiff sent to you

23   there's nine of them.

24       A.      Mm-hmm.

25       Q.      And my question is easy do you have

                                                    49


1    documents with you today?

2        A.      No I don't.

3     Q.     Why not?

4     A.     My understanding is I mailed them through

5     my father but I don't have them.

6     Q.     Do you realize that Judge Pittman ordered

7     you to bring them to the deposition?

8     A.     Yeah.  Yep.  Slipped my mind though I was

9     staying at place without a printer.

10     Q.     What place was that?

11     A.     I was staying in a factory in El Monte,

12     California, before I came here.

13     Q.     How does one stay at a factor is ate an AB

14     and B or is it --

15     A.     No it's a factor are I it's like a it's a

16     uniform manufacturing facility in he will /PHOPBL tea

17     /STKPWHRA*L where did you stay with a factory or stay

18     in a tack factory.

19     A.     It it is sufficiently close to my daughter

20     and it's owned by a by our family by liker hemi it has

21     a shower it has accommodations.

22     Q.     But you agree you didn't pring any

23     documents?

24     A.     Correct.

25     Q.     With you?

↑

50

1          A.     Did not.

2          Q.     Okay.  Did they have a printer at the

3     factory?

4          A.     They did, but I wasn't like allowed to use

5     it.

6          Q.     Did you ask to use it?

7          A.     I did.

8          Q.     You did who told you no?

9          A.     That would be the woman who was in charge

10    there and she said the /AOEPG wasn't working properly.

11         Q.     It wasn't like they did they said you can't

12    print anything?

13         A.     It wasn't like they said I couldn't print

14    it no.

15         Q.     How hard do you think you actually tried to

16    bring documents would you say --

17         A.     Didn't tried that hard, I mean, I does

18    them.  About they did say yeah, but I think the ribbon

19    wasn't working or some issue with the ink and it would

20    have been like run we or whatever and I was like I

21    don't want to go that has disrespectful and this he.

22         Q.     You kind of blue this off right?

23         A.     Yeah, I mean, I don't respect this process

24    no.

25         Q.     Okay so you could have gone to like a

1    Kinko's or --

2        A.    Yeah generally speaking I go to FedEx but

3    when I'm in a California it's a bit more challenging

4    because I'm not I'm not around FedExes as readily as I

5    am when I'm on the east coast but yeah next time tile.

6        Q.    Fair you didn't try really hard to comply?

7        A.    No wien go that far I would just say that.

8        Q.    You said you blue them off?

9        A.    I was busy no, I mean, I don't I'm happy to

10   answer them now but remember you have 30 more

11   /TPHRAEUPBTS actually like 20 but go on.

12       Q.    No we've got a little bit longer than 20

13   minutes.  I've got this whole see all these right here

14   I've go /-T a lot of paper to go through?

15       A.    Okay.  Lieutenants go with 20.

16       Q.    All right so have you mailed the tax

17   returns?

18       A.    I have not.

19       Q.    Okay.

20       A.    I don't have access to them so I can give

21   you the name of my I think his name is American CPA you

22   can pull them up you'll find them.

23       Q.    That's not really kind of how this works

24    the thing is you need to collect the documents so --

25        A.    Yeah I'm going to spend as minimal amount

52

1    of time on this as possible until the Fifth Circuit

2    rules so.

3        Q.    Do you think you've got good arguments

4    there?

5        A.    Yeah I think I'm gonna win the whole thing

6    to be honest.

7        Q.    Are you going to show up and argue /-FRLGT

8    I may if they ask me to I mean you haven't /SKPHEUTD a

9    raf /*FR brief you asked for the delay on timing?

10        Q.    Need the plaintiffs didn't ask for any

11    /STEPGS on the briefs but we might would you grant it

12    if we request it chuck or Mr. Johnson sorry?

13        A.    I, I mean, I have no objection to it, I

14    mean, you're goo 'lose either way so it's fine.

15        Q.    Okay all right so do you have the

16    information on your CPA?

17        A.    I think it's if I had my phone company pull

18    it up and tell you but a mayor -- it's American CPA dot

19    com I think his name is Dan something I'll find it and

20    send it to you.

21        Q.    Well, let me ask it let me maybe start a

22   little more basic do you object to producing your tax

23   returns?

24        A.     Yeah inextricably vay sieve so yeah I do

25   object to it.

                                                    53

1        Q.     So are you going to produce them or?

2        A.     No, sir I don't know yet I have to think

3   about it I can give you the name of the Kuhn and you

4   can write him and ask him and then he'll ask me if you

5   should good et it and then I'll make a decision.

6        Q.     On Judge Pittman ordered to you produce and

7   so are you going to produce them or not?

8        A.     We'll see.

9        Q.     So right now will you commit to producing

10   them?

11        A.     Well we'll see how the line of questions

12   go.

13        Q.     No, no, no I said right now speaking here

14   at --

15        A.     No, I won't I won't agree to anything until

16   until the end of the day.

17        Q.     Okay.

18        A.     You require my consent to abuse me in this

19   process and I'm giving you the minimal amount of that

20    consent which is what I was asked to do.

21        Q.    Mr. Johnson I'm not asking I'm not drying

22    to abuse you?

23        A.    Yes you are you are participating in a

24    lawsuit that is backed by a billion fair who is didn't

25    want to be investigated by the feds I can appreciate

                                                        54


1     that by the way it's kind of an invasive process being

2     investigated by the feds but that's what you're doing

3     and this is why you're '82 requesting to ultimately

4     loose your law license we can continue if you want.

5         Q.    Okay my question is I /THAO*EPBG and it's

6     yes or no testifying right now do you commit to --

7         A.    No.

8         Q.    -- producing the --

9         A.    The answer is no I do not contend so to be

10    pre very vice about this I do not intend to provide any

11    information until the end of the day when I make a

12    judgment call about how I feel about your line ever

13    questions and whether or not and if the judge want to

14    order me /H her oar a me or whatever I'm happy to go

15    through has whole process I have no objection to that.

16        Q.    Okay?

17        A.    In fact I rather welcome that next question

18    counselor.

19        Q.    But right now you will not --

20        A.    The answer is no.

21        Q.    Okay that's what I wanted to /TPHO*R?

22        A.    Yes.

23        Q.    Okay will you give me the CPA's if ulna

24    /EUFRLT I don't know his full name I don't handle that

25    side of?

                                                    55

1        Q.    You just said --

2        A.    Hits name is Dan something it's American

3    CPA I'm not I have the information.

4        Q.    Dan something at American CPA can you

5    provide me any more information?

6        A.    No because my main accounts have died years

7    ago or I think he retired and then died you should

8    never retire that's dive lesson to that his name is

9    George lipper LI /P-FLT PE RT and he dealt with most of

10    my tax matters until maybe a year or two ago.

11        Q.    If he's dead I can't really ask him for

12    them?

13        A.    I think his wife still runs the firm or sh

14    she has the records of all the stuff but they been

15    moved to American CPA.

Appx. 063

16    Q.    All right so we're going to go through all

17    these requests for production.  Did you produce did you

18    today did you bring any documents in response to

19    request for production number 2?

20    A.    No asked and answered.

21    Q.    Okay so --

22    A.    But no in terms of requests for production

23    so number 2 we have none of those things are applicable

24    and we have the o /THRAPLS stock and the clear view

25    stock and Xavier capital EB '80 or Kyle /PRAOT trust to

56

1    s tent I have any task force trust I am email

2    correspondence where I instruct Mr. Lambert to take my

3    interest in the umm bra SPV and put it in various

4    places but Mr. Lambert decided to steel that steel that

5    and so obviously the task force /TRUFRT isn't funded I

6    checked with my father and brother on that so they told

7    me that was not never actually done in terms of request

8    for production number 3.

9    Q.    Hold on I've got can you ask you another

10    question on number the?

11    A.    Yeah go on.

12    Q.    What about the monthly statements from wood

13    Forest bank?

14    A.    We don't have any monthly for that none of

15    the trusts have bank accounts as far as I know.

16    Q.    No this is not limited to the trusts

17    Mr. Johnson.

18    A.    Oh in he remembers the of my personal

19    banking?  I don't use online banking so you know to the

20    extent that there would be any information there it

21    would be you know debit cards taking cash taking cash

22    out or transferring it to pay an AmEx bill.

23    Q.    So your position that wood Forest bank does

24    not provide monthly statements?

25    A.    I think they do but if they do I don't know

                                                              57


1    where they go because I don't get them.

2    Q.    Did you request them?

3    A.    I did not request them no.

4    Q.    And so you produced no documents in

5    response to request for production number 3 right?

6    A.    Correct.

7    Q.    Number 4 you didn't produce anything?

8    A.    That's right no nothing.

9    Q.    And the same five 6789?

10    A.    Nothing nothing's applicable in any of

11    those things so it's like you're asking me do you have

12    any you know you're asking my in crypto currency or

13    digital Walt so by you I don't op any crip to currency

14    nor could any of my trusts nor do any of the trusts

15    that /TPWHROPGD my wife and.

16         Q.    I'm just asking full brought anything

17    today?

18         A.    I brought /S-LGTS nothing I made it very

19    clear that I asked about using the printer and I did

20    not did not use the printer at the factory.

21         Q.    Okay let's just go maybe take some low

22    /HAEPBGing fruit number 8 do you own any vehicles?

23         A.    I own a 2017 Jaguar F type which I bought

24    in mostly cash in 2017 or excuse me 2020 and that is

25    currently staying at a lot somewhere in Chantilly

                                                          58


1    Virginia but other than that I own no vehicles I don't

2    typically drive myself I typically take public

3    transportation or am driven.

4         Q.    So the documents that reflect your

5    ownership in that car did you send them did you mail

6    them?

7         A.    I don't know where those are but I'm

8    supposed to at some point get the title and everything

9    because I was planning to sell that car but I have not

10    as of yet done that.

11        Q.    When is the last time you transacted any

12    any crip to bitcoin any type of financial?

13        A.    Probably 2018 that would have been maybe

14    2017.

15        Q.    Okay.

16        A.    I haven't touched it since.

17        Q.    To go back too your car do you realize that

18    You sell that or the proceeds of it need to go to

19    satisfy this judgment?

20        A.    Yeah that's probably why I haven't actually

21    found the title yet for it.

22        Q.    I don't understand.

23        A.    But if Mr. Lambert wants to go take the car

24    and get it I think it has a flat tire and battery issue

25    so he's happy to have it.

                                                        59


1        Q.    I don't get what you mean I think your

2    answer was that's probably --

3        A.    I haven't told et as yet.

4        Q.    But I said that's probably why I didn't go

5    get the title?

6        A.    Yeah debris go they are of sort of do I

7    think the working to get the /TAOEULGT /PHAO* car was

8   listed as stolen for a period that was because it was

9   moved from one place to another because they were doing

10  asphalt in the place that I was /HRAOEUFG opened to

11  move the car /KWREUB where the car was I don't

12  typically drive because pro forma eye issues my I don't

13  have a driver's license I haven't driven a car probably

14  I think last time I drove a car was like 4 months ago

15  know that would have been three months ago maybe.

16      Q.    I did post that picture of driving when you

17  said that you had a debilitating eye condition?

18      A.    Why he why he.

19      Q.    Top down do you remember that yes, that's

20  true I haven't driven my Jaguar though since 2024?

21      Q.    Okay so tell me about all the places or

22  exchanges where you did enter ingauge in crypto

23  transactions?

24      A.    I guess the question is I'm probably not

25  supposed to talk to you about this because it is a

♠

                                                        60


1   federal issue, but I haven't used crypto currency in a

2   number of years basically sips 20172018 no actually

3   hold on is that right yeah that's right yeah the last

4   time I used any Walt associated with bitcoin was in

5   twenty it would have been 2018 yeah, but it wasn't my

6   account it was somebody else's account.

7       Q.    Let's just make the record clear so your

8   testimony --

9       A.    My testimony is ironclad and clear.

10      Q.    What -- what --

11      A.    I haven't touched anything involving

12  /KHOEUPT currency since probably probably at the latest

13  most recent period would have been maybe maybe may 2018

14  and it's probably more likely 2017.

15      Q.    And you said that's ironclad?

16      A.    As far as I know yeah.

17      Q.    Okay was that on an exchange a wallet cold

18  storage?

19      A.    That was a person-to-person transaction and

20  it was involved I think it was with Josh Jones, but I

21  could be wrong about this and Josh Jones is a owns

22  dream host and he agreed to buy some crypto from my

23  then mother-in-law.

24      Q.    So we're going to go into your different

25  investment and everything in a lot more detail later

＾

61

1   but just give me an overview of your engagement and

2   work with the crypto mining?

3       A.    I haven't done any crypto mining at all

4    month.

5    Q.    What about bitcoin mining?

6    A.    I have not done any bingo mining.

7    Q.    Do you know what that is?

8    A.    I do.

9    Q.    Okay.  Do you remember news articles where

10   you're quoted about it?

11   A.    Possibly but many of those news articles

12   are me are not always the most accurate.

13   Q.    What's your understanding of what bitcoin

14   mining is?

15   A.    It's running a computer program to equity

16   extract basically it's like a puzzle that the machines

17   are running usually done on an a sick or GPU, but I

18   haven't done it in a number of years.  There's some

19   case to be made I haven't done it in at least ten

20   years.

21   Q.    So have you so my first question's going to

22   be have you ever done it and the next one's going to be

23   when okay Mr. Johnson?

24   A.    Mm-hmm.

25   Q.    Have you personally anyone at your

                                                        62

1    direction any company you invest in any company you're

2    involved with done crypto --

3        A.    There's a compound question there so maybe

4    you want to take them one at a time.

5        Q.    Okay have you ever been /PORPBL lip done

6    any bitcoin mining, crypto --

7        A.    Yes.

8        Q.    When was the last time?

9        A.    It would have been 2015.

10       Q.    Okay what about any one acting at your

11    direction?

12       A.    No.

13       Q.    What about a company you are involved with?

14       A.    No, I'm not involved with any others

15    involved with it.

16       Q.    Okay?

17       A.    I was looking into doing it at one point

18    but ultimately I elected not to do it.  Mostly when

19    President Trump treated that he was not a fan of

20    bitcoin in the first administration that's when I

21    severed all of my relationships with anything bitcoin

22    related which I believe was in 2017.

23       Q.    What is the what's the most money you ever

24    had in that wood Forest bank account?

25       A.    Maybe 30 grand 40 grand but I'm not sure.

                                                    63

1     Q.     And that was the only coincident you've had

2    since 2017 I think you said did it?

3     A.     As far as I know I might have other

4    accounts but I'm not sure.

5     Q.     Well go on then because that's one of the

6    reasons we're asking that you say you might have other

7    accounts but --

8     A.     Might have other accounts Atwood Forest but

9    I'm not sure if I had a company called Traitwell which

10    banked there but that company is sort of moribund at

11    the current moment maybe resuscitated later after all

12    of this is sort of done with but on the whole no I

13    don't have any other accounts there.

14     A.     And haven't for a while.  Yeah.

15     Q.     I'm handing you Exhibit 3.  Okay?

16     A.     This is and if he C disclosure.

17     A.     Yeah all of that is true I donated all that

18    of money.

19     Q.     This is all yours?

20     A.     That's correct.

21     Q.     All right where did you pay the money out

22    of?

23     A.     These would have been out of all my

24    personal account but typically I did it out of an AmEx.

25      Q.    Are you producing any of your AmEx accounts

64

1    with the requests for production?

2       A.    I did not.

3       Q.    Do you have any other credit cards other

4    than AmEx?

5       A.    I don't think so.  If I do, they're long

6    they're long moribund.

7       Q.    So you -- are you looking at Exhibit 3?

8       A.    I am.

9       Q.    Okay.  And it said Traitwell?

10      A.    That's right.

11      Q.    And it also says self start up what is

12   stealth sart up?

13      A.    That would have been Traitwell what became

14   Traitwell I should say.

15      Q.    These 5,000 is not an insignificant amount

16   of money that's true understand a I was a lot richer at

17   one point?

18      Q.    How rich were you back then in 2020 when

19   you had 35,000 you made that $5,000 donation?

20      A.    Yeah it's in /TWOEPBT I was pretty rich

21   probably /*RT part Longview because of the /PA*RPBD

22   partly because of other things going on.

23       Q.      You said you were pretty rich.  Can you

24  give a number to that or more detail?

25       A.      At one point I had maybe like I was maybe

65

1  liquid like 150 grand to 250 grand but I'm not sure

2  it's been a while.

3       Q.      So is that the most you say you've ever

4  been liquid in is 150 grand.  I don't know maybe more

5  but it's been a long time since I since I recall it.

6       Q.      Then you say that you are the CEO of

7  Traitwell?

8       A.      That's right.

9       Q.      You said that's I'm thinking what yourser

10  would more.  Morery bud yeah it's more or less

11  /TKWEPLGT at present, but I still own I want to say I

12  own like /# o 80 percent of it I'm not totally sure /PU

13  but yeah the company has done pretty well for itself

14  all told but in he remembers the of the technology that

15  it's built it's pretty interesting but we'll see what

16  ends up happening with it.

17       Q.      So who is the other owner of Traitwell?

18       A.      Dorothy Morgan is another owner of it.

19  There's a number of investors behind the company maybe

20  like 10 or so other ones.

21      Q.      And it says are you scrolling through it

22  was docket entry 28APPX040 it's a Texas Secretary of

23  State do you see that?

24      A.      Yeah that's for the State of Texas yeah.

25      Q.      Yeah and it says our per score Inc. what is

66

1   that?

2       A.      That's the company that became Traitwell.

3       Q.      Okay.  Does Traitwell have any bank

4   accounts?

5       A.      Currently it has one bank account.

6       Q.      Okay.  How much is in it?

7       A.      Atwood Forest bank I think maybe like 400,

8   500 bucks.

9       Q.      Does Traitwell take in any money?

10      A.      Currently no.

11      Q.      Is Traitwell worth anything?

12      A.      Well there's some intellectual property

13  behind it so it depends whether people buy it or not.

14      Q.      What's the IP?

15      A.      The IP has to do with taking it has to do

16  with taking gentlemen no milk data and basically

17  converting it into software.

18      Q.      Okay.

19      A.      So in essence what you would do is you

20   take, you take publicly available what are called Geno

21   lied associate studies and you convert those two

22   software so the 23 and me and ancestry and other things

23   can basically tell you if you're say allergic to

24   certain types of foods or certain types of drugs I a

25   think called farm a month ge no /SKWREUBGS to be

                                                        67


1   precise.

2      Q.      O sorry than?

3      A.      I spent most of the money that I, that I

4   had at one point actually hold on so I had I had about

5   a million dollars in the wood Forest account and then

6   about 700 to 800,000 that I invested personally in

7   Traitwell so it might have been even more than that

8   well it ultimately ended up being more than that

9   because I put more money into the company to bail it

10   out at one point.  Yeah so that that's what the company

11   does is it worth anything?  Well --

12      Q.      I'm going to sop you there so hold on so

13   how did you make those transactions when you said you

14   bailed out Traitwell for hundreds of thousands of

15   dollars?

16      A.      That was from money that I had -- I had

17    sold some stock in this case it was from a company

18    called on der roll which I sold my stock for and I

19    owe -- I think I -- I put in about $200,000 and I think

20    my position was worth like $4 million and I sold it for

21    about, about a million the rest of it I came back to

22    the CEO of the company or one of the founders of the

23    company because it was his company and then I took the

24    million that I had used some of it on personal expenses

25    and then and political do /TPHAEUGZ as you see and then

                                                          68


1    some of it I put into the company into what became

2    Traitwell.  I also invested inform /*F some of that

3    money in small ticket items in things like repeat which

4    is a startup based out of trial finder Belt Line and

5    then I also /STKWEFTD in another thing called pay a la

6    but I don't typically like when I made these

7    investments in the past they've been sort of small

8    ticket kind of items and I don't really pay attention

9    to them until the CEO or whoever tells me that they're

10    doing well or poorly generally speaking I don't really

11    pay that much attention to themsd.

12        Q.    Okay so you had Debbie Morgan?

13        A.    Dorothy more Dan.

14        Q.    The?

15        A.      The other invests /WUFP them would be

16   Robert /PHARLG one of them would be the Mohammad Al har

17   thee who is out of o man Steve orb wee, a squee who is

18   Mr. Musk Peter teal was an /STWEFRPLT I'm trying to

19   think if there are others those are the big ones there

20   might have been oh Jonathan Barrett he did like a

21   hundred grand, maybe 200.  Yeah it's been a while.  I

22   don'ten.

23        Q.      All right so let's go back to you're an

24   control investment.  How much money did you invest?

25        A.      I I invested $200,000.

                                                        69


 1        Q.      When was that?

 2        A.      2017.  2017-2018 I think something like

 3   that.

 4        Q.      How did you do the invest was it yourself

 5   were you on the cap table?  SPV?

 6        A.      I don't know, I mean, so I went to Palmer

 7   Palmer and I had dinner Palmer asked me for my help.

 8        Q.      Highs Palmer?

 9        A.      Palmer lucky is the one who started on tril

10   I by the way for what it's worth I oppose totally what

11   on drill is doing these days and have for a number of

12   years but Palmer came to me and asked me to help him

13    raise money for his second act which was what

14    ultimately became on troll and I said if I help you

15    raise this money am I you know can I have equity in the

16    venture and he said well you've done left foot work for

17    me company pay you know wages or I can pay you or I can

18    give you inequity this venture and I said I'll take the

19    equity we wrote a handwritten note to each other and on

20    I think it was -- it would have been April 2nd, 2019,

21    that memorialized it and I have a copy of that like

22    floating around somewhere.

23         Q.    How would you locate that document?

24         A.    It's probably at my /PHOERPBLS house but I

25    have a photo of it somewhere too.

                                                        70

1         Q.    You have a photo of that?

2         A.    I do.

3         Q.    Okay.  Would you produce that photo?

4         A.    Sure.

5         Q.    Okay.  Can you email that over after we get

6    done today?

7         A.    Sure.

8         Q.    This was we don't immediate to make this

9    this is plaintiff's exhibit 46 do you remember it's one

10    of my favorite emails?

11          A.     I do, yes.  I think it's privileged though

12     technically to be precise about it.

13          Q.     Well I got it so how about we ask questions

14     about it.

15          A.     No I think we should actually mark it ace

16     privileged and actually say that not only is it

17     privileged it's also likely hacked so no we're not

18     going to be answering any questions about it.

19          Q.     So I'm going to ask questions because this

20     is an important document and I'll just tell you?

21          A.     Yeah.

22          Q.     Hold on I'll just tell you for the record

23     you know you had a lawyer named Carter --

24          A.     I do.

25          Q.     -- bore driveway?

                                                          71


1          A.     Yeah something like that sure.

2          Q.     He produced this document to us that's why

3     it says Johnson?

4          A.     Okay.

5          Q.     Maybe he sad do you remember you said it

6     was hacked at the trial do you remember?

7          A.     I did.  It's also privileged so there's

8     that.

9        Q.      So question I'm going to ask you about the

10   signature, the two and from up at the top. .  Mm-hmm?

11       Q.      It says Charles Johnson.  It doesn't say

12   who it's to.  Who are you writing this email to?

13       A.      Don't know.

14       Q.      Don't know?

15       A.      No.

16       Q.      You did write this though right?

17       A.      I don't know if I wrote it or not.

18       Q.      Okay.  So let's go down here an control do

19   you see that at the bottom?

20       A.      Mm-hmm.

21       A.      Mm-hmm.

22       Q.      It says I invested about 200K?

23       A.      Yeah.

24       Q.      Up to C around 80 million the current value

25   of the company is north of 2 billion so what would that

                                                        72

1    have made your?

2        A.      I think it's technically at 3 bill unnow or

3    30 pill bun use me yeah I don't know what it ended up

4    being, but I sold my position a long time ago.

5        Q.      Okay.

6        A.      So.

7       Q.    And what document show that sale?

8       A.    Palmer wired me the money so that probably

9  would count for account.

10      Q.    Into what account?

11      A.    Boo my wood Forest bank account that would

12  have been that would have been yeah I'm not actually

13  sure when he did that.  Anyway it doesn't matter I see

14  you're not asking about the umm bra synthetic ap a tur

15  ray ter company I think that position is probably my

16  largest position.

17      Q.    We're going to go through it.  All right.

18  So let let's just take these so we have on the ram do

19  you see that?

20      A.    We have on the ram, yeah.

21      Q.    Okay.  Is that sentence correct?

22      A.    I don't know -- is the sentence correct.

23      Q.    Yeah under a throm can you?

24      A.    I co founded o tham about David little man

25  sheave shoe it's worth 25 million at last funding round

1  it's got /SKEUBGS offers over a hundred million.

2      Q.    Okay.  Is that accurate?

3      A.    I don't know if it accurate or not.

4      Q.    Is it accurate based on your understanding?

5      A.      I don't think so.

6      Q.      You said you were the second ever investor

7    in an dra?

8      A.      I was after his mother I think technically.

9      Q.      So were these advisory shares special

10    equity or what?

11      A.      Don't know.

12      Q.      How did you pay the money for the 200,000

13    where did it come from?

14      A.      Palmer owed me the money.

15      Q.      Did you Charles Johnson have or any account

16    under your control send any money to an dro north.  Nor

17    would I have.

18      Q.      It says I invested about 200,000?

19      A.      Mm-hmm.

20      Q.      So you didn't actually invest 200,000 is

21    that --

22      A.      No he owed me the money so in lieu of

23    paying me the money he had me he converted it into

24    equity in what became on drill.

25      Q.      So were you ever on a cap table or have --

                                                              74



1      A.      As far as I know, no but I don't know he

2    was -- he told me that he was going to put me on the

3    cap table but to be honest but I didn't really care so

4    I don't really support what on drill's doing and so

5    when I got my million dollars for on control when they

6    finally gave me my cash for that I was happy to get

7    that money and to move on.

8          Q.    Do you --

9          A.    And I also believe that, da it's Palmer's

10    company Palmer should be allowed to have more control

11    and more equity and politically Palmer and I were

12    deviating from one another we were disagreeing about a

13    lot of political matters the biggest one of course is

14    when he starred the company it was supposed to be for

15    non-violent deterrence purposes and ultimately was used

16    was building munitions to kill people and I'm opposed

17    to that.

18          Q.    Did you report this pay out or payment from

19    an control on your taxes?

20          A.    I think I did yeah, but I'm not a hundred

21    percent on that it wouldn't matter anyway because the

22    lion's share of the cash that I made from it I just

23    rolled over into the Traitwell investment so it would

24    have been a minimal tax he /SRAEURBS da tax you know

25    tax incident.

1      Q.      Tax evasion?

2      A.      I was going to say tax -- you know, tax

3    evasive maneuver but yeah, but no just to be blunt

4    about it no I did not as far as I know the million

5    dollars that I got from that almost all of it went into

6    other investments and then I was paid a salary at

7    Traitwell, but it was below a salary of any of the

8    employees.

9      Q.      What was that?

10     A.      Maybe like 60 grand.  Yeah.

11     Q.      All right so let's --

12     A.      Could have been could have been no I think

13   it was like 64,000.  Because it was a joke at the time.

14     Q.      All right so this Exhibit 64 do you admit

15   that you wrote this email or do you have a reason to

16   think you didn't write it?

17     A.      Yes, I have reason tong that it's not

18   totally accurate, yes.

19     Q.      Who hacked it do you think?

20     A.      Well Mr. Musicst use hackers so I think

21   it's possible that he did it, but I think actually one

22   of the reasons that he wanted to go and do a basically

23   an invasive request for anything involving Mr. Musk in

24   my emails was because you'd already hacked these things

25   and so what you wanted to do was kind of build a

76

1    plausible chain that would protect you legally yeah,

2    but I think what this was if I recall this correctly I

3    could be wrong about this but I think the attorney who

4    was representing me wanted to know I think this was

5    these were emails that I might have sent concerning

6    Mr. Lambert or maybe it's possible there was something

7    else but I don't really recall writing the email but I

8    don't think /PHAOEFT of /PHOEFPT of it is accurate I

9    think a lot of it might be mistaken in different ways

10   and there are elements of it that are inaccurate so you

11   know turns out you can't patent pay with my face

12   already controls the patent on the on the Traitwell

13   stuff this probably if the email if I wrote the email

14   it would have been written in 2020 but no I don't

15   recall writing it and then in terms of the last thing

16   on it on the bitcoin mining operation there was

17   something that I invested in that I backed for $600,000

18   with a friend of mine, but I as I said when President

19   Trump came out against bitcoin in a serious way I

20   severed all ties with that person haven't talked to him

21   in many years and that would be arrest /REUPBLGT ding

22   link.

