No. _____

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

IN RE: CHARLES JOHNSON

---

**APPLICATION FOR WRIT OF MANDAMUS**

---

MICHAEL J. WYNNE
Attorney at Law
Texas State Bar No. 0078529
Telephone: (281) 450-7403
Email: mwynne@gwafirm.com

JAMES L. TURNER
Texas State Bar No. 20316950

CAMERON POWELL
D.C. Bar No. 459020

GREGOR WYNNE ARNEY, PLLC
4265 San Felipe Street, Suite 700
Houston, Texas 77027

ATTORNEY FOR PETITIONER
CHARLES JOHNSON

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES………………………………………………………iii

CERTIFICATE OF INTERESTED PERSONS………………………………….1

RELEIF SOUGHT AND JURISDICTION………………………………………2

STATEMENT OF THE ISSUES…………………………………………………2

STATEMENT OF THE CASE…………………………………………………...3

   A. Course of proceedings and disposition below……………………….....3

   B. Statement of Facts………………………………………………………...5

      1. The November 20 Show Cause Hearing……………….…………...5

      2. The unclear order to respond to "post-judgment discovery" and its subjective "good-faith" purge condition…………………………….9

      3. The punitive fine without statutory contempt authority…………….9

SUMMARY OF ARGUMENT……………………………………………………10

REASONS FOR RELEIF AND AUTHORITIES…………………………………13

   A. Standards of Review…………………………………………………..13

      1. Mandamus……………………………………………………….13

      2. Contempt……………………………………………………….13

   B. Application of standards to the facts…………………………………14

      1. Petitioner has no other adequate means to obtain relief…………....14

      2. Petitioner's right to relief is clear and indisputable……………....15

a.  The "good-faith" standard transforms civil contempt into punitive criminal contempt without affording criminal procedural safeguards…………………………………………………………15

b.  The purge conditions violate due process because are subjective and provide no objective means of release………………………………18

The Clear Order Doctrine: No Fair Ground of Doubt……………………………19

Specific Application of the Clear Order Doctrine…………………………………21

c.  Compliance is impossible from custody……………………………24

d.  The fixed fine is impermissibly punitive……………………………26

3.  Mandamus is appropriate under the circumstances……………………27

CONCLUSION……………………………………………………………………...29

CERTIFICATE OF SERVICE……………………………………………………31

CERTIFICATE OF COMPLIANCE…………………………………………………31

**Attachment 1:** ECF No. 119 - Plaintiffs' Motion to Compel Discovery; November 6, 2025

**Attachment 2:** ECF No. 129 - Order Granting ECF. No. 119; Plaintiffs' Motion to Compel Discovery, November 10, 2025

**Attachment 3:** ECF No. 130 - Order for Johnson to Attend Deposition; November 14, 2025

**Attachment 4:** ECF No. 138 - Show Cause Order re Deposition Defiance, Failure to Respond to Interrogatories, and Stealing Items; November 19, 2025

**Attachment 5:** Transcript of Motions Hearing; November 20, 2025

**Attachment 6:** ECF No. 142 - Contempt Order; November 20, 2025

## TABLE OF AUTHORITIES

**Cases**                                                                              **Page**

*Armstrong v. Guccione*, 470 F.3d 89, 113 (2d Cir. 2006)…………………………..25

*Beckhart v. NewRez LLC (In re Beckhart)*, 31 F.4th 274, 288–89 (4th Cir. 2022)….19

*Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367 (2004)………………….…13

*Consumer Financial Protection Bureau v. Brown et al.*,
21-14468, 2023 WL 3289883, at *6 (11th Cir. June 12, 2023)……………………..20

*Bloom v. Illinois*, 391 U.S. 194, 198 (1968)……………………….…………………18

*Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418 (1911)………………...……15

*Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 633 (1988)………………………….20

*In re Gee,* 941 F.3d 153 (5th Cir. 2019)…………………………………...……13

*In re Gravel*, 6 F.4th 503, 509 (2d Cir. 2021)…………………………………..20, 22

*In re Murchison,* 349 U.S. 133 (1955)…………………………….……………28

*In re Nevitt*, 117 F. 448 (8th Cir. 1902)……………………………...…………18

*In re Se. Banking Corp.*, 204 F.3d 1322, 1332 (11th Cir. 2000)…………..………..20

*International Longshoreman's Ass'n Local 1291 v. Philadelphia Marine
Trade Ass'n,* 389 U.S. 64, 76 (1967)……………………………….………………19

*Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821 (1994)……….16

*Leonard v. Martin*, 38 F.4th 481 (5th Cir. 2022)…………………………………...16

*Maggio v. Zeitz*, 333 U.S. 56 (1948)……………………………………………24

*M. D. by Stukenberg v. Abbott*, 119 F.4th 373, 379 (5th Cir. 2024)………………..21

*PHH Mortgage Corp. v. Sensenich (In re Gravel),*
6 F.4th 503, 509 (2d Cir. 2021)……………………………………..……………..20

*Sayed A. v. Susan A.*, 265 Md. App. 40, 82 (Md. Ct. App. Mar. 27, 2025)…….20, 23