23          Q.    How did you make that investment for

24   600,000?

25       A.     I owned a lot of bitcoin early on in the

                                                            77

1    process.

2        Q.     Where was that bitcoin held?

3        A.     It was held in a coin base account and it

4    was held what was the name of that, I don't know I

5    haven't had opinion in many many years.

6        Q.     What's the most bitcoin you've ever held at

7    one time?

8        A.     I don't know.  That's a good request.

9        Q.     Can you approximate it?

10       A.     No I well, I mean, the probably with it is

11   I was using it as a currency circa like 2012, 2014, I

12   mean, I bought a Honda fit with bitcoin in 2012 so

13   yeah.

14       Q.     When did you sell or liquidate your bitcoin

15   position?

16       A.     Most of it I just gave up or you know in

17   one case you know if you're not careful with how you

18   deploy it so for example I owned a website where I was

19   miscoded and somebody transferred like 40 bitcoin to

20   the account but we /STORBD it incorrectly so we ended

21   up losing those 40 bitcoin and that was back when bit

22    counsel was like 600 bucks a opinion or something like

23    that so I couldn't actually access that and then there

24    was, you know, an incident with one of my servers fried

25    that I had at one point but no so I have no bitcoin

78

1    currently and would not own it even if it were given to

2    me I would not I would liquidate it immediately because

3    it attracts a dangerous element.

4        Q.    When did you liquidate the position what

5    year?

6        A.    That would have been 2018, I mean, whenever

7    President Trump treated that he was not a fan of

8    bitcoin in the first administration that was when I

9    walked away from all bitcoin investments.

10        Q.    Have you ever had an account on gemini?

11        A.    No as far as I know.

12        Q.    Do you know what Jim nigh is?

13        A.    I think it's started by the wing will vos

14    twins but I'm not a fan of theirs so no I would not

15    work with them or associate with them or be around

16    them.

17        Q.    So you can say with certainty you have not

18    had a gemini /K-BGT?

19        A.    I can say with certain I that in fact not

20    only can I say I never had one if suspect /OPLD and I

21    turned it down.

22         Q.    The hard drives that you said you got fried

23    do you remember talking about that just a second ago?

24         A.    Yes.

25         Q.    Do you have those hard drives?

                                                          79


1          A.    I do not.

2          Q.    Where did though go?

3          A.    Into tell Monte dump.

4          Q.    Do you have any or did you ever store any

5     bitcoin crypto currency in cold /STORPBL do you know

6     what cold storage is?

7          A.    I do and I own them and I have thun /*R

8     done anytime the past, but I own none currently.

9          Q.    Okay what happened to the bit counsel that

10    was stored in cold /STORPBL?

11         A.    Some of it was water damaged and some of it

12    uploaded and I sold.

13         Q.    How did you up load it?

14         A.    There was a software at the time where you

15    could take an image of it and you could upload it to a

16    phone and so I had a phone that just had Wi-Fi enabled

17    on it and but now I no longer have the phone no longer

18    have the coins.

19              MR. THOMPSON:  I think we've been going for

20    about 1:20.

21        A.    No, I can keep going, I mean, I have no

22    desire.

23    BY MR. THOMPSON:

24        Q.    This is for the court reporter?

25        A.    Oh, okay.

                                                    80

1        Q.    So we'll take a break now.

2        A.    Okay.

3              THE VIDEOGRAPHER:  We're going off the

4    record now at 10:05.  We're off the record.

5              (Break from 10:05 until 10:15 a.m.)

6              THE VIDEOGRAPHER:  We are back on the

7    record at 10:18.

8    BY MR. THOMPSON:

9        Q.    Thank you.

10             THE REPORTER:  Back on the record yes

11    proceed.

12             MR. THOMPSON:

13    BY MR. THOMPSON:

14        Q.    All right Mr. Johnson we're back from what

15    I you /TKOEPBG /THAO about a 10 minute break or

16    something?

17         A.    Sure whatever.

18         Q.    And okay and during that break you sank you

19    said I was going to?

20         A.    I was just to be precise about it and just

21    so we're on the record I intend to sue /TKHRA piper

22    when this conclusion because first of all counsel here

23    did not do a thorough job of looking up the conflicts

24    of interest my family retained /TKHRA pipe while he was

25    moving from Quinn he man yul which is the personal firm

                                                           81


 1    of Elon Musk to /TKHRA piper which is a law firm in

 2    effect controlled by Elon Musk which is the tesla law

 3    firm and yes, I do intend to sue Mr. Thompson

 4    personally as well as /TKHRA piper when this matter

 5    conclusion when it's when the judgment is ultimately

 6    overturned at the Fifth Circuit.

 7         Q.    All right and you realize I earlier said

 8    that the federal rules allow for 7 hours on the record?

 9         A.    That's right and I intend to break those

10    federal rules just to be precise about it.

11         Q.    Why are is that?

12         A.    Because I think you're not /STK-G relevant

13    questions and I think you're here to harass me and

14  produce video clips and other things that can be leaked

15  out to the media.

16      Q.    Okay.  So I think we've been on a little

17  bit more than an hour?

18      A.    Am hum.

19            THE VIDEOGRAPHER:  Excuse me.

20            THE VIDEOGRAPHER:  _____.

21  BY MR. THOMPSON:

22      Q.    I'm asking these questions to figure out

23  our planning Mr. Johnson so you said that you're going

24  to --

25      A.    I'm gooding to leave this courtroom at noon

                                                        82


1   so you have an hour and change to keep asking your

2   questions.

3       Q.    Okay.  So I'm gonna go for is there a

4   chance you're going to stay longer originally you said

5   you were going to say?

6       A.    Zero chance than I'm going to stay more

7   than after.

8       A.    Maybe an hour five.

9       A.    That's right I'm going to leave at noon you

10  have basically /TPHAOL noon to ask all the questions

11  you want to ask and then once noon happens, if it

12  strikes noon I'm going to get out of this chair and I'm

13  going to walk down the street and I'm not going to come

14  back here.

15      Q.    Okay.  So I'm going to go for about to

16  11:30, 11:40 I'm going to see if that's still your

17  position?

18      A.    No it's going to be my position so ask your

19  questions remember I agreed to consent minimal consent

20  to participate here I have no objection to a receiver

21  being in this case in fact I would welcome it and in

22  fact had you done your homework you would have realized

23  that the account the Wyoming account that I wanted to

24  put the off ram shares in was connected in a certain

25  way with key people and so you would have realize that

                                                            83


1  had a that money was actually preserving assets I do

2  not trust Mr. Lambert having access to any of my

3  resources given his drunken misbehavior and illegal

4  conduct so I have no objection to having all of my

5  resources put into a federal trust.

6      Q.    Okay let's talk about that for a /HREUBLT?

7      A.    O I can.

8      Q.    So do you realize that the plaintiffs have

9  moved for a receiver?

10      A.      Yeah I have no objection to that though you

11 are instructed to come up with a list of three names

12 and you came one a list of one names so we should have

13 a list of three names that's what the judge said.

14      Q.      The agenda to did?

15      A.      I do object to it because I want you to

16 produce a list of three names which is what the judge

17 asked for.

18      Q.      So besides the names, number of names do

19 you object to a receiver getting appointed?

20      A.      No I have no objection to that.

21      Q.      Okay.  Do you object to the putting aside

22 how many receivers were offered do you object to the

23 relief that was sought?

24      A.      I'm not going to pay for it.

25      Q.      I don't think anyone's asked you to like?

                                                              84


1       A.      What relief are you talking about.

2       Q.      Sorry the powers that the receiver has over

3 your assets and in this case do you have any objection

4 to the relief that the plaintiff sought?

5       A.      What did he -- what was the relief he

6 sought having a receiver or what.

7       Q.      Having a receiver and we submitted a

8    proposed order you were copied on it I think it was

9    Friday noit?

10        A.    No I'm going to I trust July Pittman to

11   make the right call in this case.

12        Q.    Do you have?

13        A.    So no I object to that I object to relief

14   you were instructed by the /KWRUPBLG on Monday to come

15   up with a list of three names of receivers you did not

16   do that you came one a list of one name.  When you do

17   three names then we'll talk about the subsequent

18   matter.  It's not complicated.

19        Q.    But over all you have no objection to a

20   receiver?

21        A.    In principal I have no objection to a

22   receiver in fact I would prefer all of my assets be in

23   a federal trust dedicated federal trust to be precise.

24        Q.    Do you understand the powers that a

25   receiver has?

                                                      85


1         A.    I do and I welcome it.

2         Q.    What's your understanding actually you

3    don't have to answer that you welcome it you said?

4         A.    I do.

5         Q.    Why is that?

6       A.      It will become more obvious as the case

7    proceeds.

8       Q.      What's going to be more obvious?

9       A.      The why I welcome that.

10      Q.      All right let's go through Exhibit 64

11   again.  Trial Exhibit 64?

12      A.      Mm-hmm.

13      Q.      That's your em?

14      A.      It's what you say it's my email yeah go

15   ahead.

16      Q.      Okay all right so the o /THRAPL stock

17   right?

18      A.      Umm /H umm.

19      Q.      Talking about that.  The shares that you

20   tried to sell?

21      A.      Yep no I didn't try to sale them I tried to

22   preserve them in trust but yeah go on.

23      Q.      The shares that were part of that stock

24   purchase agreement do you know what we're talking

25   about?

86

1       A.      Yes, I so I contacted dividend middle man

2    to sell to liquidate the full position that my ex-wife

3    daughter and I have of on the ram shares and I believe

4    David went to the board of on the ram on the ram has a

5    lot of conflict of interest you know there's the issue

6    one of the board members is a gig a fund by Steve orbly

7    so a Musk business partner and there's a lot of people

8    /HAOBL that /PHEFBG is also an investor in on the ram I

9    don't know I couldn't take a position on it one way or

10   the other but then he went to the council and basically

11   we communicated back and forth they said that they

12   didn't want to sell the shares because of the order in

13   this case and I respected that I said though that they

14   could still sell the shares of my ex-wife and daughter

15   and I haven't heard back about that as yet so they're

16   going to take a position of basically waiting and

17   seeing and that's fine I don't have any objections to

18   that because I expect the entire thing to be overturned

19   at the Fifth Circuit.

20       Q.    I'm going to object as non-responsive that

21   wasn't my question.  All I was saying was all of the

22   off ram stock that you or trusts that you are

23   associated with or any of your family members have been

24   associated with that was -- you true issues -- that was

25   the entirety 100 percent you were trying to sell or

                                                    87

1    cash out that, that off ram stock?

2      A.     No I wasn't trying to sell it or cash it I

3  was trying to put it into a dedicated /KWRAOEU ohm.

4      Q.     You remember /TWAOEUG electro either tote

5  money?

6      A.     No, I /TWAEUS.

7      Q.     What's it going to be off ram shares or was

8  it gonna be turned into cash?

9      A.     The purpose.

10     Q.     Right it was cash?  70 million dollars?

11     A.     No it was put into a dedicated trust so it

12  probably would have been a basket of stocks to be

13  precise about it because there's no desire to actually

14  cause a taxable event in this case.

15     Q.     So what was the $1 million for?

16     A.     The one million /THARS was to be put into a

17  dedicated Wyoming trust and I believe you actually

18  reference it to be something like a cyber crime or

19  something like that which is very strange behavior on

20  your part but but no it was designed to /TPWAEUFL

21  preserve the asset not to sell it November desire

22  whatsoever to sell the stock I have no need of cash I

23  am not broke life is in general pretty good.

24     Q.     You said you're not broke?

25     A.     Correct.

88

1     Q.     How much money do you currently have let

2   just take your net worth right now?

3     A.     I don't know what it is it kind of depends

4   on whether or not I actually win this lawsuit right

5   doesn't it.

6     Q.     Let just start today let's take all of the

7   assets maybe that's an easier way to go at this.  Give

8   me off the /TPOP of your-to-ash cash stock clothes all

9   that stuff?

10    A.     Cash cave I minimal three grand clothes

11  maybe a few grand worth of clothes.  I own a 2017

12  Jaguar with a flat tire and a bad dart /*R battery and

13  personal loan of about $25,000 another low --

14  another -- the AmEx bill is probably like 32, 35,

15  $31,000.  I have no current let's see I have no job

16  currently probably because they're waiting to see the

17  outcome of this lawsuit and when they do I'll very

18  liable start another company which will transfer some

19  of the assets to some of my other work that I've done

20  and then what else yeah, I mean, I'm waiting I'm

21  basically waiting on the Fifth Circuit and when that's

22  over and done with I will proceed with a lawsuit

23  against you and /TKHRAP.

24    Q.     So who's the they in that other company

25    you're gonna start?

89

1        A.      Who's the they what do you mean.

2        Q.      You said you're waiting to start another

3    company is that correct?

4        A.      Yes I will start likely start a company

5    doing genetic analysis.

6        Q.      With who?

7        A.      When the time is right that will be

8    disclosed okay so it's a private matter now and I am

9    limited by /TPHA*ED.

10       Q.      And you /TPHEPBG /*R mentioned that there

11   were /S*ERTS that would go into that company?

12       A.      That's right the IP from the Traitwell

13   company would likely go into the though they may elect

14   not to take it it may /ULTS be a valueless proposition.

15       Q.      Who was that person?

16       A.      That would be people connected with I will

17   loom in a.

18       Q.      Can you spell that for the court reporter?

19       A.      I-L-L-U-M-I-N-A.

20       Q.      And who is your point of contact with that?

21       A.      That would be Jay flatly the former CEO I

22   will loom in a.

23      Q.      Do you need to get another water?

24      A.      No I'm good.

25      Q.      So what are your sources of income?

90

1       A.      I have no sources of income currently.

2       Q.      How are you to pay your $32,000 credit card

3  bill?

4       A.      I'm gonna wait until this case is

5  overturned and then I'm going to pay it the

6  old-fashioned way.

7       Q.      Which is what?

8       Q.

9       A.      Liquidating assets and paying it.

10      Q.      What assets?

11      A.      Part of the reason I part of the reason I

12  wanted to move the off ram shares is I wanted to avoid

13  a conflict of interest with a new haven't which you are

14  I wanted to start which conflicts are interest are

15  important counsel that's why you should always check on

16  them before you take a case.

17      Q.      You said you're going to liquidates to pay

18  for the credit card bill what assets are you going to

19  liquidate?

20      A.      I mean, it would depend on what how big the

21    credit card bill at that time I think I have like a

22    40,000 /TKHREUPLT on it but I'm not totally /SHR what

23    assets could you liquidate to pay that.

24        A.    I could sell an interest in my family trust

25    to my brother I could I could collect on money that

                                                        91


1    various people I have lent money to over the years

2    would pay me, there's lots of ways I could pay it if

3    you wanted to but I have no real desire to pay it

4    currently.

5        Q.    What interest in the in a trust could you

6    sell?

7        A.    I could sell my interest in my family home

8    to my brother if I wanted to.

9        Q.    When you listed your assets how come you

10    didn't mention that?

11        A.    Because I didn't know I had it until

12    recently.

13        Q.    I just asked that you question?

14        A.    But if you do pursue it I will be violating

15    like /TKHRAP does represent that family trust so you

16    will have another obvious conflict of interest conflict

17    of interest.

18        Q.    Who have you lend money or to or what

19  people owe you money an how much?

20      A.      I've lent money to friends of different

21  forms one of the biggest ones is a friend in named o

22  mayor gur rely I've lent him maybe a hundred grand I've

23  lent some money to which he can check gon Fagan.  A few

24  people over the years.

25      Q.      How much money do they owe you?

                                                    92


1       A.      Maybe like 300 grand something like that.

2       Q.      When did you loan this money?

3       A.      Over the last five six years.

4       Q.      How did you loan that much money what bank

5   accounts did it come from how did you do that how did

6   you do the transactions?

7       A.      I don't recall.  I don't know.

8       Q.      You don't recall who you transferred --

9       A.      I think it might have been through the

10  first foundation bank but I'm not sure it's been a few

11  years.

12      Q.      Was it a wire transfer?

13      A.      It would have been a wire transfer most

14  liable although yeah most likely /WAOEUFRS.

15      Q.      So first foundation bank?

16      A.      Mm-hmm.

17    Q.    Where was that located was it a branch or

18    was it nationwide?

19    A.    That one's Pasadena, but I might be

20    misremembering it exactly.

21    Q.    And that's information I guess the receiver

22    could look at?

23    A.    Yeah no problem at all I have no objection

24    to a federal receiver you're the one who's obliged to

25    come up with three names.

93

1    Q.    Okay.  When did you first contact David

2    Mittelman to try to --

3    A.    Oh Mittelman and I have talked about

4    selling my shares three dozen times in the last like

5    three or four years so he and I are constantly talking

6    about it I'm never quite doing it because I'm never

7    quite pulling the trigger on starting another company

8    we talked about it in the context of Traitwell when I

9    started that in 2019, 2018, yeah, I mean, I like David

10    I think he's a Fort Worth guy mostly though, you know,

11    they do owe me more shares of the company that I did co

12    found so that's a little annoying but partly I'm not

13    really keen on the venture model of investing these

14    days I think it's aha a lot of problems and so I'd

15  rather just to do my -- do my work another way so in

16  general I'm interested in you know basically

17  liquidating whatever asset I have that are illiquid and

18  putting them into the markets.

19      Q.    Which assets are those can you identify

20  them?

21      A.    I mean, I mentioned that I have the clear

22  labs stocky mentioned the umm bra SPV that I have an

23  interest in I mentioned gentlemen no milk prediction

24  which I'm also interested in liquidating all of the

25  assets that I have I would prefer be in the public

                                                        94

1  market not any lick with wid startups and that has a

2  lot to do with what I think is a looming recession.

3  And I would prefer all of them being /*R be in

4  dedicated trusts which are easily monitored by the

5  federal government.

6      Q.    Do you have an investment in a company

7  called land mow tow?

8      A.    I do not have an investment in it no I

9  ultimately did not invest.

10      Q.    Do you have an investment in a company

11  called accept sus tech?

12      A.    I do.  I have I own some options in it.

13    Q.    If a receiver want to identify your

14    interests in census tech highway would he go about

15    that?

16    A.    He he would tact Trevor parrot who is the

17    /KRO*ER of it and presumably Trevor would talk to him

18    about it.

19    Q.    So whatter your interests in census tech?

20    A.    I own options in it.

21    Q.    How much are they valued at?

22    A.    I don't know.

23    Q.    One dollar?  $10?  A hundred million?

24    A.    Maybe a few hundred thousand maybe a

25    million I don't know I don't typically like I I think

                                                        95


1    of it being a squirrel I put an investment in if it

2    gross great if it doesn't whatever I only really count

3    it until it's harvested until it actually is a

4    productive asset that I sell and liquidate typically by

5    putting it into the public market or by buying things

6    like a house or a car or whatever so I don't typically

7    I don't typically thing about my investments in terms

8    of like what their liquid value is it doesn't really

9    interest me.

10    Q.    Okay because when before I asked you about

11    your assets or interests you never mentioned census

12    tech so I'm trying to get an answer here?

13        A.    I didn't know that I owned census tech

14    options until maybe three weeks ago four weeks ago when

15    I talked to one of David middle man's employees who

16    reminded me of it o excuse me when I talked to Trevor

17    parrot's employee I think it was Dan sole or something.

18        Q.    I'm going to mark this as Exhibit I believe

19    it's 4.

20            (Marked Deposition Ex. 4) is that

21    BY MR. THOMPSON:

22        Q.    It's one of your sub stacks?

23        A.    Mm-hmm.  /KWR*EPL.

24        Q.    Go to the second page, Mr. Johnson.

25        A.    Yep.

                                                        96


1        Q.    Read the last paragraph above the bolded

2    lathe --

3        A.    Yes land motor and census tech I never

4    ultimately did the land mow tow deal.

5        Q.    It says in the professional world I have

6    three investments I'm doing trade well.com?

7        A.    Correct.

8        Q.    Land month so and census?

9        A.      Ultimately didn't dough the land mow tow

10   deal I did do the census tech one which is I have the

11   /OPBGSZ but I don't have any investments in land mow

12   tow I do think I may turn arn and invest in land month

13   to after this lawsuit is over, but I haven't as yet.

14        Q.      Well, here you don't say I'm think becoming

15   investing you say I have three investments I'm doing.

16        A.      Yes I'm doing as in like I planning ongoing

17   on doing yeah and I ultimately met with this is

18   September 2024 so in the centimeter of 2025 I went to

19   go meet Scott a Lee see month who is the CEO of land

20   month to I ultimately elected not to do the investment

21   at this time that may change I suspect it will change

22   and a lot of that has to do with what goes on in

23   endoknees I can't.  If he ultimately decide to go

24   forward with building endo knees I can't or the

25   Philippines I will likely help him an invest if he

                                                        97

1    decides to go in China or he decides to go in other

2    places like Thailand I will not support him.  Just to

3    be blunt about it I like I like Scott I think Scott I

4    think highly of Scott but I could have long-term

5    questions about the viability of what he's doing at the

6    price point he's doing it in and I am not a believer in

7   his in the way that in the way that he ask hard tech

8   investing and I also think that the market has changed

9   which means September 2024 and November 2025 the world

10  is a very different place.  You'll recall that the

11  person the democrats were in power in 2024 in September

12  of 2024 and obviously when the democrats are in pour

13  electric vehicles are more enticing than when reps are

14  in pour.

15       Q.    So something I'm having you said earlier

16  you just found out three weeks ago that you had

17  interest or options in census tech?

18       A.    Yes.

19       Q.    What's the date of Exhibit 4 the sub stack

20  post?

21       A.    It's September 9, 2024.

22       Q.    Okay.

23       A.    So I hadn't yet made any invest and so

24  you'll notice that the language I'm doing is indicative

25  that I haven't completed so I haven't done the

                                                    98


1   investment so when I finish investing in something when

2   I harvest it as I mentioned previously that's when I

3   can consider the investment done when the wire goes out

4   when the money transfers.

5      Q.      That wasn't my question before you just

6  said you just had learned about the options --

7      A.      Yeah I didn't know that I had had the

8  options in it.

9      Q.      Until three weeks ago?

10      A.      That's right yeah I didn't know the value

11  of it I knew that Trevor had said that he would put

12  something together for me ultimately I will probably be

13  investigating in a rifle drone company, but I haven't

14  yet made that decision yet either and that's something

15  that's being looked at through a friend of mine right

16  now.

17      Q.      In September 2024 you say that you mention

18  census tech so I'm trying to scare how you write about

19  it in your sub stack and then you just testified --

20      A.      Well typically when I vest.

21      Q.      Hold on hold on?

22      A.      Yeah.

23      Q.      Let me finish you just /SPHAEUD it seem oh

24  I just found out about census tech three weeks ago but

25  you've been /PROEUGT how?

                                                        99


1      A.      Well I've been writing about it over two

2  years I think over three years now I've been writing

3      about it thinking about it.

4          Q.     So do you just remember do you have a bad

5      memory or were you just not being honest earlier?

6          A.     No it's not about being honest it's a

7      question of I didn't know how familiar /OPLGZ I had

8      that it and now I have a somewhat rough ballpark of it

9      but again options are only worth when you actually

10     court you execute an option /THRAOER worth nothing

11     beforehand so in the case of in the case of census tech

12     know I have a lot of respect for Trevor I think he's

13     doing things the right way his company is doing really

14     well from what I understand but I'm not involved in the

15     day-to-day at census tech and partly that or most

16     /PAOEFT am do I business are waiting to see the

17     outcomes by what goes on here because they look at me

18     as an investor or me a a back of what this then Hal

19     Lambert they regard at a did you thinker dryer /*R liar

20     and fraud.

21         Q.

22             MR. THOMPSON:  I'll object as

23     non-responsive to that.  How much money did you pay for

24     these options in census tech.

25         A.     I didn't pay any money for them they were

                                                    100

1    given to me.

2    BY MR. THOMPSON:

3         Q.    What's the documentation that will show how

4    many options you have?

5         A.    There's probably some emails floating

6    around but I don't know that I'm ultimately going to

7    exercise the options anyway I may just do nature them

8    to charity or give them up entirely because I may be

9    conflicted because I may have another drone company I'm

10   investing in.

11        Q.    Will you produce those emails?

12        A.    It depends.

13        Q.    Well, I'm asking in responsive to get to

14   your /S*ERTS will you plows them?

15        A.    Well I don't I have not executed the option

16   so I don't -- likely what I will tell Trevor is that

17   I'm not interested in doing business with him until he

18   wants to do something serious and I'm not interested in

19   like a hundred grand or 200 grand worth of /OPBGSZ I'm

20   interested in like building a pre imminent drone

21   company that's more interesting to me.

22        Q.    Well --

23        A.    And I don't think I'd be legally allowed to

24   take those options if I ultimately invest in in a

25   competitor company which I may well end up doing I

101

1    think very likely I will end up investing in a

2    competitor.

3        Q.    The receiver wanted to identify how many

4    options?

5        A.    By all means.

6        Q.    Hold just --

7        A.    As I said before I have no objection to any

8    officer of the federal government combing through my

9    assets in fact I welcome it.

10       Q.    So how is a receiver or officer of the

11   federal government going to identify how many options

12   in sen Tuesday --

13       A.    I can give him the phone number of Trevor

14   parrot or any of the people working there and they

15   could tell him how many I own and I assume he would go

16   from there but I don't know.

17       Q.    Do you have your own records so like an

18   email where this is communicated?

19       A.    No I don't have an email eye got a phone

20   call over Signal three weeks ago where we had a

21   conversation light /SHRAOFRGS that /HRAGSD maybe 10 or

22   15 minutes Trevor was very grateful to me but /TRAEFR

23   /*R /#134*R78 ever /*R Trevor you know they wanted to

24    do things their way and that's fine but I don't agree

25    with the way they're doing them so I would prefer doing

102

1    other drone companies besides drone technology is

2    getting could mod tied right now we live in a world

3    lieu likes 400 dollars pro taking on it reduction tanks

4    huge /SKPHEF testimony's have not /TERPBLly Trevor's

5    company is interesting insofar as it applies the John

6    McCain national security ator 2019 but even there's

7    it's got chosen.  Heavy /HA*EFLly Chinese penetrated

8    it's kind of a problem so would he be able to get a

9    government contract which is really what I'm interested

10    with respect to Trevor I don't know, I mean, it depends

11    on whether or not the contracting officers likes heim

12    and likes what he's /TOEUPBG and generally speaking

13    he's liked but you know I don't know so no I use the a

14    receiver is welcome to talk to the same people I talk

15    to I'm happy to tell them the same thing I'm telling

16    I'm sure you are going to send them a copy of this

17    that's fine I have no objection to that I look forward

18    to them, you know, chatting and, you know, I helped

19    raise some money for census tech among friends of mine

20    many of them liked the company a lot of them didn't it

21    is what it is it's an okay company I did like the fact

22    that they were helping map the Colorado river that was

23    cool and the new the new design of the plane this is an

24    older make this is not the sen ter o six these are sen

25    ter o fives but yeah so I do like what they're doing

                                                              103

1    and I, but I have been been to the facility I'm not

2    really terribly interested in it long run.

3         Q.    I've got a question about another sub stack

4    article.  And first off is that sub stack article or

5    anything about it look not accurate or anything?

6         A.    This one or which one?

7         Q.    Yeah Exhibit 4?

8         A.    It looks fine I can't tell any difference

9    though.

10        Q.    Okay.

11        A.    Yeah.  These are about the /RUGSZ.

12        Q.    So hold on I'm handing you Exhibit 5?

13        A.    Yeah.

14        Q.    And it's an October 23rd, 2024 sub stack?

15        A.    Yeah all of this looks correct, yep.

16        Q.    Okay so I'm if you go to the it's going to

17    be the fourth page?

18        A.    Mm-hmm.

19        Q.    And do you see the sentence that says all

20   of this violence?