*Shillitani v. United States*, 384 U.S. 364 (1966)…………………………...18, 20, 24

*Taggart v. Lorenzen*, 587 U.S. 554, 557 (2019)…………………………19, 20, 23

*Topletz v. Skinner*, 7 F.4th 284 (5th Cir. 2021)……………………………..20, 21, 23

*Turner v. Rogers*, 564 U.S. 431, 448 (2011)………………….…………………26

*Waste Management Inc. v. Kattler*, 776 F.3d 336 (5th Cir. 2015)…………………14

**Statutes**

18 U.S.C. § 401……………………………………………….……….2, 12, 26

18 U.S.C. § 641…………………………………………………………26

28 U.S.C. § 1332…………………………………………………………2

28 U.S.C. § 1651…………………………………………………..2, 13

28 U.S.C. § 1651(a)………………………………………………..13

**Rules**

Federal Rule of Civil Procedure 65(d)(1)(C)…………………………………22

**Acts**

All Writs Act………………………………………………………….2, 13

Case No. _____

IN RE: CHARLES JOHNSON

**Application for Writ of Mandamus from the United States District Court for the Northern District of Texas**
Case No. 4:24-cv-00988, *Point Bridge Capital, LLC v. Charles Johnson*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal. The judge below was the Honorable Mark T. Pittman:

| | |
|---|---|
| Petitioner: | Charles Johnson |
| Respondent: | The Honorable Mark T. Pittman |
| | United States District Judge |
| | Northern District of Texas |
| | |
| Real Parties in Interest: | Point Bridge Capital, LLC |
| | Hal Lambert |
| | |
| Attorneys for Petitioner: | Michael J. Wynne |
| | GREGOR WYNNE ARNEY, PLLC |
| | 4265 San Felipe Street, Suite 700 |
| | Houston, Texas 77027 |
| | mwynne@gwafirm.com |

Attorneys for Real Parties in Interest:  [To be provided upon appearance]

By: */s/ Michael J. Wynne* _____
Michael J. Wynne
ATTORNEY OF RECORD FOR
CHARLES JOHNSON

1

## RELIEF SOUGHT AND JURISDICTION

Charles Johnson, Petitioner, files this application for a writ of mandamus from the district court's order finding him in civil contempt of court and ordering his indefinite incarceration in Case No. 4:24-cv-00988, *Point Bridge Capital, LLC v. Charles Johnson*. The jurisdiction of the district court was invoked under 28 U.S.C. § 1332 (diversity jurisdiction). This Court's jurisdiction is invoked under the All Writs Act, 28 U.S.C. § 1651.

## STATEMENT OF THE ISSUES

WHETHER THE DISTRICT COURT CLEARLY ABUSED ITS DISCRETION AND VIOLATED DUE PROCESS WHEN IT ORDERED PETITIONER'S INDEFINITE INCARCERATION FOR CIVIL CONTEMPT CONDITIONED UPON "GOOD FAITH" COMPLIANCE WITH VAGUE "POST-JUDGMENT DISCOVERY", WHERE THE PURGE STANDARD IS INHERENTLY SUBJECTIVE, TRANSFORMS COERCIVE CIVIL CONTEMPT INTO PUNITIVE CRIMINAL CONTEMPT WITHOUT AFFORDING CRIMINAL PROCEDURAL PROTECTIONS, AND CONDITIONS RELEASE UPON ACTS PETITIONER CANNOT PERFORM FROM CUSTODY.

WHETHER THE DISTRICT COURT EXCEEDED ITS AUTHORITY UNDER 18 U.S.C. § 401 IN HOLDING PETITIONER IN CONTEMPT FOR ALLEGED ACTS OUTSIDE THAT STATUTE.

## STATEMENT OF THE CASE

### A.    Course of proceedings and disposition below

Following judgment in the case, the Real Parties in Interest, Point Bridge Capital, LLC and Hal Lambert, initiated an aggressive campaign of post-judgment discovery designed to uncover Petitioner's assets. Following a Motion to Compel by the Real Parties in Interest, ECF 119, the district court entered an order (ECF 129) that (1) contained very general language and (2) referred the *pro se* Johnson to unspecified external documents, stating Johnson must (a) "serve complete, verified responses to Plaintiffs' post-judgment interrogatories," (b) "attend a deposition on November 17, 2025" at the courthouse (a later order, ECF 130, changed the courthouse location), and (c) "produce all documents responsive to Plaintiffs' post-judgment requests for production at the deposition."

Johnson obeyed every word of the non-specific order to "attend" the deposition. Johnson apparently did not produce the undefined "all responsive documents" at the deposition. Over the course of several hours, he answered questions about his financial circumstances, business relationships, trust arrangements, government contracting work, and other matters. Following the deposition, Real Parties moved for an order to show cause why Johnson should not be held in contempt. The district court ordered it would use a hearing scheduled on November 20, 2025 to determine whether Johnson's deposition testimony and

failure to answer interrogatory responses demonstrated contemptuous conduct warranting sanctions. ECF 138. Notably, ECF 138, the court's most recent notice to Johnson, a *pro se* party, did not state Johnson was still obligated to produce documents at all, though in its later Contempt Order, ECF 142, the court erroneously stated it had "ordered Defendant to Show Cause for . . . his failure to produce requested documents," citing "ECF No. 138."

At the November 20 hearing, the court found that, in his deposition, Johnson had "failed to respond to the questions asked in good faith" and had given "evasive answers" while harboring a deliberate plan "to give as minimal information as possible." ECF 142 at 2. Based on the court's findings arising from the deposition and the hearing, the court concluded that Johnson had committed civil contempt meriting immediate incarceration. The court ordered Johnson arrested and placed "in the custody of the Johnson County Jail until such a time as he purges himself of his contempt for his repeated failure to engage in post-judgment discovery in good faith." ECF 142 at 3. The court also imposed a $1,000 fine, payable to the Clerk of Court, "to purge himself of his theft of government property" for allegedly taking a water bottle and coffee mug from the courthouse following his deposition. *Id.*

## B.     Statement of Facts

### 1. The November 20 Show Cause Hearing

Even before the November 20 contempt hearing had begun, the Court admitted that emotions of frustration and anger, as well as bias, even if it was understandable, had crept into its assessment of Johnson, saying, "*I am at the end of my rope. I don't have any more patience... It's just not going to end well.*" Hrg. Tr. at 6 (emphases added). The district court's state of mind would prove to be a self-fulfilling prophecy, and a state of mind is what the court would embed into its subjective "good faith" standard for purging Johnson's contempt.