21        A.      Yes all of this violence seems a tremendous

22   also of waste to me a rugs is cut off I don't know why

23   your thing is cut off maybe you too are having printer

24   problems.  Yeah so I can't really respond to it so.

25        Q.      To the question's I too am in drone

                                                      104


1    business I think the was cut off but what drone

2    business are you referring to?

3         A.      That would be like looking at certain

4    basically certainly looking at certain drone /TKOEUS

5    can you I don't think that that's accurate so and then

6    this piece was written let's see this piece was written

7    October 23rd, 2024 so yeah so this would have been I

8    don't know if this was before or after I agreed to help

9    a in a to country with its drone policies this is

10   insulting that would have been a little later I think

11   so I think I was probably just about getting into it.

12        Q.      Did you get paid for that help?

13        A.      I did not as yet.

14        Q.      Did they say to you you would be

15   compensated?

16        A.      They did.

17        Q.      Okay what country is that?

18    A.    That that's probably something I would have

19    to ask the feds to weigh in on whether or not I'm

20    allowed to talk about that.

21    Q.    To you do -- again how much money were they

22    going to pay you this country?

23    A.    I don't know I don't know what it

24    ultimately would have worked out to.

25    Q.    What was the compensation structure?

105

1    A.    It was contingent on me doing them some

2    doing them a favor and I did them the favor I have not

3    asked for the money as yet and I have no intention of

4    asking them for the money at present.

5    Q.    What was the how much money was it?

6    A.    It was put, it was a percentage much sales

7    of a system, but I /ULTS never sold it and in the drone

8    business business can be implied in different ways I am

9    familiar in particular the system I'm most familiar

10    with is the rock gar system so that was something that

11    I studied quite extensively and my friend yo hasn't

12    necessary Rudolph that's really his name who is a

13    German who is a German military attach? at the patent

14    gon so he and I were looking alt bringing re-love tors

15    into the United States so it's possible also that's

16    what that to so I don't hasn't NASA good to blow tup

17    S400s in cry me a.

18        Q.    So you said it was a in a to country?

19        A.    It was a in a to country.

20        Q.    Was it turkey?

21        A.    No.

22        Q.    It was not turkey?

23        A.    It was not turkey.

24        Q.    Will you identify the country?

25        A.    I will not.

                                                        106


1        Q.    Will you identify or provide the emails

2    where the compensation was discussed?

3        A.    There were no emails.

4        Q.    So what how much money were you expected to

5    get paid or how much upside could you have gotten paid?

6        A.    /STP really work that way.

7        Q.    Okay well tell me how it works?

8        A.    Well it depends on how structure it but

9    likely I would have structured it in a government trust

10    likely would have been able to draw down against that

11    trust.

12        Q.    You said you've already done the work to

13    receive the consideration?

14      A.      Mm-hmm.

15      A.      Yes.

16      Q.      So government that's?

17      A.      Government trust is a way of protecting

18   assets who work foreclosure if elder government so they

19   don't get sued by weird olly /TKPWARBGS.

20      Q.      Do you have any government trusts just

21   /KWR-RPB I'm not asking?

22      A.      Yes, I think I do.

23      Q.      Would you tell the receiver what they are?

24      A.      The receiver would already know them if

25   he's an officer of the court.

                                                    107


1      Q.      Well, if the receiver needed help

2   identifying them would you tell him?

3      A.      I mean I wouldn't even have to he would

4   just know it like that's not how it works.

5      Q.      I'm just asking if he asks darns?

6      A.      Yeah of course I mean like would I tell him

7   that yeah of course they wouldn't even be a hard thing

8   for hem this do he could just do it immediately.

9      Q.      How many government trusts do you have own

10   or are a beneficiary?

11      A.      I don't know I don't know if I knew I would

12    tell you but I don't know.

13        Q.    With you tell me how I don't want to I'm

14    not going to probe I just are you tell me specifics

15    about these government trusts?

16        A.    The U.S. federal government for people who

17    do work for or favors for it construct trusts I happen

18    to have them I don't know how many there are I don't

19    know how much monies are in the accounts I don't really

20    care that's not why I got into the work I got into.

21        Q.    Is there money in those trusts?

22        A.    I don't know.

23        Q.    Okay.  How would you go about finding out?

24        A.    Typically I would draw down on those

25    government /TRUFPTS if I had some sort of you know some

                                                            108


1    sort of emergency so if I needed to pay for like a

2    medical procedure or like a child going to private

3    school or to buying a house or whatever all of that I

4    don't really have any interest in currently my

5    grandparents had government trusts my Wyoming

6    grandparents have a government trust it's a very common

7    way of doing things.

8        Q.    So I'm going to ask you a series of just

9    yes or no questions to try to lock this down.  Okay?

10    Are you do you own or are you the beneficiary of any

11    government trusts that you --

12         A.    I don't know.  The answer is yes most

13    likely but I'm not a hundred percent sure.

14         Q.    Is that the best most honest answer you can

15    give?

16         A.    That's the best mows honest answer I can

17    give.

18         Q.    Okay do you know how many or approximately

19    how many?

20    A.    I do not.

21    Q.    Do you know how much assets or --

22    A.    No.

23         Q.    What /THAOEUF /S*EFTS are in these

24    government /TRUFS it's it's just currency money?

25         A.    I'm not sure I have only had them used on

                                                     109


1    my behalf over the years so when my parents bought

2    their home that was a government that was paid for with

3    a government trust.

4         Q.    Based on work that you did?

5         A.    Based on work that I did so I know that

6    there are government trusts that are set up but part of

7    the reason yeah so I know that they exist and they have

8    been manufactured for me.

9        Q.    So if you knew he had to draw on those

10   trusts draw down get money from those trusts, how would

11   you go about doing it?

12       A.    I would call a series of people and I would

13   ask them to do it and we would see whether or not they

14   would do it it's up to their discretion.

15       Q.    Who are those people?

16       A.    I don't want to talk about my relationship

17   are the federal government.

18       Q.    Okay sew I'm going to ask you who are the

19   people you could call to draw on your government

20   trusts?

21       A.    And I'm going to answer very directly I'm

22   not going to talk about my relationship with

23   individuals in /-T federal government.

24       Q.    Okay.  Could you if you wanted to identify

25   the names of those people?

🡑

110

1        A.    I could if I wanted to but I will not.

2        Q.    So you know their names you're just not

3    telling me?

4        A.    Correct and I have no intention of doing it

5    I would rather go to jail than talk about their names.

6      Q.    It's it Alex Rodriguez?

7      A.    I would rather go to jail than talk about

8  their names.

9      Q.    Is that a yes or no?

10     A.    Even I'm.

11     Q.    Or are you refusing to answer?

12     A.    I'll realm fees to ago.

13     Q.    Is it electioner?

14     A.    I'm going as far as I know Alex fletch har

15  no relationship officially or inofficially with the

16  federal government but I don't know.

17     Q.    Is it the herry done mire?

18     A.    Again I would not talk about any

19  relationship I have with anyone who has any

20  relationship with the federal government.

21     Q.    Does Alex Rodriguez have a relationship

22  with the federal government?

23     A.    I don't know.

24     Q.    Do you have his phone number?

25     A.    No.

                                        111

1      Q.    Do you have his Signal handle?

2      A.    I typically contacts me.

3      Q.    How does he contact you?

4      A.      Through Signal or through other means.

5      Q.      What are the other means?

6      A.      He will send a car for me.

7      Q.      A what?

8      A.      A car.  He will send a car for me.

9      Q.      Explain.

10     A.      He will send a car and I will get in the

11  car and I go to where he is.

12     Q.      A random car shows up?

13     A.      Correct.  Typically yeah.  Typically yeah.

14     Q.      Okay.  What's his Signal handle?

15     A.      Don't know his Signal handle.  He typically

16  initiates the conversations.

17     Q.      What's your /STPHRAL handle?

18     A.      Mine's my phone number.  It's pretty

19  simple.  But /KPW luck getting access to that.

20     Q.      Okay so you're just you're flatly going to

21  refuse to identify any of the individuals?

22     A.      Correct yeah I'm not gon answer that.

23     Q.      If you give Alex Rodriguez's phone number

24  to judge fail I can't in now /KWRAORBG?

25     A.      Well he has many phone numbers and and da.

                                                    112

1      Q.      It's a yes or a no?

2      A.      I did give her what I thought was the phone

3   number, but I may have been incorrect about the known

4   number.

5      Q.      Was it a bogus number?

6      A.      It -- I don't know if it was a bogus number

7   or not.

8      Q.      Did you think it was a bogus number?

9      A.      I did not think it was a bogus number.

10      Q.      All right so to summarize tell me if any of

11   this is inaccurate you may or may annuity have

12   government trusts set up on your behalf but you think

13   so because your parents house was in part funded by a

14   government trust right?

15      A.      No.  There are government trusts that are

16   set up for people who do work for the federal

17   government all the time.

18      Q.      That's not nigh question it's for you?

19      A.      Oh for me yes, I believe there are

20   government trusts in my name and dedicated to me.

21      Q.      You said in your name and dedicated to you?

22      A.      Correct.

23      Q.      That would be dedicated to Charles Johnson?

24      A.      Or to my well-being or what have you I'm

25   not totally sure how it works but yes, I believe there

                                                    113

1    are government trusts where it's set aside for me.

2        Q.    And one of the /TH-PBS you think that is

3    because a government trust set up onnor behalf or

4    dedicated to you was used to purchase or fund your

5    participants house?

6        A.    Correct and conversations I've had and work

7    I've done.

8        Q.    And you know the people who are in charge

9    or have control of the trusts but you won't tell me?

10       A.    I don't know them, but I know that there

11   are people out there who have created trusts for me and

12   I don't know what the whole the whole set up is there,

13   but I I couldn't access it even if I wanted to and I

14   don't want to.

15       Q.    You won't identify those people?

16       A.    Correct.

17       Q.    But you would tell the receiver?

18       A.    The receiver would already know it

19   presumably.

20       Q.    If the receiver asks you would you tell

21   them names?

22       A.    I mean if the re -- if the receiver is one

23   of the three that you elect to predict yeah I have no

24   objection to that I have no objection to working with

25    any officer of the federal system on any matter so long

114

1    as they've got a badge I'm happy to talk to them.

2        Q.    I've got some questions about your sub

3    stack?

4        A.    Mm-hmm.

5        Q.    When did you form it?

6        A.    I think in 2020, but I don't remember.

7        Q.    And I think you've publicly described

8    yourself in that as a self made deck a millionaire?

9        A.    Mm-hmm.

10       Q.    What's a self made deck a millionaire?

11       A.    A self made tech a millionaire would be

12   somebody who's worth at least 10 mill /KWRUPBL bucks

13   sufficiently male would I don't really necessarily

14   believe that anymore like in terms of somebody people

15   that people are self made and I don't really think that

16   having millions of dollars is necessarily the best way

17   of looking at living ones life.

18       Q.    Were you ever a deck a millionaire?

19       A.    I think so at one point I may be still if

20   you look at my assets in total hand what their et al.

21   sold for but valuations change and shift over time

22   based upon macro economics factors so if people got

23    super interested ine no mix very possible my assets

24    could be worth more they could be worth less I don't

25    really care either way that's not really how I think

115

1    about it.

2         Q.    So sitting here today are you a deck a mill

3    air?

4         A.    I don't know.  I have not sat down and done

5    an assessment of my net worth in a long time nor do I

6    really care to figure out the number.

7         Q.    Well that's kind of the point of this

8    deposition?

9         A.    It is but I'm not terribly interested in

10   complying with it.

11        Q.    So you understand that the point of this

12   deposition is to find out your assets and worth?

13        A.    No the point of this deposition is to

14   harass me and try to get me on camera so it my

15   testimony can be leaked to the press as a way of

16   embarrassing me for talking to the federal government

17   about Elon Musk's criminality that's the purpose of it.

18        Q.    Do you understand that the plaintiffs have

19   at least presented or taken the position that this

20   deposition is necessary to determine your assets and

21   worth and to determine --

22         A.      I understand that's what they claim their

23   position is but Lambert.

24         Q.      Let me stop threw.  Okay.  So the answer to

25   that yes?

                                                    116


1          A.      Know the answer is that's what they claim

2    that's what they.

3          Q.      A /EUGSD?

4          A.      That's the I am that's not what's actually

5    true.

6          Q.      Okay and you are going to give minimal or

7    less than complete --

8          A.      That's right.  Yeah I have no intention of

9    doing anything other than minimal consent in being

10   here.

11         Q.      So what do you mean by mip mal consent

12   versus like --

13         A.      With will.

14         Q.      Hold on let me just ask the question.  Okay

15   and I'll let you go okay?

16         A.      Mm-hmm.

17         Q.      Explain to me the difference between

18   minimal consent which I guess you're giving?

19    A.    Mm-hmm.

20    Q.    And a hundred percent maximum consent.

21    A.    Well minimal consent is that the federal

22  government of the United States has asked me to be

23  present here so I have arranged my affairs to be

24  present here.  And so they have asked me to participate

25  in what is I believe an illegal act which is to

117

1  participate in this whole sham of whatever of a trial

2  and so I participated in that and I have ton the

3  requisite stuff of filing the appeals and filing all

4  that stuff which is annoying and come burr some and

5  minimal consent is the idea that you acknowledge that

6  the proceeding has some sort of bearing insofar as you

7  want to respect the court it's like why we wear a tie

8  it's why we wear a suit all that sort of thing that's

9  /WHA*S meant by minimal consent.  Maximal consent is

10  that I would participate with you in my own harassment

11  by basically giving you a list of everything that I own

12  or am involved with and that I will not do mostly

13  because I don't know it because I just do work and then

14  like I just you know go to work like on projects that

15  are important when they're important and then yeah, I

16  mean, you know, it's I guess what I would say about it

17  is that I don't respect the abusive process that's

18  taking place here where a foreign born olly /TKPWARBG

19  will use a proxy in the form of Hal Lambert to sue me I

20  don't respect that I think it's an abuse of process and

21  probably illegal I guess we'll see when this judgment's

22  overturned and I et al. end up suing /TKHRARP and you

23  personally so we'll see how that actually holdings

24  ultimately faceses out but I'm not really terribly word

25  about it no that's also why I'm not afraid of going to

118

1  jail or whatever or being in /SRAEULGS because like

2  first of all I don't think it will happen but even if

3  it did happen that would be great because it would

4  highlight all the abuses here and I would have sweet

5  muck not and I wouldn't look as drunk as Hal Lambert

6  does in his.

7      Q.    Anything else to add?

8      A.    No I think that pretty much sums it.

9      Q.    Just trying -- just trying to understand

10  the dinners between if you'd plain so me what minimal

11  consent is I guess it's showing up?

12      A.    That's right that's minimal consent.

13      Q.    Understand a want to knew what a Munn

14  percent Max?

15      A.      That would be being super responsive to all

16   of your emails reading all the ridiculous stuff you

17   send me to waste my time that would be what that is.

18      Q.      Answering the questions that are possessed?

19      A.      No, I mean I can answer your questions I've

20   shown you the respect by telling you the names of some

21   of the acts that I might have access to and I've showed

22   you tally by actually sitting and pre trending that

23   this is actually a will he ji mat and I've Miking up by

24   wearing a tie which courtesy you haven't extended to

25   me by the way but whatever that's /TKPWRAOR prerogative

                                                         119

1   and so yeah that's what that's what I mean by that.

2      Q.      Do you you've refused toness a lot of

3   questions today?

4      A.      Well a lot of the questions you're asking

5   I'm not allowed toness a and I made very clear that I

6   wasn't going to talk about my relationship with the

7   federal government because that's really what this is

8   about it's about you harassing me to discover what I've

9   told the federal government but so why all your

10   deposition questions about that relationship and I get

11   it like you know you work /TKHRAP /TKHRAP is /WAEL /*R

12   I if not their.  Is tesla so you kind of interest an in

13    that so I get it but it's ultimately why I can't really

14    help you.

15        Q.    Your sub stack by og are /*R rasy says

16    something along the total portfolio is exceeds 15 pill

17    bun?

18        A.    Yeah I think it's like 30 billion now but

19    typically the way people do this is they include they

20    include all of the companies they've invested in or

21    associated with and then they like sum them all up and

22    say the value of my portfolio is 30 billion I probably

23    wouldn't say that now I would few years ago but month

24    illustrates in/-LT.  And mostly because I don't really

25    believe in the veb which you are model of investing

                                                          120

1    anymore I think it's kind of fake in a way so getting a

2    sense of like it doesn't really get to the underlying

3    the way in which these things actually work and also

4    fake in the sense that like I don't think being super

5    rich is actually worthwhile.

6        Q.    So you I'm going to ask you tell me if

7    you'll do this you've got a notepad in front?

8        A.    Mm-hmm.

9        Q.    Would you take out a blank piece of paper

10    and just write down all the portfolio companies that

11    you've either you know invested in done work for or

12    where you would receive compensation --

13         A.    I wouldn't know them all, but I can give

14    you a.

15         Q.    Hold /OPLD where you have special purpose

16    vehicles and all that stuff?

17         A.    Sure.

18         Q.    And just for the court reporter's benefit

19    if you could?

20         A.    Sure I'll just list them.  So umm bra I own

21    half of for the special purpose vehicle with Hal lam

22    pertain he disputes that, but I do own it.  Clear view

23    AI I own some portion of stock they said they were

24    buying back my stock in the company.  They've never

25    actually paid me that.

                                                        121

 1         Q.    If you could could just go down the list

 2    and make /TKARPBLTS /UFRPLGTS yeah so off ram I own you

 3    know I think my ex-wife and daughter and trusts and all

 4    we own like a million dollars worth of stock we Macon

 5    test that now we may say we own some more and we'll see

 6    where that goes to the PDR.  Pa o although I think I

 7    own like 300 grand of stock there but I'm not totally

 8    sure clear labs I think I own 200K but I'm not totally

9    sure.  But again like I don't really spend all this

10   time focused on it I think I own part of an ap ter a

11   SPV but I'm not totally sure because I I don't hold

12   that currently.  I'm trying to think of any other big

13   ones nope that's kind of it off the top of my head?

14       Q.    Okay so let's look at ap ter a.

15       A.    Mm-hmm.

16       Q.    Okay?  I think that's an electric car

17   powered by solar panels?

18       A.    That's right.

19       Q.    And you have a lot of experience I think

20   you've written about visiting the company --

21       A.    Visited the company I know the company

22   quite well I have very good friends who work there I'm

23   a big believer in the technology and believe generally

24   that the company will continue to do well and I wish

25   them well.

                                                122

1        Q.    Okay and how did you /STPWEFT in ap ter a?

2        A.    I believe gator green well and I own a

3    special purpose vehicle there but whoa know more about

4    those details than I would.

5        Q.    Okay do you know the name of the special

6    purpose vehicle?

7      A.      I have do not.

8      Q.      Do you have any idea?

9      A.      No I do not.

10     Q.      How would you find out the name of it would

11   it be har?

12     A.      I would call gator green well.

13     Q.      Would he pick up your call?

14     A.      I don't know.  I haven't called him so.

15     Q.      What is the value of the special purpose

16   vehicle?

17     A.      I don't know.  I don't -- as I said before

18   I don't pay attention to the fluctuations in the thing

19   I only care about when it matures and I can collect it.

20     Q.      Do you really -- go ahead?

21     A.      So like for example you know I own a huge

22   you know position in umm bra obviously Mr. Lambert you

23   know jumping drunken fraud that he is disputes that and

24   so is that do I have a hundred million dollar position

25   in umm bra or do I not it's unclear.  Off ram do I own

                                                        123


1    the position or do I own it only when it actually gets

2    liquidated these are kind of open questions so that's

3    what I spend most of my time thinking about is when

4    something is actually materially realized really what

5    matters most is cash on hand.  Everything else is kind

6    of a it's kind of annoying and kind of useless.

7        Q.    Let's take that at like let's take a

8    special purpose vehicle in ap ter a for example.  When

9    is that value or investment realized as you say?

10       A.    Well in this case there's a lock up with

11   all investor shares in ap ter a and I think it's goes

12   for another one or two years and then you have a

13   decision I think it may even be three years and you

14   have a decision then about whether or not you are going

15   to allow your interest to convert into shares or into

16   the company long run or whether you're going to whether

17   you're going to continue to basically hold it as a

18   separate distinct entity now I personally I don't know

19   what I will do in two to three years we'll see, but I

20   wish them well and if I had the cash I would invest

21   more money in them and I have -- I have directed family

22   and friends to invest in it as well.

23       Q.    Here's a sub stack from April 5th.

24       A.    Yeah notes on the ap ter a solar mobility

25   revolution yeah I don't know when this was yeah this is

                                                    124


1    when I went to visit with my family yeah yeah with my

2    ex-wife and daughter and child yeah, oh and sister.

3      Q.      Exhibit 5 is a sub stack that you wrote?

4      A.      Yep.

5      Q.      If you go to the and said my family and I

6    visited the am ter a factory in Carlsbad right?

7      A.      Mm-hmm.

8      Q.      Okay.  Who is your contact at ap ter a?

9      A.      I have several.  The main one there is

10   gator /TKPWRAOEPBL so gator /TKPWRAOEPBL would probably

11   be about T- best one to get in touch with the company

12   through he would be the best kind of source in general.

13   And then I talked to Steve familiar bro who is the CEO

14   there but he and I you know are supposed to meet but we

15   haven't met in a while mostly he had some like family

16   matter and so he and I personally ultimately didn't

17   meet up he had some situation with his daughter

18   unfortunately or rather unfortunate.

19     Q.      Anyone else in aptary?

20     A.      I think I met the other CEO and I met

21   somebody in their investment office and I met some of

22   their engineers but I'm trying to remember exactly I

23   think I know one of their board members but I'm not

24   totally sure that I would say that it's a close enough

25   relationship yeah.

                                                      125

1  Q.  Can you provide names of those people?

2  A.  No, I don't typically remember names I'm no

3 too terribly good at that that's why I have a that's

4 probably why I write so much but it's probably I have a

5 girlfriend on again off again girlfriend and

6 ex-/WAOEUFR and other people to remember names I'm very

7 bad at remembering names I meet too many people.

8  Q.  So if you go he to the third page?

9  A.  Yep.

10  Q.  Just read that into the --

11  A.  Yeah.

12  Q.  Court and court reporter.

13  A.  Which part?

14  Q.  To be honest?

15  A.  To be honest I didn't quote know what to

16 think this by I can an investor in ap ter a through a

17 special purpose vehicle earlier last year.

18  Q.  Okay.

19  A.  To my mind the real innovation of the

20 company is it's solar paneled portfolio of patents.

21  Q.  Okay I'll stop you there?

22  A.  Umm /STKPWHRUPL so that special purpose

23 that's with greater /TKPWRAOEPBL.

24  A.  That's right.

25  Q.  And you think you invested in sait early

↑

126

1    last year so sometime in /TPO* since this was --

2         A.    Yeah it might have been 2022 but he would

3    know.  I don't know off the top of my head.

4         Q.    Do you know how much money was invested?

5         A.    I don't.

6         Q.    Ballpark?

7         A.    Maybe like 10 million maybe less yeah maybe

8    four million five million I'm not totally sure.

9         Q.    So multi millions?

10        A.    Mm-hmm.

11        Q.    Okay.

12        A.    Yeah.  That's right multi millions.

13        Q.    Did you contact Mr. /TKPWRAOEPBL or speak

14   to anyone after ap ter a had an.  PO?

15        A.    Well, they didn't have an IPO they had

16   what's called a direct listing.

17        Q.    Reverse split right?

18        A.    What they had was a direct listing and a

19   direct listing is somewhat different and there's a lock

20   up period for people's shares who were inside /T-Rs and

21   I think that qualifies insiders so I made it very clear

22   to gator when I made the investment that I wasn't

23   intending to liquidate the position for another ten

24    years we talked a lot about children in the

25    conversation he has a son I have a daughter we talked a

127

1    lot about the future of solar technology coming out of

2    China and out of the United States and, you know, we

3    /KPHEUD then and there that we would not sell our

4    position until at least five years after we did our

5    investment so whenever he whenever he makes the

6    decision and I. .  He'll make the decision when we

7    liquidate the position and you know I said I I don't

8    really want to I want to set it and forget it so and in

9    my life I've found that the best investments are the

10    are not the ones you follow O'Day today they're the

11    wonder you follow when you just make a decision and

12    then you move on to the next thing and the next thing

13    and the next thing and the next thing it's much easier

14    that way so gator made most of the decisions on that.

15        Q.    So if the receiver wanted to I guess your

16    understanding it was between four and $10 million this

17    investment in aptary?

18        A.    Mm-hmm yeah if the receiver wants to look

19    into it again the receiver has all the authorities to

20    do that I have no objection to a receiver coming

21    through on all these things that's fine doesn't bo

22    /THERT /PHAO* at Al.

23         Q.    So if you give your consent to the receiver

24    to I guess investigate your interest --

25         A.    Well it wouldn't be an investigation to be

                                                            128


1    precise about.

2         Q.    What's the word like what word shouldry

3    use?

4         A.    When you are dealing with the receiver he's

5    deputized by the court so it's not an investigate he

6    has my extent under the Rules to go through all the

7    /*ETS but I don't think a receiver's probably warranted

8    in this case but maybe the judge would disagree or

9    whatever he's free to make that decision and I have no

10   objection to a receiver coming and visiting me and

11   going through and having conversations about my assets

12   much the same way I'm having a conversation now, but I

13   expect all this will be overturned at the Fifth Circuit

14   anyway so it's kind of like whistling past the

15   graveyard as it were or willfuling past the prairie or

16   something so yeah it doesn't really phase me.

17        Q.    So if the receiver --

18        A.    The receiver's probably /PAEP I'm here pi

19   happy to have the receiver call greater ga and have a

20    conversation with him about how much of the ap ter a

21    SPV I own.

22        Q.    So if the receiver wanted to quantify the

23    investment --

24        A.    Well that's his responsibility that's not

25    my responsibility.

                                                    129

1         Q.    Hold on.  Hold on.

2         A.    Mm-hmm.

3         Q.    If receiver wanted to quantify your

4    investment in ap ter a how would he go about doing

5    that?

6         A.    He would presumably call greater

7    /TKPWRAOEPBL and ask him for the documentation for work

8    we did so.

9         Q.    And what's gator /TKPWRAOEPBL's number?

10        A.    I don't know off the top of my head I

11   obviously don't have my cell phone with me and I am not

12   inclined to.  Gator agree.  If you want to contact him

13   pretty really lid he's object LinkedIn.

14        Q.    Where does gator /TKPWRAOEPBL live?

15        A.    Last I heard he's somewhere in the try

16   state area but I don't know I haven't talked to him

17   since the funeral and we were talking about we were

18    talking about his ex-girlfriend we were talking about

19    David hallow well's deceased wife we were talking about

20    France we were talking about how he liked be being a

21    father that was the extent of it.

22        Q.    It's kind of rude to talk about investments

23    at funerals don't you think?

24        Q.    How many special purpose vehicles have you

25    invested with Mr. /TKPWRAOEPBL in?

                                                    130


1        A.    I don't know he would know he would know

2     the answer to that and in fact he would know that and

3     one of his one of our kind of mutual handlers would

4     know that answer but I don't know.

5        Q.    What do you mean by mutual handlers?

6        A.    He has somebody who super intends and

7     watches him much as I have somebody who is my adult

8     supervision and he has somebody has handles a lot of

9     that for him I believe he also has a dedicated

10    government trust from what I understand as does his

11    wife.

12        Q.    So when you talk about your adult

13    supervision you're talking about spun /*R someone

14    involved in the federal government?

15        A.    Correct.

16    Q.    For the best of your understanding is the

17  aptary investment is between four and $10 million?

18    A.    Something like that but I don't know.

19    Q.    What was the source of that money?

20    A.    For which?  For the investment generally

21  lots of different investors contributed to it.

22    Q.    The special purpose vehicle?

23    A.    Yeah lots of different investors /KREUBD to

24  it.

25    Q.    Come aptary my question is what is the

                                                            131


1  source of that four to $10 million?

2    A.    Oh different investors of people that gator

3  and I know.

4    Q.    Did you put in any of the money?

5    A.    I don't recall.  I may have S very possible

6  that I did but I don't recall because he asked me for

7  it at one opinion, but I don't remember if I sent a

8  wire or not he also owed me some money so I think we

9  might have done some write off of officer of the

10  federal of that but I don't recall.