At the November 20 hearing, Real Parties' counsel and the court examined several areas where the court *appeared* to find Johnson's testimony deficient. Not all of the questions were relevant to uncovering extant assets, however, and Johnson did answer the great majority of the questions about his assets and accounts.

***First, comprehensive questions about trust arrangements***. The court demanded that Johnson identify trusts in his or his family's names, who established the trusts, how many exist, and the assets held in each. Tr. 32-35. Johnson provided answers to the questions, even if the answers were not the ones the court or the Real Parties wished to have. He said he thought he might be the beneficiary of a trust set up by his father. *Id*. at 34. He did not know how many government trusts he was beneficiary of. *Id*. at 32. He did not know whether they had been set up for his

5

benefit. *Id*. at 32-33. And he stated he was not able to identify them. *Id*. at 33. He said he had been told trusts had been set up on behalf of his ex-wife and daughter. *Id*. at 33. He declined to name the government representative who told him about these latter trusts, *id*. at 33-34, but he was not asked why. He answered that he thought the trusts might hold Othram and Clearview stock. *Id*. at 37. He admitted that a Xavier Capital Trust had been set up for him. He admitted that it held Clearview AI and Othram stock. *Id*. at 34-35. He answered that the Task Force Trust he set up has no assets. *Id*. at 36.

   ***Second, largely irrelevant questions about government contracting work and historical payments therefrom.*** The court demanded Johnson describe what government contracting work he has performed, identify the federal agencies with which he has contracted, and enumerate the projects he has undertaken. *Id*. at 37-39. None of these questions are relevant to Johnson's current assets, raising questions about his being jailed for allegedly not answering them adequately.

   Nevertheless, Johnson testified that he was not aware of all work he may have done on behalf of the government because "sometimes you're given a contract through intermediaries". *Id*. at 37. In response to the court's question about the amount of money he had historically received from "the United States Government or any foreign government," he answered openly, saying, "somewhere around a few million." *Id*. Johnson also answered yes to questions regarding whether he had ever

had a bank account or prepaid credit cards provided for his "informant work", and answered they were "no longer operational". *Id*. at 39. He even named his former handler at the FBI. *Id*. But he declined to answer equally irrelevant questions about cases he had worked on that were "still ongoing". *Id*. Nor were such answers required by any prior show cause order.

***Third, irrelevant questions about historical payments from foreign governments.*** The court asked whether Johnson had received money from foreign governments and Johnson answered, saying, "Not to my knowledge." *Id*. at 38.

***Fourth, questions about portfolio companies and financial interests.*** The court asked whether Johnson had provided Plaintiffs with an inventory of every company in which Johnson holds any financial interest. Johnson did not deflect or become "evasive"; he openly admitted he had not.

***Fifth, questions about banking records.*** Though the court had omitted document production from its most recent order, ECF 138 – the order a *pro se* party would be most likely to view as authoritative – the court abruptly demanded production of complete bank statements from Woodforest Bank. And Johnson answered, saying he would provide the monthly statements from Woodforest bank, but he did not have them with him. *Id*. at 40. Because he was thereafter taken straight to detention, he still does not have them with him. He also informed the court he would need to be able to call "somebody to handle it for me, but I don't have a

7

phone." *Id.* And Johnson answered the question about how many bank accounts he had: he had three. *Id.* at 41. He answered questions about whether he had any investment accounts, *id.*, or safe deposit boxes, *id.* at 42. Unlike many of the questions he was asked, these were all relevant questions in the matter of his assets, and he answered all of them.

*Sixth, questions about cryptocurrency holdings.* The court asked Johnson whether he held any cryptocurrency. *Id.* at 42. Johnson answered saying he did not, *id.*, and later clarified that he had gotten rid of his cryptocurrency holdings in 2018 or 2019. *Id.* at 45-46. The court, without evident cause or explanation, implied an accusation that Johnson was "lying under oath," stating it was a "crime" and that he would refer Johnson to the U.S. Attorney's Office if he had "perjured" himself. *Id.* at 42. Real Parties asked Johnson another irrelevant question about his crypto holdings of six to seven years earlier. *Id.* at 45. Despite the irrelevance of the question and its time frame, Johnson answered as most of us would about financial affairs over half a decade ago, saying he did not know that information, *id.*, that he didn't think he ever had or at least didn't remember having "hard" cryptocurrency, *id.* at 46, and that he once had some on a laptop, *id.* at 47.

*Seventh, questions about a Wyoming LLC and alleged "government handler."* Johnson openly admitted the existence of the Wyoming LLC counsel for

Plaintiffs inquired into. *Id*. at 43. Counsel pressed Johnson to identify the person

who established the LLC, an irrelevant question Johnson declined to answer. *Id*.

### 2. The unclear order to respond to "post-judgment discovery" and its subjective "good faith" purge condition

Unlike the most recent order prior to the show cause hearing, ECF 138, the

Contempt Order did mention production of documents, and it provided no specifics

to guide the *pro se* Johnson in understanding what "engag[ing] in post-judgment

discovery" in the form of specific interrogatories, request for documents, or

deposition conduct, meant in practice, nor what would count as "good faith".