11    Q.    What is met us capital?

12    A.    Made us capital is a LLC that gator

13  /TKPWRAOEPBL gave to me as a as a gift to to basically

14    park money that I was getting to pay for various

15    entities and various events but I believe there's like

16    negative 300 bucks in there now.

17         Q.    You never mentioned met us when I asked

18    about your assets.  Why?

19         A.    Because it's not an asset that I control.

20    It's an asset that I am told to do things out of that

21    account and there's no money in it now so I don't do

22    anything out of it.

23         Q.    What do you mean?

24         A.    Typically people will call me and tell me

25    to do something with the money that was put into that

                                                            132


1    account for me and then I will typically go and do

2    those things.

3         Q.    Please explain.

4         A.    File a lawsuit, give money to a person or

5    entity yeah it's not an account that I control it's an

6    account that's I get a phone call get told to do

7    something with that account.

8         Q.    Okay where is how do you access the money

9    there in the met us capital account?

10        A.    Well there's no money in it currently but

11    typically what I do is I would go into the bank and I

12    would wire money out of it usually in person the met us

13    account was hacked a number of years ago as a lot of my

14    financial affairs were hacked and that resulted in me

15    getting what's called a controller account and all of

16    my financial properties I have so physically go into a

17    wood Forest then they call headquarters to recall

18    determine that I'm me I give a voice print someone

19    takes a photo and so there's that whole process as well

20    but yeah the m met us account I think it's like

21    negative a thousand bucks in there now.

22         Q.    What bank account was that or what bank?

23         A.    That was with wood Forest yeah, but I don't

24    have any relationship with it now.

25         Q.    Is ate separate account from approximate

133

1    erm.  You mentioned earlier?

2         A.    It is but it's not one that's controlled by

3    me it's one where I was encouraged to do that her vus

4    things but, but I haven't used that account maybe in

5    two years three years maybe.

6         Q.    Does /TKPWRAOEPBL have any affiliation with

7    the met us account?

8         A.    Well it was his LLC or it was his, you

9    know, thing that enabled me to to open it and he good

10    give that to me as far as I know he still does but I

11    don't know I don't know what his relationship is with

12    it.

13         Q.    Where are the documents for, you know, you

14    said is an where was it incorporated?

15         A.    I don't know any of that.

16         Q.    How did you get the information on how to

17    that you could take money out how did you good et the

18    access info?

19         A.    He made a series of phone calls and told

20    mow that the money was in the account and that I had

21    various things I hassed to do and I should go do them

22    and I complied.

23         Q.    How did /WOEFRT bank know that you were

24    authorized to use the met us capital account?

25         A.    I don't know but they did gator also knows

                                                        134


1    Robert March link who owns /WOEFRT bank so it's

2    possible they had a conversation about it I don't know.

3         Q.    And you think for your /*R or your

4    testimony is that met us capital is even though you had

5    access to it it's not really an asset because it's for

6    to do off the books government black work?

7         A.    We can call it off the books but usually it

8     was involved with like lawsuits or you know if they

9     needed me to something I would just do it it wasn't

10    like a complicated kind of arrangement it was actually

11    quite simple most of the money that was in there was

12    for like pairing lawyers and things, I mean, it was not

13    it was whatever.

14         Q.    What lawyers did you pay from the met us

15    account?

16         A.    I paid been any Kline man at one point.

17    Who else did I pay out of it?  I don't remember it all

18    now it's been a while but yeah there are times in which

19    I have had access to accounts that were set up for me

20    by others in which I have done what they've asked me to

21    do, you know, usually after I've gotten permission to

22    do it so.

23         Q.    Testifying here today under oath will you

24    identify all those accounts?

25         A.    No I will not.

135

1          Q.    You refuse to?

2          A.    I refuse to because I've not been given

3     permission to do so.

4          Q.    Will you identify who would be the person

5     that would give you permission to identify that

6    information?

7          A.    I will not.

8          Q.    You're aware that Judge Pittman previously

9    disagreed that you can refuse to answer these kind of

10   /*F type of questions?

11         A.    The judge can do whatever he sees fit I

12   will not participate in that.

13         Q.    Will you go to jail rather than identify

14   those people?

15         A.    No, I won't end up going to jail but that's

16   funny.

17         Q.    Would you rather?

18         A.    It would be great if I went to jail because

19   I would get the mug shot and that's what I want but

20   unfortunately I will not end up going to jail.

21   Regrettably I should say.  More likely than not what

22   will happen is Judge Pittman will push it into the

23   future and they'll I'll have to come back to Fort Worth

24   and eat a bunch of food I shouldn't and then fly back.

25         Q.    You said your flight today is at what time?

                                                      136

1          A.    It's at noon but I'm not -- or excuse me

2    it's at 2 /PU I'm not in charge of that I when I get

3    out of here I will make a phone call to one of my one

4    of my associates and they will tell me when when and

5    which airlines and all of that that will be taken care

6    of for me and then I will get in the Uber which will be

7    taken care of for me and then I will go to the fly back

8    to wherever they send me most likely they'll send me to

9    California would be my guess that's what I've asked

10   them to do but let's see it could be DC.

11        Q.    So you could stay here the rest of the day

12   and an answer all the questions?

13        A.    I would, but I want to provoke a

14   confrontation that would be cool.

15        Q.    What type of confrontation do you mean?

16        A.    Well I want to provoke getting a getting a

17   mug shot that would be great because then that would

18   highlight what's going on here and that would also be

19   useful it would elevate me in what was going on but

20   probably it won't happen like that you'll probably just

21   put me a night or two in jail or whatever that's fine

22   that's not a big deal that's why I didn't wear my

23   contacts but yeah that's fine.

24        Q.    I'm going to mark this as Exhibit 7.  So

25   you used to have a Twitter account right?

                                                        137

1         A.    I did and then I was kicked off of it and

2    then I got a new Twitter account.

3        Q.    O okay I'm talking about the old one?

4        A.    Yes.

5        Q.    Johnson thought?

6        A.    That's right Johnson thought 1 to be

7    precise.

8        Q.    And did you close it or did you get kicked

9    off of Twitter?

10        A.    I got kicked off of Twitter.

11        Q.    Wasn't to try to --

12        A.    No I'm under oath, I mean, I was kicked off

13    a hundred percent and I remember it quite vividly at

14    the time and yeah this thing that was posted was is not

15    accurate so the prim a record yeah so yeah I was kicked

16    off.

17        Q.    All right this is a think a the it's a

18    tweet by you from Johnson just tell us what Exhibit 7s

19    is?

20        A.    This is number 7 this is a tweet from the

21    Johnson thought so I have a deer /TPROEPBD who is the

22    most.  Delightly.  My bile all she should have given up

23    but he is too.  Of course I invested in him when

24    there's nothing left but the will you find a wy that.

25    A reference to o mayor gu ral of the gu ral farmer in

                                                        138

1  turkey.

2       Q.    So who is the dear friend?

3       A.    That's on mayor yeah.  Very lovely man.

4       Q.    You say or you wrote of course I invested

5  in him?

6       A.    Mm-hmm.

7       Q.    What was the investment?

8       A.    That was in a company called repeat which

9  is more or less moribund and /TKPWUPBGT but that wasn't

10 why I was instructed to invest in him.

11      Q.    What do you mean?

12      A.    Well he is the sigh on of one of the most

13 powerful agricultural countries.  In you turkey a

14 understand have hely if '82 you had more fum numb

15 strum.

16      A.    The spices regular a notice and all that

17 has his family so very lovely guy I miss him.

18      Q.    Have you told me about all the companies

19 that you have investments in or have pre /KHROEUPLD?

20      A.    I think so yeah more or less.

21      Q.    /KWRAOEUF /AOF got another one for you.

22 Actually go back to sub stack how much money do you get

23 paid how many subscribers do you have?

24      A.    I think I have like 3,000, 4,000 I'm not

25    totally sure how many of them pay I don't know like 7

139

1    o, 80, 90, I don't really pay attention to it.

2        Q.    How does sub stack pay you each month?

3        A.    They pay me they send mean to a /WOEFRT

4    account but I think it's like not even a thousand bucks

5    maybe 2,000 bucks something somewhere in that I don't

6    really know.  I don't pay attention to it.

7        Q.    And did you fly in here last night?

8        A.    What.

9        Q.    Did you fly in here last night?

10       A.    I did.

11       Q.    And did the government book that?

12       A.    No.

13       Q.    Was it through your federal?

14       A.    No that was paid for by kerry crew call and

15    she used southwest which is awful but she paid for that

16    as far as I know she used her points and then I have a

17    bunch of mayor on the points so I use a lot of my mayor

18    on the points to pay foremost things and I think

19    eventually I will use /H-FLT G points in the future to

20    pay foremost hotels that I stay at.

21       Q.    You said I have infinite I have effectively

22    infinite money to litigate these matters that /H-PS

23    when the and allied governments wanting to fund your

24    legal defenses I can basically go forever?

25         A.    Correct.

                                                        140

1         Q.    Is that an /KR accurate statement of

2    something tid?

3         A.    That is something I said close to it yeah.

4         Q.    Okay.  Which allied governments?

5         A.    That would be France typically.

6         Q.    Any other /TPWOFTS paid money towards your

7    legal fees in this case or another case?

8         A.    No and I'm not totally sure about the

9    French thing they were sort ever from endly to France

10    but I think they're CIA people who send sent me from

11    money for that I'm not.

12        Q.    Through what chas wire?

13        A.    That was sent through met us but that was a

14    long time ago I don't really know what the situation

15    was there.

16        Q.    So it went into your met us act Toyota

17    /WOEFRT bank?

18        A.    Yeah and it was designed to pay been any

19    Kline man and the clear view AI suit which I did until

20    the money was exhausted and then Mr. Kline man and I

21  went our separate ways.

22      Q.      Didn't you tell Mr. Kline man there's a

23  $20,000 check nor?

24      A.      Yeah that was something we were being if a

25  /STAOERBS with fun another so we because we knew.

                                                    141


1       Q.      So you were lying from?

2       A.      Wasn't lying it was a it was a bit of sub

3   ter /TAOUPBLG I think was the government would slay.

4       Q.      It wasn't?

5       A.      I don't know where his money and frankly I

6   don't think he really cares.

7       Q.      Does the government pay your rent?

8       A.      Depends on the property.

9       Q.      Okay what property does the government pay

10  your rent?

11      A.      Well, they don't pay rent they let you stay

12  places that's how it works.

13      Q.      What /STKAEUSZ?

14      A.      Depends on what they want you to.

15      Q.      Okay in the last year where have you stayed

16  with the government's permitted to you stay?

17      A.      A number of places but again I'm not going

18  to talk about my relationship with federal government.

19    Q.    So you could so you refusing to testify and

20    answer where you have stayed at the I guess the --

21    A.    Yaws about if I tell where I stayed that

22    would compromise the things that I government asked me

23    to do so I'm not going to do that so.

24    Q.    You could though?

25    A.    I could give a full account of where I've

142

1    been for the last ten years if I wanted to yeah in fact

2    I could give an hourly account of it.  Which is crazy,

3    but I could.

4    Q.    You said you have a terrible memory and

5    can't identify names?

6    A.    I can't remember names typically no but I

7    don't have to.

8    Q.    Are you refusing to answer the question

9    about where you stayed and where the government --

10    A.    Mm-hmm yeah bras I don't want to

11    necessarily violate the trust that's plen based in me

12    in those /TKHRAEUSZ.

13    Q.    /STPWHROUF any business dealings with

14    cutter oar turkey directly indirectly?

15    A.    You mean with the government or with

16    individuals in country or what?

17       Q.      Let's start with the government.  Okay so

18  I'll ask it again do you have any business dealings --

19       A.      No.

20       Q.      Any money --

21       A.      I have no -- I have no business dealings

22  with them as far as I know I am friendly with numerous

23  member I am friendly with the Qatarian impasse tore

24  he's a dear friend of mine I was I was a guest of at of

25  his at several of his events and I have in terms of

                                                        143


1   turkey I have medical wet my you think /-PBL walking

2   did station chief there so I'm very familiar with

3   turkey but no I have no relationship with the

4   government of turkey as far as I know many of actually

5   that's not true one of the fies may ten sal a knee who

6   was /PH-FLT IT but he died he's dead now so I guess I

7   have no relationship.

8        Q.      Do you do any work paid or up paid for the

9   Qatar regovernment?

10       A.      No.

11       Q.      The turkeys occur Turkish government?

12       A.      No.

13       Q.      I hand you what's been marked as Exhibit 8?

14       A.      I do not work nor the governments of in I

15    countries or the than the United States.

16         Q.    You are familiar with this?

17         A.    I've stolen mim yuns how.  How dare you

18    could be.  That's obviously a joke that's the aub if I

19    in joke I've got to say because it's now in a court

20    record but it's a joke I have not stolen money.

21         Q.    Who /R-RP if sign?

22         A.    That was the joke it's a reference the 7K

23    thing is a reference to the fact that sigh onnists pay

24    people money to promote certain ideology talking points

25    in social media and so no.

                                                          144


1          Q.    I'm going to hand you another exhibit?

2          A.    Mm-hmm.

3          Q.    This is a tweet from 2024?

4          A.    Let's see what this is.

5          Q.    You mentioned investment in metgation tech?

6          A.    Mm-hmm.

7          Q.    Explain --

8          A.    Yeah that would be the Joan company at

9     census tech and you know invested in this context means

10    paying attention the solar poured batteries solar plus

11    Carters /TKAOEPS the lead so this is a reference to the

12    ap ter a stuff so yeah that's what that is irrigation

13   litigation tech that would be mostly like the census

14   stuff but ultimately I just have the options in that

15   so.  Yeah.  Well yeah hurricane mitigation technology

16   is a very interesting subject I should spend more time

17   on that especially in the West Coast because that's

18   where /*R we're more likely to have containers /*R

19   hurricanes unfortunate /*R unfortunately in /-T future.

20        Q.     Can you briefly explain how drones mitigate

21   or hurricane mitigation technology?

22        A.     No not without getting in trouble so no

23   there's a technical well /TKHRAP is represented the

24   Chinese government in suing over drone /S-PBLG to I

25   wouldn't be talking about that no.

                                                          145

1        Q.     You could answer it but you refuse to?

2        A.     I refuse to correct.

3        Q.     Okay any other investments?

4        A.     Not that I know of.

5        Q.     Okay and when I talk about investments I

6   just want you to know it's indirect direct SPVs trusts

7   government money wife daughter?

8        A.     No the you were barred from by Judge

9   Pittman you should try to.

10        Q.     Well, I'm going to ask if you?

11    A.    Remember counselor you didn't check with

12    /TKHRAP whether or not they already represented my

13    family which they did and then you moved over but you

14    didn't do the conflicts check on and now you're asking

15    about the family that's not good but you can continue

16    if you want.

17    Q.    Did you invest in any companies with Navy

18    seals?

19    A.    I did there's actually a company called dar

20    a.

21    Q.    Why didn't you mention that before?

22    A.    Didn't recall it.

23    Q.    You didn't recall it?

24    A.    That was no I didn't and I think I have

25    omissions in that one too but I'm not totally sure

146

1    gator would know more on that gator was in control of

2    that investment to the OI5.

3    Q.    How many companies I've got to bring up for

4    you to say oh gator knows about that now I remember

5    feels like you're not being complete and honest in your

6    answers?

7    A.    Well a lot of them it's not my

8    responsibility but you know I pay attention to my lane

9    and I do things that the government asks me to do and

10    people does me to do in my lane so that's why we have

11    business partners and associates.  Yeah tar gap is a

12    very interesting company though I think I don't really

13    know what's going to happen with that one, but I

14    haven't talked to Joe yo /SKWRO* Joe would full is the

15    main shot caller there and I haven't talked to him in

16    maybe a year two years no that's not true we talked

17    about it will we talked about the I tannian coast good

18    guy.

19        Q.    I'm /HAPLGD you Exhibit 10.

20              (Marked Deposition Ex. 10,

21        A.    There we go.  Yes.

22    BY MR. THOMPSON:

23        Q.    Third page?

24        A.    Third page.

25        Q.    Toward the bottom?

                                                    147


1        A.    Third page third page yep.

2        Q.    One of the companies can you read that

3    please?

4        A.    No I don't see that where is that page 3?

5    Are you sure page 3?  No I don't have it here.  Maybe

6    you want to just read it out and I'll frye and find

7    that.

8         Q.    Take mine why don't you just give me that

9    one back.  I highlighted it.

10        A.    Okay.  /UFPL hum.

11        Q.    So who are those two /WREURB friends and

12   what is the company?

13        A.    Let's see here.  What is the company that's

14   a great question I don't recall this one yeah gator

15   would definitely know this one though because he

16   handles the British side of our.

17        Q.    See if that jogs your memory Exhibit 11?

18        A.    I handle the French once.

19        Q.    If you could just please keep all the

20   exhibits --

21        A.    Yep yep so tear a dies yep I'm an investor

22   in that one, yep.  If I wrote it then I'm an investor

23   in it.  Probably.

24        Q.    Okay so again if the receiver cares to try

25   to quantify --

                                                  148


1         A.    Exactly I have no objection to a federal

2    receiver you are obliged to come up with three names

3    you came unwith one come up with three.

4         Q.    Mr. Johnson, if the receiver whoever it is

5    seeks to quantify your investment or the value of your

6    investments in ter a depth how would he do it?

7        A.    He would call the company presumably he

8    could call Joe he could call he could call John Burbank

9    he could call gator /TKPWRAOEPBL he could call any

10   anybody /*R number of people.

11       Q.    So give me the full names of everyone?

12       A.    John Burbank.  So he's somebody that people

13   could call.  I don't have his contact I haven't talked

14   to him in a number of years but I think it was John at

15   passport capital when I talked to him last he has a

16   woman who worked for him named Julie Kim high typically

17   associated with O- though I think she was fired I'm not

18   totally sure what that deal is.  Yeah.  But I haven't

19   really paid attention to that in a number of years.

20       Q.    How are they going to know the name of

21   these SPVs how could they know that they're associated

22   with Mr. Chuck Johnson Charles Johnson?

23       A.    The home that Mr. Burbank lived in in

24   London was provided to him because of his help to

25   various countries in the U.S. and he will know what I'm

                                                        149


1    talking about objection, nonresponsive so this

2    investment in ter a depth was it an SPV, direct or what

3    do you know?

4        A.    I don't know.

5        Q.    Okay.

6        A.    I know that I have an interest in it I know

7    that it is sizable I don't know I don't know.

8        Q.    Okay by sizable what do you think what's

9    sizable mean to you when you sigh saysable?

10       A.    Few million bucks maybe 10 total I don't

11   know if it's all mine some of it might be gators some

12   of it might be a beginnings unclear.  I --

13       Q.    Was it in -- go ahead.

14       A.    Yeah I believe yeah I don't know what its

15   valuation is either Ien haven't really paid attention

16   to it in a you be inform years I know that it's doing

17   well and I know that it continues to get contracts from

18   the may gee but I don't know the full story with the

19   Navy nor do I really want to know because some of the

20   stuff that they do is classified from what I understand

21   and I'm not read into it.

22       Q.    Was the investment in ter a depth through

23   /TKPWRAOEPBL or did he handle it?

24       A.    He handled the paperwork around it yeah.

25       Q.    Okay was it a special purpose vehicle?

                                                        150

1      A.    I don't know.

2      Q.    You don't know?

3      A.    Chro I don't know.  /TPHO*EU that my job

4  was to source the /TWEFPLT and his was to ride the

5  capital for it so he did.  To provide the capital for

6  it so he did and I believe that there's a lot of

7  British connections there but I don't the /PWREUTS

8  don't trust me the /TPRUPBD are the ones who like me so

9  he handles the British.

10     Q.    Why don't the /PWREUTS trust?

11     A.    The whole American revolution thing yeah

12 that's a thing they're big on lineage and the French

13 like me a lot like a lot a lot so.  My family was very

14 involved in Lexington and Concord they know that

15 everybody who does business at the level in Brit an

16 you're only allowed in certain places he's allowed in

17 those places I am not.

18     Q.    Okay.  So it's 11:40?

19     A.    Yep.

20     Q.    How long have we been going I want to be

21 cognizant of the court reporter on this /#1EGS.

22           THE VIDEOGRAPHER:  Has knee.

23           MR. THOMPSON:  We'll go about five more

24 five more tints are you going to stick around.

25     A.    I don't know I have to wait I have to go

151

1    see I have go make a phone call.

2    BY MR. THOMPSON:

3        Q.    You said you were leaving at noon?

4        A.    I'm going to be leaving the building at

5    noon yes, and I may actually get into a cab and leave

6    I'm going to go file a report and say how it's going

7    and then I'm going to get instructions.

8        Q.    A report?

9        A.    Yeah.  A report.  I have to go and say what

10    happened here I'm obliged to do that the kind of

11    questions you're asking all of that I'm going to take

12    that and I'm going to go tell them.

13        Q.    Are you tell me your handlers name?

14        A.    No.  Never.

15        Q.

16            THE VIDEOGRAPHER:  I've got an hour 23

17    minutes on the record.

18            MR. THOMPSON:  That's kind of long for you

19    guys let's go off the record then.

20            THE VIDEOGRAPHER:  We are going off the

21    record at 11:42.

22            MR. THOMPSON:  Can we go back on real

23    /PWRAOEUFL.

24       A.      We're on we're on.

25    BY MR. THOMPSON:

                                                    152

 1       Q.      All right.  We're going to bra I can for

 2    take a real quick lunch break I just want to for

 3    because we've been going an for the court reporter's

 4    sake to give him a break and I still have a lotter

 5    month questions for Mr. Johnson and I intend to use my

 6    full seven hours Mr. Johnson has stated that he's going

 7    to leave and I just want to make it very clear that I'm

 8    not done with my examination here and it's 11:45 and I

 9    intend to resume the deposition around 12:15, 12:30.

10            THE VIDEOGRAPHER:  Okay we're going off the

11    record at --

12            MR. THOMPSON:  Mr. Johnson are you going to

13    be back here at 12:15.

14       A.      I don't know I'm foreclosing to have to

15    make a phone call and when I find out I'll let you know

16    or presumably you'll know whether or not I'm here or

17    not.

18            MR. THOMPSON:  Okay.

19            THE VIDEOGRAPHER:  We're going off the

20    record at 11:43.

21            (Break from 11:43 a.m. until 12:41 p.m.)

22          THE VIDEOGRAPHER:  We're back on the record

23     at 12:41.

24     BY MR. THOMPSON:

25          Q.    All right.  We're back on the record.

                                                          153


1     12:41.  We were supposed to get started at 12:30 but

2     Mr. Johnson is present.  Raw today continue,

3     Mr. Johnson?

4          A.    I am.

5          Q.    Did you make any calls?

6          A.    I did.

7          Q.    Who did you speak to during the break?

8          A.    I won't say who I spoke to.

9          Q.    Why?

10          A.    Because I'm not allowed to.

11          Q.    Did you talk about this deposition and your

12     answers?

13          A.    I did.  I did.

14          Q.    What did you say?

15          A.    I said that it's it's a lot of its an an

16     now answer but it's manageable.  Something to that

17     effect.

18          Q.    Who were you speaking with?

19          A.    I won't say.

20      Q.      Over the telephone or Signal?

21      A.      Signal message.

22      Q.      Do you delete your Signal messages?

23      A.      They're auto deleted.

24      Q.      Why do you have them set like that because

25   do you understand that you are under a duty to preserve

                                                                154

1   your messages in this case and your communications?

2       A.      I guess they'll have to arrest me.

3       Q.      What?

4       A.      I guess they'll have to arrest me.  They

5   were set long ago that way and I just continued with

6   the status quo of it.

7       Q.      You know you could change it so they don't

8   delete?

9       A.      I won't change it.

10      Q.      That wasn't my question.  You know you

11   could?

12      A.      I could, but I won't.

13      Q.      Typically they last for about a day or two.

14   Sometimes less.  Depending.

15      Q.      Why don't you want to preserve your

16   communications that relate to this case?

17      Q.

18      A.      Well, all my communications are preserved

19   through Signal.  Signal controls all of that.  I would

20   prefer to do everything on on install if I had my dra

21   thers.

22      Q.      You mean you can retrieve all your mention

23   that you sent on Signal?

24      A.      No.  Others can.  I can't.  But others can.

25      Q.      Are the others?

                                                        155


1       A.      Well it's not a secret who the are

2    furnished behind Signal.

3       Q.      I'm asking like could you personally --

4       A.      I personally couldn't but others can do it

5    for me.

6       Q.      And you choose to not change your message

7    retention settings --

8       A.      That's right I won't yeah, I mean, I don't

9    I won't and won't change anything that I've done

10   with -- regarding that.

11      Q.      Can you explain why?

12      A.      It's about the minimal compliance issue.

13      Q.      Same thing you're going to minimally

14   comply, but not a hundred percent maximum compliance?

15      A.      That's right and also Signal controls all

16    of it anyway everything I do on Signal I would prefer

17    to do everything on Signal as I said and Signal has a

18    back end so I'm happy if there's anything like super

19    bad or whatever that Signal, that Signal messages could

20    be reactivated at some point by somebody if necessary,

21    totally necessary.  In general I'm a fan of Signal and

22    prefer for all communications I use it with family with

23    friends girlfriends you know nannies.

24        Q.    So I went through some of your answers were

25    muddled so I'm not repeating this intentionally.  Okay.

                                                    156


1    So when was the first time you purchased or obtained

2    /KHOEUPT currency?

3        A.    I don't know what the first time was.

4    2021, 2012.

5        Q.    So list every crypto exchange or platform

6    where you have had an account?

7        A.    I don't know them alm.  Probably I think I

8    had one at coin base alm al.  That might be it.  I

9    don't have all the others off the top of my head.

10       Q.    By unanimous?

11       A.    No I've never used it.

12       Q.    Cracken?

13       A.    Never used it.

14      Q.      Are you sure?

15      A.      Yeah.

16      Q.      Gemini?

17      A.      /KWREFR understood /SKPWHREUT sure.

18      A.      Yes.

19      Q.      FTX?

20      A.      No never used it.

21      Q.      Are you positive?

22      A.      Yes.

23      Q.      Due coin?

24      A.      No even know what that is.

25      Q.      Bite finance?

                                                157


1       A.      By finance?  What is that.

2       Q.      Something I heard about?

3       A.      I've never used that.  I have no idea what

4   that is.

5       Q.      So you're positive coin base is the only

6   one that you've ever used?

7       A.      There might have been one or two others but

8   I don't recall them off the top of my head as you said

9   I haven't touched this stuff in a long time.

10      Q.      But it was not by unanimous crack Ken or

11  gem any FXT.  Certainly not I would have nothing to do

12    with -- I would have nothing to do with those

13    /PHRAFRPLTS under any circumstance unless directed that

14    I was to have something to do with this em?

15        Q.    What user name or email did you use to

16    register?

17        A.    I don't remember.  It was like 2016, 2017

18    when I did the coin base one it's been a long time.

19        Q.    Yeah so next question so what time periods

20    did you /KWRAO*S rest deaths for those accounts?

21        A.    That would have been like 2016, 2015 time

22    frame yeah, but I don't recall off the top of my head

23    as I said it's been a long time since I've had anything

24    to do with crypto.

25        Q.    And you would have completed the full N-

                                                    158


1    your customer identity verification?

2        A.    I don't know if they had that at that time

3    whatever the compliance software was at the time is

4    what I used.

5        Q.    You know what know your customer is are you

6    familiar?

7        A.    I do I'm familiar with with it.

8        Q.    What is that?

9        A.    Know your customer is something you have to

10    do if you are a money transmitter and my understanding

11    is that a lot of the laws around crypto have changed

12    since I've dealt with them but I don't quite haven't

13    really kept up with its it's not relevant for my

14    financial overall picture.

15        Q.    Are any of your crypto accounts still open?

16        A.    Not that I'm aware of.  If they are they're

17    knot not controlled or used by me in any form or

18    fashion.

19        Q.    You did close them?

20        A.    Just never used them anymore.  I X'd out of

21    all my positions I think after all of my crypto

22    examinations after trump's statement and I directed

23    family and friends to do likewise.