Johnson's court-appointed counsel (which he had declined) during the proceeding

sought clarification about how Johnson might purge his contempt:

> MS. SANDERS: When it comes to the issue of answering questions at
> the deposition, how would Mr. Johnson purge?
>
> THE COURT: I think that Mr. Johnson will contact someone and tell
> them when he's ready to answer the questions, both at the deposition
> and the interrogatory and produce the documents. If he's ready to do
> that, and he purges himself, he can get out of jail.

Tr. 60-61. Johnson was never told clearly what he would have to do to comply.

### 3. The punitive fine without statutory contempt authority

For alleged behavior outside the court's presence and in violation of no order,

the district court imposed a $1,000 fine as an independent condition of purge. This

fine is not designed to compel future compliance with any order or discovery

obligation. Instead, it punishes Johnson for an allegedly completed act unrelated to

the discovery dispute: "theft of government property," in the form of a water bottle and coffee mug that Johnson allegedly took from the courthouse after his deposition. ECF 142 at 3. Johnson stated that he could not pay the fine without access to a computer. Tr. 57-58. His detention followed.

## SUMMARY OF ARGUMENT

The Contempt Order violates due process and exceeds the constitutional bounds of civil contempt authority in three mutually reinforcing ways that mandate this Court's immediate intervention.

First, the order conditions release on Johnson's "good faith" engagement with discovery not specifically identified therein, in any prior order, or at the hearing—an inherently subjective standard. The Supreme Court has made clear that a detainee must hold the keys to his own release, but the district court, in its three orders to a *pro se* party, has converted "keys in pocket" to "keys with the concierge" – a standard in which the concierge not only holds the keys, but there's a complex, multi-part application process and a subjective decision criterion, "good faith," that the concierge will apply. The "good faith" requirement makes Johnson's freedom dependent on the court's satisfaction with his sincerity, cooperativeness, and internal mental state. Indeed, the court's concern with Johnson's mental state was evident in what might be described at best as an unnecessary and inappropriate question whether he suffered from a mental illness. Tr. at 51.

Johnson possesses no predictable pathway to freedom. He cannot know in advance what level of detail, tone of voice, or amount of volunteered information beyond literal answers to questions posed will satisfy the court's unexpressed expectations of "good faith." He cannot predict which documents he could produce to demonstrate sufficient compliance. The purge condition is thus standardless in its formulation, arbitrary in its application, and fundamentally violative of due process in its effect and operation.

Second, the order imposes what is in substance and effect criminal punishment while simultaneously denying Petitioner the full panoply of procedural safeguards the Constitution requires for all criminal proceedings. Johnson received no clear notice of the specific questions he would have to answer at the hearing (nor an equivalent indictment), no proof beyond a reasonable doubt, no jury trial, and no other protections the Constitution mandates when government seeks to deprive a person of liberty through criminal punishment.

Third, the order penalizes Johnson for failing to answer questions irrelevant to collecting on a judgment. Where Johnson answered virtually all relevant questions about his current financial condition (bank accounts, cryptocurrency (none), safe deposit boxes (none), etc.), the court had no justification to find contempt merely because he refused to divulge extraneous information (like the names of government handlers or details of unrelated trusts benefitting others). In other words, the

11

contempt finding was overbroad, punishing him for not satisfying curiosity on matters unrelated to satisfying the judgment. Contempt may not be used to enforce improper discovery. Similarly, jailing Johnson for failing to recall or reveal tangential information (some of which he *did* answer to the best of his ability) is an abuse of discretion. The court punished Johnson not for defying a clear order, but for failing to please the judge with his knowledge and narrative.

Fourth, the order demands compliance with conditions that are impossible to satisfy from custody, once again rendering it punitive. Johnson cannot access online banking portals or meaningfully consult with trust administrators, attorneys, and accountants. He cannot compile inventories of portfolio companies. Fifth, the court's finding of contempt for alleged theft of items outside the court's presence is not lawful under the court's contempt authority in 18 U.S.C. § 401. Finally, the court overlooked less severe remedies, such as imposing increasing fines payable to Real Parties or giving him a *clear* order for production and a date certain. Because Johnson's detention under this unconstitutional order works irreparable injury to liberty interests that no later vindication can remedy, mandamus relief is both warranted and necessary.

## REASONS FOR RELIEF AND AUTHORITIES

### A.    Standards of review

#### 1.    Mandamus

"Under the All Writs Act, federal courts 'may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.' 28 U.S.C. § 1651(a)." *In re Gee*, 941 F.3d 153, 157 (5th Cir. 2019). Among these writs stands the writ of mandamus—a remedy reserved for cases where a litigant suffers ongoing constitutional injury from a district court's clear abuse of discretion and possesses no other adequate means to obtain meaningful relief.

Three conditions must be satisfied. First, the party seeking issuance of the writ must have no adequate means to attain the relief he desires. Second, the petitioner must satisfy his burden of showing that his right to issuance of the writ is clear and indisputable. Third, the issuing court must be satisfied that the writ is appropriate under the circumstances. *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004).

#### 2.    Contempt

This Court reviews contempt findings for abuse of discretion, accepting the district court's factual findings unless they are clearly erroneous, while subjecting questions of law, such as the existence of due process, to searching *de novo* review.

*Waste Management Inc. v. Kattler*, 776 F.3d 336, 339 (5th Cir. 2015). "A party commits contempt when he violates a *definite and specific order* of the court requiring him to perform or refrain from performing *a particular act or acts* with knowledge of the court's order." *Kattler*, 776 F.3d at 341 (emphases added). To hold a party in civil contempt, the court must find each alleged violation by evidence so clear and convincing "as to enable the factfinder to come to a clear conviction without hesitancy." *Kattler*, 776 F.3d at 341 (internal quotations omitted).