24        Q.    So any assets that you had in coin base or

25    any of the exchanges what did you do when you said you

                                                    159


1    lick we taited or got out of those?

2        A.    Most of them were sent to bank accounts but

3    some of it was given away, gave some away of it to this

4    guy /KAOEUPBL ka Zhan but that was not that much I

5    think that might have been like 10,000 to $15,000 worth

6    of crypto but in general no I never really I when trump

7    gave his famous tweet although I understand his

8   position has changed on bullet point but he gave this

9   famous tweet when.  And ma knew chen give a the then

10  treasury secretary was opposed to it I took that as a

11  Signal to no longer be involved with it and then when

12  the FBI contacted me and asked me about everything I

13  knew about bullet point and when other intelligence

14  agencies asked and talked to thee about bitcoin I

15  complied with what they asked me to talk to them about

16  and then went from there.

17       Q.    So at the peak the most you had at one time

18  how much bitcoin not value but just the number of

19  bitcoin?

20       A.    I don't know I didn't track it like that I

21  didn't think of it like that.

22       Q.    What year did you have your most bitcoin?

23       A.    Maybe 2017, 2018 not totally sure.  As I

24  said it's been a long time it's been like at least six

25  seven years eight years.

                                              160

1        Q.    And currently your testimony under oath is

2   that you have no you possess no bitcoin you do not

3   access any bitcoin through --

4        A.    That's right.

5        Q.    -- yourself, trusts --

6       A.      Yeah and as far as I know, no one -- no one

7    in my family owns it either so as far as I know it's

8    we're entirely out of the thing.

9       Q.      Exhibit 11?

10              THE WITNESS:  Sir when you scan these do

11   you take pictures of them.

12              THE REPORTER:  I scan them scan them so if

13   I write on it as well.

14              THE REPORTER:  Everything on there will be

15   scanned.

16              THE WITNESS:  Cool.  Thank you.

17   BY MR. THOMPSON:

18      Q.      There's an article from 2017 it's a CNBC

19   article?

20      A.      Yeah a lot of this is incorrect I think

21   this is from CNBC.

22      Q.      So hold on.

23      A.      Yeah.  This is all disinformation from the

24   southern poverty law center which I think ultimately

25   went bankruptcy /THRAOUS the more rest thieves and

↑

                                                          161


1    other people were finder around that yeah so go on.

2       Q.      So whether you did it or not did you

3    represent to any third parties around 2017 to 2018 that

4    you were mining millions of dollars a month in crypto?

5        A.    I may have said that but it wasn't true.

6        Q.    So you think you did say that?

7        A.    It's possible yeah, but I didn't ultimately

8    do it.

9        Q.    I ask because if you go to the last page of

10   the text of the article, it says it refers to you

11   investing in the business po process the cash of

12   medical manner do you see that?

13       A.    I do.

14       Q.    And started a bit coin mining operation?

15       A.    Yes.

16       Q.    Okay.  So did you do either of those

17   things?

18       A.    I did not.  I did not yeah I was not

19   involved with the bitcoin mining operation ultimately

20   was not involved in the processing of cash from medical

21   manner.

22       Q.    Do you know anyone that did do that?

23       A.    I don't think so.  I don't know.

24       Q.    I believe on a podcast you said you were

25   very into bitcoin mining until 2018 and then you exited

                                                        162

1    the space because the us government told you to get out

2    of bitcoin did you say something like that?

3         A.    That sounds like something I might have

4    said yeah.

5         Q.    Okay.  Why would you say that you were very

6    into bitcoin mining until 2018?

7         A.    Well I was very interested in the concept

8    equal frame works around it, but I went and I /TRAFPLD

9    to Hong Kong and I met somebody who was later to will

10   moo that he that he was a /KH-PBZ /SPWELGTS officer and

11   he was very interested in bitcoin mining this was yeah

12   2017-2018 time frame and then I met with some people on

13   U.S. government and they informed me that this person

14   was likely a a CCP or some kind of Chinese spy and they

15   said well it's a good thing I didn't do business with

16   them and frankly there was so much craziness around

17   crypto and the dank around it so it's quite a dangerous

18   pining em get.  Harmed for it all the time and you know

19   my physical safety and the safety and well-being of

20   people around me is more to important to me than any

21   amount of money company ever seek to make.

22        Q.    So go back to that last exhibit do you have

23   it?

24        A.    Mm-hmm.

25        Q.    It's the CNBC article it says that you were

                                                      163

1    looking at businesses to process the cash of medical

2    marijuana is that right?

3         A.    That's right.

4         Q.    Okay.

5         A.    I think I went to a marijuana related

6    conference at one point that ultimately it won't

7    surprise anyone to know this but a lot of stoner resist

8    not the best business people and I also grew concerned

9    about the ethics of the marijuana industry as well as

10   the sort of federal legality or illegality of all of

11   that.

12        Q.    What businesses do you recall speaking with

13   about this?

14        A.    It was such a long time ago I don't really

15   remember them all I collected a lot of I collected a

16   lot of business cards at the time, but I most of the

17   people who are involved in this pace are not honest or

18   I found them to be dodgy in different ways tosy I tried

19   to minimize my involvement with them.

20        Q.    Did you ever encourage congressman Tom tan

21   contrato to run for governor?

22        A.    If I did it was in a very friendly like

23   kind of way but he was a friend of a friend and in I

24   did inconcern him to run for governor it was like that

25    would be great if you ran for governor like I had that

1    conversation with like a dozen people every like it's

2    not out of the unusual frankly if people want to run

3    for office or involved with higher involves /*FR office

4    I'm happy to support them if they are kind and good

5    people good natured.

6         Q.    Tim cray tow was a proponent of legalizing

7    marijuana?

8         A.    Was he?  I didn't know.

9         Q.    I'm asking you are wear of that one way or

10   nor?

11        A.    I have no idea.  Are you sure that's true.

12        Q.    I'm just asking if you know?

13        A.    No I have no idea.  In fact he was

14   introduced to me at a burger joint by Michelle mal con

15   and we discussed in particular we discussed Colorado

16   and we discussed whether or not I thought he could win

17   the governor's race there and I said he probably

18   wouldn't but if he wanted to run I wished him well, but

19   I don't recall, I mean, it's been a number of years and

20   I think I think the conversation went for like maybe an

21   hour or two maximum and then I haven't talked to him

22   since as far as I can recall.

23      Q.      Have you ever excuse me received any funds

24   of any sort that you now understand were proceeds from

25   the sale of marijuana distribution or sales?

165

1      A.      I don't know.  I suspect probably but I'm

2   not sure and I think I would love the U.S. government

3   and others to make that determines (let).

4      Q.      Why do you say probably?

5      A.      Just a strong suspicion people I was around

6   were interested in that kind of thing circa 2017-2018

7   it was sort of interesting time because it was legal at

8   the state level, but not at the federal level and so

9   there was a question about the legality of if you had a

10   business operating in cash in California could that

11   work or not and so ultimately never went through any

12   serious business operations.  I my understanding though

13   is that the number of people who were involved with

14   that have since gotten in trouble with the law in

15   different ways and of course I /SPOURS federal law

16   enforcement doing what they think is necessary there.

17      Q.      Let's talk about federal law enforcement a

18   little bit about so did you ever have any assistance or

19   input how federal law enforcement dealt with marijuana

20   dealers at the border?

21      A.      Reporter?  What did you say?  What was the

22   last word?  I didn't catch it.

23      Q.      Border security as it relates to drugs,

24   marijuana, car tells.

25      A.      No, I had no involvement with that as far

166

1   as I know:  It's possible it's possible that I spoke

2   with some people about it but I don't recall it.  In

3   general I would say that I am a big supporter of

4   federal law enforcement and things that they -- and the

5   federal government generally I think it's woefully

6   underfunded and would be supportive of any efforts that

7   they would do to stop things that were illegal.

8       Q.      Have you ever spoken with David leader man

9   in your life?

10      A.      I don't know who that is.

11      Q.      Is that your testimony under oath?

12      A.      It is.

13      Q.      Okay.  When was the last time you spoke

14   with Max leader man?

15      A.      I don't know who that is.

16      Q.      When was the last time you spoke about the

17   lawsuit that David leader man was in?

18      A.      I don't know who David leader man is so I

19    don't know what a lawsuit is that he's involved in.

20    Q.    That's your testimony?

21    A.    It is.  You asked me about the name of it

22    and I understand that he got arrested at one point but

23    I don't know who he is I've not seen a photo of him

24    couldn't identify him unless I'd seen a photo of him

25    but I don't know who he is.

167

1    Q.    That's your testimony?

2    A.    That is my testimony.

3    Q.    Have you provided federal law enforcement

4    or state law enforcement any information about David

5    leader man or anyone involved in marijuana growing

6    operations?

7    A.    I don't know if I should talk about

8    relationships I have with the federal government so I'm

9    gonna say no I don't know anything about any marijuana

10    cultivation or growing of operations the feds as far as

11    I know they they do pretty good work but I'm not I'm

12    not involved with it.

13    Q.    Have you ever been promised immunity

14    leniency or any other benefit in connection with any

15    crimes that the federal government charged or was

16    investigating relating to marijuana?

17      A.      As far as I know, no.

18      Q.      Okay.  You wrote a sub stack a couple of

19  days ago I think it was and it was about your I think

20  membership at a -- or your status as a federal law

21  in -- or informant do you remember that?

22      A.      I do.

23      Q.      And I think you pasted a letter you wanted

24  to give to Judge Pittman or something?

25      A.      Maybe something like that, yeah.

                                                    168


1       Q.      Okay.  You say, "I was threatened with

2  potential jail time for something which wasn't even a

3  crime."

4       A.      That's right.

5       Q.      What was that?

6       A.      That was having conversations with Julian a

7  sang yeah I went to go see him in August '17, 2017.

8       Q.      Let me start back.  So the line before you

9  say the process by which I became a code named

10  informant is complicated but it amounts to this."  I

11  was threatened with potential jail time for something

12  which wasn't even a crime.

13      A.      That's right.

14      Q.      Okay.  So what crime were you threatened

15    with or what was the potential jail time you were

16    threatened with?

17        A.    Well, the director pom pay o had designated

18    Julian a song and wick can I leaks as a non state

19    architect and I went to go see him with then Congress

20    nan ro back arrest at what a was then the Ecuadorian

21    embassy in London and he had and I had approximate

22    about a /THRAOR o four conversation or the three of us

23    had about a three or four hour conversation and when I

24    came back the United States the /*URS government ask

25    immediate about that meeting several entities from U.S.

169

1    government asked me about that meeting one group in

2    particular was very interested in that meeting and they

3    were the ones who for heim I was working at the time or

4    helping at the time I should say.

5        Q.    What's the group that you say that one

6    group in particular was very interested?

7        A.    They were very interested in the

8    conversation I had with Mr. A sang.

9        Q.    Who was the group?

10        A.    I won't discuss that.

11        Q.    Are you refusing to answer?

12        A.    That's right, I am.

13    Q.    Any government so so you said you were

14    threatened for it with a crime and federal?

15    A.    I was and.

16    Q.    Hold on hold on.

17    A.    Yeah.

18    Q.    And then so did that cause you to alter

19    your behavior or work with them or become an informant

20    is that what you're saying?

21    A.    Well you know there are many government

22    agencies and there's this process called deacon flick

23    shun and unfortunately sometimes you get very good for

24    things that you were doing under the auspices or

25    protection of another government agency and so that's

170

1    what happened there.

2    Q.    Did you tell any friends or acquaintances

3    around 2018 that you were concerned with being arrested

4    or facing jail time?

5    A.    Possibly but I'm always kind of worried

6    about that I was particularly worried because I was

7    named in the mull ler probe though apparently the

8    sections concerning me in the muller probe are

9    classified to this day despite nigh best efforts.

10    Q.    You said probably or possibly.  Can you

11    identify or recall anyone that you told acquaintances

12    friends et cetera that you were concerned that you

13    would be arrested?

14         A.    Well there was a situation --

15         Q.    Just answer --

16         A.    Yeah.

17         Q.    Names?

18         A.    No no.  There was -- I'll tell you the

19    story and then you can decide for yourself how you're

20    going to process it.  So there was a guy named James

21    wolf who was a he was part of the senate intelligence

22    committee and Mr. Wolf was having an -- a series of

23    affairs with a number of journalists and he was giving

24    them information about things going on in the senate

25    intelligence committee and he was harassing me trying

                                                    171


1    to get me to comply with his probe and so I was

2    /KAPBGTD by a number of journalists at the time saying

3    that I think wolf is trying to come after me and that

4    he may try to put me in jail if he criminally referred

5    me and then wolf himself was arrested and reside -- I

6    think oafs put in jail for a brief time which was an

7    appropriate punishment he should have gotten more time

8    but I don't want to see anyone go to prison for a non

9   violent o sense and to that's what I was telling people

10   at the time and the challenging thing because we had

11   these different government agencies smacking into each

12   other and fighting with each other but ultimately I

13   prevailed I didn't have to go before Congress the house

14   or the senate which both requested my presence and so I

15   was talking to a number of journalists the number of

16   people about that time period.

17        Q.    You didn't raise any concerns about

18   potential jail time or fear of jail based on any

19   involvement with marijuana, the specific potential

20   business that you looked at?

21        A.    As far as I'm aware no but it's possible, I

22   mean, there's a big conflict with the feds and

23   marijuana my big kind of take away --

24        Q.    So I'm going to object as non-responsive so

25   just the answer is no?

                                                        172


1        A.    No, the answer's no, I was not concerned

2   about going to jail for that, no.

3        Q.    A couple of monther questions about your

4   can crypto holdings.  Identify all of the hardware

5   wallets that you owned or used?

6        A.    I don't own any hardware wallets no I've

7    never owned a hardware wallet as far as I can recall

8    although it's a challenging question because when you

9    mine bullet point sometimes you store it on a computer

10   and I did have self computers that had coin on them so

11   poo some people would say theory.  Generally people

12   talk about a hard wallet they're talking about a UBS

13   drive or something to that effect and I never owned one

14   of those.

15        Q.    Where did you store your recovery words

16   pass keys private keys C phrase all that?

17        A.    I made a poem with them and I would recite

18   it before I brushed my teeth before I went to bed and

19   after I woke up.

20        Q.    Do you use any privacy tools to obscure the

21   origin or destination of your crypto currency holdings

22   mixers tumblingers privacy pools?

23        A.    No I don't know what anything I don't know

24   what any of those things are.

25        Q.    Did you provide your assets crypto into a

                                                    173


1    wallet that someone else nominally controlled but was

2    used for your benefit?

3         A.    No never did that as far as I can recall.

4         Q.    Who is Terry done mire?

5       A.      He's an elderly gentleman who lives in

6   northern Virginia.

7       Q.      When was the last time you spoke with him

8   or communicated with him?

9       A.      Maybe three or four days ago.

10      Q.      How often do you speak with him?

11      A.      Whenever he calls me or whenever he texts

12  me or whenever he wants to get lunch or dinner or have

13  a cigarette.

14      Q.      In the last month how many times have you

15  spoken to him?

16      A.      Maybe two or three times.

17      Q.      The past two months?

18      A.      Maybe eight or nine.

19      Q.      Past three months is that about the

20  cadence?

21      A.      Yeah it's about that, I mean, it depends he

22  has ill health so usually when he and I speak it's

23  about medical matters or about things going on

24  politically we discuss the Epstein matter recently and

25  so we had a long conversation about that and what I

174

1   should do concerning it and we discussed the 2028

2   election and we discussed this Indian gentleman that we

3    are convinced is a spy which probably is a spy but in

4    general no, I mean, he's a good guy I like him he's a

5    nice he's a gentleman he and I are both you know we're

6    from old families and so there's that aspect of it as

7    well I always speak to him over Signal or in person and

8    he's a -- and he is a lovely man.

9         Q.    So have you invested directly, indirectly

10   through a special purpose vehicle perhaps with

11   Mr. Green well in any company or SPV or fund or trust

12   that Mr. Done mire was affiliated with over the past

13   ten years?

14        A.    It's possible, I mean, we have a policy of

15   honoring our hosts so.

16        Q.    I'm going to object as non-responsive yes

17   or no?

18        A.    No, I mean, it's possible I don't know so

19   yes maybe but probably yes but my guess would be he

20   would depend on how it was structured and so the way it

21   typically works is gator is the one who brokered the

22   introduction to Mr. Done mire so gator is the one who

23   has control of any financial intersections that occur

24   between me and Mr. Done mire.  I send Mr. Done mire

25   five grand maybe four years ago five years ago and we

                                                     175

1    had the last I saw him in physical presence was had to

2    have been April or May of this year and we went to tie

3    food near his home in Fairfax.  But he has rather bad

4    health so he's not the most he's had a series of

5    strokes for example and so he's not the most in the

6    healthist of spirits.

7        Q.    So he's on our list to depose?

8        A.    Good luck.

9        Q.    Why do you say that?

10       A.    It's very unlikely you'll have access to

11   him, but I wish you luck on that.

12       Q.    Can you explain in two sentences or less

13   why?

14       A.    No, I cannot but I think it's very unlikely

15   you'll be able to see access to him.

16       Q.    Why?

17       A.    Because he what he really does for a

18   living.

19       Q.    Oh, is this another like federal employment

20   conspiracy thing?

21       A.    I don't think he's a federal governmental

22   employee currently.

23       Q.    No but just like the whole kind of?

24       A.    The won't have access to him I wish you

25   well on that in fact there as lot of questions I'd like

176

1    to ask him but you will not have a good time with that

2    that will be quite difficult for you.

3        Q.    So to testifying here today will you

4    identify any investment vehicles that you are --

5        A.    Oh, I don't know of any.

6        Q.    Just -- let me finish for the court

7    reporter.

8        A.    Yeah that's fine.  No I will not and no I

9    do not know of any if there is one, gator and Terry and

10   likely John Burbank would know about it but I was not

11   read into that that wasn't my responsibility Terry like

12   gator deals a lot with the British world and that is

13   not a world that I'm accustomed to nor do I

14   particularly like working in it in fact the last time

15   before I went to it be with Courtney love in London the

16   time before that I was advised if I went to the UK the

17   UK government could not guarantee my safety so it's not

18   a place that I like to visit the food isn't very good

19   the people aren't very nice.

20       Q.    So just to be clear can you identify

21   testifying here today yes or no can you identify any

22   investment SPV direct or invect /TKROFLG?

23       A.    If there is --

24       Q.      Involving Terry done mire yes or no can

25    you --

177

1       A.      No, I cannot identify one.  I cannot and

2    even if I could I would not so I cannot and even if I

3    could I would not.

4       Q.      Even you were aware /TKARBTS?

5       A.      Even if I were aware of it I would not

6    identify it correct, but I cannot because I don't know

7    of any.

8       Q.      In four sentences without a long filibuster

9    explain your relationship with Gary louder?

10       A.      It's quite simple we have loot of friends

11    in common.  I've met him once before he's a gentleman I

12    was more friendly with his uncle and his uncle has

13    unfortunately passed and his uncle ambassador louder

14    was our ambassador under Reagan to Vienna if I recall

15    correctly and was a lovely man patriotic Jewish guy

16    very good guy very good American and Gary does a lot of

17    investing on behalf of his larger family enterprises

18    though he and I have not done any business in quite

19    some time.

20       Q.      Have you spoken to Gary louder about this

21    case?

22          A.      I have he not as far as I can recall no.

23    I -- we are not -- he and I are not you know we had a

24    disagreement about the gaz a genocide and so he and I

25    have not really spoken in a serious way since that,

                                                      178

1    since October 7th, 2023.

2          Q.      Have you talked to Gary louder just to be

3    specific about Hal Lambert?

4          A.      As far as I know, no.  It's possible but I

5    think no unless if you have a text message or something

6    but no I don't recall talking to him about Hal Lambert.

7    Generally speaking most people --

8          Q.      No.  Object non-responsive.

9                  Do you remember at trial when I asked you

10   about your gawker lawsuit?

11         A.      Yes gawker is no longer with us.

12         Q.      How much money you the receive from gawker

13   for direct or indirect through that litigation?

14         A.      It would have have to have been a few

15   million dollars Al told but I'm not quite sure honestly

16   because teal lent me some money around it and then teal

17   and I were sort of against each other in that in the

18   fine analyses because teal and at the /*R vehicles

19   willburg were having a active so there was that whole

20   that whole thing which I had to mitigate but the

21   operation was successful, I mean, gawker no longer

22   exists nor does huffing ton post as I recall or at

23   least not in the form it was.

24        Q.     Simply is I just want the amount of money

25   to the best of your knowledge, to the best of your

                                                        179

1   knowledge how much money did you receive from your

2   litigation against gawker?

3        A.     I don't know I think it might have been

4   like a few million it's been a few years now.

5        Q.     Did your attorney get paid in that case yes

6   or no?

7        A.     Which attorney?  I had several.

8        Q.     Any of them.

9        A.     That's a good question.  I believe that one

10   of them got paid but one of them did not one of them

11   was in trouble and had to work off that so --

12        Q.     So hold on hold on.  I'm trying to trace

13   where --

14        A.     I don't recall that one's a curious case

15   because it's again -- well gawker went down in 2016,

16   2015-2016 so it's been almost ten years.

17        Q.     Let me put it this way.  Okay.  Did you out

18    of any of your accounts pay your lawyers that

19    represented you in the gawker litigation?

20        A.    It's a good question.  I don't remember.

21        Q.    Were they paid out of were the lawyers paid

22    out of any of the proceeds from your gawker lawsuit?

23        A.    It's a good question.  I don't remember.  I

24    think what happened this has been now a few years but I

25    think what happened was when gawker went belly up when

                                              180

1     it went when it went bankrupt there were a number of

2     claims that the lawsuits were I have encouraged a

3     number of people to sue gawker and so they have sued

4     gawker and each had a claim when the assets were bought

5     up by union investigation or universal media -- no

6     union vision media group and when they were bought up

7     there were these dedicated trust accounts that were set

8     up with the proceeds of when the assets got sold.

9     Okay?  And when that happens, my lawyer had access to

10    that and then he gave me I presume he took out his fee

11    I don't recall but he that was the whole process at the

12    time.

13        Q.    What you /*R what year did you get those

14    proceeds from gawker?

15        A.    Well Mr. Teal owed me some money because we

16    were --

17        Q.    Objection, nonresponsive.

18        A.    Yeah.

19        Q.    What year?

20        A.    Oh, that would have been 2015.  2015-2016.

21    Yeah.

22        Q.    What bank account would you have deposited

23    those funds?

24        A.    Don't recall.  I don't know.  It's been now

25    a number of years.

                                                        181


1        Q.    Let's --

2        A.      I think it could have been CitiBank it

3    could have been I believe I had a Bank of America

4    account but I'm not totally sure oh it could have been

5    first foundation but my my then wife handled all of

6    that at the time and so my recollection of this is that

7    the whole purpose of it was to destroy gawker and any

8    money that we made from it was incidental to the

9    operation and then teal was so overjoyed at me having

10    bankrupted gawker and having worked on that he owed me

11    a million dollars or so like it was like a million five

12    for various things that I had put on my own that I had

13    basically financed and then he in turn agreed to invest

14    in UAI or and a few other things for me and so that was

15    that would have been 2015-2016 time frame yeah.

16        Q.    Try to just /T-PBS answer the question I

17    ask.

18        A.    Okay.  Go ahead.

19        Q.    You said your wife isn't financially

20    sophisticated?

21        A.    She's not.

22        Q.    Now you're saying that she handles your

23    finances?

24        A.    No I'm saying.

25        Q.    Or handled them in 2015?

                                              182


1        A.    I was saying yes, that's the major reason

2    he's not financially sophisticated and what happened

3    was da.

4        Q.    I --

5        A.    That account that money that was going on

6    there I put it into some some kind of trust or

7    something like that but it /STP really matter anyway

8    because been it's been nine ten years.

9        Q.    Did you use any of the gawker proceeds to

10   invest in clear view off ram man Dell you were fra pay

11   depth ap ter a?

12      A.      I don't remember if I did or not I think I

13  might have gotten some consulting money at the time and

14  that that made a lot of it but some of these companies

15  I started and so typically the way it works when you

16  start a company is that you know you decide like hey

17  off ram shares are worth ten bucks or whatever you

18  decide something and then you invest or sometimes you

19  just start the company de no vo so it really depends on

20  what's going on each of those is a specific case in the

21  terms of pa a la staff yeah the pa a la investment

22  comes from when Palmer gave me the million particulars

23  for selling him back my shares in on dral much of that

24  was a handshake sort of deal and so the Traitwell stuff

25  comes out of that money from Palmer.  Palmer owed me

183

1   more money, but I thought that it was wise to sart of

2   financially separate from him because of our agreements

3   around well we had a lot of disagreements on a lot of

4   things so.  Lovely guy nice guy nice family but you

5   know sometimes it's best to have people as friends not

6   as business associates.

7       Q.      So let's talk about the off ram stock a

8   little bit.

9       A.      Mm-hmm.

10    Q.    Okay.  I just a want a time period I don't

11    need commentary here.  When did you first try to sell

12    or monetize any of the off ram stock?

13    A.    Oh I've been trying to sell the off ram

14    stock for two years now three years.  Yeah.  Would have

15    been, oh dear, it would have been in 2021 when I tried

16    to sell my stock maybe 2020 late 2020.

17    Q.    Did you ever --

18    A.    Whenever you remember whenever that was

19    that big ice storm that big Texas storm whenever that

20    was that was when I wanted to be out of off ram

21    entirely but David would not allow me to sell my stock

22    there's a restrictive covenant on it.

23    Q.    David is David Mittelman?

24    A.    Mm-hmm.  I mean precisely David's wife who

25    now also works for the company Kristen Mittelman did

                                                       184

1    not want me to sell the stock because they thought

2    would it have a negative market Signal they were trying

3    to raise around or something to that effect.

4    Q.    When was the first time you actually

5    entered into a written agreement to sell the off ram

6    stock?

7    A.    Well almost all of our David and my

8    communications tapes on Signal so that would have been

9    well, we started the company in 2018 so it would have

10   been mid midpoint 2020 when we had a real conversation

11   about it I was very uncomfortable with the direction

12   the company was going in in 2020.

13        Q.    That's not my question.  When's the first

14   time you had any signed written document, contract

15   agreement?

16        A.    So I had we didn't typically do it that way

17   so most companies that I affiliate with with /KEPGS now

18   of off ram because off ram since has raised a round so

19   David went from being the largest majority shareholder.

20        Q.    Mr. Johnson?

21        A.    Yes.

22        Q.    It's just a simple question.  When was the

23   first time you had a written contract agreement some

24   type of document where there was or the agreement to

25   sell the off ram stocks?

                                        185


1         A.    We entered into an agreement in November of

2    last -- I believe it was last year so he what he did

3    was he convened a board meeting the board agreed to buy

4    my shares and buy the totality of my wife's shares

5    ex-wife's shares everybody's shares that process

6    started in November I want to say it was November 10th

7    of 2024.

8        Q.     So right after this lawsuit was filed?

9        A.     It would have been well the conversations

10   began in the summer but it would have started in

11   November of 2024 yeah in earnest because he had to call

12   a board meeting to do it he couldn't just sell he

13   couldn't just use the stock of the -- the cash on hand

14   to buy it.

15       Q.     So again when is the first time --

16       A.     I can't you yeah it would have been

17   November a written a written thing where he con venes

18   the board would have been November 2024.  A discussion

19   about selling the stock generally which was written

20   because these are written these are written things like

21   they are if somebody kept my Signal messages was

22   probably March or April of 2020.  So we'd had a

23   discussion over the years of sell the stocky talk to

24   him quite often about sell the stock.

25       Q.     When was the first time was there ever you

                                                      186

1    know the stock purchase agreement that you were trying

2    to get to go through just recently, you know that one

3    we're talking about?

4        A.      I do I'm familiar with it, yes.

5        Q.      Was there ever a written /TKPWRA*EUPLT

6    agreement where both sides greed to the terminates and

7    signed it other than that one?

8        A.      Well when we started the company there was.

9        Q.      No, well you were selling?

10       A.      Oh when I was selling no no there was no

11   written there was nothing there was nothing that had

12   board approval I asked him to go to the board November

13   10th, 2024, to liquidate my entire position as well as

14   the position of my ex-wife and daughter.