Finally, the contempt sanction itself must be properly calibrated to be coercive rather than punitive in actual character and demonstrated purpose, designed and structured to compel *future compliance* rather than punish *past disobedience*, and conditioned on acts within the contemnor's present power to perform.

## B.    Application of standards to the facts

### 1.    Petitioner has no other adequate means to obtain relief

Petitioner satisfies the first mandamus requirement because he demonstrably possesses no other adequate remedy for the constitutional violation he suffers with each day that passes. Johnson faces indefinite incarceration under a purge condition he is powerless to satisfy due to its subjectivity and the impossibility of compliance from custody. Even if he could persuade the court to reconsider its order—and nothing in the record suggests such reconsideration is likely given the court's

unwillingness to accept Johnson's explanation[1]—the "good faith" standard ensures that any purported compliance remains subject to the court's subjective approval based on criteria the court has not articulated.

Moreover, ordinary appellate review through a direct appeal would leave Johnson imprisoned for a year or longer. Johnson would continue to suffer the profound deprivation of liberty that the contempt order inflicts. This is not the sort of injury that can be adequately remedied by a subsequent appellate victory.

### 2.    Petitioner's right to relief is clear and indisputable

#### a.    The "good faith" standard transforms civil contempt into punitive criminal contempt without affording criminal procedural safeguards

Civil contempt is "remedial, and for the benefit of the complainant," *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911), structured and intended to coerce the contemnor into compliance with the court's lawful orders through the ongoing threat of sanctions that will terminate upon compliance. Criminal contempt is "punitive, to vindicate the authority of the court," *id.*, imposed to punish completed acts of disobedience and deter future defiance through the infliction of definite, unconditional punishment.

---

[1] The district court has embraced the view that Johnson's alleged lack of cooperation constitutes willful defiance rather than genuine inability to comply. ECF 142 at 2 ("evasive", "plan"); *see also* Tr. 57-58 (court framing purge as a matter of Petitioner's "readiness"). Thus, even if Johnson were to file a motion for reconsideration or modification of the contempt order, the district court would likely deny such relief based on identical findings and reasoning.

Criminal contempt, unlike civil contempt, demands the full array of constitutional safeguards of individual liberty. The Supreme Court has explained that "it is not the fact of punishment but rather its character and purpose" that distinguishes civil from criminal contempt. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826-30 (1994). Civil contempt sanctions must be "conditional and coercive" in their structure and demonstrated operation rather than "fixed and punitive" in their character and actual effect. *Id.* at 828. A court may lawfully confine someone for civil contempt only "so long as [the] contumacy continues," and the confinement must remain "conditional upon the defendant's failure to perform an act that is yet in the defendant's power to perform." *Id.* at 829 (cleaned up).

The district court's order violates these foundational constitutional principles in multiple, mutually reinforcing ways. It imposes sanctions for what appears to be the alleged contempt of not answering irrelevant questions. Its orders have not clearly stated which questions remain to be answered or documents produced. It purports to impose civil contempt through remedial, coercive sanctions, yet its actual character, and practical effect are punitive rather than coercive. The order condemns Johnson to custody "until such a time as he purges himself of his contempt for his repeated failure to engage in post-judgment discovery in good faith." ECF 142 at 3. The phrase "repeated failure" is telling. It looks backward to past conduct rather than

forward to future compliance, focusing Johnson on his historical pattern of alleged non-cooperation rather than making clear his present obligations and future performance. This backward-looking temporal focus is the hallmark of criminal punishment designed to sanction past wrongdoing, not civil coercion designed to compel future right-doing.

More fundamentally, the subjectivity of the "good faith" requirement transforms what might otherwise be a valid coercive sanction into a punitive one. "Good faith" is not an objective standard that Johnson can satisfy through specific, measurable, verifiable acts susceptible to neutral determination. No matter how many documents Johnson manages to produce from custody, no matter how many questions he answers if given another opportunity for deposition, no matter how many interrogatory responses he submits for the court's consideration, the court retains unlimited discretion to conclude he has not acted with sufficient "good faith" to purge his contempt.

This approach exemplifies precisely the sort of indefinite detention based on subjective, standardless criteria that *Bagwell* categorically prohibits. *Bagwell*, 512 U.S. at 829-30. But Johnson received none of the essential constitutional protections. He was not given notice of the specific questions he needed to answer. He was not told during the hearing which answers were leading him toward contempt. He was held in contempt based on the civil evidentiary standard of clear and convincing

evidence, not the demanding proof beyond a reasonable doubt. He was not afforded a jury trial despite facing indefinite incarceration—indisputably a "serious" sanction by any reasonable measure of severity. *Cf. Bloom v. Illinois*, 391 U.S. 194, 198 (1968). He was not advised of his Fifth Amendment privilege against self-incrimination before being compelled to provide potentially incriminating testimony. In short, he was denied key procedural protections, yet has been sentenced to indeterminate imprisonment dependent on subjective criteria no one has clearly articulated.

> ### b.     The purge conditions violate due process because they are subjective and provide no objective means of release

The purge conditions provide no objective criteria by which Johnson can secure his freedom through his own unilateral action. The bedrock principle of permissible civil contempt, memorably articulated more than a century ago, is that contemnors must "carry the keys of their prison in their own pockets." *In re Nevitt*, 117 F. 448, 461 (8th Cir. 1902). That is, "the justification for coercive imprisonment...depends upon the ability of the contemnor to comply with the court's order." *Shillitani v. United States*, 384 U.S. 364, 371 (1966).