15       Q.      Did you ever try to sell your stock just

16   electrical to Steve os quee?

17       A.      No as far as I know, no.

18       Q.      How often do you speak with him?

19       A.      I haven't spoken to him in a long time

20   maybe three or four years yeah he's under investigation

21   so I I won't be talking to him.

22       Q.      So since let's talk 2025 okay?

23       A.      Mm-hmm that's easier to remember.

24       Q.      Names just names okay?

25       A.      Mm-hmm.

                                                    187

❦

1        Q.      Name all the people that you contacted

2    about selling the off ram stock?

3        A.    Well the main person would have been David

4    Mittelman he and later I spoke with the general counsel

5    I think his name is Robert pru sell, pru sell and that

6    would have been over email there was no phone call

7    conversation with him about that and then in terms of

8    Burbank I didn't speak to him about selling it I didn't

9    talk to Steve orbly I didn't know all of that was dealt

10   by David and David's wife presumably because she deals

11   a lot with the board but I didn't talk to her either

12   about I I just talked to David.

13       Q.    Can you produce any communications where

14   you said you wanted to sell this stock for your wife

15   and children or child?

16       A.    I can't produce any communications but he's

17   aware of them yeah.

18       Q.    So do you have any written communications,

19   email, texts, Signal, where you tell off ram or anyone

20   that the purpose of the sale is to support your wife

21   and children and that's something that you can produce?

22       A.    Yes, I think there are emails /TOPBGT

23   effect but I don't I don't recall like I don't recall

24   what exactly they say but they say something to that

25   effect what I wanted to do was --

1       Q.      Hold --

2       A.      Yeah.  So if you're forming a separate

3    company.

4       Q.      Hold.  Objection, nonresponsive?

5    BY MR. THOMPSON:

6       Q.      Did you produce those emails?

7       A.      Here or where?

8       Q.      Ever to the plaintiffs in this case?

9       A.      No I did not.  Nor would I because it's not

10   relevant.

11      Q.      I'm just going to ask you because when this

12   case started you made bragged or you know said that you

13   love discovery because you record everything and you

14   take screenshots of everything.

15      A.      Mm-hmm that's right.

16      Q.      You haven't produced anything with

17   Mittelman related to off ram or any of this stuff?

18      A.      No no because --

19      Q.      So hold on in three sentences and 30

20   seconds how do you explain that?

21      A.      Oh very simply Mr. Musk is underwriting

22   Mr. Lambert in this lawsuit Mr. Os quee who is on the

23   board of off ram is a good personal friend of

24   Mr. Musk's and does business with him so I have no

25    interest in in providing any information to Mr. Os key

189

1    also owes me money so why would I tip off my hand there

2    no on the contrary I I don't want to engage with people

3    that I don't think are responsible architects.

4        Q.    So I'm going to objection, object as

5    non-responsive.  So communications let's take

6    communications with David Mittelman you said you

7    conducted those via Signal.

8        A.    That's right.

9        Q.    All right.  Earlier you said that you

10    record everything to screenshots of everything.

11        A.    That's right.

12        Q.    So those are in conflict?

13        A.    They're not at all.

14        Q.    That statement --

15        A.    Everything you do on Signal so Signal has

16    received a grant from the State Department anything you

17    do on Signal is recorded by the government so perfectly

18    consistent to use Signal for everything.

19        Q.    You said that you screenshot you personally

20    screenshot Signal messages?

21        A.    Yeah so I took --

22        Q.    Hold on?

23    A.    Yeah.

24    Q.    And you've posted Signal messages before?

25    A.    I have.

190

1    Q.    Right?

2    A.    Right that's true.

3    Q.    So my question is you say you've screenshot

4    all your Signal messages and you record everything you

5    said that right?

6    A.    That's correct, yeah.

7    Q.    Okay.  So I'm trying to figure out when I

8    ask fore all your communications with --

9    A.    No no to be precise.

10    Q.    Hold only this is important?

11    A.    No you asked for all my communications

12    regarding Mr. Musk I'm regarding things that were not

13    germane to this case and I made an objection at the

14    time and I said then and I say now that I would have

15    been happy to participate in any discovery that was

16    reasonable and limited in scope and you decided instead

17    to throw everything relied to Mr. Musk in there and

18    obviously we know that that's because Mr. Musk is under

19    federal investigation at the time and continues to be

20    under federal investigation if I recall correct l I.

21      Q.      Did you ever make a motion for a protective

22   order to argue that the --

23      A.      O no the da.

24      Q.      Hold on.  It's out of respect for the court

25   reporter.

191

1       A.      Of course.

2               THE REPORTER:  Thank you.

3    BY MR. THOMPSON:

4       Q.      Did you ever file a motion for a protective

5    order to say that the discovery was over-broad or too

6    burdensome?

7       A.      I didn't file a motion, but I made it clear

8    over and over again in open court and it's part of the

9    brief that's before the Fifth Circuit.

10      Q.      Did you file a motion yes or no?

11      A.      No as far as I know, no.

12      Q.      Did you screenshot your -- you said I was

13   right when you said you screenshot all of your

14   conversations that you have on Signal?

15      A.      No not all of them I would say that I

16   probably screenshot fewer than 10 percent of them but

17   most of the ones with Mr. Lambert I have screenshotted

18   as with Mr. Burbank.

19        Q.      Have you communicated with Mr. Burbank

20    about this case?

21        A.      I have not I sent him a message --

22        Q.      Yes or no?

23        A.      No well, not about this case but he could

24    interpret it that Iowa I sent him a message recently

25    telling him that all was forgiven.

                                                      192


1        Q.      Did he reply yes or no?

2        A.      He read et but he did not reply to it.

3        Q.      I'm going to hand you an excerpt of a we're

4    not going to mark this as an exhibit.  It's docket

5    entry 116.  Make sure you got the right one.  There's

6    some writing I did today, but I do want you to take

7    that?

8        A.      Okay.  Embed.

9        Q.      So hold on.  Do you see this is a email

10    chain with you and David middle man and looks like Rod

11    Purcell amongst others?

12        A.      That's right yep.

13        Q.      Okay.  Do you remember when I sent an email

14    to you asking for if you were trying to sell any of the

15    off ram stock?

16        A.      Yes and I did not reply if I recall

17    correctly.

18        Q.      Why wouldn't you answer that?

19        A.      Because it's not germane to you and because

20    the off ram company in question has a lot of interest

21    in relationships with the federal government and when

22    that's all said and done we're going tooz what happens

23    with off ram long story short off ram has a cleanup

24    process it's going to undergo.

25        Q.      All right let's go to looks like this is

                                                         193

1     going to be appendix Page 4.

2         A.      This one?  Can we enter this into the

3     record?  Is that object I don't have any control over

4     it do you have any objection to entering this into the

5     record.

6         Q.      What do you want?

7         A.      The whole thing in the record make it an

8     exhibit.  Thank you.

9                 (Marked Deposition Ex. 12)

10    BY MR. THOMPSON:

11        Q.      It's already in the record in the case

12    that's why?

13        A.      Well, I mean, I'd like it as an exhibit as

14    well.

15    Q.    Tell me when you are ready to discuss?

16    A.    Go ahead.

17    Q.    Okay.  Page 4.

18    A.    Mm-hmm.

19    Q.    It says wire instructions?

20    A.    That's right.

21    Q.    Is that a screenshot from your phone north

22    that's not from my phone that's from somebody else's

23    phone but that is the account that I provided?

24    A.    You provided that screenshot in an email to

25    looks like rob Purcell who is representing off ram.

194

1    A.    I think actually that E -- that comes from

2    David Mittelman but I'm happy to claim ownership for it

3    was not -- I did not screenshot it no but I'm happy to

4    take responsibility for having sent that information

5    over to Mr. Mittelman.

6    Q.    Well, you can read through the email thread

7    and --

8    A.    Yeah so if you look at it.  Yeah I think

9    this is kind of cut but whatever it doesn't matter they

10    got it and they said that they wouldn't do it because

11    of the judgment and the order and I said no problem the

12    they still have to pay the money to my ex-wife and

13    daughter which is the last communication I had with

14    David.

15        Q.    So I am going to object as non-responsive.

16    Let's just answer my questions.  Okay?

17        A.    Yeah go ahead.

18        Q.    I want us out of here by 5 so you can catch

19    the flight that, da?

20        A.    I don't have a flight somebody has /ARPGD

21    for my hotel to be so I don't have a flight.

22        Q.    The same person you had to ask for

23    permission to stay here?

24        A.    Different person.

25        Q.    Okay.  Who provided the screenshot?

                                                    195


1        A.    In this case I think it was Mittelman but I

2    don't know.

3        Q.    What's the source, David Mittelman --

4        A.    David Mittelman took the screenshot sent me

5    the screenshot and I believe that I embedded it in the

6    email.

7        Q.    So this is David Mittelman set up JXC?

8        A.    No.

9        Q.    Okay that's my question.

10        A.    Who set up JXC is your question?

11      Q.      Yes?

12      A.      It was not me.

13      Q.      It was not you?

14      A.      It was not me.

15      Q.      Did anyone at your direction set up JXC?

16      A.      No no one at my direction set it up

17   somebody set it up for me.

18      Q.      That's my question.

19      A.      Yes.

20      Q.      What's your relationship to JXCLLC on page

21   Exhibit -- hold on hold on.

22      A.      Go ahead.

23      Q.      On in Exhibit 12 on appendix 032?

24      A.      Okay.

25      Q.      What is your relationship direct or

                                                            196


1   indirect with JXCLLC?

2       A.      It was it is a bank account number that was

3   set up for me not at my direction.

4       Q.      JXCLLC is a bank account number?

5       A.      No JX LLC that entity and that business

6   account and that address all of that was set up by

7   somebody else.

8       Q.      So my question is just simple, okay, what

9    is JXCLLC?

10         A.    It is an entity that was created for the

11    purpose of receiving proceeds from for the off ram case

12    but I don't know who owns it and I don't know who

13    controls it.

14         Q.    So you had nothing to do with JXCLLC

15    getting set up?

16         A.    Correct that's not I had nothing to do with

17    it getting set up.

18         Q.    When did you first learn that it was set

19    up?

20         A.    When I was directed to send it to David

21    Mittelman.

22         Q.    It wasn't your decision to set up a JXC or

23    any LLC in Wyoming?

24         A.    No and I've never been to Sheridan Wyoming

25    in my life my grandmother's from Cheyenne.

                                                    197


1         Q.    Did you direct anyone to set up JXCLLC or

2    any LLC in Wyoming?

3         A.    I did not, no.

4         Q.    Did you know that anyone was setting up

5    JXCLLC or any LLC that would take the proceeds of the

6    off ram stock?

7    A.    I only knew of it when I was given that

8    information and told to send it to David Mittelman and

9    I did as I was told.

10    Q.    So you had zero involvement in the creation

11    of this?

12    A.    Correct I had zero involvement in the

13    creation of the doc -- of the LLC, yeah, zero

14    involvement.  I -- yeah.  I wasn't involved with it.

15    Q.    Who set it up?

16    A.    Was set up by one of the many people that

17    helped me in the federal government.  It's not me.

18    Q.    Did you tell or instruct these unnamed

19    people to set up an LLC for you?

20    A.    I did not, no.

21    Q.    You didn't ask them to set up an LLC for

22    you?

23    A.    No, I didn't.

24    Q.    Would you have access to the funds?

25    A.    I don't think so, no.  As far as I know,

                                                    198


1    no.

2    Q.    So this Wells Fargo bank account ending in

3    6018 do you see that?

4    A.    I do.  Business checking account on Page 4

5    appendix 032 yes I see it.

6        Q.    Did you have any ability do you have were

7    you going to did you believe you would have any ability

8    to access either the account or any funds in the

9    account?

10       A.    I did not access it.  I -- you asked me

11   like a compound yes so I had no involvement whatsoever

12   in setting up the account I had no expectation of

13   receiving proceeds from the account I had no connection

14   with the account other her other than the minimal

15   amount that required me sending it from there to David

16   Mittelman.

17       Q.    So if the stock transaction had been

18   consummated for a million dollars are you with me

19   there --

20       A.    Mm-hmm.  I'm following yeah.

21       Q.    The proceeds would have gone to JXC and the

22   Wells Fargo bank account ending in 6018?

23       A.    That's right yep.

24       Q.    And your testimony today is that you would

25   have no ability to access that money?

                                                 199


1        A.    As far as I know, I would have no ability

2    to access it, yes, that's my testimony.

3      Q.    Would anyone that you are related to or

4   married to have any affiliation being able to access

5   that money either for you or for themselves?

6      A.    As far as I know, no.

7      Q.    Can you identify today any other bank

8   account that you wanted the off ram stock proceeds to

9   be deposited in?

10     A.    No, I mean, there is no one other hasn't

11  that.

12     Q.    I mean, you didn't give Othram or its

13  lawyers your /WOEFRT bank or the bank at Walmart?

14     A.    That's right yeah I did not do that.

15     Q.    Why didn't you give them that?

16     A.    Because I was not instructed to do that.

17     Q.    So you don't have this account access

18  information?

19     A.    No I have no -- the first time I saw it was

20  when I was instructed to send it to David Mittelman and

21  then I sent it to David Mittelman and he replied that

22  he'd received confirmation of it, he then screenshotted

23  it he then sent me the screenshot back to double-check

24  it I then said yes that looks good and then that was

25  the grand total of my interactions with that

                                                    200

1    information.

2         Q.    Who gave you the information?

3         A.    Who gave me the screenshot or what.

4         Q.    Know who -- what person --

5         A.    Somebody connected with the federal

6    government.

7         Q.    So did a person let me this is going to be

8    a yes or no so did a person, did a person give you the

9    information JXCLLC and the Wells Fargo bank account?

10        A.    Yes.

11        Q.    Okay.  Did you have any part roll in

12   setting up JXC?

13        A.    No none.

14        Q.    Okay did you have any role in setting up

15   Wells Fargo Bank account end in 0618?

16        A.    No.

17        Q.    It just sat -- how did you learn this

18   information?

19        A.    It was given to me by somebody involved

20   with the federal government and they asked me to then

21   relay it on to David Mittelman and I did.

22        Q.    How was it transmitted?

23        A.    I don't.

24        Q.    Are you going to give the name of that

25   person?

```
1        A.    No I am not.

2        Q.    Do you know the name of the person that

3   gave I to?

4        A.    I do but no, I'm not going to.

5        Q.    But you do know the name of the person?

6        A.    I do know the name of the person, yeah.

7        Q.    And just to be like ultra clear because

8   your testimony under oath is that you had and do not

9   have any present ability to access that /WOEFG account

10  and would not have had any ability to access --

11       A.    To answer your question I've never been

12  involved with it I have no access to it I have no plans

13  to have access to it I have no involvement with it.

14       Q.    If the Othram stock proceeds a million

15  dollars had been transferred to that Wells Fargo bank

16  account could you have accessed it for yourself or your

17  ex-wife or daughter?

18       A.    No.

19       Q.    That's your testimony under oath?

20       A.    Correct yes.

21       Q.    Are you hur sure of it?

22       A.    Yes I'm sure of it.

23       Q.    So you had no intention I guess if you
```

24    never could have accessed the account you had no

25    intention of ever spending any of that Othram money on

↑

202

1    yourself or giving it to your ex-wife or daughter?

2        A.    I believe my ex-wife is band from Wells

3    Fargo and I am as well band from Wells Fargo so neither

4    one of us could have accessed it even if we with a with

5    aed had wanted it to.

6        Q.    So the money --

7        A.    To be precise the money that was that would

8    have been sent like I guess is probably hypothetical

9    but the money that would have been sent we would have

10    had no access to.  Zero.

11        Q.    And by we you mean yourself darns?

12        A.    My ex-wife my 8 year old daughter and me

13    none of us would have had access to it.

14        Q.    That's your testimony?

15        A.    Correct.  Under oath.

16        Q.    So I was speaking over you a little bit and

17    I /POLGDZ?

18        A.    Yes to be pre sizes to be pre cease just so

19    re-/WAOEPT ourselves over and over again to be precise

20    neither my ex-wife nor my 8 year old daughter nor I

21    would have had any access to that account.

22    Q.    Even if and it would have you, you your

23    ex-wife your daughter would have no access to that

24    Wells Fargo account ending in 6018 even if the Othram

25    transaction had been consummated and a million dollars

203

1    had ended up in this Wells Fargo?

2    A.    Correct none of us would have had access to

3    it.

4    Q.    So that transaction would have benefited

5    you in no way correct?

6    A.    Correct.

7    Q.    I'll be precise.  The stock purchase

8    agreement where the Othram stock in the three trusts

9    that sale would you have had no, no benefit or interest

10   in that?

11   A.    Correct I would have that money would have

12   gone to an account I I don't know if I would have ever

13   seen that money again probably not likely not.

14   Q.    Is there do you have any reason tong or an

15   expectation or a belief that whoever controlled that

16   account would give you your ex-wife or your daughter

17   the funds from it?

18   A.    I have no expectation or belief about that

19   no.  In fact on the contrary I think they would

20    precisely have not given me the money from that so long

21    as there was a $71 million judgment against me it was a

22    measure to preserve assets not a measure to spend them

23    down.

24        Q.    By preserve assets do you mean to place the

25    $1 million beyond the reach of point breath capital and

204

1    Hal Lambert to satisfy the judgment in this case?

2        A.    No, I expected fully that the receiver

3    would have access to it it's not hard for them to have

4    access to it.  And I expected to be asked about it and

5    candidly I expected rob Purcell who worked very closely

6    with Mr. Burbank and I expected the board who works

7    very closely with Mr. Musk and the form /STAOEFP orbly

8    I expected them to go to people like you and to make a

9    big deal about I or you to go to them either way and I

10    expected to be having this conversation and for you to

11    be extremely bee Willarded about what actually was

12    going on because you don't really understand how the

13    system works.

14        Q.    So this screenshot where it says wire

15    instructions, you received this screenshot from a

16    someone in the some associated with the federal

17    government via Signal?

18      A.      Correct.

19      Q.      And then you provided that screenshot

20  information to David Mittelman via Signal?

21      A.      Correct.

22      Q.      And then he somehow copied it into an

23  email?

24      A.      Correct.

25      Q.      That's the chain of custody?

                                                        205

1      A.      Yeah I believe I sent it back to him we

2  double confirmed it but yes, it there that Signal that

3  Signal screenshot went back and forth between me,

4  Chris -- an individual in the federal /SROFT Chris to

5  me then me to Mittelman then me back to Mittelman than

6  me in this particular case yes something to that

7  effect.

8      Q.      So who would ultimately get the million

9  dollars the if the sale went through of the Othram

10  stock?

11      A.      Well ultimately when this case would be

12  overturned presumably I would but I don't know.

13  Candidly I don't really care that wasn't what I was

14  instructed to care about.

15      Q.      Why do you say presumably if you prevail on

16    this appeal and the judgment's overturned why do you

17    think that you would be entitled or get access to that

18    million dollars?

19         A.     That's just an educated guess on my part it

20    depends when an operation concludes /T*EURP what

21    happens is there's a disbursement of proceeds and this

22    would have been included in that disbursement most

23    likely.

24         Q.     Why would you /TKARS?

25         A.     Baugh I yeah why would I get access to it

                                                              206


1     because I'm in/TKPWAEPBLGD in the operation I'm doing

2     the work just like we all are of showing up here and

3     participating.

4          Q.     Sort of like compensation for your effort

5     in --

6          A.     No not compensation that's the wrong

7     phrase.  It's thinks about it like if you're ticking

8     down, taking down a ga sell or you're taking down a

9     willed beast or buffalo or whatever people get get to

10    divvied up after the operation is concluded but in

11    general one of the reasons that we did this was that

12    there's an expectation that I will be involved in a new

13    venture involved with gentlemen no mix and there would

14    be a conflict of interest in me continuing to have any

15    ownership interest with Othram so this was as much to

16    put it beyond my reach as it is to put it beyond

17    Mr. Lambert's reach so it's a way of preserving the

18    assets so that the assets can then go where they're

19    supposed to go where this process concludes.

20         Q.    So the underlying purpose of this

21    transaction --

22         A.    Which didn't go through.

23         Q.    Which didn't go through but the transaction

24    for the Othram stock to be deposited in an account

25    belonging to JXC LLC with the Wells Fargo bank account

                                                 207


1     of 6018 was so that that million dollars or the Othram

2     stock would be placed beyond the reach of Hal Lambert

3     and Point Bridge Capital in execution of this judgment?

4          A.    And beyond the reach of Charles Johnson no

5     no it's their -- these assets are being preserved

6     because Mr. Lambert has a number of debts, he is

7     currently facing hundreds of issues.

8          Q.    Mr. Johnson?

9          A.    Yes.

10         Q.    This is yes or no?

11         A.    No it's not a yes or no it's about

12    preserving an asset general a I'm making sure it's

13    beyond the reach until this court matter is concluded.

14        Q.    We'll qualify it with -- we'll go through

15    that.  Okay but the present intent or purpose --

16        A.    There's no present intent right now there

17    was at the time I received a -- a Signal message

18    instructing me to send this message to Dr. David

19    Mittelman I sent the message Mr. Mittelman then told me

20    to go talk to the attorneys there, I had a series of

21    emails with those attorneys you're privy to those

22    emails they're present right in front of me we had a

23    discussion David Mittelman and I he said he was going

24    to do what his lawyers instructed him to do I said I

25    will likely retain lawyers to help me on this the

                                                    208

1    person I looked at re-/TAEUPBGT was tore he can land.

2    Tore he can land or there was a big dispute within

3    clear view about tore he can land being represented

4    with me they said there was a conflict of interest

5    Mr. He can land said that he could not represent me and

6    I said no problem that it looks to me like the clear

7    view lawyers and the plane best of my knowledge capital

8    lawyers are colluding and that's fine you've given me

9    information that's sufficient here wish you well Mr. He

10    can land.  I theen communicated back and forth and said

11    you know 1346 this money is actually my daughter's and

12    ex-wife's maybe you could just portion that out and

13    leave my stuff beyond you know basically exposed and

14    Mr. Mittelman said he would look into that and I have

15    not heard back from him since so his position his

16    posture is to basically do nothing until the court

17    matter ends.

18         Q.    So yes or no Mr. Johnson one purpose or

19    within intent behind the sale of the Othram stock was

20    to place it beyond the reach of Hal Lambert and point

21    bridge capital until after the Fifth Circuit rules on

22    your appeal?

23         A.    No.  Until the court matter is concluded

24    until the operation is finished.

25         Q.    Okay.  So one purpose or one of the intents

                                                     209

1    behind the sale of the Othram stock is so that the

2    proceeds of it would be placed beyond the reach of Hal

3    Lambert and the plaintiffs until --

4         A.    And the defendant.  Yes.

5         Q.    Until after the matter has concluded both

6    this case and some operation that you're referring to.

7         A.    Correct.

8    Q.    And your expectation was that after the

9    court case is resolved after the operation is resolved

10   you had an expectation that you would get the proceeds

11   of that of the sale of the Othram stock?

12   A.    No I did not have that expectation.

13   Q.    I thought you said when the operation

14   conclusion?

15   A.    Whoever is running the operation decides

16   how it's /TKAEFD up the resources that are finished so

17   maybe it would go to me maybe it would go to somebody

18   else maybe it would go to another operation it's sort

19   of I am.

20   Q.    Can I say that you had an expectation that

21   after the operation was closed after the Court case was

22   resolved that there was a possibility that you would

23   get some or all of the proceeds?

24   A.    No because that's not how it works.  So

25   when operations are concluded, you're then told what

                                                    210


1    your next assignment is or what you're working on so no

2    I had no expectation of that.  I was going to do

3    precisely what I was instructed to do no more and no

4    less.

5    Q.    But we do agree that at least one purpose

6   not necessarily entire purpose of the transaction was

7   to prevent Hal Lambert and point bridge capital from

8   executing on any asset or money?

9        A.    The purpose of putting this into a Wyoming

10  trust was to make it so that the asset would be per --

11  preserved as in Mr. Lambert couldn't take it and then

12  spend it to deal with his other complications like his

13  legal bills or whatever and the purpose was to place it

14  beyond reach of either Mr. Lambert or me to literally

15  make it so that I was deacon /TPHREUBGTD and so could

16  not act in any way around that asset.

17       Q.    So your position or the position of your

18  people running this government operation is that Hill

19  and the plaintiffs are not entitled to any of the

20  Othram stock or any of the proceeds of the sale of that

21  Othram stock?

22       A.    That's not my position.  My position is

23  that when the court matters are concluded the assets

24  will be /TKAEFD up to everyone that they're supposed to

25  go to and it's not concluded yet or -- or when the

                                                   211

1   operation generally is concluded.

2        Q.    That's exactly -- okay.  So I'm foreclosing

3   to try to make that clear.

4            So, before the operation is concluded or

5    before the --

6        A.    Yes.

7        Q.    -- court matter is resolved, your position

8    is that Hill and the plaintiffs are not entitled to the

9    proceeds of that Othram stock or the stock itself?

10       A.    That's correct.

11       Q.    And the purpose of this transaction using

12   JXC the Wyoming LLC and the Wells Fargo bank account

13   was to prevent Hill and the plaintiffs from executing

14   on that stock or those proceeds before the matter the

15   court case concluded or before the operation concluded?

16       A.    That's a fair way of putting it but it

17   was -- it's about assess preservation.

18       Q.    I'm going to object to everything after --

19       A.    Yeah.

20       Q.    Afternoon?

21       A.    That's a fair way.

22       A.    I mean I think it's asked and answered but

23   we can do it again if you want we can go through it

24   again if you want.

25            MR. THOMPSON:  Let's take a break.

                                                    212

1            THE VIDEOGRAPHER:  We are going off the

2    record at 1:55.

3         (Break from 1:55 p.m. until 2:08 p.m.)

4         THE VIDEOGRAPHER:  We are back on the

5    record at 2:09.

6    BY MR. THOMPSON:

7         Q.    Mr. Johnson are you ready to continue?

8         A.    Sure.

9         Q.    During the break I think you said you

10   mentioned you got upgraded into a better hotel?

11        A.    I did.  Did.

12        Q.    Are you having to pay for it out of your

13   own funds directly or indirectly?

14        A.    Nope.

15        Q.    It's a government contract paying for it?

16        A.    I don't know.  I guess on some measure or

17   it's with points they upgraded me through the points

18   system.

19        Q.    You but won't identify who is paying for

20   your hotel room?

21        A.    I don't know who is paying for it.

22        Q.    You don't know?

23        A.    No.

24        Q.    Okay.  Would you go to Exhibit 12 which is

25   /KOBGT entry 116 we've been talking about it.  You've

                                                    213

1    got anytime front of?

2         A.    I've got anytime front of me yes.

3         Q.    Question if you can just go through the

4    whole document and where it says like the email

5    address --

6         A.    Have we not asked and answered this one

7    counsel do with he need to do it again.

8         Q.    I'm just going through parse?

9         A.    All right what are you curious about do you

10   want to go from the end the beginning or where would

11   you like to go.

12        Q.    First review it and where it says Charles C

13   Johnson 88 at Gmail.com?

14        A.    Which one is that it's at the top.

15        Q.    Why /TKWAO you start at the back in

16   chronological order?

17        A.    Which page is it on?

18        Q.    Probably starts since this is a snippet

19   APPX035 so it's actually pages 1 through 7 I'd start on

20   page I think 6 is maybe the first email exchange?

21        A.    Yes I said please pay the money by the end

22   of the day is that the one you're looking at or.

23        Q.    I just want you to go through and just if

24   you can confirm that where it says from Charles Johnson

25    that's in fact your email address and you wrote that?

214

1    A.    Oh, yeah that's all my stuff yeah on Friday

2  this is at 12:06 on the 26th of sent is that what we're

3  looking at.

4    Q.    I just want you to go through all of the

5  Exhibit 12?

6    A.    Yes, the entirety of what's in here are

7  things that I wrote to Dr. David Mittelman and to his

8  counsel.

9    Q.    Yes, I just wanted to crumb it's

10  accurate --

11    A.    On here is accurate and everything looks to

12  be in good working order and looks like the printer

13  even worked so we got everything in good working order.

14    Q.    All right so if we go to page 8 which is

15  appendix 036?