For this requirement to possess genuine meaning, the purge condition must be (1) objective rather than subjective, (2) specific rather than vague, and (3) within the contemnor's unilateral power to perform without requiring another person's discretionary approval. If the condition depends on another person's subjective

satisfaction—like a judge's fluid assessment of "good faith," a prosecutor's estimate of "sufficient cooperation," or an adverse party's self-interested conclusion that discovery has been "inadequate"—then the contemnor does not carry his own keys. To have to cajole someone else to unlock the door converts coercive confinement into punitive detention.

### The Clear Order Doctrine: No Fair Ground of Doubt

The Supreme Court's decision in *Taggart v. Lorenzen*, 587 U.S. 554, 557 (2019), rejected a purely subjective standard for civil contempt, requiring that "there is no fair ground of doubt" as to whether a contemnor's conduct violated a court order. The Court specifically disapproved the Ninth Circuit's rule that "a creditor's good faith belief" that an order "does not apply" precludes contempt "even if the creditor's belief is unreasonable," holding instead that such a subjective standard is "inconsistent with traditional civil contempt principles, under which parties cannot be insulated from a finding of civil contempt based on their subjective good faith." *Id.* at 563.

Similarly, the Fifth Circuit requires that contempt orders provide sufficient clarity that "those who must obey them will know what the court intends to require and what it means to forbid." *International Longshoreman's Ass'n Local 1291 v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76 (1967). Other circuits have applied this objective standard to discovery contempt orders. *Beckhart v. NewRez*

*LLC (In re Beckhart)*, 31 F.4th 274, 288–89 (4th Cir. 2022); *PHH Mortgage Corp. v. Sensenich (In re Gravel),* 6 F.4th 503, 509 (2d Cir. 2021).

The predicate for any *Taggart* analysis is that "the order stated in specific and clear terms what acts were required or prohibited." *In re Se. Banking Corp.*, 204 F.3d 1322, 1332 (11th Cir. 2000). "Sanctions for violation of an order are only appropriate if" the order meets this clarity standard. *Consumer Financial Protection Bureau v. Brown et al.*, 21-14468, 2023 WL 3289883, at *6 (11th Cir. June 12, 2023). The requisite clarity encompasses both the substantive requirements (what documents, what timeframe, what standard of performance) and the purge conditions (how the contemnor may secure release from contempt). *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 633 (1988). An order that conditions a contemnor's release on an ill-defined standard creates impermissible ambiguity and may violate the due process protections afforded even civil contemnors. *Shillitani v. United States*, 384 U.S. 364, 370–71 (1966); *Sayed A. v. Susan A.*, 265 Md. App. 40, 82 (Md. Ct. App. Mar. 27, 2025) ("shortcuts … are not allowed").

The Fifth Circuit applied this doctrine in *Topletz v. Skinner*, 7 F.4th 284 (5th Cir. 2021), affirming a state court contempt order for post-judgment discovery violation. Unlike here, the underlying discovery order in *Topletz* enumerated specific document categories (ownership certificates, leases or contracts, financial statements, accounts receivable records, tax returns). *Id.* at 290. The contempt order

permitted Topletz to purge by producing those documents or, alternatively, by submitting evidence of genuine effort to obtain them, filing suit against the trustee, or providing a summary of information gained through permitted inspection. *Id.* at 292, 297. The Fifth Circuit found no due process violation because the order left "no fair ground of doubt" as to what was required, and the purge mechanism was both specific and achievable through multiple means. *Id.* at 297.

### Specific Application of the Clear Order Doctrine

The three orders in the present case present a starkly different picture from the paradigm in *Topletz*, where the contempt order "incorporated several of [the party in interest's] discovery requests, specifically commanding Topletz to produce 'any documents related to [the trust and] responsive to Plaintiff's Request Nos. 9, 10, 14, 18, 27, and 28.'" *Topletz*, 7 F.4th at 300. The Contempt Order details Petitioner's failure, in the past, to respond to Plaintiffs' interrogatories and "produce requested documents," but it fatally omits what Petitioner, until recently *pro se*, must do to purge his contempt *in the future*. Focusing on "past conduct" is precisely what this Court rejected in *M. D. by Stukenberg v. Abbott*, 119 F.4th 373, 379 (5th Cir. 2024), *cert. denied sub nom. M. D. By Next Friend Stukenberg v. Abbott*, No. 24-1168, 2025 WL 2823747 (U.S. Oct. 6, 2025).

The Contempt Order suffers from four other defects. First, it does not list the specific documents due. The Contempt Order refers only generically to "failure to

produce requested documents" without identifying documents, categories, or request numbers. Failing to give Johnson clearly marked keys is punitive. *See Hicks*, 485 U.S. at 640 (remanding where contempt order was ambiguous about purge conditions).

Second, the purge condition of "good faith" is vague and subjective, lacking an objective benchmark for compliance and realistic path to release. The court's trio of orders (ECF 129, 138, 142) were so general and cross-referenced that a *pro se* litigant could not "know what the court intends to require," violating Rule 65(d)'s spirit that injunctions (and by extension orders enforcing discovery) must be specific. *See* FRCP 65(d)(1)(C) (requiring court to "describe in reasonable detail— and not by referring to the complaint or other document—the act or acts restrained or required").