16    A.    That's right.

17    Q.    September 23rd at 3:59 p.m. do you see

18  that?

19    A.    Mm-hmm.

20    Q.    It says hey Heather can we please transfer

21  funds this week I need this transaction completed a sap

22  so I can go to work did I read that correctly?

23      A.    Yes that's right.

24      Q.    You did write that?

25      A.    I did write that although it's I think it's

215

1    underlined by you not by me is that right.

2       Q.    Yes?

3       A.    Okay yeah.

4       Q.    This is submitted to the court?

5       A.    I didn't want it to look like I was overly

6    emphatic about it.  Frankly I've kind of enjoyed the

7    vacation but go on.

8       Q.    Those are the words you did write?

9       A.    I did write those, yes.

10      Q.    Okay.  And then you wrote on a /STUBGT

11   about some letter that you wanted to give to Judge

12   Pittman at the conference on November --

13      A.    Oh yes well I didn't give it to him but

14   yes, I did write about it yep.

15      Q.    Do you have that letter with you?

16      A.    No I don't have any printed documents with

17   me for the reasons we aforementioned.

18      Q.    You provided an excerpt of that letter on

19   your sub stack I believe?

20      A.    I believe I took the entirety of it.

21    Q.    That's my question?

22    A.    Yeah it's in entirety yes.

23    Q.    So is the question that my question is what

24   you posted on your sub stack is a complete and verbatim

25   copy of what you were going to give to Judge Pittman in

216

1   open court?

2    A.    It may be slightly edited but the gist of

3   it is correct yes, I think I might have edited it

4   because I think I node you a if.  But stylistic and

5   link business particularly the gist of it assist.

6    Q.    Other than typos the substance everything

7   is /TKAFRPLGTS?

8    A.    The substance is more or less accurate

9   yeah.

10    Q.    Okay.  So you were going to tell excuse me.

11   So you were going to tell are judge Pittman this is yes

12   or no my ex-wife and daughter were in need of cash as

13   they're home had been burgled and I wanted to move them

14   to safer /KPHAO indications?

15    A.    That's right.

16    Q.    And then you said I myself want to get

17   remarried and to move in with my partner and the money

18   offered here will give me an opportunity to marry her.

19    A.    Thaws, yes.

20    Q.    Those are two statements you intended to

21  tell judge judge Pittman and be under oath?

22    A.    That's right yep.

23    Q.    Okay.  You stand by everything in that

24  letter?

25    A.    No.

                                                    217


1    Q.    Actually?

2    A.    -- I don't actually there are a few things

3  in it that I've since learned were mistakes.

4    Q.    The things I just read to you you stand by

5  them?

6    A.    The things you just read to me I stand by

7  but they were not selling me Othram stock would not

8  have guaranteed that those things would have happened

9  if that's the question you are asking.

10    Q.    That was my question.  Those were the

11  statements that you wanted to give to judge Pittman --

12    A.    Correct.

13    Q.    -- and --

14    A.    But did not give him just put it up on my

15  sub stack.

16    Q.    And you wouldn't have been trying to

17    mislead or deceive judge Pittman?

18         A.    No on the contrary I think there's one

19    thing in there that I was mistaken on and so special

20    agent Johnathan Buma contacted me the other night and

21    said that he wasn't trying to go to work for Mr. Musk

22    and so he wanted that on record or Mr. Teal I want that

23    or /*R on record as well he said he wasn't doing that I

24    have no reason to doubt him but somebody told me that

25    he was an I /RAEP will so you know we're going to give

                                                              218

1    him the benefit of the doubt on that I think I think

2    that's fire and I should /PEURBL affix something saying

3    that I said this under oath in my sub stack tonight as

4    an update or something to that effect as nor the

5    burgled thing I did talk to my ex-wife after I'd

6    published that and she has informed me that they've

7    upgraded the security on the home so she's happy living

8    in her childhood home and as for the girlfriend matter,

9    I believe my girlfriend is quite happy with the way

10    things are going and we're not in any hurry on any of

11    the other stuff we have some other concerns at the

12    present.

13         Q.    Are you serious with your /TKPWEURPBLD?

14         A.    Serious enough.

15          Q.     Are you guys going to get a police

16    together?

17          A.     No not immediately.

18          Q.     When was your ex-wife's house burgled?

19          A.     Oh, it would have been three or four years

20    ago now no it would have been maybe two years ago the

21    house was broken into quite often unfortunately it's

22    and there was some police reports filed about it I

23    think it's been broken into like three or four times in

24    the last 20 years.

25          Q.     20 years?

                                                        219


1          A.     Yeah.

2          Q.     Okay.  But the -- the incident you were

3    referencing in that letter was --

4          A.     Yeah that took place about a -- two years

5    ago I think that.

6          Q.     Okay.

7          A.     Yeah so these all right everything is okay.

8          Q.     When was the last time you had a Signal

9    asset sent a Signal chat or received a Signal chat from

10    David Mittelman?

11          A.     Must have been ten days week or a week ago

12    maybe /SHRAOEUBLGTS more than that he told me is he was

13    just going to wait on what the outcome here was is

14    that's fair enough wish you well David's wife and he

15    are trying to get a big government contract so they are

16    more focused on that and candidly were they successful

17    at getting that contract the value of my stock would go

18    up so I'm noth not in in I hurry for hem toish can just

19    take their time as far as I'm concerned in fact I hope

20    they get there I hope they get it so that I collect

21    this check fatter check /SRAEUFD is very precise he's a

22    molecular gentlemen yetst by trade and they tend to be

23    re-precise so I knew anything I send date would end up

24    here so I'm pretty happy with the outcome of all that

25    and I'm happy to have it all on the record it's fine by

🔼

220

1    me I don't need the million bucks or whatever that's

2    not it won't break the bank.

3         Q.    And that the transaction the stock purchase

4    agreement of the Othram stock to the Wyoming LLC was

5    that for all of the stock in the three trusts evening

6    it's darns?

7         A.    Yeah we were taking the matter one full

8    swoop.

9         Q.    So there would have been no Othram stock

10    left over?

11    A.    None of my family would have any shares

12  whatsoever in Othram but now that I'm not able to sell

13  that stock this is a key detail because this it affects

14  my position and probably affects the position of your

15  client so or your alleged client so if they're

16  successful at getting a very big government contract

17  that million dollars this they offered me I can go back

18  to the board and say well you offered it to me at this

19  when you guys didn't have this much revenue now you

20  have this revenue this stock is worth more so I can go

21  and get a bigger chunk of the equity later but /TPHOUTS

22  it's all or rond that they're on record saying they're

23  going to pay me it we're having a conversation about it

24  under the circumstances under oath I'm on camera

25  everything cool everything's gravy and so you're happy

221

1  because it wasn't transferred toen a LLC that you don't

2  control and I'm happy because it wasn't transferred the

3  you guys and spent on Mr. Lambert's other legal bills

4  or other issues everything is cool so I'm quite happy

5  with the outcome.

6    Q.    So yes or no 100 percent of the stock that

7  was in the EB white trust the /STKAEUFyer /KPAEP trust

8  the Cal rue trust or any other vehicle that that owned

9    or possessed the Othram stock a hundred percent of that

10   was at the time intended to go through in that stock

11   purchase agreement that would have gotten where the

12   funds would have been transferred to that Wyoming LLC

13   that we've been talking about?

14        A.    So all of the stock I don't your question's

15   confused me so let me make sure that I understand it.

16   All of the interest that my family and I have had in

17   Othram would have been over the moments in which I sold

18   and took all of the stock there and sent it to the

19   Wyoming trust I would have no more relationship with

20   Othram other than like the job David high five whatever

21   would have no financial relationship whatever with the

22   Othram or the Mittelman's or any of the other players

23   there as far as I know maybe something with orb wee

24   because orb wee owes me some money and Burbank owes me

25   some money but as far as I can no the board members owe

                                                      222

1    me money.

2         Q.    This is Exhibit 13.

3         A.    Okay.

4         Q.    These are emails that you sent to judge

5    Pittman?

6         A.    That's right.

7       Q.      Do you recall those not that --

8       Q.      What is this executed in March cope a

9    county I didn't send this -- oh this is you this is you

10   declaration declaration I got it.  Yeah that's fine I

11   have no objection to this?

12      Q.      All right so Mr. Johnson I want you to

13   focus on it's going to be the email that you sent and

14   it's going to start on and 004?

15      A.      I see it entirely.

16      Q.      And then go through the are rest of the

17   dock here when you have reviewed it tell me appendix.

18

19      A.      Yes, I reviewed it and I recall writing all

20   this.

21      Q.      Okay that was my question those are all

22   your words they're not changed or anything except for

23   maybe some highlighting?

24      A.      That's right yep.

25      Q.      Okay.

                                                223


1       A.      The highlighting is all yours I presume or

2    the underlining I haven't seen the highlighting

3    underlining is all you Wright okay.

4       Q.      But the words that were written are all

5      yours?

6         A.    Mm-hmm.

7         Q.    And this was sent to judge Pittman?

8         A.    That's right.

9         Q.    And you intended to be truthful and

10    accurate to him?

11        A.    That's right yep.

12        Q.    Then if you can go to page 004 appendix 004

13    I think it's the first page?

14        A.    Yes.

15        Q.    It's an email sent from you to me and also

16    CC'g Pittman orders?

17        A.    That's right yep.

18        Q.    And can you read just the first two lines

19    dear judge Pittman and then the next line?

20        A.    Dear judge Pittman also it's offensive to

21    be compared to criminals when I use a Wyoming LLC and a

22    bank account.  Mr. Thompson --

23        Q.    Wait.  Just the first two lines?

24        A.    Okay.

25        Q.    Those are the words that you wrote?

                                                      224


1         A.    That's right.

2         Q.    You're trying to be honest with the judge

3   there?

4        A.    That's right.

5        Q.    Accurate?

6        A.    Mm-hmm.

7        Q.    Not misleading him?

8        A.    Not misleading him at all.

9        Q.    Can you read the next, the paragraph

10   beginning I have worked diligently?

11       A.    Yes.

12       Q.    Thanks.

13       A.    I have worked diligently to keep my

14   finances private.  Wyoming where I spent many happy

15   summers is a great place for protecting my privacy from

16   the kind of over-broad object true stiff searches that

17   are at issue here."

18       Q.    Were you being honest with judge Pittman

19   there?

20       A.    I wouldn't say that every summer I spent in

21   Wyoming was happy but in the main I think that that's

22   correct.

23       Q.    Were you -- let me put this were you trying

24   to mislead judge Pittman in this statement?

25       A.    No.

                                                    225

1      Q.      Were you trying to mislead him about your

2   connections to Wyoming?

3      A.      No.

4      Q.      In any part of this email to judge Pittman

5   were you trying to mislead him?

6      A.      No on the contrary I was trying to inform

7   him but elected not to put it into the record anyway,

8   but I suppose we're putting it into the record now and

9   that's fine by me anyway.

10     Q.      And that's Exhibit 13?

11     A.      Yeah.

12     Q.      Going back to the Othram stock did they

13   give you any control over the company?

14     A.      Othram the company or Othram who which

15   shares.

16     Q.      The shares that were in the trust and were

17   getting transferred?

18     A.      No on the contrary I didn't want any

19   control.

20     Q.      That was my question?

21     A.      No I didn't want any control of Othram no,

22   no, no on the contrary.  No.  Absolutely not I'm not a

23   board member I'm not an executive there I am to the

24   extent my trusts my trusts is a shareholder there but I

25   have no involvement with the company other than to wish

1    them well and pat them on the back when they do a good

2    job which is often.

3        Q.    You mentioned a conflict is that because of

4    a potential future company you're thinking about or a

5    current company you have?

6        A.    I have no current company that would

7    conflict with Othram we decided David and I that

8    Traitwell was not in competition or implicate with

9    Othram there was some discussion as to whether or not

10   that would be in conflict because they're both

11   gentlemen no milk startups but they're both David is

12   interested in solving forensic cases and Traitwell is

13   not interested in that and any new company I form there

14   may well be a conflict with David's company which is

15   why I elected to execute and remove these remove

16   basically my involvement from the company.  And by the

17   way I have I want to be re-clear on the record I have

18   nothing but respect for David but there are other

19   things that need to be done in the gentlemen no milk

20   space that nobody's doing and so unfortunately I think

21   I think that that's rather unfortunate that no one's

22   coining that and so I think things should -- somebody

23   should do them and I was informed by people who are

24    engaged in the gentlemen no mix space that I would

25    'expected that I would have no other gentlemen no milk

227

1    investments were I to work on this project that they

2    would like my help on so I said all right I'm happy to

3    finally sell all my shares with Othram.

4        Q.    Is that different than Traitwell?

5        A.    It's different than Traitwell.

6        Q.    But some of the Traitwell IP might go

7    through this new venture?

8        A.    Unclear.

9        Q.    Possible?

10        A.    It's unclear because what probably not

11    because the puzzle that they've asked me the work on

12    wouldn't necessarily require that.

13        Q.    So I'm going to ask just yes or nos here.

14    Okay?

15        A.    Mm-hmm.

16        Q.    St the IP that you reference at Traitwell

17    owns is it a patent?

18        A.    It has not been patented it is a process of

19    software writing.

20        Q.    Is it a tennis shoe or did you --

21        A.    I think you could call it a tennis shoe.

22          Q.      Do you consider it confidential or

23   proprietary or unique?

24          A.      Yes, it was hard to do yes.  Yes but it

25   could well be case that with the lawsuits around 23 and

                                                        228


1    me and ancestry and my DNA it could well be that the

2    entire personal gentlemen nomics industry is illegal

3    and that it relies on personally protected information

4    and so if that's the case we're sort of waiting on

5    those court decisions then the value of the shares of

6    Traitwell would be approximating zero.  If it's not the

7    case, then the value of them and I've had conversation

8    with ancestry or whatever and whatevers answer trisity

9    or 23 and me or whatever is going to pay and I'm quite

10   happy to take that on that's fine do bother me neither

11   way.  The puzzle I've been asked to work on involving

12   jen mix the bigger puzzle is more interesting to me and

13   probably much more remunerative anyway so I would I can

14   lieu just I would like to probably sell everything I

15   own and put it all in a protected trust a /PWRAOEUPBD

16   trust or whatever and then just work on the task at

17   hand.

18          Q.      You mentioned gentlemen mix?

19          A.      Yes.

20      Q.      Does clear labs is it involved with jen mix

21  or?

22      A.      Sort of its involved with food food

23  analysis.

24      Q.      Quiv /*F give me a quick answer here.  Why

25  do you -- you talked about conflicts.  Why do you not

229

1  think you needed to sell clear labs or your interest in

2  clear labs?

3      A.      Candidly I don't even know how much stocky

4  actually own in clear labs but candidly I'm happy to go

5  to sue son tomorrow and sell it if sue son would buy it

6  I think sue son is broke they have no interest in I

7  think it's like 200 grand something like that it's not

8  that much money so it's not risible to the level I'm

9  not a co-founder of clear labs I don't write about

10  things that clear labs does I have no real involvement

11  with clear labs I saw clear labs like I literally went

12  to their offices the first time like a year ago so I

13  have no involvement with them like they don't call me I

14  don't call them you know had you know Persian tea with

15  them and smoked a cigarette that was the extent of it

16  so I have no involvement with them.

17      Q.      So a little different than Othram where you

18    wrote that you co founded Othram so --

19        A.    Correct and it's larger amounts of money

20    larger direction I helped come up with the name Othram

21    I was very involved m the making of Othram hiring of

22    David Mittelman to be its CEO it's just a it's a

23    totally different order of things and also my skill set

24    is not it's not complementary to what Dr. Mittelman is

25    doing or his wife is doing with the company, I don't --

                                                            230


1    there's nothing I can offer, you know, I have nothing

2    to offer to them nor to -- nor to clear labs around

3    that.

4        Q.    Just to clarify something?

5        A.    Yeah.

6        Q.    You said that previously I asked you if you

7    had any control or role in the operations of Othram and

8    you said no but now you said sounds like you do believe

9    you had a -- is that just previously or today just

10    simply?

11        A.    Today I have no involvement with the

12    company when the company started I was very involved

13    now I am not involved and I have not visited them I

14    have not seen them when they've been in TC I had been

15    invited to their events but I have chosen not to go and

16    I wish them well in what they're doing but it's not

17    it's not interesting to me like what they're doing is

18    has it's a solved problem it's not interesting.

19        Q.    Some cleanup go back to or Exhibit 12 was

20    that where we have the screenshot of the Wyoming --

21        A.    That's right yeah.

22        Q.    Okay I'm not talking about that account,

23    all right?  Do you, any trusts you are a beneficiary

24    of, do you have any relation to any bank or brokerage

25    account open in the name of a Wyoming LLC any Wyoming

                                                          231


1    LLC?

2        A.    Now no, I do not.

3        Q.    I've got the ask the question and that is

4    well when did you?

5        A.    Maybe about six years ago seven years ago

6    and that was a family thing so I don't know I was not

7    involved in that my grandmother was well, we

8    increasingly find her assets strewn about so my

9    grandmother was a very successful stock picker oddly

10   enough and she had assets all over Wyoming and all over

11   California and so I routinely get checks in the mail

12   from those assets it is what it is.

13       Q.    How big are those checks?

14      A.      $500, 10,000 bucks all the time I get money

15  from her even though she's been dead since 1994.

16      Q.      How do they know where to send the check?

17      A.      Most of it goes to my mother and father but

18  candidly most of the money that I've /TPWOEPBT for that

19  has gone into money for subsequent generations like

20  what am I going to do with a 500 -- I get a lot of my

21  namesake who also lives in Wyoming he invented the

22  swinging poly pump and TxDOT a number of /PAEFPBTS so

23  when oil prices get.  I get a bunchful mailbox money

24  for the purpose that too but I don't I have no

25  involvement with that my father and my mother have most

                                                        232


1  involvement with that as does my brother I'm not really

2  engaged with that.  The last time I was in Wyoming so

3  that might be another question you might ask me was in

4  2024 -- no.  2023.  And I looked at buying a property

5  in Cody which I did not buy thank God to be very clear

6  Alaska and Wyoming are the best states in the Union.

7      Q.      Let's switch gears and talk a little bit

8  about your devices, okay?  You said you have multiple

9  phones how many?

10      A.      I don't know.  Probably around 10 or 11.

11      Q.      You use 10 phones actively?

12      A.      Depends on what the thing is but yeah

13  people give me phones I use the phones I get rid of the

14  phones I have them stored various places I give them to

15  other people I buy them for other people yeah I have a

16  lot of phones I have a lot of computers and I have a

17  lot of phones.

18      Q.      Where are those currently located?

19      A.      I think they're in a storage box in

20  Chantilly but I'm not sure.

21      Q.      Same question about computers.

22      A.      Yeah I don't know how many computers I

23  have.

24      Q.      Let's --

25      A.      Yeah.

                                                  233


1      Q.      Let's go back to, say, '20, last five

2  years.  How many computers have you owned?

3      A.      Somewhere between 30 and 50.

4      Q.      You wrote about your computer committing

5  accept a cue?

6      A.      Yes.  The main computer that I used

7  foreclosure most of my work basically fried itself and

8  shut off one day and was not usable again and I got rid

9  of it.

10      Q.      Did you have any did you try to wipe it or

11   do anything?

12      A.      No.  No.  And this has happened to me in

13   the past where I've worked on a computer and worked on

14   something and I wasn't -- the entire battery the whole

15   thing died and by the way by the way this is -- if you

16   if you run in the circles I run in this is not an

17   uncommon thing it has been known to happen once or

18   twice.  The accept a cue is obviously a joke obviously

19   the computer did not commit suicide but yeah I have

20   owned devices that have been remotely advertise

21   ruptured destroyed shut off, you know, wiped remotely

22   so yeah I have had that happen to me many times

23   actually and yeah.

24      Q.      A tech safe guy like yourself must back

25   everything up though?

                                                    234


1       A.      Depends on what I'm instructed to do around

2    that but typically the way it works is when I buy a

3    computer what I do is I usually pay cash for the

4    computer and then I instruct one of my handlers they

5    ask me for the device code and they ask me for the like

6    the Wi-Fi code that I'll be using the most and then I

7    write that down on a piece of paper and usually I will

8  mail that to them or give it to them.  Typically I buy

9  most of my computers used and I buy them in cash

10  through Craigslist or I instruct somebody who works for

11  me to go and buy the computer for me and then we do a

12  hard reset of the computer and then I give again the

13  device code and the Wi-Fi code to whoever is in charge

14  of paying for that whole thing.

15      Q.    Yes or no do you about I the computers used

16  for operational security reasons or just because

17  they're cheaper?

18      A.    Depends on what we're doing.  I've never

19  gone into an am store and bought a computer as an

20  example.

21      Q.    Go back to the jom mix.  You either posted

22  saying that you'd sent an email offering to buy 23 and

23  me and you had the funds to do that were you just

24  joking?

25      A.    No I had the cash to do it at the time I

235

1  had a guaranty from a /SOFPB law firm to do that.

2      Q.    Okay let's talk about that then. ?  Wealth

3  firm) when was that?

4      A.    Well depends on when we're talking so 23

5  and me went bankrupt and when it went bankruptcy there

 6    was this question about bids around that.  And so

 7    ultimately the company went back to an with a chick key

 8    and/or ra cull was involved with acquiring them so that

 9    was by /*F kind of a moot tail but I was talking.

10         A.     Of the o mon any sovereign wealth fund

11    about buying it in total out of time I think the

12    valuation was somewhere between a hundred million and

13    150 million but the /SOFPB wealth fund of o man is you

14    know quite large and so they had the cash to underwrite

15    it and /THERB I looked at or people joining in on that

16    and when I knew that Oracle was going to bid on that it

17    was kind of a moot point.

18         Q.     Could you produce a single document showing

19    that you were /SPHAOEG with the o mon anies?

20         A.     Certainly the man in question is a man by

21    the name of month has /PH-PL Al har they and yes, I

22    have probably communications with them that can prove

23    that he too spoke the with me largely over /STPHRAL but

24    I'm heavy happy to provide his contact information and

25    the receiver but.  But we ultimately didn't do the

                                                          236

 1    transaction so it sort of is a moot point again great

 2    respect to the o mon anies o mon any sovereign wealth

 3    funds and very big support terse of them general and I

4    wish them base I think they're one of the more.  And I

5    was supposed go visit them in April of this year

6    ultimately did not go to visit them because of the

7    court matter that was instructed not to leave the

8    country and until this court matter was concluded.

9         Q.    Who instructed you to to?

10        A.    Some people in the federal government of

11   the United States.

12        Q.    Judge Pittman?

13        A.    No.

14        Q.    Okay.

15        A.    But it's no great loss I didn't really want

16   to go to owe o man it's kind of a long trip.  But it's

17   quite beautiful from what I understand.

18        Q.    In the past three years okay and that's

19   what I'm cabining my time frame on?

20        A.    The past 30 years?

21        Q.    Three.

22        A.    Three.  Okay.

23        Q.    How many government handlers have you

24   worked with?

25        A.    I wouldn't know.  Somewhere between five

237

1    and 20.

2       Q.      Okay.

3       A.      Yeah.  Are we talking U.S. or are we

4    talking foreign?

5       Q.      Altogether.

6       A.      Between five and 20.

7       Q.      U.S.?

8       A.      Between five and ten.

9       Q.      So a couple of questions about your secret

10    agent status.  Okay?  Back to that sub stack you talked

11    about you know you were threatened with /TORBL /*R

12    potential jail time and my understanding that was about

13    Julian a song?

14      A.      That's right yep.

15      Q.      Was it about marijuana or any money lan

16    during?

17      A.      No as far as I know no.

18      Q.      Okay.

19      A.      If it was they didn't tell me.

20      Q.      Which agency threatened you with jail time?

21      A.      Well to be precise about it the FBI at the

22    time -- well there were two FBI agents that contacted

23    me first about Steve ban non and that would have been

24    in -- no no this is important I'm getting to it.

25      Q.      I just want the dance?

                                                        238

1      A.    No, no, no this is important so during the

2    pandemic I was contacted by two FBI agents and those

3    two FBI agents then in turn introduced me to Johnathan

4    Buma and so Jonathan Buma was joking that I was under

5    all these visions and I said well, my understanding is

6    that another agency shut all those investigations down

7    and he started laughing and he said yes, that's true

8    and he said we were gonna get you and put you in jail

9    for this and I said well it's a good thing didn't you

10    do that and that was the conversation that he and I had

11    had in his hot tub at his home in San Juan Capistrano

12    which in fact is not his home.

13      Q.    Did you sign any immunity --

14      A.    No.

15      Q.    -- cooperation or non process prosecution

16    agreement?

17      A.    No.

18      Q.    Have you been paid anything for serving as

19    an informant or a confidential human source?

20      A.    No I have never asked for it in fact I've

21    rejected offers if any.

22      Q.    Did any agency or government affiliate set

23    up bank accounts give you prepaid cards in connection

24    with your informant work?

25      A.      As far as I know, well that's a difficult

239

1    question I'm not sure I should answer so I'm

2    foreclosing to say that I'm not going to talk about

3    things that the U.S. government has asked me to do.

4        Q.      Are you refusing to answer?

5        A.      I am.

6        Q.      You've already testified about government

7    trusts do you have anything to answer on that point?

8        A.      No.

9        Q.      I believe you publicly claim that the FBI

10   said that you were an excellent source?

11       A.      That's right yep.

12       Q.      Johnathan Buma was your handler?

13       A.      One of them yes.  I had several at the

14   time.

15       Q.      In our questions about the government

16   trusts, do you consider a Wyoming LLC discussed in

17   Exhibit 12 that was going to be the subject or the

18   recipient of the Othram proceeds as a government trust

19   in --

20       A.      It's not for me to say I don't know could

21   have been one very likely could have been one but I

22   don't know it's not my it wasn't my duty to do that my

23  instructions were to do as I was told and I did as I

24  was told.

25      Q.    I guess tell me if you can answer this yes

240

1  or no you considerably believe that it's probable that

2  the Wyoming LLC that was going to be the recipient of

3  the Othram proceeds is a government trust set up in

4  your benefit?

5      A.    I don't know if it was for my benefit or

6  and I do believe it was a government trust but I have

7  no way of knowing that fully I know that I was

8  encouraged to set it up and excuse me I was encouraged

9  to send it the screenshot to Dr. David Mittelman and he

10  in turn sent the money to me but he did not do any of

11  those things and so I don't really know what that whole

12  thing was about there's a lot of things like that in my

13  life why I get instructed to do something and then

14  never really figure out what it's about.  And yes it's

15  enormously frustrating but that's how it goes.

16      Q.    So the government told to you set that up

17  that account?

18      A.    No no they asked they never I never set up

19  any of those bank accounts I never was involved with I

20  in of that all I did was a take screenshot of that

21    thing and then send /TOEUTD Dr. David Mittelman an the

22    /SKAOERBT was not actually taken by me it was taken by

23    somebody else who sent it to me so I didn't even

24    screenshot it it was a screenshot provided to me.

25      Q.      Copied it over?

                                                                    241

1      A.      Correct.  And then deleted it as I was

2    instructed to.  Actually no to be precise I forwarded

3    it because you can do that within Signal I did not

4    delete it.

5      Q.      Do you know the gator /TKPWRAOEPBL set up

6    that account?

7      A.      I have no idea but that was not him as far

8    as I know he was not involved as far as I know the sum

9    total of the conversations I've add had with greater

10    /TKPWRAOEPBL since this well since he was smeared in

11    summer fort the total conversations I've had with him

12    were about his children about his child David Hal la

13    well's wife's funeral and that was it we haven't

14    discussed this court case and his wife who is on again

15    off again friendly with my girlfriend she said that we

16    would wait until the matter was concluded and we'd have

17    a dinner party when it was concluded, but I rather this

18    matter has been rather complicated because I was

19    supposed to invest in another company with gator

20    /TKPWRAOEPBL and this whole court proceeding thing

21    blocked me from being able to do that which is

22    unfortunate.

23        Q.    Were you identified N- will you identify

24    the name of that company?