This vagueness invokes the cautionary precedent of *In re Gravel*, 6 F.4th 503, 509 (2d Cir. 2021), where the Second Circuit reversed a contempt order because the underlying injunction language was unclear. The district court order had barred the debtor from "disputing" that it was "current," but it was ambiguous whether including fees and charges on the mortgage statement violated this prohibition. *Id.* The appellate court held that "an order must be sufficiently clear to erase all doubt" about what conduct is prohibited, and "[a]mbiguity determined strictly from the words of the order itself" must favor the contemnor on

22

appeal. *Id.* Here, the Contempt Order's invocation of "good faith" compliance with "post-judgment discovery" is comparably ambiguous. Under *Taggart*, there is a fair ground of doubt whether Petitioner's allegedly evasive deposition testimony and inadequate document production would be cured by whatever further action the court might demand.

Third, there is no safety valve. Civil contempt detention is constitutional only if the contemnor has an objectively attainable exit ramp. The Fifth Circuit vacated a purportedly "civil" contempt sanction where the contemnors had "no realistic opportunity to purge the contempt, which renders the sanction criminal." *Stukenberg*, 119 F.4th at 379. The Supreme Court likewise reversed a contempt adjudication resting on an unintelligible decree, warning: "When [judicial contempt] is founded upon a decree too vague to be understood, it can be a deadly one." *Int'l Longshoremen*, 389 U.S. at 76 (reversing civil contempt where underlying order was "too vague" to sustain contempt). In *Topletz*, the state court's contempt language— "full and/or proper responses and/or documentation"—was construed to permit alternative means of purging, such as submitting evidence of effort to compel production from the trustee. The Contempt Order contains no such language and no mechanism by which Petitioner might satisfy the "good faith" standard short of producing documents the Court may believe should exist. *Cf. Sayed A.*, 265 Md.

App. 40 (reversing contempt order with no safety valve and impossible/vague purge conditions).

What "post-judgment discovery" remains unanswered? The Real Parties' response will range across prior motions, orders, and the patchwork of the hearing transcript, doing nothing but demonstrating an unacceptable burden on a *pro se* party. And what does it mean, measurably, to engage in discovery "in good faith"? How does Johnson know with any confidence when he has achieved it? He cannot. The standard is subjective, standardless, and dependent on discretionary judicial assessment.

### c.    Compliance is impossible from custody

The purge condition demands acts Johnson cannot perform from his confinement in the county jail. If a party is imprisoned without a realistic possibility of eventual compliance, the imprisonment ceases to be a coercive measure and becomes a punitive one. *Shillitani*, 384 U.S. at 371; *accord Maggio v. Zeitz*, 333 U.S. 56, 75-78 (1948) (holding that civil contempt incarceration is constitutionally impermissible when compliance is factually impossible). If the asserted purpose of civil contempt is to coerce compliance with lawful court orders, then imprisoning someone who cannot comply serves absolutely no coercive purpose. The incarceration becomes purely punitive—punishment inflicted for past disobedience, or lack of "good faith," rather than inducement offered for future compliance. "After

the passage of a significant period of time, a contemnor who is coercively confined and claims . . . to be incapable of complying with the court's order, is entitled to have the court convene a new hearing at which the court will reconsider, regardless of past findings, whether the person is presently capable of complying." *Armstrong v. Guccione*, 470 F.3d 89, 113 (2d Cir. 2006).

Here, Johnson cannot possibly comply with the sweeping discovery demands while in custody. He cannot access online banking portals. Modern online banking universally requires secure login credentials entered through internet-connected devices, two-factor authentication protocols using mobile phones or email accounts, and navigation of password-protected systems designed specifically to prevent unauthorized access.

He cannot consult meaningfully with trust administrators and attorneys who maintain authoritative records about trusts. If accessing government contracting files or classified databases containing detailed information about his work with federal agencies were somehow necessary to purge his contempt—he does not know—he cannot do it. He cannot retrieve corporate records for the portfolio companies in which he may hold ownership interests. Such records would be maintained by the business entities themselves, their registered agents, or corporate filing offices in various states. Even if Johnson could somehow direct a trusted third party to access his computer remotely, it would create substantial risks of unauthorized access.

### d.     The fixed fine is impermissibly punitive

The district court imposed a separate $1,000 fine as an independent condition of purge. This monetary sanction is not permitted by 18 U.S.C. § 401, which allows contempt only for "[m]isbehavior of any person in [the court's] presence or so near thereto as to obstruct the administration of justice" or for disobedience of a court order. Neither finding was made or was plausible. Rather than referring Johnson for criminal proceedings under 18 U.S.C. § 641 (theft of government property), the court tried to fold the issue into a contempt proceeding without a charge, trial, or other due process. Contempt is not intended to be a debtor's prison.

The fine also violates constitutional contempt principles: (1) the court failed to make an express finding that Johnson was able to pay, as it must per *Turner v. Rogers*, 564 U.S. 431, 448 (2011), (2) the fine is fixed and punitive rather than conditional, and (3) coercive in its structure and purpose. *Bagwell* teaches that fixed fines payable to the government—as opposed to escalating, conditional fines carefully designed to compel future compliance or compensatory payments directed to injured parties—bear all the hallmarks of criminal punishment rather than civil remediation. 512 U.S. at 829-30 (holding "a 'flat, unconditional fine' totaling even as little as $50 announced after a finding of contempt is criminal if the contemnor has no subsequent opportunity to reduce or avoid the fine through compliance"). The $1,000 fine here punishes Johnson for an alleged completed act bearing no

relationship whatsoever to the discovery dispute: taking a water bottle and coffee mug from the courthouse after concluding his deposition. The fine does not coerce any future conduct or compel compliance with any court order or discovery obligation. It simply exacts a financial penalty for past behavior the court deems wrongful—the very definition of criminal punishment.