25        A.    Sure.  It's /KAOULD sky dweller.

242

1        Q.    Sky dweller arrow?

2        A.    Yeah.

3        Q.    Were you going to provide any funds?

4        A.    A group around me would have, yeah.  Very

5    likely but ultimately it was for naught.  And wy the

6    way there are other more sophisticated drones I think

7    /TWRAE probably for the best that we if end up doing it

8    I don't really like the CEO I don't really trust him he

9    seems kind of shady to me good if you're not please

10    answer this shortly if you're not providing any money

11    yourself, you would bring to the table why would they

12    give you any type of equity interest.

13        A.    Has.  La France.  It's the may relationship

14    with the French world would have been my relationship

15    with the French world would have been essential for

16    that operation.

17      Q.      Why?

18      A.      Well I grew up speaking /SPREPBLG I speak

19   it true eventually I'm friendly with all of them I'm

20   part of the French American foundation I've known

21   president Mac Ron since 2012 before /H he was

22   preponderate and yeah, if you have a solar poured drone

23   it's extremely valuable for the western part of Africa

24   which is where the French have a lot of territory so I

25   would have gone to Allen chay pin I would have gone to

                                                        243

1    my home network and we would have gone to chay pin

2    C-H-A-P-P-I-N.

3       Q.      Slow down?

4       A.      Yeah so he would have fund it the one of

5    the Americans in the United States that likes France.

6       Q.      When was if last time you spoke with he man

7    yul ma crone?

8       A.      I haven't toke with him but the last time I

9    saw him was /TPWH 2019.

10      Q.      The Wyoming LLC and that bank account did

11   Terry done mire set that up?

12      A.      He did not.

13      Q.      How do you know with certainty just brief

14   answer?

15     A.     He doesn't typically deal with Wyoming as a

16   rule he deals more with the Turk issuing world the

17   Indian world and the democratic rep of con go, but not

18   so much with domestic matters that's not his purview.

19     Q.     What is the best estimate of the total

20   amount of money you've received from the U.S. or

21   foreign governments and I'm including government

22   trusts, any operational funds --

23     A.     Doesn't work like that.  I don't know, I

24   mean, in the millions I don't know how much yeah.

25     Q.     Has any agency or government entity or

↑

244

1   agent instructed you not to disclose any trusts,

2   account, asset, special purpose vehicle that was set up

3   or that you have control or a relationship with?

4     A.     Well I don't have control over any of this

5   em.

6     Q.     Wait I said or a relationship with.

7     A.     I don't know it's a good question.  They

8   asked me well two of them asked me to come here and to

9   basically do the minimal consent thing which I have now

10   done and directed that's an interesting question I

11   don't know no, I mean, in general like when the

12   receiver which I assume is what you want to do when the

13    receiver starts knocking on doors he, he or she as the

14    case may be has, you know, has my full cooperation

15    provided I'm instructed to give it.

16         Q.    So you remember me asking an iteration of

17    the following question a bunch please identify all of

18    your assets whether it's accounts special purpose

19    vehicles et cetera et cetera?

20         A.    Mm-hmm.  Mm-hmm.  Mm-hmm.

21         Q.    You've identified some, right?

22         A.    Mm-hmm.

23         Q.    My question is have you withheld the names

24    of any or omitted the names or not provided a complete

25    picture based on any instructions from your government

                                                          245

1    handlers or --

2         A.    Not knowingly there may be one or two that

3    I'm missing but I have done a lot of them so I don't

4    always remember them.

5         Q.    Have you asked any government agency,

6    government agents, agent to contact judge Pittman or

7    the U.S. attorney's office to give the basis or say

8    that you should be excused or not need to provide full

9    compliance with the federal rules in this court's

10    orders?

11          A.       I instructed one of my handlers to do

12   whatever he thought was the just thing to do and that I

13   would follow it as he wished so they said if you want

14   to talk to judge Pittman and the U.S. attorney or talk

15   to whoever and I'm happy to have you do that but notify

16   desire for to you do that on my behalf that's what I

17   told him.

18          Q.       My question is are you aware so you --

19   so --

20          A.       As far as I know no.

21          Q.       The?

22          A.       But I'm not aware I wouldn't want to be

23   aware that's not take /STPHRAO /STKPHREUTS a little bit

24   did you request darts.

25          A.       No, I wouldn't request it that's not how it

                                                             246

1    works.

2           Q.       I need the question out there?

3           A.       Yeah.  Go ahead.

4           Q.       Did you request any of your government

5    contacts to speak with email communicate with judge

6    Pittman or the U.S. attorney's office to excuse any of

7    your compliance with the federal rules, your discovery

8    obligations or judge Pittman's orders?

9       A.      No on the contrary I in -- I -- when I

10      would ask --

11      Q.      Objection.  Objection?

12      A.      Yeah.

13      Q.      Non-responsive?

14      A.      No.  The answer is no.

15      Q.      Okay.  Are you aware of any of your

16      government contacts nevertheless contacting judge

17      Pittman or the U.S. attorney's office?

18      A.      I don't know.

19      Q.      Are you aware?

20      A.      Am I aware?

21      Q.      Can you identify a time --

22      A.      No.

23      Q.      -- a date?

24      A.      I did not.  And in fact but you're asking

25      like kind of a silly question it doesn't work like that

247

1       so I wouldn't instruct them like they don't they

2       instruct me like that's not how that works.

3       Q.      Did they indicate that they would speak

4       with judge Pittman or the U.S. attorney's office?

5       A.      As far as I know, no, but I never asked so

6       it's -- it's kind of immaterial.  I would never ask a

7    law enforcement official to intervene with a U.S.

8    attorney or a federal judge on my behalf.  That's just

9    not how it works.

10        Q.    So if it's immaterial, what's the -- what's

11   the point about not just providing full and complete

12   transparent answers about your relationship with the

13   government and say that's the reason you can't answer

14   all of this like the discovery in this case and

15   disclose all your assets?

16        A.    Well typically it would be tipping off the

17   people who are under investigation so you don't

18   typically do that kind of thing you wait until an

19   operation is concluded.

20        Q.    And what's the operation?

21        A.    I mean, I work in a small piece of it but

22   it has a lot to do with compromised law firms and

23   compromised technology.

24        Q.    For secret operations is it common for a

25   source to publicly brag about their importance and talk

                                                      248


1    about operational details or reference operational

2    details?

3         A.    Well it depends on what they're actually

4    what the actual target is so for an FBI the FBI thing

5    when I was closed out as a code named informant I was

6    free to talk about that to even write a book about it

7    typically the way it works is they approve the book I

8    don't support that I think that's a first amendment

9    violation because the FBI is supposed to pay you when

10   you are a confidential informant if you do dangerous

11   things for them.  I elected not to get paid that way I

12   elected to write books and novels and whatever about it

13   and so we had a -- we you know, but there are other

14   government agencies that I have conversations with and

15   happens all the time and in fact the FBI itself is

16   routinely under investigation by other government

17   agencies that's very common that's like you can't there

18   are only 50,000 agents in the FBI it's like a baby

19   agency there's like nobody there.

20        Q.    Are you writing a novel?

21        A.    I am.  I am writing a novel it's a lot of

22   fun.

23        Q.    Is it done?

24        A.    It's almost finished, yeah.  It requires

25   some edits but it's almost finished.

                                                    249


1        Q.    Is it an auto biography?

2        A.    No it's a novel.

3      Q.      Is it historical, fix based?

4      A.      It's about my relationship with Jeffrey

5   Epstein TV ban no and Steve peel but it's Roman that

6   clay about so no.

7      Q.      Not fansy?

8      A.      Not a fantasy though I am writing a second

9   book about science fix in the Mormon church so.

10      Q.      Have you shared in of any of this novel

11   with anyone?

12      A.      Maybe some of it yeah.

13      Q.      With who?

14      A.      With my father read a version of it.  A

15   friend of mine at the French embassy read some of it.

16   Maybe a few others.

17      Q.      Well, let's be specific.  Who?

18      A.      I don't know them all maybe like five or

19   six -- no that's no true.  Did George /SEUBL read it no

20   he read an earlier version, I mean, it's gone through

21   many iterations it's about 300 pages and counting I

22   have a little bit to do to tighten up the ending but

23   yeah I'm very happy I wrote it, it's -- it was a lot of

24   fun.  There's more to go on it.

25      Q.      You invited your sub stack and transiter

250

```
 1   physicalers to request /-T right?
 2        A.    Yes.
 3        Q.    Have you sent it out to them?
 4        A.    No no as far as I know I have not sent it
 5   to anyone on there.
 6        Q.    Typically the way it works when you request
 7   that is you see who's interested a understand then you
 8   add them to a list so when there's when there's a book
 9   that has a publisher and all of that when that's good
10   and that's tight I will send them galley copies those
11   who asked?
12        Q.    Did you write reports when you were a
13   confidential auto human course?
14        A.    I the dozens of them.
15        Q.    Did you share your novel or a draft of this
16   novel with Johnathan Buma?
17        A.    No I did not.
18        Q.    You say that with certainty?
19        A.    Mm-hmm I do.  He shared a copy of his novel
20   his auto /PWROEUFG with me but I have not sent him a
21   copy of mew stiff.
22        Q.    Did you write reports for Johnathan Buma?
23        A.    I did.  And for others in the FBI doesn't
24   quite work like that the way it works is you write a
25   report and then they in Your Honor the put it into the
```

⬆

1    system so Buma would take what I would write and put it

2    into the system that's the way of protecting it from

3    the sovereign immunity kind of perspective.

4        Q.    Did Buma allow you to access information in

5    FBI databases separate from your own reporting?

6        A.    No nor would I have had -- nor would I have

7    wand it even if it had been provided.

8        Q.    Did you write reports for other FBI agents?

9        A.    I did.  Many others.

10       Q.    Did any other FBI agents allow you to

11   access FBI databases?

12       A.    No.

13       Q.    Did Buma or any other FBI agents or agents

14   from other agencies allow you to read confidential

15   human source reporting provided by other confidential

16   sources?

17       A.    No, I don't think so.

18       Q.    Did Johnathan Buma provide FBI documents to

19   you for review?

20       A.    Documents for review?  Ion what that means.

21       Q.    To look at.  To?

22       A.    To look at?  Yes.

23       Q.    FBI documents.

24     A.     Correct.  On several occasions.

25     Q.     Did Johnathan Buma provide you with

                                                    252

1  confidential human source reports other than your own?

2     A.     I don't recall but it may have happened I

3  I'm not totally certain.

4     Q.     How would --

5     A.     Typically the way it would work is he would

6  call me about a report that he had read and he would

7  try to summarize it but no he did not as far as I --

8  nothing that was classified nothing that I didn't have

9  clearance for.

10     Q.     John than Buma has been indicted for

11  illegally downloading FBI documents, right?

12     A.     That's right, yep after by the way I was

13  confidential informant for him but yes.

14     Q.     The classified information procedures act

15  has been invoked by the government are you aware of

16  that?

17     A.     As far as I know, but I haven't followed

18  the case in any detail.

19     Q.     Did Buma ever transmit any of those

20  documents to you?

21     A.     No and if he had I would have reported him.

22      Q.      Did he transmit confidential human source

23  reporting to you?

24      A.      If it was confidential or classified there

25  was no way I was going to touch it or be involved with

᠕

253

1   it.

2       Q.      Did Buma ever transmit FBI or confidential

3   human source documents to another person who then gave

4   them to you?

5       A.      As far as I know, no.  No.

6       Q.      What agencies do you report to?

7       A.      Decline to answer.

8       Q.      Is it more than one agency?

9       A.      Yes.

10      Q.      When's your confidential human source or

11  confidential source relationship begin with agencies

12  other than the FBI?

13      A.      Decline to answer.

14      Q.      You refuse to answer?

15      A.      Yes.

16      Q.      Could you answer it?

17      A.      Yes.

18      Q.      Do you have any documentation of your

19  relationship with those agencies?

20    A.    I do.

21    Q.    Could you provide it?

22    A.    No.  I would not provide it unless

23 instructed to by those handler in those cases.

24    Q.    What topics were you reporting on to those

25 agencies?

                                                  254

1    A.    Compromised law firms and compromised

2 technologies.

3    Q.    Do those agencies threaten or have leverage

4 over you?

5    A.    No.

6    Q.    Who are your handlers?

7    A.    Decline to answer.

8    Q.    Couple of other OI5 or is it 015?

9    A.    I don't know.  Probably both.

10    Q.    What?

11    A.    We called it both.  Probably (we called

12 it).

13    Q.    What is 015 or 0I5 just summarize and

14 explain it to me?

15    A.    Well it's part of the anglo American

16 Alliance and it deals with technology and it was a way

17 of inviting John Burbank to be helpful to the country

18    as his father had been helpful to the country.

19        Q.    What is the correct name of it?

20        A.    I don't know.

21        Q.    Who is your contact with it?

22        A.    You might ask Heather green well about it

23    you might ask, God, Bob or Peter yeah Peter vanish had

24    quite a fall so I don't know and then Bob, Bob hangs

25    Gus ma is sort of out of commission now so they're the

                                                              255

1    older six at work.

2        Q.    Can you spell those last names?

3        A.    Heavens no.

4        Q.    For the court reporter?

5        A.    Varnish I think is spelled like

6    V-A-R-N-I-S-H.  Guns ma Bob hangs gis ma I could never

7    spell ^ it ^ it'd cell correctly but I think it's

8    HANKES-/TKPW*FPLT DREI Zed -- no was it Zed or was it S

9    I think it might be S.  MA.

10        Q.    Is it an investment vehicle OI5 or 015?

11        A.    If it is I never received proceeds from it

12    so I have no idea I was actually when it was being set

13    up I made very clear that well it was made clear to me

14    that I was too American to participate that was the

15    phrase at the time and I said okay guilty as charged

16    but I was not involved with it.  And the last I heard

17    of it was maybe in 2021, 2020, but I wasn't involved

18    with it.  The person you really want on that one is

19    John Burbank would be my guess but I don't know I

20    wasn't involved with it.

21         Q.    The judge Pittman issued an order for you

22    to respond to the motion for a receiver by Wednesday.

23    Are you going to respond or oppose it?

24         A.    Is it by Wednesday or is it on Wednesday or

25    what is the -- does it actually say?

                                                    256

1         Q.    Have you signed up for ECF notifications?

2         A.    No, I'm not allowed on it.

3         Q.    By the government handlers?

4         A.    I'm not allowed on it I've tried to sign up

5    for it like six or severance times and every time I try

6    to fill it out it rejects me.

7         Q.    It says accord orders a response to the

8    motion by Wednesday at 12 p.m. ?

9         A.    Okay.

10        Q.    So are you going to file an open position

11   or anything to it?

12        A.    No, I think you're instructed to do three

13   of them but you are what you are saying you just have

14    the one so if there's just the one I will have a

15    conversation with somebody and ask about just the one

16    and then I will make a decision on Wednesday about

17    replying to it.

18        Q.    But you've been clear you fundamentally are

19    okay with the receiver?

20        A.    I have no objection to a receiver in

21    principal T particular receiver I ma I have an

22    objection to but I don't know if I don't know this

23    person nor have I had it looked into nor has it been

24    looked into on my behalf nor has it et cetera et cetera

25    et cetera.  I am not involved with that part of it.  I

                                                          257

1    take these things day by day and do as I'm told.

2        Q.    Told by who?

3        A.    People who are involved with me. It's so

4    much simpler existence when you just do as you're told?

5              MR. THOMPSON:  All right let's take a

6    little break where are we at on the record now.

7              THE VIDEOGRAPHER:  We are going off the

8    record at 3:05.

9              (Break from 3:05 p.m.s (OSKOUI) (OSKOUI) os

10             quee until 3:13 p.m.)

11             THE VIDEOGRAPHER:  We're back on the record

12    at 3:14.

13    BY MR. THOMPSON:

14        Q.     All right Mr. Johnson a couple of questions

15    about Steve os quee.  Do you know who I'm referring to?

16        A.     I do.

17        Q.     Okay.  Just in one or two sentences, who is

18    your understanding who is Steve os quee is?

19        A.     I believe he's a managing partner at gig a

20    fund which is he says it's a venture capital firm but

21    I'm not convinced that that's true.  And he's well he's

22    got to be in his mid 40's now I lives in Austin, Texas,

23    and he's from New York originally and from the

24    Rochester area I believe and previously worked for

25    Peter teal and currently is in business with Luke no

                                                    258


1    Zik and with Mr. He hon Musk.

2        Q.     Okay.  In the past five years have you had

3    any disputes business disputes with Mr. Os quee about

4    money, stock, anything?

5        A.     Yes.  I have had one dispute with him.  He

6    and Mr. No Zik said that they would pay me a commission

7    after I introduced them to David Mittelman at Othram

8    and they elected not to pay that and that wasn't Mr. Os

9    quee's doing that was Mr. No Zik's doing so I have no I

10    will well towards Mr. Os quee I wish him well you know

11    I think he's a nice guy but I don't really have any

12    dispute about that they owe me a fee on the money that

13    they invested from gig a fund and gig a fund a lot of

14    people think that figure a fund is a front for Musk and

15    certainly there's some money in there that comes from

16    shall we call it a Persian die a important ra and so

17    yeah I wish him well I have no objections to him

18    frankly as soon as I'm done with the Othram stuff I'm

19    happy to move on to other matters.  I stayed at orb

20    quee's home actually on several occasions and he's a

21    great host too though he doesn't cook he usually orders

22    in.

23        Q.    Has he ever given money to any of the

24    companies you are affiliated with?

25        A.    Given money he has invested in Othram.

    259

1        Q.    How about Traitwell?

2        A.    Oh he did invest he he invested $500,000 in

3    Traitwell and he asked for his money back when I

4    started writing critical things about Elon Musk and I

5    said no it doesn't work like that I'm afraid we won't

6    be giving you your money back and then he of course

7    elected not to pay the fee he owed me so-and-so we had

8      a big dispute there.

9          Q.      So Mr. Os quee invested according to your

10     500 FRAND m Traitwell?

11         A.      Mm-hmm.

12         Q.      Why did he ask for it back?

13         A.      Because I was writing critical things about

14     Elon must can.

15         Q.      What did he say the reason was for?

16         A.      He said because I was writing critical

17     things about Elon /PH*UFRBG and he September it in an

18     email which was stiff upped the of him.

19         Q.      That was it?

20         A.      That was it and he never followed up and I

21     said no, I'm not going to do that that's not how it

22     works and Luke no Zik his business partner said that

23     the money had to be done by os quee personally not quig

24     a /PWAUPBD because I quote had the wrong lineage end

25     quote that's literally what he said verbatim and I'm

↟

                                                        260

1      happy to have that open the record because it was wild.

2          Q.      So for Traitwell?  It's like was a $500,000

3      investment from os quee himself or?

4          A.      Os quee himself gig a fund was diligencing

5      it but gig a fund elected not to do it and gig a fund

6   is only two guys os quee and no sick actually only two

7   of them and they had what os quee said it was the

8   biggest /TPAOEULT he's /*FR had with like no Zik about

9   whether or not not to invest in me what I had been told

10  is that Mr. Os quee is the face of the operation and

11  that Mr. No stick is the real player /P-PBD everything.

12  Mr. No Zik when he /STOFRD I was a federal informant

13  freaked out and went a bit you know went a bit crazy

14  refused to contact me he was he went really crazy

15  Mr. Os squee asked me if I would be happy to host him

16  at the FBI headquarters in DC and I said no, no

17  objection I wished him well and that was the last -- he

18  and I haven't spoken in a number of years I have

19  nothing against him I wish him well Mr. No Zik is he's

20  a different matter he's you know likes to do /TRUGS he

21  likes to do all these parties Mr. Lambert has gone

22  though those parties I'm not going to go to a party

23  where people are doing drugs it's not really my thing

24  oh by the way both of them have a very close

25  relationship with the Mormon church interestingly

261

1   enough which is something else you might want to

2   include they are the money behind angel studios gig a

3   fund was and angel studios is the one that did the

4    sound of freedom thing that movie a few years ago with

5    Tim ka veas us Jesus from passion of the Christ I

6    haven't seen it.

7         Q.     In the past when the os quee invest that

8    500,000 what year?

9         A.     That would have been in 2020.

10        Q.     Okay.  So since less say and when was

11   Traitwell formed?

12        A.     That would have been 2018-2019.

13        Q.     Okay.  So let's say from 2018 onward who

14   are the biggest investors in Traitwell?

15        A.     I am.  I'm the biggest investor in

16   Traitwell.  Robert March link is also an investor.

17        Q.     How much?

18        A.     I don't know off the top of my head maybe

19   400,000, 300,000.  Don't know.  Maybe 7 but I don't

20   know and then yeah I have an accountant that handles

21   this so I'm not sure what the best person would be to

22   for you to talk to about that but yeah.

23        Q.     And you said there's only how much money is

24   in Traitwell's /PWAEUPGT?

25        A.     I think total there's like 2.1 million,

                                                    262


1    2.4 million something like that something like that

2    it's very undercapitalized relative to what I was

3    trying to do.

4         Q.    So there's 2.1 million currently in

5    Traitwell's bank account?

6         A.    No no, now there's no money in Traitwell's

7    bank account yeah.

8         Q.    What happened to it all?

9         A.    It was spent on salaries for staff yeah

10   Dorothy and Gavin and Prem and others.

11        Q.    Did Traitwell ever deliver a product or

12   anything?

13        A.    Mm-hmm it delivered a product where you can

14   take your 23 and me data and you could spit out various

15   it would tell you things about yar health that were

16   kind of controversial so yeah there was a lot of things

17   that it was the idea of the company was ultimately to

18   force 23 and me or ancestry to acquire it and

19   ultimately that didn't happen but a new company that

20   I'm planning on forming will probably avail itself of

21   some of the some of the things I learned during the

22   process of making that company.

23        Q.    Did Traitwell return any money to

24   investors?

25        A.    I it did not, no.

1    Q.    And now it essentially has month money?

2    A.    It has no money, but I could recapitalize

3    it and I'm likely to recap lies it after this.

4    Q.    After what?

5    A.    After the lawsuit's concluded.

6    Q.    Why wait?

7    A.    Why spend money on an asset that could be

8    seized by a $70 million judgment?

9    Q.    Well, if you were confident that you were

10   going to win and had the judgment --

11   A.    Well it could go bankrupt and then I could

12   scoop up all the assets quite cheaply which would be

13   pretty great to be honest.  I have no objection to it

14   going bankrupt and in fact it going bankrupt would be

15   beneficial to me.  It would be annoying to lose money I

16   invested but these things happen.

17   Q.    All right so this is a yes or a no I think:

18         Has anyone specifically told you that Elon

19   Musk is funding this lawsuit?

20   A.    Yes several people.

21   Q.    Did they tell you that in person or in

22   written communications?

23   A.    I don't know about the written

24   communications.  Possibly on Signal I guess that's

25    written communication I don't know but yes the I have

🔺
                                                            264

1    been informed repeatedly that Mr. Musk is and

2    associates of Mr. Musk I should say are behind this

3    lawsuit and that Mr. Lambert is their front man.

4         Q.    Were those people your government contacts?

5         A.    Some of them were.  Some of them were also

6    journalists that were investigating it and some of them

7    were also members of a foreign government.

8         Q.    So your non government agency

9    handler/contacts --

10        A.    Yes.

11        Q.    -- who told that you Elon Musk is funding

12   this lawsuit?

13        A.    A number of journalists have been somebody

14   from the Wall Street Journal asked me about it directly

15   I forget which one because they move around a bunch but

16   somebody asked me about it.

17        Q.    Was the --

18        A.    I was asked -- it was a woman I forget her

19   name now, but I get asked by journeymansts a lot about

20   things and I true I to make myself available to them

21   there was a woman who asked me about it and there's

22   also a man who asked me about it and there was also a

23    French woman has asked me about it and she I think the

24    French woman was at righters.

25         Q.     What journalist do you serve as a source

265

1    to?

2         A.     Any journalist that would call me and I'm

3    in a position to answer them.  I mean I routinely have

4    journalists from all over the world reach out to me and

5    ask me things that I know things about and I guess

6    yesterday was Michael wolf is who I was talking to of

7    Epstein fame but I can't I like journalists they're

8    interesting.

9         Q.     So who what -- need the names what is the

10    name of the reporter?

11         A.     I'm not going to be identifying reporters

12    who I talk with.

13         Q.     Kind of like your government sources it's

14    a --

15         A.     You got it.  And also it's kind of a

16    violation of a certain jurnst source protection so I'm

17    happy to go to the mat on that and litigate that at the

18    federal level that would be kind of fun to be honest.

19         Q.     Okay so putting aside stuff from your

20    supposed --

21        A.        I mean obviously if I tell you the

22    /STPHAEUPLS of journalsts that are investigating Musk

23    and Musk is funding be the lawsuit and Musk is the

24    largest customer or largest client of /TKHRAP that

25    would be a real problem wouldn't it and so I'm not

                                                        266

1    going to be doing that because then they could be

2    harassed and sued with frivolous lawsuits like I've

3    been.

4        Q.        So besides communications from the supposed

5    government sources that you have and putting aside

6    communications from reporters who you won't identify

7    can you identify any communication?

8        A.        I can butly elected no on the.

9        Q.        Bait or a earn?

10        A.        No I will not talk about any of the

11    journalists that I talked to about Mr. Musk.

12        Q.        So my question just to be clear I'll ask it

13    again Mr. Johnson.  It doesn't involve jurnsts.  It

14    doesn't involve any supposed government sources.  Are

15    you with me?

16        A.        I'm following everything you're saying.

17        Q.        Okay.  So who has told you that Elon

18    Musk --

19     A.     The individuals in question who have asked

20  me about Musk funding this suit have been either

21  government affiliated foreign governments affiliated or

22  connected to the journal list tick core of the United

23  States so I have no desire to name any of those people

24  at present.

25     Q.     So you can't identify --

267

1      A.     No no I can identify them I choose not to

2   I'm declining to answer the question.

3      Q.     You said you were listening to my question

4   you actually weren't because I'm -- I'm excluding your

5   supposed government sources and your supposed

6   journeymanst contacts so I'm asking what non

7   journalists non government contacts have told you that

8   Elon Musk is funding this lawsuit?

9      A.     Gator /TKPWRAOEPBL told me that.

10     Q.     Did he show you any documents?

11     A.     No he told me about it from another

12  associate of ours who works for the nervous system SA.

13     Q.     Didn't you initially blame John Burbank and

14  the Chinese for this lawsuit?

15     A.     /W-FPL Burbank --

16     Q.     It's a yes or no?

17          A.      No it's a no it's -- it's -- partly that

18     was done to sort of Russell John so I've known for

19     quite some time that it was Musk behind it and I have

20     no objection to that I actually kind of welcome it and

21     by the way he does this with other people as well so

22     it's not be a surprise to me and by the way he's

23     funding several lawsuits in this court if I believe I

24     believe there's one with the open AR lawsuit as well

25     that's here he's elected that Texas will be his home

                                                           268


1     and this is where he /STKEPBDZ to conduct his law fair.

2     I personally prefer he would do it in Washington, D.C.

3     or Los Angeles but you know everyone's got to do what

4     they've got to do.

5          Q.      Well Mr. Johnson I think at this time I'm

6     going to conclude the deposition I don't think that and

7     I appreciate your time showing up but I don't think you

8     answered the questions as the federal rules require I

9     think you refused to answer questions that are fair

10     game and everything but that's an issue to take up with

11     judge Pittman but as a matter of courtesy if you could

12     just stick around the court reporter has any questions?

13          A.      Sure.

14          Q.      To clarify.  How long do you think it will

15    take?

16              THE REPORTER:  Not long.

17              THE WITNESS:  Okay.

18              THE VIDEOGRAPHER:  We're going off the

19    record at 3:28 (.

20              MR. THOMPSON:  Oh actually hold an yeah

21    okay we're back on the record at 3:28.

22    BY MR. THOMPSON:

23       Q.    Just to be clear Mr. Johnson refused to

24    answer multiple questions about his finances relying on

25    supposed government contacts and I believe that's fair

                                                269


1     game and you know for that for that and all the

2     questions that he refused to answer the plaintiffs will

3     keep open this deposition subject to bringing it up

4     with with judge Pittman but nothing more for the

5     witness today given that he's refusing to answer and

6     made clear he's going to refuse to answer questions on

7     a host of relevance subjects?

8               THE VIDEOGRAPHER:  Okay we are going off

9     the record at 3:29.

10              (Time noted: 3:29 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25