Moreover, the fine is payable to the Clerk of Court—a government official— rather than to any other allegedly injured party who might claim compensable damages. This confirms the fine's punitive character. At the November 20 hearing, Johnson stated he could not pay the fine from his pocket—where the keys of his liberty must be accessible. He needed a computer (or, presumably, at least a trip to a bank) to pay the fine. The fine component of the contempt order thus violates due process, imposing a criminal punishment without affording criminal procedural safeguards, or the safety valve of paying.

### 3.    Mandamus is appropriate under the circumstances

Several compelling, mutually reinforcing factors compel the conclusion that mandamus is not merely appropriate but urgently necessary. First and foremost, Petitioner faces ongoing deprivation of his fundamental liberty interest. He sits in a county jail cell, separated from his family, unable to attend to his business affairs, stripped of his freedom of movement and association, confined for an indefinite duration that grows longer each day. When liberty interests are threatened by

governmental action, courts must be particularly vigilant and exacting in ensuring that constitutional safeguards are scrupulously honored. See *In re Murchison*, 349 U.S. 133, 136 (1955) (observing that "[a] fair trial in a fair tribunal is a basic requirement of due process").

Second, the district court's error is clear and easily correctable through straightforward remedial action. The court need not revisit complex factual disputes or reconsider legal issues involving competing lines of authority. It need only either vacate the Contempt Order and direct Johnson's release from custody or enter a revised order that specifies objective purge conditions with precision and provides Johnson either temporary release or supervised access to the resources necessary for compliance.

Third, allowing this egregious constitutional violation to continue uncorrected pending ordinary appellate review would work profound, irreparable injury to Johnson's fundamental rights. Time spent in custody cannot be returned once it has been served.

Fourth, the district court's order amounts to a judicial usurpation of power that demands this Court's corrective intervention. By conditioning release on inherently subjective "good faith" compliance and by demanding unspecified discovery responses that Johnson cannot possibly provide from custody, the court has exceeded the constitutional bounds of civil contempt authority. It has purported to wield a

coercive, remedial tool while actually imposing criminal punishment. It has purported to provide Johnson the keys to his own release while keeping them on the bench.

Finally, this case presents issues of broader importance that transcend the immediate interests of the individual parties, implicating vital principles that protect all citizens against arbitrary detention. If district courts may imprison litigants indefinitely based on subjective "good faith" standards divorced from objective criteria, then civil contempt becomes a tool of arbitrary, unreviewable detention untethered from meaningful constitutional constraints. If courts may demand discovery or fine compliance while simultaneously depriving contemnors of the means necessary to comply, then the impossibility doctrine becomes an empty promise.

For all these compelling reasons, mandamus is not merely appropriate but constitutionally necessary.

## CONCLUSION

The district court's contempt order violates fundamental principles of due process by conditioning Charles Johnson's liberty on inherently subjective criteria he remains utterly powerless to satisfy from custody. The order purports to impose civil contempt while actually inflicting criminal punishment. It demands "good faith" compliance without defining with any precision what that means. It imprisons

Johnson in a facility where he cannot access the online accounts, third-party recordkeepers, personal computers, and professional advisors. And it imposes without due process or statutory authority fixed $1,000 fine for alleged "theft of government property"—a completed past act unrelated to any ongoing discovery obligation—that Johnson cannot pay from behind bars.

WHEREFORE, Petitioner Charles Johnson respectfully requests that this Court:

(1) Grant this application for writ of mandamus; (2) direct the district court to vacate its Contempt Order; (3) order Petitioner's release from custody; and (4) grant such other and further relief as the Court deems just and proper.

Alternatively, if this Court concludes that some civil contempt sanction remains appropriate under the circumstances, Petitioner respectfully requests that this Court direct the district court to enter a revised order that: (1) eliminates entirely the subjective "good faith" requirement and conditions release solely on objective, measurable acts susceptible to neutral verification; (2) specifies with particularity which documents must be produced, and which interrogatories must be answered; (3) affords Petitioner temporary release from custody or, at a minimum, provides him supervised access to online accounts, personal computers, and third-party recordkeepers necessary to compile responsive information; and (4) establishes a definite and reasonable timeframe within which Petitioner must perform the

specified acts, after which—assuming compliance—he will be released regardless of any subjective assessment of his "good faith."

Respectfully submitted,

/s/ Michael J. Wynne
**Michael J. Wynne**
TX Bar No. 00785289
mwynne@gwafirm.com
**James L. Turner**
TX Bar No. 20316950
jturner@gwafirm.com
**Cameron Powell**
D.C. Bar No. 459020
cpowell@gwafirm.com
GREGOR WYNNE ARNEY, PLLC
4265 San Felipe, Suite 700
Houston, Texas 77027
(281) 450-7403 (direct)

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served via the Court's ECF filing system in compliance with Rule 25(b) and (c) of the FEDERAL RULES OF APPELLATE PROCEDURE on December 29, 2025, on the following counsel of record:

William Thompson
DLA PIPER, LLP
1900 N. Pearl Street, Suite 220
Dallas, Texas 75201

ATTORNEYS FOR REAL PARTIES IN INTEREST

/s/ James L. Turner
**James L. Turner**

31

## CERTIFICATE OF COMPLIANCE

This application for writ of mandamus complies with the type-volume limitation of FEDERAL RULE OF APPELLATE PROCEDURE 21(d) and 32(a)(7)(B) in that it contains fewer than 30 pages. It also complies with the typeface requirements of FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) in that it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/ James L. Turner*
**James L. Turner**
**Attorney for Petitioner**
**Charles Johnson**

Dated: December 29, 2025